UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KATHERINE FERNANDEZ, on behalf of herself and others similarly situated,<br><br>    Plaintiff,<br> v.<br><br>BULLDOZER HOSPITALITY GROUP, INC., d/b/a OSTERIA LA BAIA, ROBERT PETROSYANTS and MARIANNA SHAHMURADYAN,<br><br>    Defendants. | No.: 25-cv-04490 (AS) |

   Pursuant to Rule 56.1 of the Local Rules of this Court, Plaintiff Katherine Fernandez and Opt-in Plaintiff Adrian Montor-Peran (collectively, "Plaintiffs"), on behalf of themselves and other commonly situated employees of Defendant Bulldozer Hospitality Group, Inc., submit the following undisputed facts in support of their motion for partial summary judgment:[1]

   1.  Defendant Bulldozer Hospitality Group, Inc. owns and operates a restaurant called "Osteria La Baia" located in Manhattan at 129 W 52nd St, New York, NY 10019 ("OLB"). (Amended Complaint ("Complaint")) (ECF No. 15) ¶ 7; Answer to Amended Complaint ("Answer") (ECF No. 17) ¶ 7).

   2.  OLB commenced operations on November 15, 2021. (Buzzard Decl. ¶ 24 & Ex. 19).

   3.  Defendant Marianna Shahmuradyan ("Shahmuradyan") has and continues to be the sole owner of OLB since it opened in 2022. (Buzzard Decl., Ex. 1 (Shamuradyan Dep.) at 15:18-16:19).

---

[1] In support of their Local Rule 56.1 Statement, Plaintiffs cite to the December 12, 2025 Declaration of Lucas C. Buzzard in Support of Plaintiffs' Motion for Partial Summary Judgment ("Buzzard Decl.") and exhibits annexed thereto which are cited herein as "Buzzard Ex. __." Deposition transcripts are identified by the deponent's last name, e.g. "Shahmuradyan Dep."

4. Defendant Shahmuradyan's husband, Defendant Robert Petrosyants ("Petrosyants") is the director of operations at OLB. (Buzzard Decl., Ex. 2 (Petrosyants Dep.) at 19:17-25; ).

5. Janos Paliko has been the manager of OLB since at least 2023. (Shahmuradyan Dep. at 17:19-18:11).

**Defendants' Shahmuradyan's and Petrosyants's Operational Control Over OLB**

6. Defendant Shahmuradyan owns and operates OLB. (Complaint ¶ 10; Answer ¶ 10).

7. As owner, Defendant Shahmuradyan "oversees everything" at the restaurant. (Shahmuradyan Dep. at 48:3-11 ("I oversee everything.")).

8. Defendant Shahmuradyan admitted at deposition that she has "ultimate authority over all operations of the restaurant." (Shahmuradyan Dep. at 69:24-70:8 ("Q: Okay. Now, as owner of the restaurant, you have ultimate authority over all operations of the restaurant, correct? A: Correct.")).

9. As the 100% owner, Defendant Shahmuradyan has financial control over the restaurant. (Shahmuradyan Dep. at 35:23-36:2).

10. Defendant Shahmuradyan has authority to hire and fire any employee at the restaurant. (Shahmuradyan Dep. at 70:5-8).

11. For example, Defendant Shahmuradyan is the one who ultimately decides how much employees' are paid at OLB. (Shahmuradyan Dep. at 20:24-21:13 ("Q; But as the owner, you were the one who decided how much everyone was going to make at the restaurant; right? A: Yeah. …")).

12. Mr. Paliko was hired by Defendant Shahmuradyan to manage the day-to-day operations of OLB. (Shahmuradyan Dep. at 20:12-14, 22:22-23:3, 82:13-20).

2

13. Defendant Shahmuradyan decided how much to pay Mr. Paliko when he was hired at OLB. (Shahmuradyan Dep. at 54:16-55:5).

14. The restaurant's general manager, Mr. Paliko, reports to Defendant Shahmuradyan. (Shahmuradyan Dep. at 41:8-12)

15. Every week, Defendant Shahmuradyan speaks with Mr. Paliko via telephone about OLB's operations. (Shahmuradyan Dep. at 23:8-10).

16. During these telephone meetings, Defendant Shahmuradyan checks to make sure that payroll at the restaurant was run. (Shahmuradyan Dep. at 23:11-16).

17. When asked about these telephone meetings at deposition, Shahmuradyan testified that during such meetings she asks Paliko "to make sure to send [her] all the reports" and that "payroll is done," and she "makes sure [payroll] is done." Shahmuradyan Dep. at 23:13-16.

