UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
KATHERINE FERNANDEZ, on behalf of herself and others similarly situated,

                          Plaintiff,

-against-

BULLDOZER HOSPITALITY GROUP, INC., d/b/a OSTERIA LA BAIA, ROBERT PETROSYANTS and MARIANNA SHAHMURADYAN,

                          Defendants.
------------------------------------------------------------------X

Case No.: 1:25-cv-4490 (AS) (GS)

**DEFENDANTS' LOCAL CIVIL RULE 56.1 STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Defendants, Bulldozer Hospitality Group, Inc. ("Bulldozer"), Robert Petrosyants ("Petrosyants"), and Marianna Shahmuradyan ("Shahmuradyan") (Bulldozer, Petrosyants, and Shahmuradyan collectively hereinafter the "Defendants"), by their attorneys, Sage Legal LLC, pursuant to Rule 56 of the Federal Rules of Civil Procedure (hereinafter referred to as "Rules" or "Rule") and Local Civil Rule 56.1 of the Local Rules for the Southern District of New York (hereinafter "Local Rule" or "LCR"), hereby respectfully submit this Rule 56.1 Statement of Material Facts in Support of their Motion for Summary Judgment (hereinafter "SMF"), as to which Defendants contend there are no genuine issue to be tried.

**DEFENDANTS' STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT AGAINST PLAINTIFF**

**Defendants Bulldozer, Robert, and Marianna**

1. Bulldozer Hospitality Group Inc. ("Bulldozer") is a corporation that does business as Osteria La Baia ("Osteria" or "the Restaurant"). Paliko Dep. 7:3-8:2.

2. Osteria first opened in or about 2022. Shahmuradyan Dep. 16:13-15.

3. Shahmuradyan is the sole owner of Osteria. Shahmuradyan Dep. 15:18-16:19.

1

4.     At all relevant times, Shahmuradyan and Petrosyants have been married. Shahmuradyan Dep. 14:21-15:3; Petrosyants Dep. 22:2-4.

5.     Since 2023, Petrosyants has acted as Director of Operations. Petrosyants Dep. 22:5-17.

6.     Neither Shahmuradyan nor Petrosyants have ever had any other job titles at Osteria. Petrosyants Dep. 26:17-20; 36:14-24.

7.     There are more than fifty (50) tipped, front-of-house employees at Osteria. Petrosyants Dep. 181:13-16; 181:25-182:17.

8.     Janos Paliko ("Paliko"), the General Manager, has been primarily responsible for managing the day-to-day front-of-house operations, specifically pertaining to employees, since in or around September 2023. Paliko Decl. ¶¶ 13-14.

9.     As General Manager, Paliko has sole discretion to hire, fire, and discipline front-of-house employees. Paliko Decl. ¶ 14-15.

10.    Non-party Stephanie Willsey ("Willsey") has been a controller with Defendants since July 2023. Willsey Decl. ¶ 4.

11.    Willsey is responsible for processing payroll weekly, managing vendor payments, data entry for accounting and bookkeeping purposes, and preparing financial reports. Willsey Decl. ¶¶ 6-7.

**Plaintiff Katherine Hernandez**

12.    Plaintiff Katherine Fernandez ("Fernandez") began working at Osteria in October 2022, and was ultimately fired. Fernandez Dep. 36:3-5; 33:10-18.

13.    Fernandez was hired by a former General Manager named Fotis. Fernandez Dep. 36:6-15.

2

14. Fernandez was first hired as a busser, and then after a few weeks, was promoted to busser and runner, and later served as a runner. Fernandez Dep. 39:9-15; Teran Dep. 87:2-4.

**Plaintiff Adrian Montor-Teran**

15. Adrian Montor-Teran ("Teran") was employed at Osteria as a busboy, from June 2024 to December 2024. Teran Dep. 30:5-13; 34:18-24; 38:18-24.

16. Teran filed his consent to join this case by signing his name as Adrian Montor-Peran, which is not the correct spelling of his name. ECF Docket Entry 12; Teran Dep. 11:4-18.

