UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

KATHERINE FERNANDEZ, on behalf of herself and
others similarly situated,

                               Plaintiff,

           -against-

BULLDOZER HOSPITALITY GROUP, INC., d/b/a
OSTERIA LA BAIA, ROBERT PETROSYANTS and
MARIANNA SHAHMURADYAN,

                               Defendants.

-----------------------------------------------------------------X

**Case No.: 1:25-cv-4490 (AS) (GS)**

**DEFENDANTS' RESPONSE TO PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS PURSUANT TO LOCAL RULE 56.1 IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Defendants, Bulldozer Hospitality Group, Inc. ("Bulldozer"), Robert Petrosyants ("Petrosyants"), and Marianna Shahmuradyan ("Shahmuradyan") (Bulldozer, Petrosyants, and Shahmuradyan collectively hereinafter the "Defendants"), by their attorneys, Sage Legal LLC, hereby respectfully submit this submits this response (and counterstatement of facts) to the Plaintiff's Statement of Undisputed Material Facts Pursuant to Local Rule 56.1 in Support of its Motion for Partial Summary Judgment (hereinafter "CSMF" or "Statement"). Following its response to Defendant's Statement, Plaintiff also sets forth those facts as to which it contends there are genuine issues to be tried consistent with the requirements of Rule 56.1.

## RESPONSES TO PLAINTIFF'S STATEMENT

1.    Defendant Bulldozer Hospitality Group, Inc. owns and operates a restaurant called "Osteria La Baia" located in Manhattan at 129 W 52nd St, New York, NY 10019 ("OLB"). (Amended Complaint (Complaint") (ECF No. 15) ¶ 7; Answer to Amended Complaint ("Answer") (ECF No. 17) ¶ 7).

**Response: Admit.**

1

2.     OLB commenced operations on November 15, 2021. (Buzzard Decl. ¶ 24 & Ex. 19).

**Response: Deny. OLB opened in 2022. Shahmuradyan Dep. 16:13-15. Petrosyants was not involved with OLB in 2021 or 2022. Petrosyants Dep. 22:21-23:3; 125:16-25; 131:9-132:17.**

3.     Defendant Marianna Shahmuradyan ("Shahmuradyan") has and continues to be the sole owner of OLB since it opened in 2022. (Buzzard Decl., Ex. 1 (Shamuradyan [*sic*] Dep.) at 15:18-16:19).

**Response: Admit, but Defendants deny that Shahmuradyan is an employer because she does not hire or fire employees nor set their schedules, pay, and/or terms & conditions of employment.  Shahmuradyan Dep. 16:20-17:20; 18:3-11; 20:12-21:13; 21:23-22:17; 22:22-23:3; 23:13-19; 29:11-15; 30:2-12; 32:13-15; 33:12-35:7; 43:4-17; 48:3-15; 54:16-55:20; 57:11-14; 70:9-71:20; 82:13-20; Petrosyants Dep. 64:9-19.**

4.     Defendant Shahmuradyan's husband, Defendant Robert Petrosyants ("Petrosyants") is the director of operations at OLB. (Buzzard Decl., Ex. 2 (Petrosyants Dep.) at 19:17-25; ) [*sic*].

**Response: Admit, but deny that Petrosyants is an employer because she does not hire or fire employees nor set their schedules, pay, and/or terms & conditions of employment. Petrosyants Dep. 20:11-21:7; 23:13- 24:18; 29:14-21; 34:11-14; 52:5-12; 67:20-23; 68:9-15; 101:25-102:3.**

5.     Janos Paliko has been the manager of OLB since at least 2023. (Shahmuradyan Dep. at 17:19-18:11).

**Response: Deny. Although Paliko has worked at OLB since February 2022, and was promoted to Assistant General Manager in 2023, he became the General Manager since in or about September of 2024. Paliko Dep. 14:24-15:4; 15:20-25; Paliko Decl. ¶ 4, 8, 13.**

**AS TO "Defendants' Shahmuradyan's and Petrosyants' Operational Control Over OLB"**

6.    Defendant Shahmuradyan owns and operates OLB. (Complaint ¶ 10; Answer ¶ 10).

**Response: Admit, but note that Shahmuradyan's control over operations is strictly limited to financial overview; she does not handle day-to-day operations concerning front-of-house staff, and front-of house operations are conducted by managers such as Paliko. Shahmuradyan Dep. 16:20-17:20; 18:3-11; 20:12-21:13; 21:23-22:17; 22:22-23:3; 23:13-19; 25:7-24 (Paliko decides how much to pay the tipped employees, and interviews employees to be hired); 28:20-29:8 (Only Paliko would know specific details about the Plaintiffs' employment; not Shahmuradyan or Petrosyants); 29:11-15; 30:2-12; 32:7-15 (Shahmuradyan does not know how much bartenders are paid hourly, or whether they make tips; Paliko would know); 33:12-35:7; 42:10-23 (Shahmuradyan believes that Paliko likely hired Teran and knows how much he was paid; she does not know); 43:4-17 (Shahmuradyan does not communicate with Paliko regarding day-to-day operation, via text message or otherwise); 48:3-15; 51:6-18 (Paliko decided when OLB would be open for service, and conducts any pre-shift work); 52:16-53:22 (Shahmuradyan believes that Paliko or another manager implemented the Toast payroll system, and does not know whether Paliko hired anyone else to do scheduling); 54:16-55:20 (Paliko never consults with Shahmuradyan prior to hiring or firing employees); 57:11-14 (Shahmuradyan admits she does not know whether all tipped employees of OLB are paid the same hourly rate); 70:9-71:20; 82:13-20 (When Shahmuradyan first hired Paliko, she instructed him to "[t]o hire people, to oversee everything that's happening on the floor, bartenders, bussers, make sure that everybody has the right schedule. Everything that needs to be – operational side"); Petrosyants Dep. 25:3-16 (Paliko/management runs the day-to-day operations of OLB); 27:25-28:14 (Paliko is the**

only manager of OLB; Paliko has only ever informed Petrosyants of Paliko's hiring or firing of employees after the fact, and even then, only sometimes); <u>41:21-42:14</u> (Paliko is in charge of hiring, firing, and ensuring that employees are properly paid their wages and tips); <u>49:8-25</u> (Paliko was instructed by Petrosyants to produce the payroll records for this case, implying that Paliko has the primary authority over that process and its records); <u>64:9-19;</u> <u>71:9-72:4</u> (Management, including Paliko for front-of-house and the head chef for back-of-house, is responsible for training lower-level employees); <u>78:20-79:10</u> (Paliko alone decides how many front-of-house employees are needed each shift); <u>99:20-24</u> (Paliko decides which sections employees while work in); <u>109:13-20</u> (Employees' issues with clocking in are reported to Paliko, who alone has authority to alter records to rectify such issues); <u>Paliko Dep. 29:5-30:11</u> (Paliko is responsible for interviewing, hiring, and firing food service employees, and does not consult with anyone before doing so); <u>13:11-17</u> (Stephanie is in charge of payroll).

7.    As owner, Defendant Shahmuradyan "oversees everything" at the restaurant. (Shahmuradyan Dep. at 48:3-11 ("I oversee everything.")).

**Response: Admit, but note again that this oversight is limited to financial overview, from a distance; for example, management is responsible for hiring, firing, and payroll; Chef is responsible for the kitchen; the director of operations meets with vendors; hostesses seat people; waiters do their job. <u>Shahmuradyan Dep. 48:3-11.</u> Shahmuradyan "[does not] need to get involved," because "every area is run by specific people." <u>Shahmuradyan Dep. 48:13-15.</u>**

8.    Defendant Shahmuradyan admitted at deposition that she has "ultimate authority over all operations of the restaurant." (Shahmuradyan Dep. at 69:24-70:8 ("Q: Okay. Now, as owner of the restaurant, you have ultimate authority over all operations of the restaurant, correct? A: Correct.").

**Response: Deny. While Shahmuradyan, as the sole owner, retains ultimate authority in theory, nearly all operational decisions *related to employment* within OLB are performed by Paliko. Just after the section Plaintiffs cite, Shahmuradyan noted a carveout for management, and clarified that she "[does not] decide certain things in the restaurant," including but not limited to employment issues and private events. Shahmuradyan Dep. 70:21-71:20; 16:20-17:20; 18:3-11; 20:12-21:13; 21:23-22:17; 22:22-23:3; 23:13-19; 25:7-24 (Paliko decides how much to pay the tipped employees, and interviews employees to be hired); 28:20-29:8 (Only Paliko would know specific details about the Plaintiffs' employment; not Shahmuradyan or Petrosyants); 29:11-15; 30:2-12; 32:7-15 (Shahmuradyan does not know how much bartenders are paid hourly, or whether they make tips; Paliko would know); 33:12-35:7; 42:10-23 (Shahmuradyan believes that Paliko likely hired Teran and knows how much he was paid; she does not know); 43:4-17 (Shahmuradyan does not communicate with Paliko regarding day-to-day operation, via text message or otherwise); 48:3-15; 51:6-18 (Paliko decided when OLB would be open for service, and conducts any pre-shift work); 52:16-53:22 (Shahmuradyan believes that Paliko or another manager implemented the Toast payroll system, and does not know whether Paliko hired anyone else to do scheduling); 54:16-55:20 (Paliko never consults with Shahmuradyan prior to hiring or firing employees); 57:11-14 (Shahmuradyan admits she does not know whether all tipped employees of OLB are paid the same hourly rate); 70:9-71:20; 82:13-20 (When**

Shahmuradyan first hired Paliko, she instructed him to "[t]o hire people, to oversee everything that's happening on the floor, bartenders, bussers, make sure that everybody has the right schedule. Everything that needs to be – operational side"); Petrosyants Dep. 25:3-16 (Paliko/management runs the day-to-day operations of OLB); 27:25-28:14 (Paliko is the only manager of OLB; Paliko has only ever informed Petrosyants of Paliko's hiring or firing of employees after the fact, and even then, only sometimes); 41:21-42:14 (Paliko is in charge of hiring, firing, and ensuring that employees are properly paid their wages and tips); 49:8-25 (Paliko was instructed by Petrosyants to produce the payroll records for this case, implying that Paliko has the primary authority over that process and its records); 64:9-19; 71:9-72:4 (Management, including Paliko for front-of-house and the head chef for back-of-house, is responsible for training lower-level employees); 78:20-79:10 (Paliko alone decides how many front-of-house employees are needed each shift); 99:20-24 (Paliko decides which sections employees while work in); 109:13-20 (Employees' issues with clocking in are reported to Paliko, who alone has authority to alter records to rectify such issues); Paliko Dep. 29:5-30:11 (Paliko is responsible for interviewing, hiring, and firing food service employees, and does not consult with anyone before doing so); 13:11-17 (Stephanie is in charge of payroll).

9.    As the 100% owner, Defendant Shahmuradyan has financial control over the restaurant. (Shahmuradyan Dep. at 35:23-36:2).

Response: Admit, but note that financial control is not the same as operational control, and thus does not itself make Shahmuradyan an employer with control over the employees at issue. Shahmuradyan Dep. 16:20-18:7.

10.    Defendant Shahmuradyan has authority to hire and fire any employee at the restaurant. (Shahmuradyan Dep. at 70:5-8).

**Response: Deny. While Shahmuradyan *could* decide to hire and fire employees, she immediately after this question clarified that she does not make such decisions in effect, and is never involved in such decisions either, as day-to-day operations are conducted by management. Shahmuradyan Dep. 70:9-25. Management "runs everything, from hiring to payroll to running day-to-day operation." Shahmuradyan Dep. 18:3-11. Critically, Paliko has never consulted with Shahmuradyan before hiring or firing anyone. Shahmuradyan Dep. 55:15-20; Paliko Dep. 29:5-30:11.**

11.    For example, Defendant Shahmuradyan is the one who ultimately decides how much employees' [*sic*] are paid at OLB. (Shahmuradyan Dep. at 20:24-21:13 ("Q; But as the owner, you were the one who decided how much everyone was going to make at the restaurant; right? A: Yeah. …").

**Response: Deny. This is a blatant misrepresentation of the record. Shahmuradyan Dep. 20:24-21:13. Shahmuradyan said, "Yeah," then went on to say, "but – I did not – […] I do not remember who made" this decision.  Id.**

12.    Mr. Paliko was hired by Defendant Shahmuradyan to manage the day-to-day operations of OLB. (Shahmuradyan Dep. at 20:12-14, 22:22-23:3, 82:13-20).