18. Defendant Shahmuradyan sometimes meets with Mr. Paliko in-person at OLB. (Shahmuradyan Dep. at 29:16-23).

19. During these meetings, Defendant Shahmuradyan discuss OLB's day-to-day operations and whether there any problems with the restaurant's payroll. (Shahmuradyan Dep. at 29:24-30:7).

20. Defendant Shahmuradyan gave Mr. Paliko the responsibility to decide how much to pay the tipped employees at OLB. (Shahmuradyan Dep. at 25:7-21).

21. Defendant Shahmuradyan gave Mr. Paliko the responsibility to interview, schedule, and terminate employees at OLB. (Shahmuradyan Dep. at 25:22-26:16).

22. Defendant Shahmuradyan hired the head chef at OLB when the restaurant first opened. (Shahmuradyan Dep. at 21:15-22).

23. Defendant Shahmuradyan decided how much to pay the head chef. (Shahmuradyan Dep. at 21:23-22:17).

24. Defendant Shahmuradyan tasked the head chef with hiring the employees who worked in the kitchen at OLB. (Shahmuradyan Dep. at 22:18-21).

25. OLB's payroll company is called Toast. (Shahmuradyan Dep. at 53:8-10).

26. OLB employees' payroll records are maintained on Toast. (Petrosyants Dep. at 60:12-15).

27. Defendant Shahmuradyan has access to OLB's payroll records that are electronically-maintained through Toast. (Shahmuradyan Dep. at 23:20-25:6 (testifying that she has access to "the application where [she] see[s] the payroll" through Toast and that she "mostly go[es] on QuickBooks")).

28. Shahmuradyan reviews OLB's payroll through Toast at least once per month. (Shahmuradyan Dep. at 23:22-24:3).

29. Shahmuradyan testified that, as the owner, she "look[s] down" at the restaurant's finances and "goes through all the QuickBooks." (Shahmuradyan Dep. at 16:20-23).

30. Defendant Petrosyants testified that Defendant Shahmuradyan is present in the restaurant a few times each week. (Petrosyants Dep. at 65:2-23).

31. Defendant Shahmuradyan is listed as the principal on OLB's liquor license. (Shahmuradyan Dep. at 69:10-13).

32. Defendant Shahmuradyan signs off on OLB's tax returns. (Shahmuradyan Dep. at 16:22-24).

33. At deposition, Petrosyants testified: "I think my wife [(Shahmuradyan)] is the boss . . . of the restaurant." (Petrosyants Dep. at 64:9-11.)

4

34. Petrosyants testified that, as "the owner," Shahmuradyan "has access to anything she wants" at the restaurant. (Petrosyants Dep. at 52:2-4).

35. Petrosyants testified that, to his knowledge, OLB's front-of-house staff understand that Shahmuradyan is the owner. (Petrosyants Dep. at 68:16-19.)

**Defendant Robert Petrosyants**

36. Defendant Petrosyants was hired by his wife, Defendant Shahmuradyan to be OLB's director of operations. (Shahmuradyan Dep. at 18:16-34; Petrosyants Dep. at 21:23-25).

37. Defendant Petrosyants was not interviewed prior to being hired. (Petrosyants Dep. at 21:23-22:15).

38. Shahmuradyan has given Petrosyants "carte blanche to do whatever [he] want[s] in terms of running the operations" of the restaurant. (Petrosyants Dep. at 37:15-18, 38:7-11).

39. Defendant Petrosyants testified that, as director of operations, his job duties are "running the business" of OLB. (Petrosyants Dep. at 20:11-13; 33:13-34:14; 52:10-12).

40. Specifically, Defendant Petrosyants is responsible for "oversee[ing] the operations," vendors, payments, the quality of food, and the quality of service at OLB. (Petrosyants Dep. at 20:11-18).

41. At deposition, Petrosyants testified his job of "run[ning] the restaurant" included "mak[ing] sure that the financials are in line with . . . being a profitable restaurant. (Petrosyants Dep. at 52:10-12).

42. Defendant Petrosyants is also responsible for ensuring that employees are paid at the restaurant and "paid properly." (Petrosyants Dep. at 21:11-18).

43. Defendant Petrosyants has the authority to hire and fire employees at the restaurant. (Petrosyants Dep. at 23:13-25).

5

44. Defendant Petrosyants has the authority to discipline employees at OLB. (Petrosyants Dep. at 101:24--102:7).

45. When Shahmuradyan is not present in the restaurant, Petrosyants is the "highest-ranking" employee. (Petrosyants Dep. at 66:3-8).

46. Petrosyants meets with the restaurant's general manager a "[f]ew times per week" to discuss "[o]perations in the restaurant." (Petrosyants Dep. at 29:8-16.)