17. Teran was hired by Paliko through the recommendation of another employee. Teran Dep. 35:14-19, 34:25-35:9.

18. Teran claims he worked at Osteria from June 2024 until December 2024. Teran Dep. 34:18-24, 38:18-24.

19. Teran earned $180.00 in tips a day on average, with the lowest amount received being $80.00 in a day, and the highest amount being $200.00 per day. Teran Dep. 47:5-22, 66:22-24.

20. Teran wrote down his hours worked on paper but threw those notes out, satisfied that he was properly paid. Teran Dep. 53:2-56:4.

**Plaintiffs Properly Received Notice of the Tip Credit, Verbally and In Writing**

21. There is a poster on a billboard in the restaurant, which discusses the tip credit. Paliko Decl. ¶ 21, Ex. A.

22. Employees pass by this billboard frequently throughout the day and have an opportunity to review it because it is located in the hallway next to the management office. Paliko Decl. ¶ 22.

3

23. A poster on the billboard reads, "[e]mployers of tipped employees who meet certain conditions may claim a partial wage credit based on tips received by their employees. Employers must pay tipped employees a cash wage of at least $2.13 per hour if they claim a tip credit against their minimum wage obligation. *If an employe' s tips combined with the employer s cash wage of at least $2.13 per hour do not equal the minimum hourly wage, the employer must make up the difference*" (emphasis added). Paliko Decl. ¶ 21, Ex. A.

24. Additionally, each employee receives a weekly pay stub electronically containing information about the tip credit, identifying their minimum wage per hour, the tipped minimum wage they are paid, the difference between the two identified as the tip credit amount, the amount of tips that they made, and if they did not receive sufficient tips to make up the difference between the tipped wage and the minimum wage the tip makeup amount to pay them the full minimum wage they are entitled to. Paliko Decl. ¶ 23.

25. All new employees are required to be entered into the Toast system; there is no employee at the restaurant who does not use Toast to clock in & out and receive their pay stubs. Paliko Decl. ¶ 24.

26. Toast is used to manage the restaurant's operations, including but not limited to payroll and tip management, timekeeping for employees, human resources functions involving onboarding employees and processing employment separations, and managing employment documents such as tax forms, notices of pay rate and pay day, and electronic signatures. Willsey Decl. ¶ 8-9, 11.

27. Each employee who is onboarded at Osteria inputs their name, email, and related identifying information in order to establish their own account with Toast. Paliko Decl. ¶ 25; Willsey Decl. ¶ 10.

28. When the employees first sign in, they are prompted to electronically review and sign all employment documents, such as their I-9 form, tax forms such as the W4 and the related New York state form, handbook (together with acknowledgment), and notice of pay rate and payday. Paliko Decl. ¶ 26.

29. Upon completing the application and registration process, each employee receives an employee number, which they use from any device to log in to the Toast system in order to clock in, clock out, and review their pay stubs and any other information available for their review in the Toast system. Paliko Decl. ¶ 27; Willsey Decl. ¶ 12.

30. Every time payroll is processed, Toast prepares a paystub for each employee's pay, which is viewable on Toast's website and/or application. Willsey Decl. ¶ 13.

31. Separately, restaurant has a mandatory service charge of three percent (3%) together with an automatic gratuity of eighteen percent (18%) for any special event, banquet, function, or package deal; Fernandez received tips from special events. Petrosyants Dep. 153:5-155:11, 178:12-179:5; Paliko Decl. ¶ 28; ECF Docket Entry 50-1; Fernandez Dep. 67:13-15; 104:11-12.

32. Employees were notified about the service charge and automatic gratuity for special events, banquets, functions, or package deals. Petrosyants Dep. 162:23-164:18, 170:25-171:6.

33. The three percent (3%) service charge was never a gratuity. Petrosyants Dep. 179:6-13.

34. Fernandez concedes that, upon a review of the event contract, it is common sense that the three percent (3%) service charge is not a gratuity given the existence of the eighteen percent (18%) gratuity next to the service charge, although she thought she was entitled to a twenty percent (20%) gratuity. Fernandez Dep. 108:2-14; 109:16-25.

5

35. Nonetheless, Fernandez had been verbally informed about the tip credit and pool system by Magalis Rodriguez, a floor manager at Osteria who had recommend she work at Osteria. Fernandez Dep. 48:22-49:14; 72:20-73:3; 73:10-21; 32:9-14; 36:21-23.