**Response: Deny. Shahmuradyan says she interviewed Paliko before he was hired as manager; admits that she hired the previous manager before Paliko; and that she gave Paliko instructions for his role in managing daily operations (including to hire people, oversee the floor, bartenders, bussers, oversee scheduling). Shahmuradyan Dep. 20:12-14, 22:22-23:3, 82:13-20. Nothing about this implies that Shahmuradyan had any control over the employees**

whom Paliko managed; it hardly implies that she exercised control over Paliko himself either. **Shahmuradyan Dep. 82:13-20.** Shahmuradyan's hiring of the previous manager was an outlier, and again, would not change that she does not manage front-of-house employees. **Shahmuradyan Dep. 22:22-23:3.** Moreover, Paliko clarified in his own deposition that he was not hired by Shahmuradyan, but that he merely spoke with her after he naturally assumed the management role as his own; the discussion Shahmuradyan describes regarding his job duties does not imply an employer relationship with Paliko. **Paliko Dep. 16:19-17:19; Shahmuradyan Dep. 20:12-14.**

13.   Defendant Shahmuradyan decided how much to pay Mr. Paliko when he was hired at OLB. (Shahmuradyan Dep. at 54:16-55:5).

**Response: Deny. In the very lines Plaintiffs cite, Shahmuradyan says exactly the opposite ("Q: When you hired Janos, did you discuss how much he was going to get paid? A: I did not."). Shahmuradyan Dep. 54:16-18. Shahmuradyan's subsequent statement that she later decided how much to pay Paliko was only after Paliko himself affirmatively told Shahmuradyan how much he wanted to be paid. Shahmuradyan Dep. 54:19-24. Regardless, Shahmuradyan's negotiations in this process with Paliko, the manager, are not indicative of her general decision-making authority over front-of-house employees such as the Plaintiffs, as Paliko is unquestionably not similarly situated to them. Shahmuradyan Dep. 54:25-55:5. Her lack of authority over front-of-house employees' payment is demonstrated by her ignorance regarding the bartenders' hourly payment, as well as her ignorance of whether all tipped employees were paid the same hourly rate. Shahmuradyan Dep. 32:13-15; 57:11-14.**

14.   The restaurant's general manager, Mr. Paliko, reports to Defendant Shahmuradyan. (Shahmuradyan Dep. at 41:8-12)

**Response: Deny. Paliko testified that Shahmuradyan only does finances, and is not involved in operations.** Paliko Dep. **18:7-19:24.**

15.    Every week, Defendant Shahmuradyan speaks with Mr. Paliko via telephone about OLB's operations. (Shahmuradyan Dep. at 23:8-10).

**Response: Deny. Paliko's communications with Shahmuradyan are limited to invoices, and booking reservations for her friends.** Paliko Dep. **91:9-13.**

16.    During these telephone meetings, Defendant Shahmuradyan checks to make sure that payroll at the restaurant was run. (Shahmuradyan Dep. at 23:11-16).

**Response: Deny. Paliko says that he does not recall speaking to Shahmuradyan about payroll, and instead speaks to Stephanie Willsey ("Willsey"), the controller.** Paliko Dep. **91:14-92:7.**

17.    When asked about these telephone meetings at deposition, Shahmuradyan testified that during such meetings she asks Paliko "to make sure to send [her] all the reports" and that "payroll is done," and she "makes sure [payroll] is done." Shahmuradyan Dep. at 23:13-16.

**Response: Admit, but note that Shahmuradyan's role is limited to broad financial overview.** Shahmuradyan Dep. **23:17-19. Questioning whether payroll is done, and for reports indicating same, is squarely within her role, and does not implicate any control over the inner workings of that payroll process.** Shahmuradyan Dep. **23:13-16. Shahmuradyan herself even clarifies that she does not even check the reports, and only makes sure they are done.** Shahmuradyan Dep. **23:15-16. Moreover, any such discussions are so miniscule in sum and substance that Paliko does not even recall their occurrence.** Paliko Dep. **91:14-92:7.**

18.    Defendant Shahmuradyan sometimes meets with Mr. Paliko in-person at OLB. (Shahmuradyan Dep. at 29:16-23).

**Response: Admit, but note that Shahmuradyan says these discussions are limited to "making sure all the finances are on point."** <u>Shahmuradyan Dep.</u> **30:2-7.**

19. During these meetings, Defendant Shahmuradyan discuss OLB's day-to-day operations and whether there any problems with the restaurant's payroll. (Shahmuradyan Dep. at 29:24-30:7).

**Response: Admit, but note, again, that the purpose of such discussions are to ensure the finances are running smoothly.** <u>Shahmuradyan Dep.</u> **30:2-30:12. For example, they never discuss anything pertaining to staffing or food.** <u>Id.</u>

20. Defendant Shahmuradyan gave Mr. Paliko the responsibility to decide how much to pay the tipped employees at OLB. (Shahmuradyan Dep. at 25:7-21).

**Response: Admit, but object to this statement as immaterial, because this does not change the fact that Shahmuradyan has no employer relationship with front-of-house employees like the Plaintiffs. Rather, this fact highlights her lack of decision-making authority over those employees.**

21. Defendant Shahmuradyan gave Mr. Paliko the responsibility to interview, schedule, and terminate employees at OLB. (Shahmuradyan Dep. at 25:22-26:16).

**Response: Admit, but objects to this statement as immaterial, because again, this does not change the fact that Shahmuradyan has no employer relationship with front-of-house employees like the Plaintiffs.** <u>Shahmuradyan Dep.</u> **16:20-17:20; 18:3-11; 20:12-21:13; 21:23-22:17; 22:22-23:3; 23:13-19; 29:11-15; 30:2-12; 32:13-15; 33:12-35:7; 43:4-17; 48:3-15; 54:16-55:20; 57:11-14 (Shahmuradyan does not know whether all tipped employees of OLB are paid the same hourly rate);** <u>70:9-71:20; 82:13-20;</u> <u>Petrosyants Dep.</u> **64:9-19. Rather, this fact highlights her lack of decision-making authority over those employees.**

22.     Defendant Shahmuradyan hired the head chef at OLB when the restaurant first opened. (Shahmuradyan Dep. at 21:15-22).

**Response: Admit, but objects to this statement as immaterial, because the head chef is not similarly situated to the front-of-house employees such as the Plaintiffs. Moreover, the head chef, like Paliko, was "hired" for the purpose of hiring lower-level employees and managing the day-to-day operations of those employees. Shahmuradyan Dep. 22:18-23:3.**

23.     Defendant Shahmuradyan decided how much to pay the head chef. (Shahmuradyan Dep. at 21:23-22:17).

**Response: Deny. In the very portion of her deposition which Plaintiffs cite, Shahmuradyan says repeatedly that she does not remember how much he was paid, or who decided. Shahmuradyan Dep. 21:23-22:17. Moreover, she says "I did not decide how much he was […] getting paid." Shahmuradyan Dep. 22:9-13. Shahmuradyan only says "[y]es" that there some kind of negotiation about how to pay him, or that he told her how much he wanted to be paid and she agreed to it. Shahmuradyan Dep. 22:14-17.  This statement is otherwise immaterial, as the head chef is not similarly situated to front-of-house employees such as the Plaintiffs.**

24.     Defendant Shahmuradyan tasked the head chef with hiring the employees who worked in the kitchen at OLB. (Shahmuradyan Dep. at 22:18-21).

**Response: Admit, but object to this statement as immaterial, because again, this does not change the fact that Shahmuradyan has no employer relationship with lower-level employees like the Plaintiffs. Rather, this fact highlights her lack of decision-making authority over those employees.**

25.    OLB's payroll company is called Toast. (Shahmuradyan Dep. at 53:8-10).

**Response: Admit.**

26.    OLB employees' payroll records are maintained on Toast. (Petrosyants Dep. at 60:12-15).

**Response: Admit.**

27.    Defendant Shahmuradyan has access to OLB's payroll records that are electronically-maintained through Toast. (Shahmuradyan Dep. at 23:20-25:6 (testifying that she has access to "the application where [she] see[s] the payroll" through Toast and that she "mostly go[es] on QuickBooks")).

**Response: Admit, but objects to this statement as immaterial, because mere access to the payroll system does not implicate control over that system, and Shahmuradyan's access was primarily focused on her role to oversee the finances of OLB, generally. Shahmuradyan Dep. 16:20-17:20; 18:3-11; 20:12-21:13; 21:23-22:17; 22:22-23:3; 23:13-19; 29:11-15; 30:2-12; 32:13-15; 33:12-35:7; 43:4-17; 48:3-15; 54:16-55:20; 57:11-14 (Shahmuradyan does not know whether all tipped employees of OLB are paid the same hourly rate); 70:9-71:20; 82:13-20; Petrosyants Dep. 64:9-19; Paliko Dep. 13:11-17 (Stephanie is in charge of payroll).**

28.    Shahmuradyan reviews OLB's payroll through Toast at least once per month. (Shahmuradyan Dep. 23:22-24:3).

**Response: Admit, but objects to this statement as immaterial, because mere review of the payroll system does not implicate control over that system, and Shahmuradyan's access was primarily focused on her role to oversee the finances. Shahmuradyan Dep. 16:20-17:20; 18:3-11; 20:12-21:13; 21:23-22:17; 22:22-23:3; 23:13-19; 29:11-15; 30:2-12; 32:13-15; 33:12-35:7; 43:4-17; 48:3-15; 54:16-55:20; 57:11-14 (Shahmuradyan does not know whether all tipped**

**employees of OLB are paid the same hourly rate); <u>70:9-71:20; 82:13-20; Petrosyants Dep.</u>**
**<u>64:9-19; Paliko Dep. 13:11-17 (Stephanie is in charge of payroll).</u>**

29.    Shahmuradyan testified that, as the owner, she "look[s] down" at the restaurant's
finances and "goes through all the QuickBooks." (Shahmuradyan Dep. at 16:20-23).

**Response: Admit, but objects to this statement as immaterial, because mere review of the**
**payroll system does not implicate control over that system, or an employer relationship with**
**the employees subject to that system.**

30.    Defendant Petrosyants testified that Defendant Shahmuradyan is present in the
restaurant a few times each week. (Petrosyants Dep. at 65:2-23).

**Response: Deny. Shahmuradyan testified that she goes to the restaurant "[v]ery rarely,"**
**possibly once a month or less, maybe once every two weeks at the most frequently.**
**<u>Shahmuradyan Dep. 29:11-15.</u>**

31. Defendant Shahmuradyan is listed as the principal on OLB's liquor license.
(Shahmuradyan Dep. at 69:10-13).

**Response: Admit, but object to this statement as immaterial.**

32.    Defendant Shahmuradyan signs off on OLB's tax returns. (Shahmuradyan Dep. at
16:22-24).

**Response: Admit, but objects to this statement as immaterial. Again, this is squarely within**
**her role as owner in charge of finances, and implicates no employer relationship with  front-**
**of-house employees.**

33.    At deposition, Petrosyants testified: "I think my wife [(Shahmuradyan)] is the boss
. . . of the restaurant." (Petrosyants Dep. at 64:9-11.)

**Response: Admit, but objects to this statement as immaterial, because it is more of an opinion than a fact. Moreover, Petrosyants went on to clarify that although her role involves "mak[ing] decisions on a certain level," management makes other decisions, and thus "they consider [Paliko] as the boss as well." <u>Petrosyants Dep.</u> 64:9-19.**

34.    Petrosyants testified that, as "the owner," Shahmuradyan "has access to anything she wants" at the restaurant. (Petrosyants Dep. at 52:2-4).

**Response: Admit, but object to this statement as immaterial. Again, this is squarely within her role as owner in charge of finances, and access does not equal employer relationship with front-of-house employees. This is further demonstrated by the fact that, despite having access, Shahmuradyan does not know such basic facts as whether all OLB's tipped employees are paid the same hourly rate, or how bartenders are paid. <u>Shahmuradyan Dep.</u> 57:11-14; <u>Paliko Dep.</u> 13:11-17 (Stephanie is in charge of payroll).**

35.    Petrosyants testified that, to his knowledge, OLB's front-of-house staff understand that Shahmuradyan is the owner. (Petrosyants Dep. at 68:16-19.)

**Response: Admit, but objects to this statement as immaterial. Shahmuradyan's ownership of OLB, and employee awareness of same, does not mean she has an employer relationship with those employees.**

**AS TO "Defendant Robert Petrosyants"**

36.    Defendant Petrosyants was hired by his wife, Defendant Shahmuradyan to be OLB's director of operations. (Shahmuradyan Dep. at 18:16-34; Petrosyants Dep. at 21:23-25).