47. During these meetings, Petrosyants and the general manager discuss service at the restaurant to ensure that it is running "[p]roperly and good," and that the front-of-house service staff are providing consistent service to customers. (Petrosyants Dep. at 30:8-31:6.)

48. When he is in the restaurant, Petrosyants pays close attention to whether the front-of-house service staff are providing consistent performance for the customers. (Petrosyants Dep. at 30:23-31:10).

49. When Defendant Petrosyants sees a server not performing their duties properly, he would report that to OLB's manager, who would then "take action." (Petrosyants Dep. at 32:17-22).

50. OLB has pre-shift meeting for its front-of-the-house employees before the commencement of each shift at the restaurant. (Petrosyants Dep. at 66:23-67:2, 67:24-68:2).

51. Defendant Petrosyants attends and provides directions at the pre-shift meetings. (Petrosyants Dep. at 67:14-19).

52. For example, Defendant Petrosyants discussed employees maintaining consistency, performance, and "best value" at the restaurant. (Petrosyants Dep. at 67:20-23).

53. At these meetings, he also "mak[es] sure that everyone" gives their "consistently best performance." (Petrosyants Dep. at 68:6-14).

54. Defendant Petrosyants frequently discusses staffing issues with OLB's managers to ensure the restaurant schedules correct number of employees scheduled to work each shift. (Petrosyants Dep. at 80:12-81:9).

55. Defendant Petrosyants has access to OLB's payroll records maintained by the restaurant's payroll company, Toast. (Petrosyants Dep. at 60:9-21).

56. Defendants Shahmuradyan and Petrosyants hired the restaurant's accountant. (Shahmuradyan Dep. at 39:13-19; Petrosyants Dep. at 59:5-12).

57. Shahmuradyan, Petrosyants, and OLB's general manager are the only three people with access to OLB's hard-copy records, which are maintained in the restaurant's storage area. (Petrosyants Dep. at 51:6-52:4.)

58. According to Paliko, Petrosyants participated in his hiring as general manager. (Buzzard Decl., Ex. 3 (Paliko Dep.) at 17:14-17.)

59. According to Paliko, Petrosyants gave him a pay increase. (Paliko Dep. at 18:7-9, 20:24-21:6).

**Tip Credit at OLB**

60. OLB employs servers, bussers, runners and bartenders as "food-service" employees (a/k/a "front-of-the-house employees") who interact with and provide service to customers in the restaurant. (Petrosyants Dep. at 69:4-15).

61. OLB's "food-service" employees are paid pursuant to a tip credit minimum wage rate. (Petrosyants Dep. at 42:19-22, 69:25-70:4; Paliko Dep. at 38:5-16).

62. In discovery in this Action, Plaintiffs served document requests ("Document Requests") on all Defendants (the "Requests"). (Buzzard Decl., Ex. 4 (Document Requests)).

63.     As part of the Document Requests, Plaintiffs also sought the production of any and all written notices of pay rates that Defendants provided to any Class Member. (Buzzard Decl., Ex. 3 at Requests 1, 5, 10, 11).

64.     In response to these requests, Defendants did not produce any written wage notices that Defendants contend they provided to any Class Member. (Buzzard Decl., Ex. 5 (Defendants' Responses) at Responses 1, 5, 10, 11).

65.     Prior to the initial conference in this lawsuit, the parties submitted a joint letter setting forth their agreement about certain pre-certification discovery that Defendants agreed to produce. (ECF Dkt No. 26).

66.     As part of that agreement, Defendants agreed to produce the following information:

> All wage notices/pay rate acknowledgment forms that Defendants allegedly provided tipped employees who worked at OLB during the limitations period and, as a result of which, Defendants claims they complied with the new hire notice/tip credit notice requirements for the putative class. To the extent Defendants do not have any such records, they will inform Plaintiffs to this effect in writing by the September 26, 2025 production deadline.

(*Id*. at 2).

67.     On September 11, 2025, this Court approved the parties' agreement. (ECF Dkt No. 27).

68.     On September 26, 2025, Defendants' attorneys emailed Plaintiffs' counsel the following about their agreement to all wage notices/pay rate acknowledgment forms:

> These documents have not yet been located. We will follow up regarding availability.

(Buzzard Decl., Ex. 6 (September 26 Email) at p. 2.)

8

69. At his November 18, 2025 deposition, Petrosyants, who was testifying on behalf of himself and the corporate defendant, stated that OLB was "still searching" for any notices of how employees were to be paid but had not found any yet. (Petrosyants Dep. at 171:7-17.)