36. Additionally, Fernandez understood the concept of tipped minimum wage from her previous jobs at another restaurant called Harry's Steakhouse ("Harry's"). Fernandez Dep. 28:23-29:14; 29:19-30:10; 48:11-21; 72:10-19.

37. Although Fernandez denies receive emails along with her check notifying her that her paystub was available, she was verbally informed about the fact she may access her paystub using her Toast account. Fernandez Dep. 57:16-20.

38. Fernandez was aware that she would need to log into the Toast application to view her paystub. Fernandez Dep. 57:21-58:3.

39. Fernandez had seen her paystub on at least one occasion, within Toast. Fernandez Dep. 92:7-10.

40. Fernandez admits to receiving a check stub for every week in which she worked at Osteria. Fernandez Dep. 91:13-15.

41. Fernandez mentioned in her deposition having photos of when the tip pool was started, which implies having some sort of physical evidence constituting written notice. Fernandez Dep. 74:17-19.

42. Teran was verbally informed about the tip credit by Paliko. Teran Dep. 35:20-23.

43. When onboarding employees, Paliko routinely informed employees verbally about the tip credit. Paliko Decl. ¶ 20.

44. Additionally, Teran understood the concept of the tip credit and the tipped minimum wage making up the minimum wage with his tips from his previous jobs as a busboy at other restaurants. Teran Dep. 27:6-33:20.

45. As an administrator, Willsey has access to records concerning each employee's login and activity in Toast. Willsey Decl. ¶ 14-15.

46. Based on these records, Teran indisputably accessed the Toast application and actively utilized the application. Willsey Decl. ¶ 18, Ex. A.

47. Critically, Teran admits to entering his email address when he first signed up with Toast. Teran Dep. 74:24-75:7.

48. Accordingly, he would have had access to view his paystubs at any time. Willsey Decl. ¶ 19.

**Julio Perez Was Not a Manager**

49. Julio Perez ("Perez") has been a server at Bulldozer since 2022. Perez Decl. ¶ 4.

50. Perez was hired as a server by the former General Manager, Fotis. Perez Decl. ¶ 6.

51. Paliko promoted Perez to head waiter, more than one (1) year ago. Paliko Dep. 89:22-90:6.

52. Perez is the captain/main server/head waiter, because he is the most experience server that Osteria has. Petrosyants Dep. 72:19-73:7; 93:17-22; 98:4-14; Paliko Dep. 89:22-90:6.

53. At times, Perez has assisted in training fellow servers regarding their common job duties, which include serving customers, bringing plates and napkins to tables, taking plates from tables, taking customers' orders, and more. Petrosyants Dep. 73:8-75:21; Fernandez Dep. 75: 13-19; Perez Decl. ¶ 5, 10, 23, 30.

54. At times, usually on the rare occasions when Paliko is not present, Perez oversees his fellow servers to ensure service is performed adequately. Petrosyants Dep. 93:23-94:24; 97:10-21; 98:18-99:3; 99:20-100:8; 111:17-114:4; Teran Dep. 68:23-69:6; Paliko Dep. 23:2-25:9; 94:6-9.

55. During these occasions, Perez does not have increased duties to manage or supervise front-of-house staff. Perez Decl. ¶ 13, 23-24.

56. Notably, the restaurant's operational procedures effectively run themselves, on such occasions. Paliko Dep. 23:2-25:9.

57. For example, for days Paliko will not be not present, Paliko assigns employees to their sections in advance. Paliko Dep. 93:12-24.

58. The restaurant has pre-shift meetings before opening to customers, and those meetings are run by Paliko and the head chef. Petrosyants Dep. 66:23-67:12.

59. Petrosyants occasionally attends these meetings. Petrosyants Dep. 67:14-23.

60. Perez merely relays Paliko's floor plan to employees at those pre-shift meetings. Paliko Dep. 93:25-94:5; Perez Decl. ¶ 14.

61. At pre-shift meetings in which Paliko is absent, Perez merely relays information that Paliko tells him to. Perez Decl. ¶ 18

62. Discussion at the pre-shift meetings included specials of the day, how to sell more, complaints about service, and busboys not cleaning tables (in order to encourage the bussers to provide better service). Teran Dep. 45:18-46:7.