**Response: Admit, but objects to this statement as immaterial, because Petrosyants is not a front-of-house employee like the Plaintiffs.**

37.    Defendant Petrosyants was not interviewed prior to being hired. (Petrosyants Dep. at 21:23-22:15).

**Response: Admit, but objects to this statement as immaterial.**

38.    Shahmuradyan has given Petrosyants "carte blanche to do whatever [he] want[s] in terms of running the operations" of the restaurant. (Petrosyants Dep. at 37:15-18, 38:7-11).

**Response: Admit, but note that Petrosyants' role as director of operations includes nearly everything except employee management; Petrosyants maintained responsibility over general, non-employee business operations like, for example, overseeing vendors, general payments and earnings, and quality of food and service. Petrosyants Dep. 20:11-21; 52:22-53:7. Meanwhile, Paliko handles day-to-day employee operations, including hiring, firing, setting schedules, setting wages, training employees, and/or setting terms and conditions of employment. Paliko Dep. 29:5-30:11; 34:14-21; 93:2-16; Petrosyants Dep. 41:21-42:13; 71:9-11; 71:23-72:11 (the chef is similarly responsible for training back-of-house staff about food/plates); 102:8-11; 106:16-18; Shahmuradyan Dep. 16:25-17:5; 25:22-27:4 (confirming that only Paliko has authority over employee operations; and that Paliko is not involved in interviewing, hiring, or firing); 28:20-29:8 (Paliko would know specific details of the Plaintiffs' employment, but Shahmuradyan and Petrosyants do not); 30:8-18 (Paliko decides how many employees work each shift); 32:2-15 (implied that only Paliko would know how much bartenders are paid per hour, and whether they make tips); 40:16-41:7 (The manager hired the person or people who run the social media accounts); 48:3-11 (Shahmuradyan describes Petrosyants' job as "meet[ing] with the vendors").**

39.    Defendant Petrosyants testified that, as director of operations, his job duties are "running the business" of OLB. (Petrosyants Dep. at 20:11-13; 33:13-34:14; 52:10-12).

**Response: Admit, but note that Petrosyants clarified that "running the business" means overseeing vendors, payments, operations, quality of food, and quality of service. Petrosyants Dep. 20:11-21:6. Although Petrosyants oversees that employees are paid and do their jobs, generally, this does not mean that he himself controls those processes; for example, Paliko exclusively handles day-to-day employee operations, including hiring, firing, setting schedules, setting wages, and/or setting terms and conditions of employment. Paliko Dep. 29:5-30:11; 34:14-21; 93:2-16; Petrosyants Dep. 41:21-42:13; 71:9-11; 71:23-72:11 (the chef is similarly responsible for training back-of-house staff about food/plates); 102:8-11; 106:16-18; Shahmuradyan Dep. 16:25-17:5; 25:22-27:4 (confirming that only Paliko has authority over employee operations; and that Paliko is not involved in interviewing, hiring, or firing); 28:20-29:8 (Paliko would know specific details of the Plaintiffs' employment, but Shahmuradyan and Petrosyants do not); 30:8-18 (Paliko decides how many employees work each shift); 32:2-15 (implied that only Paliko would know how much bartenders are paid per hour, and whether they make tips); 40:16-41:7 (The manager hired the person or people who run the social media accounts); 48:3-11 (Shahmuradyan describes Petrosyants' job as "meet[ing] with the vendors"). Moreover, Petrosyants clarified later running the restaurant involves ensuring that the finances are profitable, which establishes that his role was about general oversight, not direct a direct employer relationship with, front-of-house employees. Petrosyants Dep. 52:5-12.**

40.    Specifically, Defendant Petrosyants is responsible for "oversee[ing] the operations," vendors, payments, the quality of food, and the quality of service at OLB. (Petrosyants Dep. at 20:11-18).

**Response: Admit, but note that none of this involves direct management of employees. Admit, but note that Petrosyants' role as director of operations includes nearly everything except employee management; Petrosyants maintained responsibility over general, non-employee business operations like, for example, overseeing vendors, general payments and earnings, and quality of food and service. Petrosyants Dep. 20:11-21; 52:22-53:7. Meanwhile, Paliko handles day-to-day employee operations, including hiring, firing, setting schedules, setting wages, training employees, and/or setting terms and conditions of employment. Paliko Dep. 29:5-30:11; 34:14-21; 93:2-16; Petrosyants Dep. 41:21-42:13; 71:9-11; 71:23-72:11 (the chef is similarly responsible for training back-of-house staff about food/plates); 102:8-11; 106:16-18; Shahmuradyan Dep. 16:25-17:5; 25:22-27:4 (confirming that only Paliko has authority over employee operations; and that Paliko is not involved in interviewing, hiring, or firing); 28:20-29:8 (Paliko would know specific details of the Plaintiffs' employment, but Shahmuradyan and Petrosyants do not); 30:8-18 (Paliko decides how many employees work each shift); 32:2-15 (implied that only Paliko would know how much bartenders are paid per hour, and whether they make tips); 40:16-41:7 (The manager hired the person or people who run the social media accounts); 48:3-11 (Shahmuradyan describes Petrosyants' job as "meet[ing] with the vendors").**

41.    At deposition, Petrosyants testified his job of "run[ning] the restaurant" included "mak[ing] sure that the financials are in line with . . . being a profitable restaurant. (Petrosyants Dep. at 52:10-12).

**Response: Admit, but note that this does not implicate direct management of employees, or specific involvement in the process of payroll or tip disbursement. Paliko Dep. 31:3-7 (Paliko merely took over the tip pool system, which had been created before him); 31:23-32:6 (The**

tip system is created in Toast, and point values were determined before Paliko took over management); <u>Molina Dep. 73:9-75:5</u> (Molina says management was in charge of dividing the tips nightly, not Petrosyants); <u>88:7-14.</u> Petrosyants' role as director of operations includes nearly everything except employee management; Petrosyants maintained responsibility over general, non-employee business operations like, for example, overseeing vendors, general payments and earnings, and quality of food and service. <u>Petrosyants Dep. 20:11-21; 52:22-53:7.</u> Meanwhile, Paliko handles day-to-day employee operations, including hiring, firing, setting schedules, setting wages, training employees, and/or setting terms and conditions of employment. <u>Paliko Dep. 29:5-30:11; 34:14-21; 93:2-16;</u> <u>Petrosyants Dep. 41:21-42:13; 71:9-11; 71:23-72:11</u> (the chef is similarly responsible for training back-of-house staff about food/plates); <u>102:8-11; 106:16-18;</u> <u>Shahmuradyan Dep. 16:25-17:5; 25:22-27:4</u> (confirming that only Paliko has authority over employee operations; and that Paliko is not involved in interviewing, hiring, or firing); <u>28:20-29:8</u> (Paliko would know specific details of the Plaintiffs' employment, but Shahmuradyan and Petrosyants do not); <u>30:8-18</u> (Paliko decides how many employees work each shift); <u>32:2-15</u> (implied that only Paliko would know how much bartenders are paid per hour, and whether they make tips); <u>40:16-41:7</u> (The manager hired the person or people who run the social media accounts); <u>48:3-11</u> (Shahmuradyan describes Petrosyants' job as "meet[ing] with the vendors").

42.    Defendant Petrosyants is also responsible for ensuring that employees are paid at the restaurant and "paid properly." (Petrosyants Dep. at 21:11-18).

**Response: Admit, but note again that Petrosyants' roles are many, and are each limited to broad oversight. <u>Petrosyants Dep. 20:11-21:6.</u> Meanwhile, Paliko handles day-to-day employee operations, including hiring, firing, setting schedules, setting wages, training**

employees, and/or setting terms and conditions of employment. Paliko Dep. 29:5-30:11; 34:14-21; 93:2-16; Petrosyants Dep. 41:21-42:13; 71:9-11; 71:23-72:11 (the chef is similarly responsible for training back-of-house staff about food/plates); 102:8-11; 106:16-18; Shahmuradyan Dep. 16:25-17:5; 25:22-27:4 (confirming that only Paliko has authority over employee operations; and that Paliko is not involved in interviewing, hiring, or firing); 28:20-29:8 (Paliko would know specific details of the Plaintiffs' employment, but Shahmuradyan and Petrosyants do not); 30:8-18 (Paliko decides how many employees work each shift); 32:2-15 (implied that only Paliko would know how much bartenders are paid per hour, and whether they make tips); 40:16-41:7 (The manager hired the person or people who run the social media accounts); 48:3-11 (Shahmuradyan describes Petrosyants' job as "meet[ing] with the vendors").

43.    Defendant Petrosyants has the authority to hire and fire employees at the restaurant. (Petrosyants Dep. at 23:13-25).

Response: Admit, but note again that Petrosyants "[does not] get involved with the […] lower-level employees," including "service, front of the house and back of the house." Petrosyants Dep. 23:13-25. It is not necessary for Petrosyants to "get involved with" front-of-house employees, because Paliko handles all day-to-day employee operations, including hiring, firing, setting schedules, setting wages, and/or setting terms and conditions of employment. Paliko Dep. 29:5-30:11 (Paliko interviews, hires, and fires employees, and employees report to him; Paliko consults with no one else prior to making these decisions); 34:14-21; 93:2-16; Petrosyants Dep. 41:21-42:13; 71:9-11; 71:23-72:11 (the chef is similarly responsible for training back-of-house staff about food/plates); 102:8-11; 106:16-18; Shahmuradyan Dep. 16:25-17:5; 25:22-27:4 (confirming that only Paliko has authority over

employee operations; and that Paliko is not involved in interviewing, hiring, or firing); **28:20-29:8 (Paliko would know specific details of the Plaintiffs' employment, but Shahmuradyan and Petrosyants do not); 30:8-18 (Paliko decides how many employees work each shift); 32:2-15 (implied that only Paliko would know how much bartenders are paid per hour, and whether they make tips); 40:16-41:7 (The manager hired the person or people who run the social media accounts); 48:3-11 (Shahmuradyan describes Petrosyants' job as "meet[ing] with the vendors"). Notably, Petrosyants does not remember if he *ever* hired or fired anyone. Petrosyants Dep. 24:3-18.**

44.     Defendant Petrosyants has the authority to discipline employees at OLB. (Petrosyants Dep. at 101:24-102:7).

**Response: Admit**, but note that Petrosyants clarifies that he does not remember if he *ever* disciplined anyone. **Petrosyants Dep. 101:25-102:3. It is not necessary for Petrosyants to discipline employees at OLB because Paliko handles all day-to-day employee operations, including hiring, firing, setting schedules, setting wages, and/or setting terms and conditions of employment. Paliko Dep. 29:5-30:11 (Paliko interviews, hires, and fires employees, and employees report to him; Paliko consults with no one else prior to making these decisions); 34:14-21; 93:2-16; Petrosyants Dep. 41:21-42:13; 71:9-11; 71:23-72:11; 102:8-11; 106:16-18; Shahmuradyan Dep. 16:25-17:5; 25:22-27:4 (confirming that only Paliko has authority over employee operations; and that Paliko is not involved in interviewing, hiring, or firing); 28:20-29:8 (Paliko would know specific details of the Plaintiffs' employment, but Shahmuradyan and Petrosyants do not); 30:8-18 (Paliko decides how many employees work each shift); 32:2-15 (implied that only Paliko would know how much bartenders are paid per hour, and whether they make tips); 40:16-41:7 (The manager hired the person or people who run the**

social media accounts); <u>41:11-16</u> (Shahmuradyan confirms that managers never report to Robert, and does not know how often Robert visits OLB); <u>43:18-44:9</u> (Robert's conversations with Shahmuradyan about his work are extremely limited; for example, he informs her of the names of new vendors. They speak about OLB so rarely that they do not exchange emails or text messages about it); <u>48:3-11</u> (Shahmuradyan describes Petrosyants' job as "meet[ing] with the vendors").

45.    When Shahmuradyan is not present in the restaurant, Petrosyants is the "highest-ranking" employee. (Petrosyants Dep. at 66:3-8).