70. When asked at deposition whether Plaintiff and any other food service employees had been provided with "notice of the tip credit," Petrosyants responded, "I don't know" and "I have no idea." (Petrosyants Dep. at 176:14-22).

71. Defendants did not produce any wage notices/pay rate acknowledgment forms in discovery. (Buzzard Decl. ¶ 8).

72. Defendants did not provide a written wage notice to any Class Member. (*See supra* ¶¶ 59-67; Buzzard Decl. ¶ 8).

73. No Class Member received a written wage notice that informed them of, among other things, their hourly pay rate, overtime hourly pay rate, and the amount of tip credit that was being taken from their wages. (*See supra* ¶ 59-67; Buzzard Decl. ¶ 8).

**Amounts of Tip Credits Taken at OLB**

74. On September 10, 2025, the parties informed the Court that they had reached an agreement with respect to a dispute about the scope of pre-certification discovery whereby Defendants had agreed to produce significant sample pre-certification discovery by September 26, 2025. (ECF Dkt. No. 26)

75. As part of that agreement, Defendants produced spreadsheet summaries of annual payroll that was run at OLB. *See* Buzzard Decl. ¶ 8.

76. On October 3, 2025, Defendants' counsel represented that these reports show "the total hours that each putative class member worked each year [and that the] reports show a list of each employee by name, job title, and department, and reflect their year-to date hours broken down

into categories such as regular, overtime, and/or spread of hours." Buzzard Decl., Ex. 7 (October 3 Email).

77. Defendants also produced a declaration from Sephanie Willsey, OLB's controller, in which she describes the information contained in the spreadsheets. Buzzard Decl., Ex. 8 (Willsey Decl.)

78. Specifically, the controller testified that:

> The spreadsheets that Bulldozer produced came from a report function in Toast, the point-of-sale system used by the Corporate Defendant, and contain annual reports concerning the following information organized by lettered column in the spreadsheet, as follows: (A) Company; (B) Location; (C) Department; (D) Job; (E) Last Name; (F) First Name; (G) Employee Number; (H) Salary Type; (I) Earning; (J) Hours; (K) Amount; (L) Hourly Amount; and (M) Hourly Rate.

Willsey Decl. ¶ 5.

79. The spreadsheets were produced for the following years: (i) 2021; (ii) 2022; (iii) 2023; (iv) 2024; and (v) 2025 bearing the following file names corresponding to each year: 2021.csv, 2022.csv, 2023.csv, 2024.csv, 2025.csv. (Willsey Decl. ¶ 6; *see also* Buzzard Decl., Exs. 9 (2021.csv), 10 (2022.csv), 11 (2023.csv), 12 (2024.csv), 13 (2025.csv)).[2]

80. The information in the spreadsheet for 2025 summarizes payroll records at OLB from January 1, 2025 through on or about August 26, 2025. (Willsey Decl. ¶ 7).

81. All of the information contained in each of these spreadsheets came from user-inputted information in the Toast system and is merely a summary of information contained in the Toast system. (Willsey Decl. ¶ 8).

---

[2] For purposes of filing this motion, Plaintiffs' counsel has converted to PDF format the spreadsheets produced by Defendants in native format as file names 2021.csv, 2022.csv, 2023.csv, 2024.csv, 2025.csv. *See* Buzzard Decl. ¶¶ 11-15. Should the Court require the native format version of the spreadsheets, Plaintiffs will provide them immediately upon request.

82. Where a row on a spreadsheet states "REGULAR" in column I, the number in column J corresponds to the total number of regular hours paid to the employee in the time period covered by the spreadsheet and the number in column L lists the total dollar amount of wages and/or tips paid to the employee in that time period. (Willsey Decl. ¶ 13).

83. Similarly, where a row on a spreadsheet states "OVERTIME" in column I, the number in column J corresponds to the total number of overtime hours paid to the employee in the time period covered by the spreadsheet and the number in column L lists the total dollar amount of overtime wages paid to the employee in that time period. (Willsey Decl. ¶ 15).

84. In discovery in this litigation, Plaintiffs created additional spreadsheets summaries which: (1) removed all employees who were not "front-of-house" food service workers by deleting all employees who did not have the notation "FOH" in column C (Department); and (2) added columns O, P, and Q to the spreadsheets that Defendants produced. (Buzzard Decl. ¶ 17 & Exs. 14-18).

85. In the additional columns, Plaintiffs provided tabulations of (a) the total amounts that OLB food service employees would have been paid had Defendants paid them at the full New York State minimum wage rates and overtimes wage rates for each hour worked, and (b) the difference between the total amounts OLB paid the food service employees and the total amount those employees would have earned had they been paid pursuant to the full New York State minimum wage rates and overtimes wage rates. (Buzzard Decl. ¶ 18 & Exs. 14-18).