63. No terminations were made nor was any discipline issued at pre-shift meetings. Teran Dep. 46:8-47:4.

64. Paliko is the only person responsible for making the schedule. Paliko 34:22-35:14.

65. Perez does not have authority to accept employees' requests for time off. Petrosyants Dep. 108:22-109:4.

66. Similarly, inquiries from employees regarding employees' absences or latenesses were always relayed to Paliko, the General Manager, even if they were originally sent to Perez. Id; Perez Decl. ¶ 20-21.

67. Perez does not have authority to send employees home on slow days. Petrosyants Dep. 95:3-16; 95:16-96:16; Perez Decl. ¶ 16-17.

68. Perez does not have authority to alter the time clock records, if any employee reports such an issue. Petrosyants Dep. 109:13-23.

69. Perez does not have authority to discipline employees. Paliko Dep. 25:11-23.

70. For example, if an employee shows up late when Paliko is not there, Perez merely informs Paliko, who then takes appropriate action in his discretion the following day. Id; 86:12-87:4; Perez Decl. ¶ 12.

71. In fact, on one occasion in which Perez reported an employee to Paliko for engaging in insubordination, Paliko declined to impose any disciplinary measures. Perez Decl. ¶ 27.

72. Perez has only ever participated in corrective action notices of other employees as a witness, not as a decisionmaker who imposed discipline. Paliko Dep. 88:3-89:3.

73. Perez does not interview employees, but sometimes observes interviews. Petrosyants Dep. 102:8-105:22.

74. Perez is not responsible for hiring, firing, or promoting employees. Id; Paliko 87:10-18; Perez Decl. ¶ 11, 22, 29.

75. At times, and only when asked, Perez has been involved in employee evaluations, under Paliko, in the limited capacity of witnessing areas for improvement. Paliko Dep. 84:14-86:10; Perez Decl. ¶ 36.

76. The chef and head bartender have been similarly involved in the evaluation process. Paliko Dep. 84:14-86:10; Perez Decl. ¶ 36.

77. Perez only handles complaints from patrons, never from employees; Paliko handles employee complaints (for example, Fernandez had asked Paliko questions, not Perez). Perez Decl. ¶ 37; Fernandez Dep. 88:17-89:6.

78. Perez is not responsible for maintaining any sales records at the restaurant. Perez Decl. ¶ 31.

79. Rather, Paliko printed tip reports and distributed tips. Perez Decl. ¶ 32; Teran Dep. 59:19-22.

80. Perez does not take custody of any cash tips except his own, and only then, when he (i) places the cash tips he receives in the safe in the absence of the general manager; and (ii) receives his portion of the tips from the tip pool distribution. Perez Decl. ¶ 33-35; Teran Dep. 66:18-21.

81. Perez does not make any key decisions at Osteria, including but not limited to: selecting materials, supplies, machinery, equipment, tools, or food. Perez Decl. ¶ 39. These tasks are handled by the Director of Operations. Perez Decl. ¶ 40.

82. Additionally, Perez does not have supervisory or managerial decision-making authority regarding the safety or security of employees; budgeting; or legal compliance. Perez Decl. ¶ 41-44.

83. Teran assumes that Perez was paid both as a waiter with tips, and as a manager, but admits that he does not know how much Perez was paid. Teran Dep. 41:3-23; 43:2-4.

84. Teran's basis for concluding that Perez is a manger is "because it's logical." Teran Dep. 41:7-23, 43:2-4.

85. Perez did not hire Teran. Teran Dep. 42:2-19.

86. Paliko hired Teran. Id; 40:13-20.

87. Perez did not terminate Teran. Teran Dep. 56:21-22.

88. Teran admits that he does not know for sure that Perez terminated anyone. Teran Dep. 93:13-94:9.

89. Perez was trained by another busser named Artemio, not Perez. Teran Dep. 44:21-45:13.

90. Since Perez is a server and front-of-house employee, and not a manager or supervisor, he has participated in the tip pool at Osteria, receiving the amount that he is entitled to within his role. Petrosyants Dep. 114:5-115:23; 122:4-8; Fernandez Dep. 75:20-22; Perez Decl. ¶ 5, 7.