**Response: Admit, but objects to this statement as immaterial because Paliko handles all employment issues. <u>Paliko Dep.</u> <u>29:5-30:11</u> (Paliko interviews, hires, and fires employees, and employees report to him; Paliko consults with no one else prior to making these decisions); <u>34:14-21; 93:2-16;</u> <u>Petrosyants Dep.</u> <u>24:3-18</u> (Petrosyants does not remember if he *ever* hired or fired anyone); <u>41:21-42:13; 71:9-11; 71:23-72:11</u> (the chef is similarly responsible for training back-of-house staff about food/plates); <u>102:8-11; 106:16-18;</u> <u>Shahmuradyan Dep.</u> <u>16:25-17:5; 25:22-27:4</u> (confirming that only Paliko has authority over employee operations; and that Paliko is not involved in interviewing, hiring, or firing); <u>28:20-29:8</u> (Paliko would know specific details of the Plaintiffs' employment, but Shahmuradyan and Petrosyants do not); <u>30:8-18</u> (Paliko decides how many employees work each shift); <u>32:2-15</u> (implied that only Paliko would know how much bartenders are paid per hour, and whether they make tips); <u>40:16-41:7</u> (The manager hired the person or people who run the social media accounts); <u>48:3-11</u> (Shahmuradyan describes Petrosyants' job as "meet[ing] with the vendors").**

46.    Petrosyants meets with the restaurant's general manager a "[f]ew times per week" to discuss "[o]perations in the restaurant." (Petrosyants Dep. at 29:8-16.)

**Response: Admit, but note that these conversations are limited to high-level discussions of consistency in service and performance. Petrosyants Dep. 29:14-21. Defendants object to this statement as immaterial because Paliko handles all employment issues. Paliko Dep. 29:5-30:11 (Paliko interviews, hires, and fires employees, and employees report to him; Paliko consults with no one else prior to making these decisions); 34:14-21; 93:2-16; Petrosyants Dep. 24:3-18 (Petrosyants does not remember if he *ever* hired or fired anyone); 41:21-42:13; 71:9-11; 71:23-72:11 (the chef is similarly responsible for training back-of-house staff about food/plates); 102:8-11; 106:16-18; Shahmuradyan Dep. 16:25-17:5; 25:22-27:4 (confirming that only Paliko has authority over employee operations; and that Paliko is not involved in interviewing, hiring, or firing); 28:20-29:8 (Paliko would know specific details of the Plaintiffs' employment, but Shahmuradyan and Petrosyants do not); 30:8-18 (Paliko decides how many employees work each shift); 32:2-15 (implied that only Paliko would know how much bartenders are paid per hour, and whether they make tips); 48:3-11 (Shahmuradyan describes Petrosyants' job as "meet[ing] with the vendors").**

47.    During these meetings, Petrosyants and the general manager discuss service at the restaurant to ensure that it is running "[p]roperly and good," and that the front-of-house service staff are providing consistent service to customers. (Petrosyants Dep. at 30:8-31:6.)

**Response: Admit, but note that this is squarely within Petrosyants' role as director of operations, and does not necessitate personal involvement in the management of front-of-house employees. Defendants object to this statement as immaterial because Paliko handles all employment issues. Paliko Dep. 29:5-30:11 (Paliko interviews, hires, and fires employees,**

and employees report to him; Paliko consults with no one else prior to making these decisions); 34:14-21; 93:2-16; Petrosyants Dep. 24:3-18 (Petrosyants does not remember if he *ever* hired or fired anyone); 41:21-42:13; 71:9-11; 71:23-72:11 (the chef is similarly responsible for training back-of-house staff about food/plates); 102:8-11; 106:16-18; Shahmuradyan Dep. 16:25-17:5; 25:22-27:4 (confirming that only Paliko has authority over employee operations; and that Paliko is not involved in interviewing, hiring, or firing); 28:20-29:8 (Paliko would know specific details of the Plaintiffs' employment, but Shahmuradyan and Petrosyants do not); 30:8-18 (Paliko decides how many employees work each shift); 32:2-15 (implied that only Paliko would know how much bartenders are paid per hour, and whether they make tips); 40:16-41:7 (The manager hired the person or people who run the social media accounts); 48:3-11 (Shahmuradyan describes Petrosyants' job as "meet[ing] with the vendors").

48.    When he is in the restaurant, Petrosyants pays close attention to whether the front-of-house service staff are providing consistent performance for the customers. (Petrosyants Dep. at 30:23-31:10).

**Response: Admit, but note that this is squarely within Petrosyants' role as director of operations, and does not necessitate personal involvement in the management of front-of-house employees, such as hiring, firing, setting schedules, setting wages, and/or setting terms and conditions of employment, which Paliko handles. Defendants object to this statement as immaterial because Paliko handles all employment issues. Paliko Dep. 29:5-30:11 (Paliko interviews, hires, and fires employees, and employees report to him; Paliko consults with no one else prior to making these decisions); 34:14-21; 93:2-16; Petrosyants Dep. 24:3-18 (Petrosyants does not remember if he *ever* hired or fired anyone); 41:21-42:13; 71:9-11;**

**71:23-72:11** (the chef is similarly responsible for training back-of-house staff about food/plates); **102:8-11; 106:16-18; Shahmuradyan Dep. 16:25-17:5; 25:22-27:4** (confirming that only Paliko has authority over employee operations; and that Paliko is not involved in interviewing, hiring, or firing); **28:20-29:8** (Paliko would know specific details of the Plaintiffs' employment, but Shahmuradyan and Petrosyants do not); **30:8-18** (Paliko decides how many employees work each shift); **32:2-15** (implied that only Paliko would know how much bartenders are paid per hour, and whether they make tips); **48:3-11** (Shahmuradyan describes Petrosyants' job as "meet[ing] with the vendors").

49.    When Defendant Petrosyants sees a server not performing their duties properly, he would report that to OLB's manager, who would then "take action." (Petrosyants Dep. at 32:17-22).

**Response: Admit, but note that this properly demonstrates that Petrosyants' role does not involve managing employees himself. Defendants object to this statement as immaterial because Paliko handles all employment issues. Paliko Dep. 29:5-30:11 (Paliko interviews, hires, and fires employees, and employees report to him; Paliko consults with no one else prior to making these decisions); 34:14-21; 93:2-16; Petrosyants Dep. 24:3-18 (Petrosyants does not remember if he *ever* hired or fired anyone); 41:21-42:13; 71:9-11; 71:23-72:11 (the chef is similarly responsible for training back-of-house staff about food/plates); 102:8-11; 106:16-18; Shahmuradyan Dep. 16:25-17:5; 25:22-27:4 (confirming that only Paliko has authority over employee operations; and that Paliko is not involved in interviewing, hiring, or firing); 28:20-29:8 (Paliko would know specific details of the Plaintiffs' employment, but Shahmuradyan and Petrosyants do); 30:8-18 (Paliko decides how many employees work each shift); 32:2-15 (implied that only Paliko would know how much bartenders are paid per**

hour, and whether they make tips); <u>40:16-41:7</u> **(The manager hired the person or people who run the social media accounts); <u>48:3-11</u> (Shahmuradyan describes Petrosyants' job as "meet[ing] with the vendors").**

50.    OLB has pre-shift meeting for its front-of-the-house employees before the commencement of each shift at the restaurant. (Petrosyants Dep. at 66:23-67:2, 67:24-68:2).

**Response: Admit, but objects to this statement as immaterial because Paliko handles all employment issues. <u>Paliko Dep. 29:5-30:11</u> (Paliko interviews, hires, and fires employees, and employees report to him; Paliko consults with no one else prior to making these decisions); <u>34:14-21; 93:2-16;</u> <u>Petrosyants Dep. 24:3-18</u> (Petrosyants does not remember if he _ever_ hired or fired anyone); <u>41:21-42:13; 71:9-11; 71:23-72:11</u> (the chef is similarly responsible for training back-of-house staff about food/plates); <u>102:8-11; 106:16-18;</u> <u>Shahmuradyan Dep. 16:25-17:5; 25:22-27:4</u> (confirming that only Paliko has authority over employee operations; and that Paliko is not involved in interviewing, hiring, or firing); <u>28:20-29:8</u> (Paliko would know specific details of the Plaintiffs' employment, but Shahmuradyan and Petrosyants do not); <u>30:8-18</u> (Paliko decides how many employees work each shift); <u>32:2-15</u> (implied that only Paliko would know how much bartenders are paid per hour, and whether they make tips); <u>40:16-41:7</u> (The manager hired the person or people who run the social media accounts); <u>48:3-11</u> (Shahmuradyan describes Petrosyants' job as "meet[ing] with the vendors").**

51.    Defendant Petrosyants attends and provides directions at the pre-shift meetings. (Petrosyants Dep. at 67:14-19).

**Response: Admit, but note that Petrosyants involvement in these meetings is limited to broad reminders about consistency in performance. <u>Petrosyants Dep. 67:20-23.</u> Further,**

Petrosyants frequently travels and is not present for pre-shift meetings as a result. Petrosyants Dep. 66:23-67:5.

52.    For example, Defendant Petrosyants discussed employees maintaining consistency, performance, and "best value" at the restaurant. (Petrosyants Dep. at 67:20-23).

Response: Admit, but note that this is squarely within his role as director of operations, and does not imply the ability to hire, fire, set schedules, set wages, and/or set terms and conditions of employment for front-of-house employees.

53.    At these meetings, he also "mak[es] sure that everyone" gives their "consistently best performance." (Petrosyants Dep. at 68:6-14).

Response: Admit, but note that any further "instructions" are delivered by management, and that no such instructions involve hiring, firing, setting schedules, setting wages, and/or setting terms and conditions of employment. Petrosyants Dep. 68:6-15. Defendants object to this statement as immaterial because Paliko handles all employment issues. Paliko Dep. 29:5-30:11 (Paliko interviews, hires, and fires employees, and employees report to him; Paliko consults with no one else prior to making these decisions); 34:14-21; 93:2-16; Petrosyants Dep. 24:3-18 (Petrosyants does not remember if he *ever* hired or fired anyone); 41:21-42:13; 71:9-11; 71:23-72:11 (the chef is similarly responsible for training back-of-house staff about food/plates); 102:8-11; 106:16-18; Shahmuradyan Dep. 16:25-17:5; 25:22-27:4 (confirming that only Paliko has authority over employee operations; and that Paliko is not involved in interviewing, hiring, or firing); 28:20-29:8 (Paliko would know specific details of the Plaintiffs' employment, but Shahmuradyan and Petrosyants do not); 30:8-18 (Paliko decides how many employees work each shift); 32:2-15 (implied that only Paliko would know how much bartenders are paid per hour, and whether they make tips); 40:16-41:7 (The manager

hired the person or people who run the social media accounts); **48:3-11** (Shahmuradyan describes Petrosyants' job as "meet[ing] with the vendors").

54.    Defendant Petrosyants frequently discusses staffing issues with OLB's managers to ensure the restaurant schedules correct number of employees scheduled to work each shift. (Petrosyants Dep. at 80:12-81:9).

**Response: Admit, but note that that this is squarely within his role as director of operations, and does not imply any further involvement with front-of-house employees; for example, Petrosyants has no involvement in hiring, firing, setting schedules, setting wages, and/or setting terms and conditions of employment. Paliko Dep. 29:5-30:11 (Paliko interviews, hires, and fires employees, and employees report to him; Paliko consults with no one else prior to making these decisions); 34:14-21; 93:2-16; Petrosyants Dep. 24:3-18 (Petrosyants does not remember if he *ever* hired or fired anyone); 41:21-42:13; 71:9-11; 71:23-72:11 (the chef is similarly responsible for training back-of-house staff about food/plates); 102:8-11; 106:16-18; Shahmuradyan Dep. 16:25-17:5; 25:22-27:4 (confirming that only Paliko has authority over employee operations; and that Paliko is not involved in interviewing, hiring, or firing); 28:20-29:8 (Paliko would know specific details of the Plaintiffs' employment, but Shahmuradyan and Petrosyants do not); 30:8-18 (Paliko decides how many employees work each shift); 32:2-15 (implied that only Paliko would know how much bartenders are paid per hour, and whether they make tips); 40:16-41:7 (The manager hired the person or people who run the social media accounts); 48:3-11 (Shahmuradyan describes Petrosyants' job as "meet[ing] with the vendors").**

55.    Defendant Petrosyants has access to OLB's payroll records maintained by the restaurant's payroll company, Toast. (Petrosyants Dep. at 60:9-21).

**Response: Admit, but note that access to the payroll system and its records does not necessitate an employer relationship with the front-of-house employees within that system and its records. <u>Petrosyants Dep.</u> <u>84:20-25</u> (Q: "[A]ll the front-of-house employees are subject to the same payroll policies at the restaurant, correct?" A: "I really hope so." This implies lack of involvement in payroll); 85:13-20 (Q: "Isn't it true that all front-of-house employees are subject to the same payroll policies at Osteria La Baia?" A: "As I said, to my best – I might be mistaken, but to my best knowledge, I think they – they do." This response is speculative at best, and implies lack of involvement in payroll). Beyond mere access, Petrosyants has no involvement in payroll, and hardly understands the records which were produced, or whether any other potentially relevant records could exist); <u>49:8-25</u> (Paliko was ultimately responsible for producing records relevant to this lawsuit); <u>60:16-21; 132:12-14; 156:7-20; 159:21-160:4; 174:21-175:7.</u>**

56.    Defendants Shahmuradyan and Petrosyants hired the restaurant's accountant. (Shahmuradyan Dep. at 39:13-19; Petrosyants Dep. at 59:5-12).