86. Specifically, in the spreadsheets created by Plaintiffs, column O ("Rate Owed") lists the full New York State hourly minimum wage rate and hourly overtime wage rate applicable during the time period covered by each spreadsheet. For rows where there is the notation "REGULAR" in column I, the full New York regular minimum wage rate applicable for the period

is used. For those rows where the notation "OVERTIME" appears in column I, the full New York overtime wage rate (1.5 times the applicable minimum wage rate) is used. (Buzzard Decl. ¶ 19 & Exs. 14-18 at Column O).

87. Column P in the spreadsheets created by Plaintiffs lists the total amount of wages the food service employees would have earned during the period covered by the spreadsheet had they been paid without any tip credit being applied to their wages (i.e., they were paid at the full New York minimum wage/overtime rate during the applicable period). For each row, the number in column P is derived by multiplying the "Rate Owed" in column O by the number of hours that appear in column J. (Buzzard Decl. ¶ 20 & Exs. 14-18 at Column P).

88. Column Q in the spreadsheets created by Plaintiffs provides a calculation of the difference between the amount each employee was actually paid during the period covered by the spreadsheet and the amount they would have earned during that period had they been paid pursuant to the full New York State minimum wage rates and overtime wage rates. For each row, the number in column Q is derived by subtracting the hourly amount paid that appears in column L from the amount owed in column P. (Buzzard Decl. ¶ 21 & Exs. 14-18 at Column Q).

89. At the bottom of each of the spreadsheets created by Plaintiffs, Plaintiffs totaled the amounts in each row of column Q to reach the "Total Minimum Wage Owed." This constitutes the total amount Defendants took in tip credits from all front-of-house employees' wages for that year. Buzzard Decl. ¶ 22 & Exs. 14-18.

90. Based on these calculations, Defendants took $15,562.65 in tip credits from employees' wages in 2021. *See* Buzzard Decl., Ex. 14 at "Total Minimum Wage Owed").

91. Based on these calculations, Defendants took $135,261.03 in tip credits from employees' wages in 2022. *See* Buzzard Decl., Ex. 15 at "Total Minimum Wage Owed").

92. Based on these calculations, Defendants took $125,377.86 in tip credits from employees' wages in 2023. *See* Buzzard Decl., Ex. 16 at "Total Minimum Wage Owed").

93. Based on these calculations, Defendants took $162,054.40 in tip credits from employees' wages in 2024. *See* Buzzard Decl., Ex. 17 at "Total Minimum Wage Owed").

94. Based on these calculations, Defendants took $231,757.51 in tip credits from employees' wages between January 1, 2025 and on or about August 26, 2025. *See* Buzzard Decl., Ex. 18 at "Total Minimum Wage Owed"); *see also* Willsey Decl. ¶ 7.

95. Adding together the total amount of tip credits Defendants took for each period listed above, Defendants took a total of $670,013.45 in tip credits between 2021 and on or about August 26, 2025. *See supra* at ¶¶ 86-90; Buzzard Decl. ¶ 23.

**Liquidated Damages**

96. Defendants took no affirmative steps to determine the requirements of the wage and hour laws. (Petrosyants Dep. at 48:7-12; Shahmuradyan Dep. at 33:12-35:7).

97. Shahmuradyan has not "personally done anything to ensure that the compensation and tipping practices at Osteria La Baia are in accordance with federal or state law." (Shahmuradyan Dep. at 33:12-17, 34:9-19).

98. Shahmuradyan does not know whether anyone at OLB has ever done anything to ensure that the restaurant's compensation and/or tipping practices follow federal or state law. (Shahmuradyan Dep. at 34:21-35:7).

99. At deposition, Petrosyants could not identify any steps OLB had taken to ensure that the way it pays its employees follows the law. (Petrosyants Dep. at 46:16-22).

100. Petrosyants does not recall OLB seeking any legal advice about how to pay its employees. (Petrosyants Dep. at 46:23-47:2, 48:7-12).

Dated: December 12, 2025                               **JOSEPH & KIRSCHENBAUM LLP**

                                                By: <u>/s/Lucas C. Buzzard</u>
                                                      D. Maimon Kirschenbaum
                                                      Josef Nussbaum
                                                      Lucas C. Buzzard
                                                      45 Broadway, Suite 320
                                                      New York, NY 10006
                                                      212-688-5640

                                                      *Attorneys for Plaintiffs*
                                                      *and the putative class*