91. Perez had been verbally informed by Fotis of the tip credit minimum wage. Perez Decl. ¶ 7.

92. Fernandez believes that Perez is a manager, in part, because: he did not wear the same uniform as other servers; he relayed specials; he was proactive in addressing issues involving customers, as well as employee and system performance; he ate food; he participated in meetings; he utilized Toast; and he printed menus. Fernandez Dep. 75:23-78:8; 81:15-21.

11

**Defendants Petrosyants and Shahmuradyan Were Not Plaintiffs' Employers**

93. As owner, Shahmuradyan's sole duties involve reviewing the finances, from a 30,000 foot view. Shahmuradyan Dep. 15:18-19; 16:20-25.

94. Shahmuradyan has similarly always performed her same job. Shahmuradyan Dep. 15:18-19.

95. Shahmuradyan does not need get involved in the daily operations of the restaurant and its employees, beyond general oversight, to perform her bookkeeping functions. Shahmuradyan Dep. 48:5-15.

96. Shahmuradyan does not handle the day-to-day operations of Osteria, including dealing with employees. Shahmuradyan Dep. 16:25-17:3; 20:12-14; Paliko 17:7-19; 18:23-24.

97. Shahmuradyan does not even know how many tipped employees currently work at Osteria, or any of their names except for Paliko. Shahmuradyan Dep. 56:8-11; 64:3-66:24.

98. Shahmuradyan has never been responsible for hiring lower-level employees. Shahmuradyan Dep. 17:21-18:2; 22:22-23:3; 18:19-23; 21:20-22; 49:12-50:8; 61:6-66:24.

99. Shahmuradyan has only ever promoted Paliko to General Manager, and only remembers ever hiring the manager before Paliko, Director of Operations Petrosyants, and the first/head chef. Id.

100. As Director of Operations, Petrosyants is responsible for running operational aspects of the business, including overseeing the quality of food and service, dealing with vendors and payments. Petrosyants Dep. 20:7-21:6.

101. Petrosyants has never ever had any other job titles or duties at Osteria. Petrosyants Dep. 26:17-20; 36:14-24.

102. Petrosyants is not involved in hiring, firing, or managing rank-and-file employees. Petrosyants Dep. 21:7-18; 23:13-25.

103. In fact, Petrosyants does not remember ever hiring or terminating any employees at Osteria. Petrosyants Dep. 24:3-18.

104. Paliko does not remember Petrosyants ever doing so, either. Paliko Decl. ¶ 18.

105. Petrosyants is not responsible for creating the employee schedules. Paliko 35:15-23.

106. No employee has ever asked Petrosyants for time off. Petrosyants Dep. 109:5-8.

107. Employees have not complained to Petrosyants about their pay or tips. Petrosyants Dep. 88:13-18.

108. All decisions pertaining to hiring, firing, disciplining all front-of-house staff, and other day-to-day employee operations, are the responsibility of the managers. Shahmuradyan Dep. 16:25-17:3; 82:13-20.

109. Osteria has one General Manager, Paliko, who is solely responsible for handling employee operations; although he sometimes informs Petrosyants about staffing decisions, Petrosyants plays no role in those decisions. Shahmuradyan Dep. 17:2-20; 30:8-18; Petrosyants Dep. 28:8-29:6.

110. Paliko was initially hired at Osteria in February 2022, as a floor manager, by the General Manager at the time. Paliko Dep. 14:24-15:4; 15:20-25; Paliko Decl. ¶ 4-5.

111. After around a year, Paliko was promoted to assistant general manager, by a different General Manager. Paliko Dep. 16:2-9.

112. Paliko was never overtly interviewed or promoted to General Manager by Shahmuradyan or Petrosyants. Paliko Dep. 16:19-17:19.

113. Rather, Paliko simply took over the prior General Manager's role when the prior left. Paliko Dep. 16:19-17:6.

114. Eventually, a conversation was had between Paliko, Shahmuradyan, and Petrosyants, in which they approved of his new role. Paliko Dep. 17:7-19; Shahmuradyan Dep. 20:12-14.

115. As General Manager, Paliko is in charge of front-of-house operations. Paliko Dep. 21:24-25.

116. Front-of-house employees are tipped employees. Petrosyants Dep. 182:18-183:2.

117. As General Manager, Paliko is there most often, usually five or six days per week, especially when Osteria is busy. Paliko Dep. 22:15-24; Petrosyants Dep. 93:10-12.