**Response: Admit, but note that this does not necessitate participating in hiring decisions regarding front-of-house staff like the Plaintiffs.**

57.    Shahmuradyan, Petrosyants, and OLB's general manager are the only three people with access to OLB's hard-copy records, which are maintained in the restaurant's storage area. (Petrosyants Dep. at 51:6-52:4.)

**Response: Admit, but note that access to hard-copy records does not necessitate an employer relationship with the front-of-house employees whose records are accessible.**

58.    According to Paliko, Petrosyants participated in his hiring as general manager. (Buzzard Decl., Ex. 3 (Paliko Dep.) at 17:14-17.)

**Response: Deny. Paliko himself testified that this was more like a "conversation" than an interview, and that prior to this conversation, "nobody promoted me. The […] general manager who had been with us, he left, and I just took over his role." <u>Paliko Dep.</u> 16:19-24. Even if Paliko had been hired by Petrosyants, note that Paliko is not a front-of-house employee like the Plaintiffs. <u>Paliko Dep.</u> 17:14-17.**

59.    According to Paliko, Petrosyants gave him a pay increase. (Paliko Dep. at 18:7-9, 20:24-21:6).

**Response: Admit, but note again that Paliko is not a front-of-house employee like the Plaintiffs, and thus any such decision by Petrosyants does not implicate any decision-making authority by Petrosyants over the Plaintiffs. <u>Paliko Dep.</u> 17:14-17.**

**AS TO "Tip Credit at OLB"**

60.    OLB employs servers, bussers, runners and bartenders as "food-service" employees (a/k/a "front-of-the-house employees") who interact with and provide service to customers in the restaurant. (Petrosyants Dep. at 69:4-15).

**Response: Admit.**

61.    OLB's "food-service" employees are paid pursuant to a tip credit minimum wage rate. (Petrosyants Dep. at 42:19-22, 69:25-70:4; Paliko Dep. at 38:5-16).

**Response: Admit, but note that the tip credit differs per employee. <u>Fernandez Dep.</u> 64:3-66:14; Molina Dep. 70:21-71:3; 79:24-80:5; 106:22-107:5.**

62.    In discovery in this Action, Plaintiffs served document requests ("Document Requests") on all Defendants (the "Requests"). (Buzzard Decl., Ex. 4 (Document Requests)).

**Response: Admit.**

63.    As part of the Document Requests, Plaintiffs also sought the production of any and all written notices of pay rates that Defendants provided to any Class Member. (Buzzard Decl., Ex. 3 at Requests 1, 5, 10, 11).

**Response: Admit.**

64.    In response to these requests, Defendants did not produce any written wage notices that Defendants contend they provided to any Class Member. (Buzzard Decl., Ex. 5 (Defendants' Responses) at Responses 1, 5, 10, 11).

**Response: Admit. Defendants note that they have these forms in hard-copy form in storage, but that they could not locate them, because this system was set up before they began operating it. Petrosyants Dep. 43:16-44:10; 167:14-21; Paliko Dep. 31:3-7.**

65.    Prior to the initial conference in this lawsuit, the parties submitted a joint letter setting forth their agreement about certain pre-certification discovery that Defendants agreed to produce. (ECF Dkt No. 26).

**Response: Admit.**

66.    As part of that agreement, Defendants agreed to produce the following information:

All wage notices/pay rate acknowledgment forms that Defendants allegedly provided tipped employees who worked at OLB during the limitations period and, as a result of which, Defendants claims they complied with the new hire notice/tip credit notice requirements for the putative class. To the extent Defendants do not have any such records, they will inform Plaintiffs to this effect in writing by the September 26, 2025 production deadline.

(*Id*. at 2).

**Response: Admit.**

67.    On September 11, 2025, this Court approved the parties' agreement. (ECF Dkt No. 27).

**Response: Admit.**

68.     On September 26, 2025, Defendants' attorneys emailed Plaintiffs' counsel the

following about their agreement to all wage notices/pay rate acknowledgment forms:

> These documents have not yet been located. We will follow up regarding
> availability.

(Buzzard Decl., Ex. 6 (September 26 Email) at p. 2.)

**Response: Admit.**

69.     At his November 18, 2025 deposition, Petrosyants, who was testifying on behalf of

himself and the corporate defendant, stated that OLB was "still searching" for any notices of how

employees were to be paid but had not found any yet. (Petrosyants Dep. at 171:7-17.)

**Response: Admit.**

70.     When asked at deposition whether Plaintiff and any other food service employees had

been provided with "notice of the tip credit," Petrosyants responded, "I don't know" and "I

have no idea." (Petrosyants Dep. at 176:14-22).

**Response: Admit that Petrosyants testified as such, but note that notice was provided to
Plaintiffs via pay stubs on the Toast application, which they each had access to. ECF Dkt No.
76-1 (Exhibit A - copies of Plaintiff Katherine Fernandez's Pay Stubs), 76-2 (Exhibit B -
copies of Plaintiff Adrian Montor Teran's Pay Stubs), and 83-1 (copies of Plaintiff Javier
Molina's Pay Stubs). In addition, Defendants had posted billboards providing written notice
to Plaintiffs of same. Paliko Decl. ¶¶ 21-22 ("We also have a poster on a billboard in the
restaurant that discusses the tip credit. A copy of the billboard with the posters is annexed
hereto as Exhibit "A" (providing, *inter alia*, that "[e]mployers of tipped employees who meet
certain conditions may claim a partial wage credit based on tips received by their employees.
Employers must pay tipped employees a cash wage of at least $2.13 per hour if they claim a
tip credit against their minimum wage obligation. *If an employee's tips combined with the***

*employer's cash wage of at least $2.13 per hour do not equal the minimum hourly wage, the employer must make up the difference*") (emphasis added)." "Employees pass by this billboard frequently throughout the day and have an opportunity to review it because it is located in the hallway next to the management office"); Declaration of Janos Paliko in Support of Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment ("Paliko Decl. Opp.") ¶¶ 4-6 ("The poster has remained on that same billboard, in that same hallway, ever since [I started working at OLB as a floor manager in February 2022]") Moreover, Adrian Montor Teran admitted in his deposition to filling out his notice and acknowledgment of pay rate and pay day form from the New York State Department of Labor (when viewing Defendants' Exhibit A, a blank version of same). Teran Dep. 95:2-12; Paliko Dep. 38:24-39:25 ("All the time when I do the hiring, I – I give them the – the notice of the pay rate and everything. I go over all the requirements to be sure we are in accordance with the federal law and state." Q: "Do you give them something in writing?" A: "Yes." Q: "And do they sign it?" A: "Yes"); Willsey Decl. (73) ¶¶ 10-19.

71.    Defendants did not produce any wage notices/pay rate acknowledgment forms in discovery. (Buzzard Decl. ¶ 8).

**Response: Admit, but note that Plaintiffs' pay rates are set forth in their pay stubs. Plaintiffs received wage notice from Defendants, in a variety of forms. For example, they each received pay stubs, which were visible in the Toast application, which they each had access to. ECF Dkt No. 76-1 (Exhibit A - copies of Plaintiff Katherine Fernandez's Pay Stubs), 76-2 (Exhibit B - copies of Plaintiff Adrian Montor Teran's Pay Stubs), and 83-1 (copies of Plaintiff Javier Molina's Pay Stubs). In addition, Defendants had posted billboards providing written notice to Plaintiffs of same. Paliko Decl. ¶¶ 21-22 ("We also have a poster on a billboard in the**

restaurant that discusses the tip credit. A copy of the billboard with the posters is annexed hereto as Exhibit "A" (providing, *inter alia*, that "[e]mployers of tipped employees who meet certain conditions may claim a partial wage credit based on tips received by their employees. Employers must pay tipped employees a cash wage of at least $2.13 per hour if they claim a tip credit against their minimum wage obligation. *If an employee's tips combined with the employer's cash wage of at least $2.13 per hour do not equal the minimum hourly wage, the employer must make up the difference*") (emphasis added)." "Employees pass by this billboard frequently throughout the day and have an opportunity to review it because it is located in the hallway next to the management office"); Declaration of Janos Paliko in Support of Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment ("Paliko Decl. Opp.") ¶¶ 4-6 ("The poster has remained on that same billboard, in that same hallway, ever since [I started working at OLB as a floor manager in February 2022]") Moreover, Adrian Montor Teran admitted in his deposition to filling out his notice and acknowledgment of pay rate and pay day form from the New York State Department of Labor (when viewing Defendants' Exhibit A, a blank version of same). Teran Dep. 95:2-12; Paliko Dep. 38:24-39:25 ("All the time when I do the hiring, I – I give them the – the notice of the pay rate and everything. I go over all the requirements to be sure we are in accordance with the federal law and state." Q: "Do you give them something in writing?" A: "Yes." Q: "And do they sign it?" A: "Yes"); Willsey Decl. (73) ¶ 11.

72.    Defendants did not provide a written wage notice to any Class Member. (*See supra* ¶¶ 59-67; Buzzard Decl. ¶ 8).

**Response: Deny. Plaintiffs received wage notice from Defendants, in a variety of forms. For example, they each received pay stubs, which were visible in the Toast application, which**

they each had access to. ECF Dkt No. 76-1 (Exhibit A - copies of Plaintiff Katherine Fernandez's Pay Stubs), 76-2 (Exhibit B - copies of Plaintiff Adrian Montor Teran's Pay Stubs), and 83-1 (copies of Plaintiff Javier Molina's Pay Stubs). In addition, Defendants had posted billboards providing written notice to Plaintiffs of same. Paliko Decl. ¶¶ 21-22 ("We also have a poster on a billboard in the restaurant that discusses the tip credit. A copy of the billboard with the posters is annexed hereto as Exhibit "A" (providing, *inter alia*, that "[e]mployers of tipped employees who meet certain conditions may claim a partial wage credit based on tips received by their employees. Employers must pay tipped employees a cash wage of at least $2.13 per hour if they claim a tip credit against their minimum wage obligation. *If an employee's tips combined with the employer's cash wage of at least $2.13 per hour do not equal the minimum hourly wage, the employer must make up the difference*") (emphasis added)." "Employees pass by this billboard frequently throughout the day and have an opportunity to review it because it is located in the hallway next to the management office"); Declaration of Janos Paliko in Support of Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment ("Paliko Decl. Opp.") ¶¶ 4-6 ("The poster has remained on that same billboard, in that same hallway, ever since [I started working at OLB as a floor manager in February 2022]") Moreover, Adrian Montor Teran admitted in his deposition to filling out his notice and acknowledgment of pay rate and pay day form from the New York State Department of Labor (when viewing Defendants' Exhibit A, a blank version of same). Teran Dep. 95:2-12; Paliko Dep. 38:24-39:25 ("All the time when I do the hiring, I – I give them the – the notice of the pay rate and everything. I go over all the requirements to be sure we are in accordance with the federal law and state." Q: "Do you

give them something in writing?" A: "Yes." Q: "And do they sign it?" A: "Yes"); **Willsey Decl. (73) ¶¶ 10-19.**

73.    No Class Member received a written wage notice that informed them of, among other things, their hourly pay rate, overtime hourly pay rate, and the amount of tip credit that was being taken from their wages. (*See supra* ¶ 59-67; Buzzard Decl. ¶ 8).