118. In contrast, Shahmuradyan goes to Osteria rarely, every few months or weeks, and mostly views the finances from a distance. Shahmuradyan Dep. 29:9-15; 23:20-24:4.

119. Additionally, Shahmuradyan rarely speaks to Paliko. Shahmuradyan Dep. 23:4-10.

120. Petrosyants is in the restaurant a few times per week, not on any specific schedule, to oversee general operations. Petrosyants Dep. 26:5-6; 25:14-16; 61:19-62:3; Paliko Decl. ¶ 16-17.

121. Petrosyants is not at Osteria on a daily basis, because he travels frequently. Paliko Decl. ¶ 16-17.

122. During his visits to the restaurant, Petrosyants meets with Paliko to ensure that service is being performed adequately and with consistency by lower-level employees. Petrosyants Dep. 29:8-31:3.

123. Paliko is responsible for hiring and firing employees, and has full authority to do so without the permission of Shahmuradyan or Petrosyants. Petrosyants Dep. 41:21-24; 44:11-24; 28:8-14; Shahmuradyan Dep. 26:4-10; 55:15-20.

124. In addition, Paliko's job duties include: deciding how much to pay tipped employees; setting the employee schedules; deciding how many of each type of employee (for example, servers, bartenders, busboys) to staff in a single shift. Shahmuradyan Dep. 25:7-26:3; 26:11-16; 30:8-18.

125. In the time since Paliko started working as a manager at Osteria, Shahmuradyan does not believe she has ever corrected or questioned a single thing he's done. Shahmuradyan Dep. 82:21-83:6-14.

126. Importantly, neither Shahmuradyan nor Petrosyants were responsible for interviewing or hiring either Plaintiff, Teran or Fernandez. Shahmuradyan Dep. 42:10-20; Petrosyants Dep. 61:11-15; Fernandez 36:3-15.

**Defendants Have Properly Claimed the Tip Credit**

127. When Fernandez first began working at Osteria in October 2022, she was paid $15.00 per hour for training, and then was paid $10.00 per hour, plus tips. Fernandez Dep. 47:13-48:10.

128. At some point, Fernandez earned a raise to $12.50 per hour, plus tips (and later, her paystubs show that she received another raise to $15.00 per hour, though she denies this; she also denies ever being paid $11.00 per hour). Fernandez Dep. 49:21-50:11; 123:6-124:6; 62:11-12.

129. Apart from one (1) other employee, Fernandez is the only one to receive such a raise. Fernandez Dep. 62:21-63:6.

130. On average, Fernandez earned $1,200 to $1,300 per week at Osteria, including nightly tips of $50 at the lowest, $300 at the highest, and $200 on average. Fernandez Dep. 89:19-24; 40:22-41:7.

131. Fernandez typically worked between thirty-eight (38) and forty-one (41) hours per week at Osteria, with some variation. Fernandez Dep. 58:14-16; 90:4-6; 90:14-25; 91:2-5.

132. Fernandez believes that the lowest amount she ever received in a week was $700.00. Fernandez Dep. 89:25-90:3.

133. Fernandez admits that even her lowest weekly pay, $700, divided by her highest hours worked would yield an hourly rate of $17.07. Fernandez Dep. 90:7-13; 91:6-8.

134. Fernandez admits to receiving tips from the tip pool, at the end of every night. Fernandez Dep. 80:5-8; 81:3-5.

135. Fernandez admits that, other than Perez's participation in the tip pool, she had no other complaints regarding her wages at Osteria. Fernandez Dep. 91:9-12.

136. Teran typically worked thirty-six (36) to forty (40) hours per week. Teran Dep. 71:17-21.

137. Teran's typical weekly pay, including tips, was around $800 to $900. Teran Dep. 71:22-72:7.

138. Teran admits that his typical weekly pay of $800 with tips (at the low end), divided by 40 hours per week (at the high end), would yield an hourly rate of $20, which is above the minimum wage. Teran Dep. 72:8-23; 73:8-74:3.

139. Osteria utilizes Toast to ensure that in the event any employee's tipped minimum wage, together with that employee's tips earned in a week, amounts to less than the regular

16

minimum wage for that week, the Toast system automatically adds the differential owed to make up the difference. Petrosyants Dep. 92:14-16; Willsey Decl. ¶ 20-23.