**Response: Deny. Plaintiffs received wage notice from Defendants, in a variety of forms. For example, they each received pay stubs, which were visible in the Toast application, which they each had access to. Pay stubs provided to Plaintiffs via pay stubs on the Toast application served as written wage notice informing them of these items. ECF Dkt No. 76-1 (Exhibit A - copies of Plaintiff Katherine Fernandez's Pay Stubs), 76-2 (Exhibit B - copies of Plaintiff Adrian Montor Teran's Pay Stubs), and 83-1 (copies of Plaintiff Javier Molina's Pay Stubs). In addition, Defendants had posted billboards providing written notice to Plaintiffs of same. Paliko Decl. ¶¶ 21-22 ("We also have a poster on a billboard in the restaurant that discusses the tip credit. A copy of the billboard with the posters is annexed hereto as Exhibit "A" (providing, *inter alia*, that "[e]mployers of tipped employees who meet certain conditions may claim a partial wage credit based on tips received by their employees. Employers must pay tipped employees a cash wage of at least $2.13 per hour if they claim a tip credit against their minimum wage obligation. *If an employee's tips combined with the employer's cash wage of at least $2.13 per hour do not equal the minimum hourly wage, the employer must make up the difference*") (emphasis added)." "Employees pass by this billboard frequently throughout the day and have an opportunity to review it because it is located in the hallway next to the management office"); Declaration of Janos Paliko in Support of Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment**

("Paliko Decl. Opp.") ¶¶ 4-6 ("The poster has remained on that same billboard, in that same hallway, ever since [I started working at OLB as a floor manager in February 2022]") Moreover, Adrian Montor Teran admitted in his deposition to filling out his notice and acknowledgment of pay rate and pay day form from the New York State Department of Labor (when viewing Defendants' Exhibit A, a blank version of same). Teran Dep. 95:2-12; Paliko Dep. 38:24-39:25 ("All the time when I do the hiring, I – I give them the – the notice of the pay rate and everything. I go over all the requirements to be sure we are in accordance with the federal law and state." Q: "Do you give them something in writing?" A: "Yes." Q: "And do they sign it?" A: "Yes"); Willsey Decl. (73) ¶¶ 10-19.

**AS TO "Amounts of Tip Credits Taken at OLB"**

74.    On September 10, 2025, the parties informed the Court that they had reached an agreement with respect to a dispute about the scope of pre-certification discovery whereby Defendants had agreed to produce significant sample pre-certification discovery by September 26, 2025. (ECF Dkt. No. 26)

**Response: Admit.**

75.    As part of that agreement, Defendants produced spreadsheet summaries of annual payroll that was run at OLB. *See* Buzzard Decl. ¶ 8.

**Response: Admit.**

76.    On October 3, 2025, Defendants' counsel represented that these reports show "the total hours that each putative class member worked each year [and that the] reports show a list of each employee by name, job title, and department, and reflect their year-to date hours broken down into categories such as regular, overtime, and/or spread of hours." Buzzard Decl., Ex. 7 (October 3 Email).

**Response: Admit.**

77.    Defendants also produced a declaration from Sephanie [*sic*] Willsey, OLB's controller, in which she describes the information contained in the spreadsheets. Buzzard Decl., Ex. 8 (Willsey Decl.)

**Response: Admit. Note that the accuracy of the spreadsheets is dependent upon the accuracy of the Toast system, which depends on the accuracy of user-inputted information from OLB's point-of-sale system. Willsey Decl. (69-8) ¶¶ 1, 5-18; Willsey Decl. (73) ¶¶ 1, 4-6, 8-14, 19-24; Willsey Decl. (85) ¶¶ 4-7; Fernandez Dep. 42:22-43:8.**

78.    Specifically, the controller testified that:

The spreadsheets that Bulldozer produced came from a report function in Toast, the point-of-sale system used by the Corporate Defendant, and contain annual reports concerning the following information organized by lettered column in the spreadsheet, as follows: (A) Company; (B) Location; (C) Department; (D) Job; (E) Last Name; (F) First Name; (G) Employee Number; (H) Salary Type; (I) Earning; (J) Hours; (K) Amount; (L) Hourly Amount; and (M) Hourly Rate.

Willsey Decl. ¶ 5.

**Response: Admit. Note that the accuracy of the spreadsheets is dependent upon the accuracy of the Toast system, which depends on the accuracy of user-inputted information from OLB's point-of-sale system. Willsey Decl. (69-8) ¶¶ 1, 5-18; Willsey Decl. (73) ¶¶ 1, 4-6, 8-14, 19-24; Willsey Decl. (85) ¶¶ 4-7; Fernandez Dep. 42:22-43:8.**

79.    The spreadsheets were produced for the following years: (i) 2021; (ii) 2022; (iii) 2023; (iv) 2024; and (v) 2025 bearing the following file names corresponding to each year: 2021.csv, 2022.csv, 2023.csv, 2024.csv, 2025.csv. (Willsey Decl. ¶ 6; *see also* Buzzard Decl., Exs. 9 (2021.csv), 10 (2022.csv), 11 (2023.csv), 12 (2024.csv), 13 (2025.csv)).

**Response: Admit.**

80. The information in the spreadsheet for 2025 summarizes payroll records at OLB from January 1, 2025 through on or about August 26, 2025. (Willsey Decl. ¶ 7).

**Response: Admit. Note that the accuracy of the spreadsheets is dependent upon the accuracy of the Toast system, which depends on the accuracy of user-inputted information from OLB's point-of-sale system. Willsey Decl. (69-8) ¶¶ 1, 5-18; Willsey Decl. (73) ¶¶ 1, 4-6, 8-14, 19-24; Willsey Decl. (85) ¶¶ 4-7; Fernandez Dep. 42:22-43:8.**

81. All of the information contained in each of these spreadsheets came from user-inputted information in the Toast system and is merely a summary of information contained in the Toast system. (Willsey Decl. ¶ 8).

**Response: Admit, but disputes the characterization of this information as "merely" a summary of information contained in the Toast system. Note that the spreadsheets, and the information contained in the Toast system, are accurate reflections of user-inputted information from OLB's point-of-sale system. Willsey Decl. (69-8) ¶¶ 1, 5-18; Willsey Decl. (73) ¶¶ 1, 4-6, 8-14, 19-24; Willsey Decl. (85) ¶¶ 4-7; Fernandez Dep. 42:22-43:8.**

82. Where a row on a spreadsheet states "REGULAR" in column I, the number in column J corresponds to the total number of regular hours paid to the employee in the time period covered by the spreadsheet and the number in column L lists the total dollar amount of wages and/or tips paid to the employee in that time period. (Willsey Decl. ¶ 13).

**Response: Admit, but note that the accuracy of the spreadsheets is dependent upon the accuracy of the Toast system, which depends on the accuracy of user-inputted information from OLB's point-of-sale system. Willsey Decl. (69-8) ¶¶ 1, 5-18; Willsey Decl. (73) ¶¶ 1, 4-6, 8-14, 19-24; Willsey Decl. (85) ¶¶ 4-7; Fernandez Dep. 42:22-43:8.**

83.    Similarly, where a row on a spreadsheet states "OVERTIME" in column I, the number in column J corresponds to the total number of overtime hours paid to the employee in the time period covered by the spreadsheet and the number in column L lists the total dollar amount of overtime wages paid to the employee in that time period. (Willsey Decl. ¶ 15).

**Response: Admit, but note that the accuracy of the spreadsheets is dependent upon the accuracy of the Toast system, which depends on the accuracy of user-inputted information from OLB's point-of-sale system. Willsey Decl. (69-8) ¶¶ 1, 5-18; Willsey Decl. (73) ¶¶ 1, 4-6, 8-14, 19-24; Willsey Decl. (85) ¶¶ 4-7; Fernandez Dep. 42:22-43:8.**

84.    In discovery in this litigation, Plaintiffs created additional spreadsheets summaries which: (1) removed all employees who were not "front-of-house" food service workers by deleting all employees who did not have the notation "FOH" in column C (Department); and (2) added columns O, P, and Q to the spreadsheets that Defendants produced. (Buzzard Decl. ¶ 17 & Exs. 14-18).

**Response: Admit, and note that the accuracy of the spreadsheets is dependent upon the accuracy of the Toast system, which depends on the accuracy of user-inputted information from OLB's point-of-sale system. Willsey Decl. (69-8) ¶¶ 1, 5-18; Willsey Decl. (73) ¶¶ 1, 4-6, 8-14, 19-24; Willsey Decl. (85) ¶¶ 4-7; Fernandez Dep. 42:22-43:8. Defendants also object to this fact as immaterial, given that the mere organization of data, and omission of data that is totally irrelevant (given that all Plaintiffs were front-of-house workers), has no bearing on Defendants' credibility or on any claims at issue. Fernandez Dep. 39:9-15; Teran Dep. 35:10-11; Molina Dep. 11:2-5; 40:7-10; 76:14-16; 103:23-25.**

85.    In the additional columns, Plaintiffs provided tabulations of (a) the total amounts that OLB food service employees would have been paid had Defendants paid them at the full New York State minimum wage rates and overtimes wage rates for each hour worked, and (b) the difference between the total amounts OLB paid the food service employees and the total amount those employees would have earned had they been paid pursuant to the full New York State minimum wage rates and overtimes wage rates. (Buzzard Decl. ¶ 18 & Exs. 14-18).

**Response: Admit, but note that the accuracy of the spreadsheets is dependent upon the accuracy of the Toast system, which depends on the accuracy of user-inputted information from OLB's point-of-sale system. Willsey Decl. (69-8) ¶¶ 1, 5-18; Willsey Decl. (73) ¶¶ 1, 4-6, 8-14, 19-24; Willsey Decl. (85) ¶¶ 4-7; Fernandez Dep. 42:22-43:8.**

86.    Specifically, in the spreadsheets created by Plaintiffs, column O ("Rate Owed") lists the full New York State hourly minimum wage rate and hourly overtime wage rate applicable during the time period covered by each spreadsheet. For rows where there is the notation "REGULAR" in column I, the full New York regular minimum wage rate applicable for the period is used. For those rows where the notation "OVERTIME" appears in column I, the full New York overtime wage rate (1.5 times the applicable minimum wage rate) is used. (Buzzard Decl. ¶ 19 & Exs. 14-18 at Column O).

**Response: Admit, but note that the accuracy of the spreadsheets is dependent upon the accuracy of the Toast system, which depends on the accuracy of user-inputted information from OLB's point-of-sale system. Willsey Decl. (69-8) ¶¶ 1, 5-18; Willsey Decl. (73) ¶¶ 1, 4-6, 8-14, 19-24; Willsey Decl. (85) ¶¶ 4-7; Fernandez Dep. 42:22-43:8.**

87.    Column P in the spreadsheets created by Plaintiffs lists the total amount of wages the food service employees would have earned during the period covered by the spreadsheet had they been paid without any tip credit being applied to their wages (i.e., they were paid at the full New York minimum wage/overtime rate during the applicable period). For each row, the number in column P is derived by multiplying the "Rate Owed" in column O by the number of hours that appear in column J. (Buzzard Decl. ¶ 20 & Exs. 14-18 at Column P).

**Response: Admit, but note that the accuracy of the spreadsheets is dependent upon the accuracy of the Toast system, which depends on the accuracy of user-inputted information from OLB's point-of-sale system. Willsey Decl. (69-8) ¶¶ 1, 5-18; Willsey Decl. (73) ¶¶ 1, 4-6, 8-14, 19-24; Willsey Decl. (85) ¶¶ 4-7; Fernandez Dep. 42:22-43:8.**

88.    Column Q in the spreadsheets created by Plaintiffs provides a calculation of the difference between the amount each employee was actually paid during the period covered by the spreadsheet and the amount they would have earned during that period had they been paid pursuant to the full New York State minimum wage rates and overtime wage rates. For each row, the number in column Q is derived by subtracting the hourly amount paid that appears in column L from the amount owed in column P. (Buzzard Decl. ¶ 21 & Exs. 14-18 at Column Q).

**Response: Admit, but note that the accuracy of the spreadsheets is dependent upon the accuracy of the Toast system, which depends on the accuracy of user-inputted information from OLB's point-of-sale system. Willsey Decl. (69-8) ¶¶ 1, 5-18; Willsey Decl. (73) ¶¶ 1, 4-6, 8-14, 19-24; Willsey Decl. (85) ¶¶ 4-7; Fernandez Dep. 42:22-43:8.**

89.     At the bottom of each of the spreadsheets created by Plaintiffs, Plaintiffs totaled the amounts in each row of column Q to reach the "Total Minimum Wage Owed." This constitutes the total amount Defendants took in tip credits from all front-of-house employees' wages for that year. Buzzard Decl. ¶ 22 & Exs. 14-18.

**Response: Admit, but note that the accuracy of the spreadsheets is dependent upon the accuracy of the Toast system, which depends on the accuracy of user-inputted information from OLB's point-of-sale system. Willsey Decl. (69-8) ¶¶ 1, 5-18; Willsey Decl. (73) ¶¶ 1, 4-6, 8-14, 19-24; Willsey Decl. (85) ¶¶ 4-7; Fernandez Dep. 42:22-43:8.**

90.     Based on these calculations, Defendants took $15,562.65 in tip credits from employees' wages in 2021. *See* Buzzard Decl., Ex. 14 at "Total Minimum Wage Owed").