140. Willsey maintains in her declaration that this is reflected in the pay stubs of every employee at Bulldozer. Willsey Decl. ¶ 24; see also, e.g., ECF Docket Entry 50-2 at 2, 4, 6, 8, 10, 12, 14, 16, 18, 20, 22, 24, 26, 28, 30, 32, and 34 (providing "Additional Information" that the regular rate of pay is $16.50, tip credit is $1.50, and tipped wage is $15.00, and showing no tip make up because she earned the minimum wage with her tips)

**Fernandez and Teran are Disgruntled Employees**

141. Notably, Fernandez was terminated from Osteria (by Paliko), while she was on a two (2) week vacation. Fernandez Dep. 119:16-19; 33:19-34:10; 35:4-7.

142. Teran quit both due to an unrelated knee injury, and due to the pressure he had been feeling around Paliko and Perez. Perez Dep. 56:11-24; 74:13-23; 84:14-23; 85:6-7; 105:24-106:5.

143. Fernandez admits in her deposition that she is suing because she was fired. Fernandez Dep. 141:24-142:7.

144. Additionally, Fernandez says she is suing partly because she was harassed and discriminated against, despite no such causes of action existing within this lawsuit. Id.; 94:3-7; 96:5-18; 97:11-98:20; 138:10-19.

145. Fernandez says in her deposition that she is suing to get justice for her suffering, yet has not established any injury, or even any violation of the law irrespective of an injury to her, pertaining to any of the claims herein. Fernandez Dep. 93:21-94:2; 94:13-25; 97:11-98:20.

146. Fernandez also contradicts her own stated motivations, when she admits that "I don't care if they obey the law right now because I don't work there anymore." Fernandez Dep. 95:2-10.

147. In fact, Fernandez repeatedly said "I don't care" at her deposition. <u>Fernandez Dep. 95:7; 132:2, 4-6, 9; 134:21; 139:10-11; 147:11; 148:7.</u>

148. Despite Harry's not paying Fernandez the minimum wage on at least one occasion, and notwithstanding Harry's never paying her to make up for that difference, Fernandez has never pursued any claims against Harry's. <u>Fernandez Dep. 30:14-31:14; Fernandez Dep. 28:23-29:14; 30:11-13.</u>

149. Similarly, Teran previously pursued legal action against only one of the other restaurants he worked at, Seafire Grill, despite them all having similar tip credit minimum wage policies and all not providing written notice. <u>Teran Dep. 20:19-23:19; Teran Dep. 31:25-32:8; Teran Dep. 32:9-20.</u>

**Defendants' Records Support Their Motion for Summary Judgment**

150. Fernandez's pay stubs show she was properly paid at all times. <u>Kataev Decl. ¶ 3, Ex. A.</u>

151. Teran's pay stubs show he was properly paid at all times. <u>Kataev Decl. ¶ 5, Ex. C.</u>

152. Defendants' special event contracts make it evident that the three percent (3%) service charge was mandatory and not a gratuity, because each contract had the same service charge and since each contract had an automatic eighteen percent (18%) gratuity alongside the three percent (3%) service charge. <u>Kataev Decl. ¶ 4, Ex. B.</u>

Dated: Jamaica, New York
       December 12, 2025

Respectfully submitted,

**SAGE LEGAL LLC**

  <u>*/s/ Emanuel Kataev, Esq.*</u>
Emanuel Kataev, Esq.
18211 Jamaica Avenue
Jamaica, NY 11423-2327
(718) 412-2421 (office)
(917) 807-7819 (cellular)
(718) 489-4155 (facsimile)
emanuel@sagelegal.nyc

*Attorneys for Defendants
Bulldozer Hospitality Group, Inc.,
Robert Petrosyants, and
Marianna Shahmuradyan*

**<u>VIA ECF</u>**
Joseph & Kirschenbaum LLP
Attn: Josef Nussbaum, Esq.
45 Broadway, Suite 320
New York, NY 10006-3007
(212) 688-5640 (office)
jnussbaum@jk-llp.com

*Attorneys for Plaintiffs
Katherine Fernandez, and
Adrian Montor-Peran*