**Response: Admit, to the extent the total referenced in the fact is an accurate calculation. Note that the accuracy of the spreadsheets is dependent upon the accuracy of the Toast system, which depends on the accuracy of user-inputted information from OLB's point-of-sale system. Willsey Decl. (69-8) ¶¶ 1, 5-18; Willsey Decl. (73) ¶¶ 1, 4-6, 8-14, 19-24; Willsey Decl. (85) ¶¶ 4-7; Fernandez Dep. 42:22-43:8. Defendants also object to this fact as immaterial and premature, given that liability has not yet been established. Plaintiffs impliedly mischaracterize Defendants as having taken tip credits they were not entitled to; Defendants were, in fact, entitled to those tip credits.**

91.     Based on these calculations, Defendants took $135,261.03 in tip credits from employees' wages in 2022. *See* Buzzard Decl., Ex. 15 at "Total Minimum Wage Owed").

**Response: Admit, to the extent the total referenced in the fact is an accurate calculation. Note that the accuracy of the spreadsheets is dependent upon the accuracy of the Toast system, which depends on the accuracy of user-inputted information from OLB's point-of-sale**

system. **Willsey Decl. (69-8) ¶¶ 1, 5-18; Willsey Decl. (73) ¶¶ 1, 4-6, 8-14, 19-24; Willsey Decl. (85) ¶¶ 4-7; Fernandez Dep. 42:22-43:8. Defendants also object to this fact as immaterial and premature, given that liability has not yet been established. Plaintiffs impliedly mischaracterize Defendants as having taken tip credits they were not entitled to; Defendants were, in fact, entitled to those tip credits.**

92.    Based on these calculations, Defendants took $125,377.86 in tip credits from employees' wages in 2023. *See* Buzzard Decl., Ex. 16 at "Total Minimum Wage Owed").

**Response: Admit, to the extent the total referenced in the fact is an accurate calculation. Note that the accuracy of the spreadsheets is dependent upon the accuracy of the Toast system, which depends on the accuracy of user-inputted information from OLB's point-of-sale system. Willsey Decl. (69-8) ¶¶ 1, 5-18; Willsey Decl. (73) ¶¶ 1, 4-6, 8-14, 19-24; Willsey Decl. (85) ¶¶ 4-7; Fernandez Dep. 42:22-43:8. Defendants also object to this fact as immaterial and premature, given that liability has not yet been established. Plaintiffs impliedly mischaracterize Defendants as having taken tip credits they were not entitled to; Defendants were, in fact, entitled to those tip credits.**

93.    Based on these calculations, Defendants took $162,054.40 in tip credits from employees' wages in 2024. *See* Buzzard Decl., Ex. 17 at "Total Minimum Wage Owed").

**Response: Admit, to the extent the total referenced in the fact is an accurate calculation. Note that the accuracy of the spreadsheets is dependent upon the accuracy of the Toast system, which depends on the accuracy of user-inputted information from OLB's point-of-sale system. Willsey Decl. (69-8) ¶¶ 1, 5-18; Willsey Decl. (73) ¶¶ 1, 4-6, 8-14, 19-24; Willsey Decl. (85) ¶¶ 4-7; Fernandez Dep. 42:22-43:8. Defendants also object to this fact as immaterial and premature, given that liability has not yet been established. Plaintiffs impliedly**

mischaracterize Defendants as having taken tip credits they were not entitled to; Defendants were, in fact, entitled to those tip credits.

94.    Based on these calculations, Defendants took $231,757.51 in tip credits from employees' wages between January 1, 2025 and on or about August 26, 2025. *See* Buzzard Decl., Ex. 18 at "Total Minimum Wage Owed"); *see also* Willsey Decl. ¶ 7.

**Response: Admit, to the extent the total referenced in the fact is an accurate calculation. Note that the accuracy of the spreadsheets is dependent upon the accuracy of the Toast system, which depends on the accuracy of user-inputted information from OLB's point-of-sale system. Willsey Decl. (69-8) ¶¶ 1, 5-18; Willsey Decl. (73) ¶¶ 1, 4-6, 8-14, 19-24; Willsey Decl. (85) ¶¶ 4-7; Fernandez Dep. 42:22-43:8. Defendants also object to this fact as immaterial and premature, given that liability has not yet been established. Plaintiffs impliedly mischaracterize Defendants as having taken tip credits they were not entitled to; Defendants were, in fact, entitled to those tip credits.**

95.    Adding together the total amount of tip credits Defendants took for each period listed above, Defendants took a total of $670,013.45 in tip credits between 2021 and on or about August 26, 2025. *See supra* at ¶¶ 86-90; Buzzard Decl. ¶ 23.

**Response: Admit, to the extent the total referenced in the fact is an accurate calculation. Note that the accuracy of the spreadsheets is dependent upon the accuracy of the Toast system, which depends on the accuracy of user-inputted information from OLB's point-of-sale system. Willsey Decl. (69-8) ¶¶ 1, 5-18; Willsey Decl. (73) ¶¶ 1, 4-6, 8-14, 19-24; Willsey Decl. (85) ¶¶ 4-7; Fernandez Dep. 42:22-43:8. Defendants also object to this fact as immaterial and premature, given that liability has not yet been established. Plaintiffs impliedly**

**mischaracterize Defendants as having taken tip credits they were not entitled to; Defendants were, in fact, entitled to those tip credits.**

**AS TO "Liquidated Damages"**

96.    Defendants took no affirmative steps to determine the requirements of the wage and hour laws. (Petrosyants Dep. at 48:7-12; Shahmuradyan Dep. at 33:12-35:7).

**Response: Deny with respect to Petrosyants. Plaintiffs misstate the record they cite; Petrosyants testified only that he could not recall whether they sought legal advice. Petrosyants Dep. 48:7-12. Moreover, Shahmuradyan merely stated that this is not her role. Shahmuradyan Dep. 33:12-35:7. Given that neither Petrosyants nor Shahmuradyan employed Plaintiffs, Shahmuradyan stated accurately that this was not her role. Id. Nonetheless, OLB has ensured they remain compliant with the law by hiring lawyers, and through its managers (Paliko), who are tasked with ensuring employees are paid appropriately. Shahmuradyan Dep. 38:22-39:4; 37:21-38:16 (OLB used to work with a management company, who helped them open and implement their systems); 39:13-19 (OLB works with an accountant or accounting company); 53:6-14 (OLB relies on the company Toast for its payroll); Petrosyants Dep. 21:11-18 (Petrosyants broadly oversees that employees are properly paid); 41:25-42:4 (Paliko is responsible for making sure service staff are paid the appropriate wages); 49:8-25 (Paliko was ultimately responsible for producing records relevant to this lawsuit); 161:21-162:16; 167:14-21 (an HR/management company implemented systems at OLB prior to Petrosyants' and Shahmuradyan's involvement); Paliko Dep. 31:3-7 (Paliko merely took over the tip pool system, which had been created before him); 31:23-32:6 (The tip system is created in Toast, and point values were determined before Paliko took over management); 38:24-39:25 ("All the time when I do the hiring, I – I**

**give them the – the notice of the pay rate and everything. I go over all the requirements to be sure we are in accordance with the federal law and state." Q: "Do you give them something in writing?" A: "Yes." Q: "And do they sign it?" A: "Yes"); Willsey Decl. (69-8) ¶¶ 1, 5-6 (Willsey is the Controller at OLB; "The spreadsheets [dating back to 2021] that Bulldozer produced came from a report function in Toast, the point-of-sale system used by the Corporate Defendant, and contain annual reports concerning the following information organized by lettered column in the spreadsheet, as follows: (A) Company; (B) Location; (C) Department; (D) Job; (E) Last Name; (F) First Name; (G) Employee Number; (H) Salary Type; (I) Earning; (J) Hours; (K) Amount; (L) Hourly Amount; and (M) Hourly Rate"); Willsey Decl. (73) ¶¶ 1, 4-6, 8-9, 11, 13, 19-24 ("In the event any employee s tipped minimum wage together with that employees tips earned in a week amounts to less than the regular minimum wage for that week, the Toast system automatically adds the differential owed to make up the difference"); Willsey Decl. (85) ¶¶ 4-7.**

97.    Shahmuradyan has not "personally done anything to ensure that the compensation and tipping practices at Osteria La Baia are in accordance with federal or state law." (Shahmuradyan Dep. at 33:12-17, 34:9-19).

**Response: Admit, but note that Shahmuradyan merely stated that this is not her role. Shahmuradyan Dep. 33:12-35:7. Given that Shahmuradyan did not employ Plaintiffs, this fact is immaterial. Id. Nonetheless, OLB has ensured they remain compliant with the law by hiring lawyers, and through its managers (Paliko), who are tasked with ensuring employees are paid appropriately. Shahmuradyan Dep. 38:22-39:4; 37:21-38:16 (OLB used to work with a management company, who helped them open and implement their systems); 39:13-19 (OLB works with an accountant or accounting company); 53:6-14 (OLB relies on the**

**company Toast for its payroll); <u>Petrosyants Dep.</u> <u>21:11-18</u> (Petrosyants broadly oversees that employees are properly paid); <u>41:25-42:4</u> (Paliko is responsible for making sure service staff are paid the appropriate wages); <u>49:8-25</u> (Paliko was ultimately responsible for producing records relevant to this lawsuit); <u>161:21-162:16; 167:14-21</u> (an HR/management company implemented systems at OLB prior to Petrosyants' and Shahmuradyan's involvement); <u>Paliko Dep.</u> <u>31:3-7</u> (Paliko merely took over the tip pool system, which had been created before him); <u>31:23-32:6</u> (The tip system is created in Toast, and point values were determined before Paliko took over management); <u>38:24-39:25</u> ("All the time when I do the hiring, I – I give them the – the notice of the pay rate and everything. I go over all the requirements to be sure we are in accordance with the federal law and state." Q: "Do you give them something in writing?" A: "Yes." Q: "And do they sign it?" A: "Yes"); <u>Willsey Decl. (69-8) ¶¶ 1, 5-6</u> (Willsey is the Controller at OLB; "The spreadsheets [dating back to 2021] that Bulldozer produced came from a report function in Toast, the point-of-sale system used by the Corporate Defendant, and contain annual reports concerning the following information organized by lettered column in the spreadsheet, as follows: (A) Company; (B) Location; (C) Department; (D) Job; (E) Last Name; (F) First Name; (G) Employee Number; (H) Salary Type; (I) Earning; (J) Hours; (K) Amount; (L) Hourly Amount; and (M) Hourly Rate"); <u>Willsey Decl. (73) ¶¶ 1, 4-6, 8-9, 11, 13, 19-24</u> ("In the event any employee s tipped minimum wage together with that employees tips earned in a week amounts to less than the regular minimum wage for that week, the Toast system automatically adds the differential owed to make up the difference"); <u>Willsey Decl. (85) ¶¶ 4-7.</u>**

98.    Shahmuradyan does not know whether anyone at OLB has ever done anything to ensure that the restaurant's compensation and/or tipping practices follow federal or state law. (Shahmuradyan Dep. at 34:21-35:7).

**Response: Admit, but note that Shahmuradyan merely stated that this is not her role. Shahmuradyan Dep. 33:12-35:7. Given that Shahmuradyan did not employ Plaintiffs, this fact is immaterial. Id. Moreover, Shahmuradyan's lack of knowledge is not dispositive of OLB's compliance. Shahmuradyan Dep. 33:12-35:7. Nonetheless, OLB has ensured they remain compliant with the law by hiring lawyers, and through its managers (Paliko), who are tasked with ensuring employees are paid appropriately. Shahmuradyan Dep. 38:22-39:4; 37:21-38:16 (OLB used to work with a management company, who helped them open and implement their systems); 39:13-19 (OLB works with an accountant or accounting company); 53:6-14 (OLB relies on the company Toast for its payroll); Petrosyants Dep. 21:11-18 (Petrosyants broadly oversees that employees are properly paid); 41:25-42:4 (Paliko is responsible for making sure service staff are paid the appropriate wages); 49:8-25 (Paliko was ultimately responsible for producing records relevant to this lawsuit); 161:21-162:16; 167:14-21 (an HR/management company implemented systems at OLB prior to Petrosyants' and Shahmuradyan's involvement); Paliko Dep. 31:3-7 (Paliko merely took over the tip pool system, which had been created before him); 31:23-32:6 (The tip system is created in Toast, and point values were determined before Paliko took over management); 38:24-39:25 ("All the time when I do the hiring, I – I give them the – the notice of the pay rate and everything. I go over all the requirements to be sure we are in accordance with the federal law and state." Q: "Do you give them something in writing?" A: "Yes." Q: "And do they sign it?" A: "Yes"); Willsey Decl. (69-8) ¶¶ 1, 5-6 (Willsey is the Controller at OLB;**

"The spreadsheets [dating back to 2021] that Bulldozer produced came from a report function in Toast, the point-of-sale system used by the Corporate Defendant, and contain annual reports concerning the following information organized by lettered column in the spreadsheet, as follows: (A) Company; (B) Location; (C) Department; (D) Job; (E) Last Name; (F) First Name; (G) Employee Number; (H) Salary Type; (I) Earning; (J) Hours; (K) Amount; (L) Hourly Amount; and (M) Hourly Rate"); Willsey Decl. (73) ¶¶ 1, 4-6, 8-9, 11, 13, 19-24 ("In the event any employee s tipped minimum wage together with that employees tips earned in a week amounts to less than the regular minimum wage for that week, the Toast system automatically adds the differential owed to make up the difference"); Willsey Decl. (85) ¶¶ 4-7.

99.    At deposition, Petrosyants could not identify any steps OLB had taken to ensure that the way it pays its employees follows the law. (Petrosyants Dep. at 46:16-22).

Response: Admit, but note that Petrosyants' lack of knowledge is not dispositive of OLB's compliance.  Nonetheless, OLB has ensured they remain compliant with the law by hiring lawyers, and through its managers (Paliko), who are tasked with ensuring employees are paid appropriately. Shahmuradyan Dep. 38:22-39:4; 37:21-38:16 (OLB used to work with a management company, who helped them open and implement their systems); 39:13-19 (OLB works with an accountant or accounting company); 53:6-14 (OLB relies on the company Toast for its payroll); Petrosyants Dep. 21:11-18 (Petrosyants broadly oversees that employees are properly paid); 41:25-42:4 (Paliko is responsible for making sure service staff are paid the appropriate wages); 49:8-25 (Paliko was ultimately responsible for producing records relevant to this lawsuit); 161:21-162:16; 167:14-21 (an HR/management company implemented systems at OLB prior to Petrosyants' and Shahmuradyan's involvement);

Paliko Dep. 31:3-7 (Paliko merely took over the tip pool system, which had been created before him); 31:23-32:6 (The tip system is created in Toast, and point values were determined before Paliko took over management); 38:24-39:25 ("All the time when I do the hiring, I – I give them the – the notice of the pay rate and everything. I go over all the requirements to be sure we are in accordance with the federal law and state." Q: "Do you give them something in writing?" A: "Yes." Q: "And do they sign it?" A: "Yes"); Willsey Decl. (69-8) ¶¶ 1, 5-6 (Willsey is the Controller at OLB; "The spreadsheets [dating back to 2021] that Bulldozer produced came from a report function in Toast, the point-of-sale system used by the Corporate Defendant, and contain annual reports concerning the following information organized by lettered column in the spreadsheet, as follows: (A) Company; (B) Location; (C) Department; (D) Job; (E) Last Name; (F) First Name; (G) Employee Number; (H) Salary Type; (I) Earning; (J) Hours; (K) Amount; (L) Hourly Amount; and (M) Hourly Rate"); ; Willsey Decl. (73) ¶¶ 1, 4-6, 8-9, 11, 13, 19-24 ("In the event any employee s tipped minimum wage together with that employees tips earned in a week amounts to less than the regular minimum wage for that week, the Toast system automatically adds the differential owed to make up the difference"); Willsey Decl. (85) ¶¶ 4-7.

100.  Petrosyants does not recall OLB seeking any legal advice about how to pay its employees. (Petrosyants Dep. at 46:23-47:2, 48:7-12).

**Response: Admit, but note that Petrosyants' lack of knowledge is not dispositive of OLB's compliance. Nonetheless, OLB has ensured they remain compliant with the law by hiring lawyers, and through its managers (Paliko), who are tasked with ensuring employees are paid appropriately. Shahmuradyan Dep. 38:22-39:4; 37:21-38:16 (OLB used to work with a management company, who helped them open and implement their systems); 39:13-19 (OLB**

works with an accountant or accounting company); <u>53:6-14</u> (OLB relies on the company Toast for its payroll); <u>Petrosyants Dep. 21:11-18</u> (Petrosyants broadly oversees that employees are properly paid); <u>41:25-42:4</u> (Paliko is responsible for making sure service staff are paid the appropriate wages); <u>49:8-25</u> (Paliko was ultimately responsible for producing records relevant to this lawsuit); <u>161:21-162:16; 167:14-21</u> (an HR/management company implemented systems at OLB prior to Petrosyants' and Shahmuradyan's involvement); <u>Paliko Dep. 31:3-7</u> (Paliko merely took over the tip pool system, which had been created before him); <u>31:23-32:6</u> (The tip system is created in Toast, and point values were determined before Paliko took over management); <u>38:24-39:25</u> ("All the time when I do the hiring, I – I give them the – the notice of the pay rate and everything. I go over all the requirements to be sure we are in accordance with the federal law and state." Q: "Do you give them something in writing?" A: "Yes." Q: "And do they sign it?" A: "Yes"); <u>Willsey Decl. (69-8) ¶¶ 1, 5-6</u> (Willsey is the Controller at OLB; "The spreadsheets [dating back to 2021] that Bulldozer produced came from a report function in Toast, the point-of-sale system used by the Corporate Defendant, and contain annual reports concerning the following information organized by lettered column in the spreadsheet, as follows: (A) Company; (B) Location; (C) Department; (D) Job; (E) Last Name; (F) First Name; (G) Employee Number; (H) Salary Type; (I) Earning; (J) Hours; (K) Amount; (L) Hourly Amount; and (M) Hourly Rate"); <u>Willsey Decl. (73) ¶¶ 1, 4-6, 8-9, 11, 13, 19-24</u> ("In the event any employee s tipped minimum wage together with that employees tips earned in a week amounts to less than the regular minimum wage for that week, the Toast system automatically adds the differential owed to make up the difference"); <u>Willsey Decl. (85) ¶¶ 4-7.</u>

### DEFENDANTS' SUPPLEMENTAL STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT AGAINST PLAINTIFF

**Plaintiff Javier Molina**

1.      Despite Plaintiff Javier Molina's ("Molina") insistence that he began working at Osteria in or around April through June of 2024, his pay stubs reveal that he worked at Osteria starting in late July of 2024, for around two months, and ultimately left in or around August of 2024. Molina Dep. 27:5-18; 112:12-113:15; 120:12-121:20; 142:11-19.

2.      Molina was hired by Janos Paliko ("Paliko"), who told him to come in for training the next day. Molina Dep. 53:16-23.

3.      Molina worked exclusively as a busser. Molina Dep. 11:2-5; 110:9-12.

**Plaintiffs Properly Received Notice of the Tip Credit, Verbally and In Writing**

4.      Additionally, Molina received a pay stub each week, electronically via the app Toast, containing information about the tip credit, identifying his minimum wage per hour, the tipped minimum wage he was paid, the difference between the two identified as the tip credit amount, the amount of tips he made, and if he did not receive sufficient tips to make up the difference between the tipped wage and the minimum wage the tip makeup amount to pay him the full minimum wage he was entitled to. Molina Dep. 34:17-35:5; 37:10-19; 60:6-25 (Molina also received a paper check); 63:18-22; 69:5-9; 87:16-20; 102:4-103:6; 107:10-20; 110:13-130:3; 132:7-133:8.

5.      Molina provided his email address on the touch screen to be placed into the Toast system, so that he could have access to it via the phone application. Molina Dep. 59:4-7; 87:6-20.

6.      Toast included Molina's schedule, pay stubs, and other employment-related documents. Molina Dep. 87:6-20.

7.      Molina received an employee ID number, which was reflected on his pay stub. Molina Dep. 112:3-11.

8.      Nonetheless, Molina had been verbally informed about his pay stub by a coworker at Osteria. Molina Dep. 64:23-66:2.

9.      Additionally, Molina understood the concept of tipped minimum wage from his previous jobs at other restaurants. Molina Dep. 47:8-12; 70:17-71:3; 77:16-25; 79:24-80:9.

10.     Molina admits to using the Toast application to view his paystub on at least one occasion. Molina Dep. 87:11-20.

11.     Molina admits to receiving a check for every week in which he worked at Osteria. Molina Dep. 58:17-18.

12.     Moreover, Molina received an LS54 form, though he denies it. Molina Dep. 43:25-44:22.

**Julio Perez Was Not a Manager**

13.     Julio Perez ("Perez") was one of the first people at Osteria to speak with Molina; but Molina was hired by Paliko. Molina Dep. 46:16-47:17; 48:18-20; 53:16-23; 54:12-22; 55:9-15.

14.     Notably, Paliko was absent for nearly the entire, approximately two-month, duration of Molina's time working at Osteria. Molina Dep. 27:13-15; 53:2-8; 63:6-10.

15.     In Paliko's absence, Perez assisted other employees in a limited capacity, including by leading the team meetings, informing employees of what sections Paliko had assigned them to, opening and closing the restaurant, relaying the schedule via Toast, participating in the nightly tipping out process, asking employees to help clean tables, set tables, and assist in other sections. Molina Dep. 54:2-8; 67:4-13; 82:18-85:24; 86:17-87:15; 88:7-15.

16.    Perez's authority during this time remained limited; notably, Perez was unable to help resolve Molina's alleged problem with his check, because only Paliko was authorized to do that; and Perez did not assign employees to their stations. <u>Molina Dep. 50:13-24</u> ("Julio told me to wait because the other manager is on vacation"); <u>81:20-82:17.</u>

17.    Molina never saw Perez fire anyone, hire anyone, or inform any employees of how much they would be paid. <u>Molina Dep. 85:25-86:16.</u>

**Defendants Have Properly Claimed the Tip Credit**

18.    When Molina worked at Osteria in 2024, he was paid $16.00 per hour, plus tips. <u>Molina Dep. 113:16-118:9.</u>

19.    Molina testified that, when he worked forty (40) hours per week, his gross pay might be $1200, with $400 taken out in taxes, and net pay being $800; $300 of that might be from hours worked, and the remaining would be from tips. <u>Molina Dep. 96:3-97:2.</u>

20.    In his first pay stub dated July 29, 2024, for a week in which he worked less than five (5) hours, Molina received weekly gross pay in the amount of $71.20. <u>Molina Dep. 112:7-11; 120:12-121:20.</u>

21.    In another weekly pay stub in which Molina worked 34.13 hours, he received gross pay in the amount of $1,190.90; Molina admits his pay stub says this, but denies ever earning this. <u>Molina Dep. 122:6-124:16.</u>

22.    Molina admits that pay stub 80 shows that his tip wage was $10.65 per hour, his tip credit was $5.35 per hour, and that this adds up to $16.00 per hour. <u>Molina Dep. 124:19-126:3.</u> Molina admits to receiving tips from the tip pool, which were divided at the end of every night. <u>Molina Dep. 74:2-75:5.</u>

**Molina is a Disgruntled Employee**

23.    Notably, Molina quit his employment with Osteria, after Perez had informed Molina of the option to leave, following a disagreement. Molina Dep. 61:2-8.

24.    Molina is a serial litigant who was represented by his current counsel in a prior class action wage-and-hour lawsuit against his former employer. Molina Dep. 7:14-8:20; see also Molina v. SBX Restaurant Corp., et al.; Case No.: 1:25-cv-892 (KPF), ECF Docket Entry 1.

Dated: Jamaica, New York
           January 22, 2026                                   Respectfully submitted,

                                                              **SAGE LEGAL LLC**

                                                              _/s/ Emanuel Kataev, Esq._____
                                                              Emanuel Kataev, Esq.
                                                              18211 Jamaica Avenue
                                                              Jamaica, NY 11423-2327
                                                              (718) 412-2421 (office)
                                                              (917) 807-7819 (cellular)
                                                              (718) 489-4155 (facsimile)
                                                              emanuel@sagelegal.nyc

                                                              *Attorneys for Defendants*
                                                              *Bulldozer Hospitality Group, Inc.,*
                                                              *Robert Petrosyants, and*
                                                              *Marianna Shahmuradyan*

**VIA ECF**
Joseph & Kirschenbaum LLP
Attn: Josef Nussbaum, Esq.
45 Broadway, Suite 320
New York, NY 10006-3007
(212) 688-5640 (office)
jnussbaum@jk-llp.com

*Attorneys for Plaintiff*
*Katherine Fernandez*