UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KATHERINE FERNANDEZ, on behalf of herself
and others similarly situated,

              Plaintiff,

v.

BULLDOZER HOSPITALITY GROUP, INC., d/b/a
OSTERIA LA BAIA, ROBERT PETROSYANTS
and MARIANNA SHAHMURADYAN,

              Defendants.

No.: 25-cv-04490 (AS)

## PLAINTIFFS' COUNTER-STATEMENT OF MATERIAL FACTS IN DISPUTE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND STATEMENT OF ADDITIONAL MATERIAL FACTS

**I.    Plaintiffs' Counter-Statement Of Material Facts In Dispute**

Plaintiff Katherine Fernandez and Opt-in Plaintiffs Javier Patricio Molina and Adrian Montor-Peran (collectively, "Plaintiffs"), by and though their undersigned attorneys, Joseph & Kirschenbaum LLP, hereby submit this Counter-Statement of Material Facts in Dispute in Opposition to Defendants' Motion for Summary Judgment as follows:[1]

1.    Bulldozer Hospitality Group Inc. ("Bulldozer") is a corporation that does business as Osteria La Baia ("Osteria" or "the Restaurant"). <u>Paliko Dep. 7:3-8:2.</u>

**Response:**    Admit.

2.    Osteria first opened in or about 2022. <u>Shahmuradyan Dep. 16:13-15.</u>

**Response:**    Admit.

3.    Shahmuradyan is the sole owner of Osteria. <u>Shahmuradyan Dep. 15:18-16:19.</u>

---

[1] In support of their Local Rule 56.1 Statement, Plaintiffs cite to the January 22, 2026 Declaration of Lucas C. Buzzard in Support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment ("Buzzard Decl.") and exhibits annexed thereto which are cited herein as "Buzzard Ex. __." Deposition transcripts are identified by the deponent's last name, e.g. "Shahmuradyan Dep."

**Response:**    Admit.

4.    At all relevant times, Shahmuradyan and Petrosyants have been married. Shahmuradyan Dep. 14:21-15:3; Petrosyants Dep. 22:2-4.

**Response:**    Plaintiffs lack sufficient knowledge to admit or deny the assertion in Paragraph 4.

5.    Since 2023, Petrosyants has acted as Director of Operations.    Petrosyants Dep. 22:5-17.

**Response:**    Admit.

6.    Neither Shahmuradyan nor Petrosyants have ever had any other job titles at Osteria. Petrosyants Dep. 26:17-20; 36:14-24.

**Response:**    Plaintiffs lack sufficient knowledge to admit or deny the assertion in Paragraph 6.

7.    There are more than fifty (50) tipped, front-of-house employees at Osteria. Petrosyants Dep. 181:13-16; 181:25-182:17.

**Response:**    Admit.

8.    Janos Paliko ("Paliko"), the General Manager, has been primarily responsible for managing the day-to-day front-of-house operations, specifically pertaining to employees, since in or around September 2023. Paliko Decl. ¶¶ 13-14.

**Response:**    Admit that Paliko is the Restaurant's general manager, but deny that he was the only employee "primarily responsible for managing the day-to-day front-of-house operations."

By way of further response, Plaintiffs state that Julio Perez was also responsible for managing the day-to-day front-of-house operations at Osteria La Baia. (SAMF ¶¶ 154-201).

9.      As General Manager, Paliko has sole discretion to hire, fire, and discipline front-of-house employees. Paliko Decl. ¶ 14-15.

**Response:**      Deny.

By way of further response, Plaintiffs state that a Defendants Shahmuradyan and Petrosyants, as well OLB's manager, Luis Perez, also had the authority to hire, fire, and discipline front-of-house employees at the Restaurant. (SAMF ¶¶ 159-167, 173, 208, 240).

10.      Non-party Stephanie Willsey ("Willsey") has been a controller with Defendants since July 2023. Willsey Decl. ¶ 4.

**Response:**      Plaintiffs lack sufficient knowledge to admit or deny the assertion in Paragraph 10.

11.      Willsey is responsible for processing payroll weekly, managing vendor payments, data entry for accounting and bookkeeping purposes, and preparing financial reports. Willsey Decl. ¶¶ 6-7.

**Response:**      Plaintiffs lack sufficient knowledge to admit or deny the assertion in Paragraph 11.

12.      Plaintiff Katherine Fernandez ("Fernandez") began working at Osteria in October 2022, and was ultimately fired. Fernandez Dep. 36:3-5; 33:10-18.

**Response:**      Admit.

13.      Fernandez was hired by a former General Manager named Fotis. Fernandez Dep. 36:6-15.

**Response:**     Admit.

14.     Fernandez was first hired as a busser, and then after a few weeks, was promoted to busser and runner, and later served as a runner. Fernandez Dep. 39:9-15; Teran Dep. 87:2-4.

**Response:**     Admit.

15.     Adrian Montor-Teran ("Teran") was employed at Osteria as a busboy, from June 2024 to December 2024. Teran Dep. 30:5-13; 34:18-24; 38:18-24.

**Response:**     Admit.

16.     Teran filed his consent to join this case by signing his name as Adrian Montor-Peran, which is not the correct spelling of his name. ECF Docket Entry 12; Teran Dep. 11:4-18.

**Response:**     Admit. By way of further response, Plaintiffs state that this was simply a typographical error.

17.     Teran was hired by Paliko through the recommendation of another employee. Teran Dep. 35:14-19, 34:25-35:9.

**Response:**     Admit.

18.     Teran claims he worked at Osteria from June 2024 until December 2024. Teran Dep. 34:18-24, 38:18-24.

**Response:**     Admit.

19.     Teran earned $180.00 in tips a day on average, with the lowest amount received being $80.00 in a day, and the highest amount being $200.00 per day. Teran Dep. 47:5-22, 66:22-24.

**Response:**     Admit.

20.     Teran wrote down his hours worked on paper but threw those notes out, satisfied that he was properly paid. Teran Dep. 53:2-56:4.

4

**Response:**    Admit that Teran wrote down the hours he worked on paper and that he threw those notes away, but deny that he did so because he was "satisfied that he was properly paid."

By way of further response, Plaintiffs state that Teran testified that he threw the notes away because he "got the check and [] was satisfied with what they paid [him][,]" not that he was properly paid. (Teran Dep. at 56:2-3).

21.    There is a poster on a billboard in the restaurant, which discusses the tip credit. Paliko Decl. ¶ 21, Ex. A.

**Response:**    Plaintiffs lack sufficient knowledge to admit or deny whether there is *currently* such a poster in the Restaurant but Plaintiffs deny that any such sign was posted during the time that Plaintiffs worked at the Restaurant.

By way of further response, Plaintiffs state that the poster referenced in Paragraph 21 was not displayed in the Restaurant during the time that Plaintiff Fernandez worked there between 2022 and 2025. (Fernandez Dep. at 44:12-23).  Plaintiffs also note that, in any event, the poster only includes information about the federal tip credit and does not reference any New York State law requirements.

22.    Employees pass by this billboard frequently throughout the day and have an opportunity to review it because it is located in the hallway next to the management office. Paliko Decl. ¶ 22.

**Response:**    Plaintiffs incorporate their response to paragraph 21 here.

23.    A poster on the billboard reads, "[e]mployers of tipped employees who meet certain conditions may claim a partial wage credit based on tips received by their employees. Employers must pay tipped employees a cash wage of at least $2.13 per hour if they claim a tip credit against

their minimum wage obligation. *If an employe's tips combined with the employer s cash wage of at least $2.13 per hour do not equal the minimum hourly wage, the employer must make up the difference*" (emphasis added). <u>Paliko Decl. ¶ 21, Ex. A.</u>

**Response:**    Admit.

24.    Additionally, each employee receives a weekly pay stub electronically containing information about the tip credit, identifying their minimum wage per hour, the tipped minimum wage they are paid, the difference between the two identified as the tip credit amount, the amount of tips that they made, and if they did not receive sufficient tips to make up the difference between the tipped wage and the minimum wage the tip makeup amount to pay them the full minimum wage they are entitled to. <u>Paliko Decl. ¶ 23.</u>

**Response:**    Admit that employees received paystubs at OLB but deny that the paystubs included all of the information listed in Paragraph 24.

By way of further response, Plaintiffs state that the paystubs OLB provided its tipped employees listed multiple and inconsistent hourly rates and thus the rate the employee was owed and the rate they were being paid after OLB applied a tip credit was not evident from the paystub. (SAMF ¶¶ 270-271.) In addition, the paystubs OLB provided employees did not state that "if [employees] did not receive sufficient tips to make up the difference between the tipped wage and the minimum wage the tip makeup amount to pay them the full minimum wage they are entitled to." (*Id.* ¶ 272).

25.    All new employees are required to be entered into the Toast system; there is no employee at the restaurant who does not use Toast to clock in & out and receive their pay stubs. <u>Paliko Decl. ¶ 24.</u>

**Response:**    Admit.

26.     Toast is used to manage the restaurant's operations, including but not limited to payroll and tip management, timekeeping for employees, human resources functions involving onboarding employees and processing employment separations, and managing employment documents such as tax forms, notices of pay rate and pay day, and electronic signatures. Willsey Decl. ¶ 8-9, 11.

> **Response:**     Plaintiffs lack sufficient knowledge to admit or deny how the Restaurant uses Toast. However, Plaintiffs deny that OLB ever provided any "notices of pay rate and pay day" forms via the Toast system or via any other methods. (SAMF ¶¶ 257-269).
>
> By way of further response, Plaintiffs state that they never received any notices of pay rate and pay day while employed at the Restaurant. (*Id.* ¶¶ 257-259). Moreover, Plaintiffs note that Defendants' claim that they provided employees with "notices of pay rate and pay day" is incredible in light of their failure to produce even one such form in discovery in this litigation despite their obligation to produce such forms and their assurances that they would produce them, if they existed. (*Id.* ¶¶ 260-269).

27.     Each employee who is onboarded at Osteria inputs their name, email, and related identifying information in order to establish their own account with Toast. Paliko Decl. ¶ 25; Willsey Decl. ¶ 10.

> **Response:**     Plaintiffs lack sufficient knowledge to admit or deny the assertions in Paragraph 27 about what "each employee" does at OLB.

28.     When the employees first sign in, they are prompted to electronically review and sign all employment documents, such as their I-9 form, tax forms such as the W4 and the related New York state form, handbook (together with acknowledgment), and notice of pay rate and pay-day. Paliko Decl. ¶ 26.

**Response:**    Admit that employees signed certain forms when they were onboarded but deny that they were ever provided, let alone signed, any "notices of pay rate and pay day" forms. (SAMF ¶¶ 257-269).

By way of further response, Plaintiffs state that they never received any notices of pay rate and pay day while employed at the Restaurant. (*Id*. ¶¶ 257-259). Moreover, Plaintiffs note that Defendants' claim that they provided employees with "notices of pay rate and pay day" is incredible in light of their failure to produce even one such form in discovery in this litigation despite their obligation to produce such forms and their assurances that they would produce them, if they existed. (*Id*. ¶¶ 260-269).

29.    Upon completing the application and registration process, each employee receives an employee number, which they use from any device to log in to the Toast system in order to clock in, clock out, and review their pay stubs and any other information available for their review in the Toast system. Paliko Decl. ¶ 27; Willsey Decl. ¶ 12.

**Response:**    Plaintiffs lack sufficient knowledge to admit or deny the assertion in Paragraph 29.

30.    Every time payroll is processed, Toast prepares a paystub for each employee's pay, which is viewable on Toast's website and/or application. Willsey Decl. ¶ 13.

**Response:**    Plaintiffs lack sufficient knowledge to admit or deny the assertion in Paragraph 30.

31.    Separately, restaurant (sic) has a mandatory service charge of three percent (3%) together with an automatic gratuity of eighteen percent (18%) for any special event, banquet, function, or package deal; Fernandez received tips from special events. Petrosyants Dep. 153:5-

155:11, 178:12-179:5; Paliko Decl. ¶ 28; ECF Docket Entry 50-1; Fernandez Dep. 67:13-15;
104:11-12.

**Response:**      Admit.

32.      Employees were notified about the service charge and automatic gratuity for special
events, banquets, functions, or package deals.  Petrosyants Dep. 162:23-164:18, 170:25-171:6.

**Response:**      Admit.

33.      The three percent (3%) service charge was never a gratuity.  Petrosyants Dep.
179:6-13.

**Response:**      Deny. The assertion in Paragraph 33 is not a factual statement but rather a
legal conclusion and should thus be stricken.

By way of further response, Plaintiffs state that whether a "service charge" is a
gratuity is a legal question which is not determined based Defendants' self-serving
testimony.  Specifically, under New York State law, a "service charge" is presumed to be
a gratuity unless certain preconditions are met. *See* N.Y. Comp. Codes R. & Regs. tit. 12,
§ 146-2.18(b) (there is "a rebuttable presumption that any charge in addition to charges for
food, beverage, and other specified materials or services, including…any charge for
'service' or 'food service,' is a charge purported to be a gratuity"), § 146-2.19(b) ("The
employer has the burden of demonstrating, by clear and convincing evidence, that the
notification [that a charge is not a gratuity] was sufficient to ensure that a reasonable
customer would understand that such charge was not purported to be a gratuity.").

34.      Fernandez concedes that, upon a review of the event contract, it is common sense
that the three percent (3%) service charge is not a gratuity given the existence of the eighteen

percent (18%) gratuity next to the service charge, although she thought she was entitled to a twenty percent (20%) gratuity. Fernandez Dep. 108:2-14; 109:16-25.

**Response:**     Plaintiffs incorporate their response to Paragraph 33 here.

35.     Nonetheless, Fernandez had been verbally informed about the tip credit and pool system by Magalis Rodriguez, a floor manager at Osteria who had recommend she work at Osteria. Fernandez Dep. 48:22-49:14; 72:20-73:3; 73:10-21; 32:9-14; 36:21-23.

**Response:**     Admit.

By way of further response, Plaintiffs state that the vague and ambiguous assertion of being "verbally informed about the tip credit" does not mean that Defendants provided Fernandez with the specific details they were required to provide her under New York law, nor does it mean that Defendants told her they were actually taking a tip credit.

36.     Additionally, Fernandez understood the concept of tipped minimum wage from her previous jobs at another restaurant called Harry's Steakhouse ("Harry's"). Fernandez Dep. 28:23-29:14; 29:19-30:10; 48:11-21; 72:10-19.

**Response:**     Admit.

37.     Although Fernandez denies receive emails along with her check notifying her that her paystub was available, she was verbally informed about the fact she may access her paystub using her Toast account. Fernandez Dep. 57:16-20.

**Response:**     Admit.

38.     Fernandez was aware that she would need to log into the Toast application to view her paystub. Fernandez Dep. 57:21-58:3.

**Response:**     Admit.

39.     Fernandez had seen her paystub on at least one occasion, within Toast. <u>Fernandez</u>

<u>Dep. 92:7-10.</u>

**Response:**     Admit.

40.     Fernandez admits to receiving a check stub for every week in which she worked at

Osteria. <u>Fernandez Dep. 91:13-15.</u>

**Response:**     Admit.

41.     Fernandez mentioned in her deposition having photos of when the tip pool was

started, which implies having some sort of physical evidence constituting written notice.

<u>Fernandez Dep. 74:17-19.</u>

> **Response:**     Admit that Plaintiff Fernandez has pictures of tip sheets from the time that
>
> the tip pool was started. Defendants' assertion that these photos "impl[y] having some sort
>
> of physical evidence constituting written notice" is vague and ambiguous, as Defendants
>
> do not specify what the imagined "written notice" would have said and thus that portion of
>
> this statement should be stricken.

42.     Teran was verbally informed about the tip credit by Paliko. <u>Teran Dep. 35:20-23.</u>

**Response:**     Admit.

> By way of further response, Plaintiffs state that the vague and ambiguous assertion
>
> that "Teran was verbally informed about the tip credit" does not mean that Defendants
>
> provided Teran with the specific details they were required to provide him under New York
>
> law, nor does it mean that Defendants told him they were actually taking a tip credit.

43.     When onboarding employees, Paliko routinely informed employees verbally about

the tip credit. <u>Paliko Decl. ¶ 20.</u>

**Response:**    Plaintiffs lack sufficient knowledge to admit or deny the assertion in Paragraph 43 about what Paliko routinely informed employees at OLB.

44.    Additionally, Teran understood the concept of the tip credit and the tipped minimum wage making up the minimum wage with his tips from his previous jobs as a busboy at other restaurants. <u>Teran Dep. 27:6-33:20.</u>

**Response:**    Admit.

45.    As an administrator, Willsey has access to records concerning each employee's login and activity in Toast. <u>Willsey Decl. ¶ 14-15.</u>

**Response:**    Plaintiffs lack sufficient knowledge to admit or deny the assertion in Paragraph 45.

46.    Based on these records, Teran indisputably accessed the Toast application and actively utilized the application. <u>Willsey Decl. ¶ 18, Ex. A.</u>

**Response:**    Admit that Teran had access to Toast but deny that the proffered evidence support the contention that he "actively utilized the application" as all the entries in the exhibit Defendants cite to here are the from the same date (September 9, 2024). (<u>Willsey Decl. ¶ 18, Ex. A</u>).

47.    Critically, Teran admits to entering his email address when he first signed up with Toast. <u>Teran Dep. 74:24-75:7.</u>

**Response:**    Admit.

48.    Accordingly, he would have had access to view his paystubs at any time. <u>Willsey Decl. ¶ 19.</u>

**Response**:    The statement in Paragraph 48 is not a fact but rather speculation and should thus be stricken.

49.    Julio Perez ("Perez") has been a server at Bulldozer since 2022. Perez Decl. ¶ 4.

**Response:**    Admit.

50.    Perez was hired as a server by the former General Manager, Fotis. Perez Decl. ¶ 6.

**Response:**    Plaintiffs lack sufficient knowledge to admit or deny the assertion in Paragraph 50.

51.    Paliko promoted Perez to head waiter, more than one (1) year ago. Paliko Dep. 89:22-90:6.

**Response:**    Plaintiffs lack sufficient knowledge to admit or deny the assertion in Paragraph 51.

52.    Perez is the captain/main server/head waiter, because he is the most experience server that Osteria has. Petrosyants Dep. 72:19-73:7; 93:17-22; 98:4-14; Paliko Dep. 89:22-90:6.

**Response:**    Deny.

By way of further response, Plaintiffs state that Perez was a manager at OLB and he had the authority to hire, fire, and discipline front-of-house employees at the Restaurant. (SAMF ¶¶ 154-201). Moreover, Plaintiffs deny that Perez is called a "captain." (Fernandez Dep. 74:8-15).

53.    At times, Perez has assisted in training fellow servers regarding their common job duties, which include serving customers, bringing plates and napkins to tables, taking plates from tables, taking customers' orders, and more. Petrosyants Dep. 73:8-75:21; Fernandez Dep. 75: 13-19; Perez Decl. ¶ 5, 10, 23, 30.

**Response:**    Admit.

54.    At times, usually on the rare occasions when Paliko is not present, Perez oversees his fellow servers to ensure service is performed adequately. Petrosyants Dep. 93:23-94:24; 97:10-

21; 98:18-99:3; 99:20-100:8; 111:17-114:4; Teran Dep. 68:23-69:6; Paliko Dep. 23:2-25:9; 94:6-9.

**Response:**    Admit that Perez oversees his fellow servers to ensure service is performed adequately but deny that that only occurred on rare occasions.

By way of further response, Plaintiffs state that Perez's primary job duties at OLB were to supervise and oversee the food-service employees to ensure that they were performing their duties properly. (SAMF ¶¶ 154-201).

55.    During these occasions, Perez does not have increased duties to manage or supervise front-of-house staff. Perez Decl. ¶ 13, 23-24.

**Response:**    Deny.

By way of further response, Plaintiffs state that Perez was a manager at OLB and he had the authority to hire, fire, and discipline front-of-house employees at the Restaurant. (SAMF ¶¶ 154-201).

56.    Notably, the restaurant's operational procedures effectively run themselves, on such occasions. Paliko Dep. 23:2-25:9.

**Response:**    Deny.

By way of further response, Plaintiffs state that the restaurant is a complex operation that does not run by itself and thus there was always a management level employee (either one or more of Paliko, Perez, or Petrosyants) present in the Restaurant. (Fernandez Decl. ¶¶ 45-46).

57.    For example, for days Paliko will not be not present (sic), Paliko assigns employees to their sections in advance. Paliko Dep. 93:12-24.

**Response:**    Deny.

By way of further response, Plaintiffs state that, on the days that Paliko was off, Perez also assigned employes to their sections. (SAMF ¶¶ 179-180).

58.    The restaurant has pre-shift meetings before opening to customers, and those meetings are run by Paliko and the head chef. Petrosyants Dep. 66:23-67:12.

**Response:**    Admit that the Restaurant has pre-shift meetings but deny that those meetings are run by Paliko and the head chef only.

By way of further response, Plaintiffs state that the manager, Perez, also led pre-shift meetings when he was present in the Restaurant. (SAMF ¶¶ 181-183). In fact, Perez admits that he also led those meetings. *See* Perez Decl. ¶ 19 ("If the General Manager is absent and unable to lead the pre-shift meeting, I conduct the pre-shift meeting by relaying to the front-of-house staff what the General Manager directs me to tell them.)

59.    Petrosyants occasionally attends these meetings. Petrosyants Dep. 67:14-23.

**Response:**    Admit.

60.    Perez merely relays Paliko's floor plan to employees at those pre-shift meetings. Paliko Dep. 93:25-94:5; Perez Decl. ¶ 14.

**Response:**    Plaintiffs lack sufficient knowledge to admit or deny the assertion about the specific alleged incident that is vaguely described in Paragraph 60.

61.    At pre-shift meetings in which Paliko is absent, Perez merely relays information that Paliko tells him to. Perez Decl. ¶ 18

**Response:**    Plaintiffs lack sufficient knowledge to admit or deny the assertion about the specific alleged incident that is vaguely described in Paragraph 71.

62.    Discussion at the pre-shift meetings included specials of the day, how to sell more, complaints about service, and busboys not cleaning tables (in order to encourage the bussers to provide better service).  Teran Dep. 45:18-46:7.

**Response:**    Admit.

63.    No terminations were made nor was any discipline issued at pre-shift meetings. Teran Dep. 46:8-47:4.

**Response:**    Deny.

By way of further response, Plaintiffs state that management would sometimes discipline employees or threaten them with discipline at the pre-shift meetings. (SAMF ¶¶ 183-184).

64.    Paliko is the only person responsible for making the schedule. Paliko 34:22-35:14.

**Response:**    Admit that Paliko created the schedule but deny that he was the only employee responsible for making it.

By way of further response, Plaintiffs state that if an employee needed to alter their schedule to take time off or to swap a shift with a coworker, the employee could ask Perez and Perez could change the employee's schedule. (SAMF ¶¶ 168-172).

65.    Perez does not have authority to accept employees' requests for time off. Petrosyants Dep. 108:22-109:4.

**Response:**    Deny.

By way of further response, Plaintiffs state that Perez had and exercised the authority to accept employees' requests for time off. (SAMF ¶ 172).

66.     Similarly, inquiries from employees regarding employees' absences or latenesses were always relayed to Paliko, the General Manager, even if they were originally sent to Perez. Id; Perez Decl. ¶ 20-21.

**Response:**     Deny.

By way of further response, Plaintiffs state that employees could also relay inquiries about absences or latenesses to Perez and he could approve or deny such requests on the spot without discussing them first with Paliko. (SAMF ¶¶ 168-172).

67.     Perez does not have authority to send employees home on slow days. Petrosyants Dep. 95:3-16; 95:16-96:16; Perez Decl. ¶ 16-17.

**Response:**     Deny.

By way of further response, Plaintiffs state that Perez had and exercised the authority to send employees home on slow days. (SAMF ¶ 170). For example, on a few occasions, Perez called Plaintiff Fernendez and told her that he did not need her to come in to work that day because the Restaurant was not busy. (Fernandez Decl. ¶ 32).

68.     Perez does not have authority to alter the time clock records, if any employee reports such an issue. Petrosyants Dep. 109:13-23.

**Response:**     Deny.

By way of further response, Plaintiffs state that Perez had and exercised the authority to alter the time clock records. (SAMF ¶ 196). For example, on a few occasions, Plaintiff Fernandez forgot to clock-in at the beginning of her shift or to clock-out at the end of the shift. On these occasions, she would contact Perez to inform him of the mistake, and he would fix the time record. (Id. at ¶ 197).

69.     Perez does not have authority to discipline employees. Paliko Dep. 25:11-23.

**Response:**    Deny.

By way of further response, Plaintiffs state that Perez had and exercised the authority to discipline employees. (SAMF ¶¶ 165, 183-184). For example, if a server complained to Perez about a runner's or busser's performance, Perez would sometimes cut the runner or busser and tell them to leave early. (*Id.* ¶ 166). As another example, the Restaurant does not allow employees to swap shifts without telling management first. (Fernandez Decl. ¶ 25). On some occasions when an employee swapped shifts with their coworker without telling management, Perez reprimand that employee and told them that, if it happened again, the employee would be terminated. (*Id.*). In fact, Perez threatened Plaintiff Fernandez with termination when she had swapped shifts without telling him first. (*Id.* ¶ 26).

70.    For example, if an employee shows up late when Paliko is not there, Perez merely informs Paliko, who then takes appropriate action in his discretion the following day. Id; 86:12-87:4; Perez Decl. ¶ 12.

**Response:**    Deny.

By way of further response, Plaintiffs state that Perez had and exercised the authority discipline employees at OLB if they showed up late for work. (SAMF ¶ 172).

71.    In fact, on one occasion in which Perez reported an employee to Paliko for engaging in insubordination, Paliko declined to impose any disciplinary measures. Perez Decl. ¶ 27.

**Response:**    Plaintiffs respectfully note that the assertion in Paragraph 71 is excessively vague and thus the Court should not credit it.

72.    Perez has only ever participated in corrective action notices of other employees as a witness, not as a decisionmaker who imposed discipline. Paliko Dep. 88:3-89:3.

**Response:**    Deny.

By way of further response, Plaintiffs state that Perez had and exercised the authority to discipline employees. (SAMF ¶¶ 165-166, 183-184)  As an example, if a server complained to Perez about a runner's or busser's performance, Perez would sometimes cut the runner or busser and tell them to leave early. (*Id.* at 166).  As another example, Perez signed and issued a corrective notice to Plaintiff Fernandez. (*Id.* at 167).

73.    Perez does not interview employees, but sometimes observes interviews. Petrosyants Dep. 102:8-105:22.

**Response:**    Deny.

By way of further response, Plaintiffs state that Perez had and exercised the authority to interview employees. (SAMF ¶ 156).  For example, Plaintiff Teran was interviewed by Perez. (*Id.* ¶ 157). Moreover, Plaintiff Fernandez witnessed Perez interviewing prospective hires on many occasions.  Specifically, Plaintiff Fernandez saw Perez sitting at a table and talking with individuals who, at the time, did not work at the Restaurant.  Oftentimes, she saw Perez reviewing a resume with those individuals.  Later, she saw some of these individuals start training in the Restaurant and become full-fledged employees. (*Id.* ¶ 158).

74.    Perez is not responsible for hiring, firing, or promoting employees. Id; Paliko 87:10-18; Perez Decl. ¶ 11, 22, 29.

**Response:**    Deny.

By way of further response, Plaintiffs state that Perez had and exercised the authority to hire, fire, or promote employees. (SAMF ¶¶ 159-167).  For example, on at least three or four occasions, new employees explicitly told Plaintiff Fernandez that Perez

19

had hired them. (*Id*. at ¶ 160). As another example, Plaintiff Fernandez witnessed a server complaining to Perez that a busser was not performing their job duties adequately. Perez proceeded to yell at the busser and told them they were "stupid" and "were not doing their job." Perez then told the busboy to "get out of here," and Plaintiff Fernandez never saw that busser work at the Restaurant again. (*Id*. at ¶ 161).

75.    At times, and only when asked, Perez has been involved in employee evaluations, under Paliko, in the limited capacity of witnessing areas for improvement. Paliko Dep. 84:14-86:10; Perez Decl. ¶ 36.

**Response:**    Deny.

By way of further response, Plaintiffs state that Perez had and exercised the authority to discipline or promote employees based on his evaluation of them and he did not merely act as a witness to areas employees could improve. (SAMF ¶¶ 165-166, 183-184)  For example, Perez issued Plaintiff Fernandez with a written warning Specifically, Perez provided Fernandez with a disciplinary form called "Corrective Action Record." That form was essentially a written warning to Plaintiff Fernandez for not attending a meeting that the Restaurant's management said they expected her to attend. The form also states that "Any further violation of the above mentioned incident, or any other company violation, may result in additional corrective action, up to and including termination." The form was signed by Perez as "supervisor" and his signature appears above the line that states "Supervisor Signature." (*Id*. ¶ 167).

76.    The chef and head bartender have been similarly involved in the evaluation process. Paliko Dep. 84:14-86:10; Perez Decl. ¶ 36.

**Response:**    Admit.

77.     Perez only handles complaints from patrons, never from employees; Paliko handles employee complaints (for example, Fernandez had asked Paliko questions, not Perez). Perez Decl. ¶ 37; Fernandez Dep. 88:17-89:6.

**Response:**     Deny.

By way of further response, Plaintiffs state the citation to the Fernandez deposition in Paragraph 77 does not support the statement in that Paragraph.  Plaintiffs further state that Perez had and exercised the authority to handle complaints from employees and he, in fact, encouraged employees to come to him with any issues they may have at the Restaurant. (SAMF ¶¶ 191-192). As an example, if employees had any complaints about issues such as, for example, coworkers' performances or under- of over-staffing at the Restaurant, they would raise the issues with either. Perez or Paliko. (*Id.*). If Plaintiff Fernandez had an issue with a server making mistakes in the kitchen or with a busser not cleaning and turning tables over fast enough, she would raise those issues with. Perez directly.  (Fernandez Decl. ¶ 50).

78.     Perez is not responsible for maintaining any sales records at the restaurant. Perez Decl. ¶ 31.

**Response:**     Plaintiffs lack sufficient knowledge to admit or deny the assertion in Paragraph 78.

79.     Rather, Paliko printed tip reports and distributed tips. Perez Decl. ¶ 32; Teran Dep. 59:19-22.

**Response:**     Deny.

By way of further response, Plaintiffs state that Perez was also involved informing employees about how much they earned in tips and in distributing tips to employees. (SAMF ¶¶ 193-194).

80.    Perez does not take custody of any cash tips except his own, and only then, when he (i) places the cash tips he receives in the safe in the absence of the general manager; and (ii) receives his portion of the tips from the tip pool distribution. <u>Perez Decl. ¶ 33-35; Teran Dep. 66:18-21.</u>

**Response:**    Deny.

By way of further response, Plaintiffs state that, on some occasions, Perez would be responsible for collecting all the cash tips received during a shift, calculating how much each employee was entitled to from those tips, and then distributing to each employee their respective share of the tips. (SAMF ¶¶ 198-199).

81.    Perez does not make any key decisions at Osteria, including but not limited to: selecting materials, supplies, machinery, equipment, tools, or food. <u>Perez Decl. ¶ 39.</u> These tasks are handled by the Director of Operations. <u>Perez Decl. ¶ 40.</u>

**Response:**    Plaintiffs lack sufficient knowledge to admit or deny whether Perez is involved in any of the decisions outlined described in Paragraph 81, however Plaintiffs deny that these decision are the only "key" decisions at the Restaurant.

By way of further response, Plaintiffs state that Perez made other key decisions at the restaurant such as interviewing, hiring, disciplining and scheduling employees. (SAMF ¶¶ 154-201).

82.    Additionally, Perez does not have supervisory or managerial decision-making authority regarding the safety or security of employees; budgeting; or legal compliance. <u>Perez Decl. ¶ 41-44.</u>

**Response:**    Plaintiffs lack sufficient knowledge to admit or deny the assertion in Paragraph 82.

83.    Teran assumes that Perez was paid both as a waiter with tips, and as a manager, but admits that he does not know how much Perez was paid. Teran Dep. 41:3-23; 43:2-4.

**Response:**    Admit.

By way of further response, Plaintiffs state that Defendants' payroll records indicate that Perez was, in fact, paid more than the other food-service employees at the Restaurant. (SAMF ¶¶ 202-203).

84.    Teran's basis for concluding that Perez is a manger is "because it's logical." Teran Dep. 41:7-23, 43:2-4.

**Response:**    Deny that Teran's only basis for concluding Perez is a manager was his logic. *See* Teran Dep. at 41:21-42:7 (testifying that he knew Perez was a manager because Perez participated in his hiring), 42:22-24 (testifying that Perez was a manager because he interviewed people), 68:23-69:6 (testifying that Julio was a manger because he "ran the people" and made complaints about waiters and busboys).

85.    Perez did not hire Teran. Teran Dep. 42:2-19.

**Response:**    Deny.

By way of further response, Plaintiffs state Perez interviewed Teran before Teran was hired and that Perez participated in the decision to hire Teran. (SAMF ¶¶ 157, 161).

86.    Paliko hired Teran. Id; 40:13-20.

**Response:**    Deny.  Plaintiffs incorporate their responses to Paragraph 85 here.

87.    Perez did not terminate Teran. Teran Dep. 56:21-22.

**Response:**    Admit.

88.    Teran admits that he does not know for sure that Perez terminated anyone. Teran Dep. 93:13-94:9.

**Response:**     Deny.

By way of further response, Plaintiffs state that the assertion in Paragraph 88 is not supported by the cited evidence.  In fact, Teran testified that he observed Perez participate in firing decisions. (Teran Dep. 93:13-94:9) ("Q. Have you ever seen Julio fire any employees? A. Yes. Like I said before, they fired two and the other ones left on their own because they couldn't stand him.[…]").

89.     Perez was trained by another busser named Artemio, not Perez.  Teran Dep. 44:21-45:13.

**Response:**     Admit.

90.     Since Perez is a server and front-of-house employee, and not a manager or supervisor, he has participated in the tip pool at Osteria, receiving the amount that he is entitled to within his role. Petrosyants Dep. 114:5-115:23; 122:4-8; Fernandez Dep. 75:20-22; Perez Decl. ¶ 5, 7.

**Response:**     Deny that Perez was not a manager or supervisor but admit that participated in the Restaurant's tip pool. (SAMF ¶¶ 154-201).

91.     Perez had been verbally informed by Fotis of the tip credit minimum wage. Perez Decl. ¶ 7.

**Response:**     Plaintiffs lack sufficient knowledge to admit or deny the assertion in Paragraph 91.

92.     Fernandez believes that Perez is a manager, in part, because: he did not wear the same uniform as other servers; he relayed specials; he was proactive in addressing issues involving customers, as well as employee and system performance; he ate food; he participated in meetings; he utilized Toast; and he printed menus. Fernandez Dep. 75:23-78:8; 81:15-21.

**Response:**    Admit.

By way of further response, Plaintiffs state that Perez is a manager because he had and exercised the authority to interview, hire, fire, discipline and alter the schedules of employees at the Restaurant. (SAMF ¶¶ 154-201).

93.    As owner, Shahmuradyan's sole duties involve reviewing the finances, from a 30,000 foot view. Shahmuradyan Dep. 15:18-19; 16:20-25.

**Response:**    Deny that Shahmuradyan's "sole duties" are limited to "reviewing the Restaurant's finances, from a 30,000 foot view."

By way of further response, Plaintiffs state that Shahmuradyan admitted that, among other things, she "oversees everything" at the Restaurant, has "ultimate authority over all operations of the restaurant," has the authority to hire and fire employees, hired management level employees and the chef, and reviews day to day operations and payroll issues with the Restaurant's general manager on a weekly basis. (SAMF ¶¶ 204-232).

94.    Shahmuradyan has similarly always performed her same job. Shahmuradyan Dep. 15:18-19.

**Response:**    Plaintiffs incorporate their response to Paragraph 93 here.

95.    Shahmuradyan does not need get involved in the daily operations of the restaurant and its employees, beyond general oversight, to perform her bookkeeping functions. Shahmuradyan Dep. 48:5-15.

**Response:**    Deny. By way of further response, Plaintiffs incorporate their response to Paragraph 93 here.

96.    Shahmuradyan does not handle the day-to-day operations of Osteria, including dealing with employees. Shahmuradyan Dep. 16:25-17:3; 20:12-14; Paliko 17:7-19; 18:23-24.

**Response:**     Deny. By way of further response, Plaintiffs incorporate their response to Paragraph 93 here.

97.     Shahmuradyan does not even know how many tipped employees currently work at Osteria, or any of their names except for Paliko. Shahmuradyan Dep. 56:8-11; 64:3-66:24.

**Response:**     Plaintiffs lack sufficient knowledge to admit or deny the assertion in Paragraph 97.

98.     Shahmuradyan has never been responsible for hiring lower-level employees. Shahmuradyan Dep. 17:21-18:2; 22:22-23:3; 18:19-23; 21:20-22; 49:12-50:8; 61:6-66:24.

**Response:**     Admit.

99.     Shahmuradyan has only ever promoted Paliko to General Manager, and only remembers ever hiring the manager before Paliko, Director of Operations Petrosyants, and the first/head chef. Id.

**Response:**     Admit that Shahmuradyan promoted Paliko to General Manager, and that she hired the manager before Paliko, hired the Director of Operations, Petrosyants, and hired the first/head chef at the Restaurant, but deny that that is all Shahmuradyan "has only ever" done at the Restaurant.

By way of further response, Plaintiffs state that Shahmuradyan admitted that, among other things, she "oversees everything" at the Restaurant, has "ultimate authority over all operations of the restaurant," has the authority to hire and fire employees, hired management level employees and the chef, and reviews day to day operations and payroll issues with the Restaurant's general manager. (SAMF ¶¶ 204-232).

100.    As Director of Operations, Petrosyants is responsible for running operational aspects of the business, including overseeing the quality of food and service, dealing with vendors and payments. Petrosyants Dep. 20:7-21:6.

**Response:**    Admit.

101.    Petrosyants has never ever had any other job titles or duties at Osteria. Petrosyants Dep. 26:17-20; 36:14-24.

**Response:**    Deny.

By way of further response, Plaintiffs state that Petrosyants admitted that, among other things, Shahmuradyan gave him "carte blanche" to operate the restaurant as he sees fit, and that he is responsible for "running the business," which includes overseeing all operations, ensuring employees are paid, maintaining the quality of service, reviewing the restaurant's financials, and meeting with the general manager several times per week to discuss service and staffing issues. (SAMF ¶¶ 233-256).

102.    Petrosyants is not involved in hiring, firing, or managing rank-and-file employees. Petrosyants Dep. 21:7-18; 23:13-25.

**Response:**    Admit.

103.    In fact, Petrosyants does not remember ever hiring or terminating any employees at Osteria. Petrosyants Dep. 24:3-18.

**Response:**    Admit that Petrosyants so testified.

By way of further response, Petrosyants participated in hiring Paliko and other managers. (SAMF ¶¶ 240, 255).

104.    Paliko does not remember Petrosyants ever doing so, either. Paliko Decl. ¶ 18.

**Response:**    Deny.

By way of further response, Plaintiffs state that the evidence cited by Defendants does not support the statement in Paragraph 104 and that evidence, in fact, contradicts the statement in this Paragraph. Specifically, in his declaration, Paliko states: "To my knowledge, Petrosyants has not hired or fired anyone at the restaurant *other than managers such as myself* […]." Paliko Decl. ¶ 18 (emphasis added).

105.    Petrosyants is not responsible for creating the employee schedules. Paliko 35:15-23.

**Response:**    Admit.

106.    No employee has ever asked Petrosyants for time off. Petrosyants Dep. 109:5-8.

**Response:**    Plaintiffs lack sufficient knowledge to admit or deny the assertion in Paragraph 106.

107.    Employees have not complained to Petrosyants about their pay or tips. Petrosyants Dep. 88:13-18.

**Response:**    Plaintiffs lack sufficient knowledge to admit or deny the assertion in Paragraph 106.

108.    All decisions pertaining to hiring, firing, disciplining all front-of-house staff, and other day-to-day employee operations, are the responsibility of the managers. Shahmuradyan Dep. 16:25-17:3; 82:13-20.

**Response:**    Admit that OLB's managers were responsible for decisions pertaining to front of house staff and other day-to-day employee operations.

By way of further response, Plaintiffs state that Shahmuradyan and Petrosyants were also responsible for decisions pertaining to hiring, firing and job functions of OLB's managers. (SAMF ¶¶ 204-256).

109.    Osteria has one General Manager, Paliko, who is solely responsible for handling employee operations; although he sometimes informs Petrosyants about staffing decisions, Petrosyants plays no role in those decisions. Shahmuradyan Dep. 17:2-20; 30:8-18; Petrosyants Dep. 28:8-29:6.

**Response:**    Deny that Paliko was "solely responsible" for employee operations and that Petrosyants played "no role" in staffing decisions.

By way of further response, Plaintiffs state that Defendants admitted that Petrosyants oversaw all operations, ensured employees were paid, and maintained the quality of service at the Restaurant. (SAMF ¶¶ 235-237). Moreover, Petrosyants testified that he meets with Paliko several times per week to discuss service and staffing issues. (SAMF ¶¶ 243-244). Finally, in addition to Petrosyants and Paliko, Julio Perez was also responsible for handling operations at OLB. (*Id*. ¶¶ 154-201).

110.    Paliko was initially hired at Osteria in February 2022, as a floor manager, by the General Manager at the time. Paliko Dep. 14:24-15:4; 15:20-25; Paliko Decl. ¶ 4-5.

**Response:**    Plaintiffs lack sufficient knowledge to admit or deny the assertion in Paragraph 110.

111.    After around a year, Paliko was promoted to assistant general manager, by a different General Manager. Paliko Dep. 16:2-9.

**Response:**    Plaintiffs lack sufficient knowledge to admit or deny the assertion in Paragraph 111.

112.    Paliko was never overtly interviewed or promoted to General Manager by Shahmuradyan or Petrosyants. Paliko Dep. 16:19-17:19.

**Response:**    Deny.

By way of further response, Plaintiffs state that the evidence cited by Defendants in support of Paragraph 112 does not support the assertions stated therein. Specifically, Paliko testified that Defendant Petrosyants "decided" to "promote' him. Paliko Dep. 16:19-17:6 (""Q. Who promoted you to general manager? A. Actually, nobody promoted me. The -- the general manager who been with us, he left, and I just took over his role. Q. Just decided on your own? A. Was, of course, our director, operation, Robert, who -- who decided. Q. So Robert hired you to be the general manager? A. He promote me."). Moreover, Defendant Shahmuradyan testified that she also interviewed Paliko *before* hiring him. (Shahmuradyan Dep. 20:12-14 ("Q. Okay. And did you interview Janos before hiring? A. Yes.").

113. Rather, Paliko simply took over the prior General Manager's role when the prior left. Paliko Dep. 16:19-17:6.

**Response:** Deny.

By way of further response, Plaintiffs incorporate their response to Paragraph 112 here.

114. Eventually, a conversation was had between Paliko, Shahmuradyan, and Petrosyants, in which they approved of his new role. Paliko Dep. 17:7-19; Shahmuradyan Dep. 20:12-14.

**Response:** Deny. Plaintiffs incorporate their response to Paragraph 113 here.

115. As General Manager, Paliko is in charge of front-of-house operations. Paliko Dep. 21:24-25.

**Response:** Admit.

116. Front-of-house employees are tipped employees. Petrosyants Dep. 182:18-183:2.

**Response:**    Admit.

117.    As General Manager, Paliko is there most often, usually five or six days per week, especially when Osteria is busy. Paliko Dep. 22:15-24; Petrosyants Dep. 93:10-12.

**Response:**    Admit.

118.    In contrast, Shahmuradyan goes to Osteria rarely, every few months or weeks, and mostly views the finances from a distance. Shahmuradyan Dep. 29:9-15; 23:20-24:4.

**Response:**    Deny.

By way of further response, Shahmuradyan goes to the Restaurant a few times per week. (SAMF ¶ 228).

By way of further response, Plaintiffs state that Shahmuradyan admitted that, among other things, she "oversees everything" at the Restaurant, has "ultimate authority over all operations of the restaurant," has the authority to hire and fire employees, hired management level employees and the chef, and reviews day to day operations and payroll issues with the Restaurant's general manager. (*Id.* ¶¶ 204-232).

119.    Additionally, Shahmuradyan rarely speaks to Paliko. Shahmuradyan Dep. 23:4-10.

**Response:**    Deny.

By way of further response, Plaintiffs state that Shahmuradyan speaks to Paliko on a weekly basis. (SAMF ¶ 213; Shahmuradyan Dep. 23:8-10 ("Q. How frequently do you speak to him on the phone? A. Once a week."))

120.    Petrosyants is in the restaurant a few times per week, not on any specific schedule, to oversee general operations. Petrosyants Dep. 26:5-6; 25:14-16; 61:19-62:3; Paliko Decl. ¶ 16-17.

**Response:**    Admit.

121.    Petrosyants is not at Osteria on a daily basis, because he travels frequently. Paliko Decl. ¶ 16-17.

**Response:**    Admit.

122.    During his visits to the restaurant, Petrosyants meets with Paliko to ensure that service is being performed adequately and with consistency by lower-level employees. Petrosyants Dep. 29:8-31:3.

**Response:**    Admit.

123.    Paliko is responsible for hiring and firing employees, and has full authority to do so without the permission of Shahmuradyan or Petrosyants. Petrosyants Dep. 41:21-24; 44:11-24; 28:8-14; Shahmuradyan Dep. 26:4-10; 55:15-20.

**Response:**    Admit.

124.    In addition, Paliko's job duties include: deciding how much to pay tipped employees; setting the employee schedules; deciding how many of each type of employee (for example, servers, bartenders, busboys) to staff in a single shift. Shahmuradyan Dep. 25:7-26:3; 26:11-16; 30:8-18.

**Response:**    Admit.

125.    In the time since Paliko started working as a manager at Osteria, Shahmuradyan does not believe she has ever corrected or questioned a single thing he's done. Shahmuradyan Dep. 82:21-83:6-14.

**Response:**    Plaintiffs lack sufficient knowledge to admit or deny the assertion regarding Shahmuradyan's beliefs set forth in Paragraph 125.

126.    Importantly, neither Shahmuradyan nor Petrosyants were responsible for interviewing or hiring either Plaintiff, Teran or Fernandez. Shahmuradyan Dep. 42:10-20; Petrosyants Dep. 61:11-15; Fernandez 36:3-15.

**Response:**    Admit.

127.    When Fernandez first began working at Osteria in October 2022, she was paid $15.00 per hour for training, and then was paid $10.00 per hour, plus tips. Fernandez Dep. 47:13-48:10.

**Response:**    Admit.

128.    At some point, Fernandez earned a raise to $12.50 per hour, plus tips (and later, her paystubs show that she received another raise to $15.00 per hour, though she denies this; she also denies ever being paid $11.00 per hour). Fernandez Dep. 49:21-50:11; 123:6-124:6; 62:11-12.

**Response:**    Admit.

129.    Apart from one (1) other employee, Fernandez is the only one to receive such a raise. Fernandez Dep. 62:21-63:6.

**Response:**    Admit.

130.    On average, Fernandez earned $1,200 to $1,300 per week at Osteria, including nightly tips of $50 at the lowest, $300 at the highest, and $200 on average. Fernandez Dep. 89:19-24; 40:22-41:7.

**Response:**    Admit.

131.    Fernandez typically worked between thirty-eight (38) and forty-one (41) hours per week at Osteria, with some variation. Fernandez Dep. 58:14-16; 90:4-6; 90:14-25; 91:2-5.

**Response:**    Admit.

132.    Fernandez believes that the lowest amount she ever received in a week was $700.00. <u>Fernandez Dep. 89:25-90:3.</u>

**Response:**    Admit.

133.    Fernandez admits that even her lowest weekly pay, $700, divided by her highest hours worked would yield an hourly rate of $17.07. <u>Fernandez Dep. 90:7-13; 91:6-8.</u>

**Response:**    Admit that Fernandez's lowest weekly pay including wages *and* tips divided by her highest number of hours would yield hourly *earnings* of $17.07 however deny that that means that she earned an "hourly rate" of $17.07.

By way of further response, Plaintiffs state that Defendants are mischaracterizing the term "hourly rate," as tips are not included in the calculation of an employee's hourly rates. *E.g., Davis v. 2192 Niagara St., LLC*, No. 15-CV-00429A(F), 2016 U.S. Dist. LEXIS 98351, at *28 (W.D.N.Y. July 26, 2016) ("[U]nder the FLSA, an employer is required to pay its employees overtime pay at the rate of one and one-half times each employee's regular hourly rate defined as including 'all remuneration for employment,' *but specifically excluding tips or gratuities*." (quoting 29 U.S.C. § 207; 29 C.F.R. § 531.60) (emphasis added)).

134.    Fernandez admits to receiving tips from the tip pool, at the end of every night. <u>Fernandez Dep. 80:5-8; 81:3-5.</u>

**Response:**    Admit.

135.    Fernandez admits that, other than Perez's participation in the tip pool, she had no other complaints regarding her wages at Osteria. <u>Fernandez Dep. 91:9-12.</u>

**Response:**    Admit.

136.    Teran typically worked thirty-six (36) to forty (40) hours per week. <u>Teran Dep.</u> <u>71:17-21.</u>

**Response:**    Admit.

137.    Teran's typical weekly pay, including tips, was around $800 to $900. <u>Teran Dep.</u> <u>71:22-72:7.</u>

**Response:**    Admit.

138.    Teran admits that his typical weekly pay of $800 with tips (at the low end), divided by 40 hours per week (at the high end), would yield an hourly rate of $20, which is above the minimum wage. <u>Teran Dep. 72:8-23; 73:8-74:3.</u>

**Response:**    Admit that Teran's typical weekly pay including wages *and* tips divided by his highest number of hours would yield hourly *earnings* of $20, however deny that that means that he earned an "hourly rate" of $20.

By way of further response, Plaintiffs state that Defendants are mischaracterizing the term "hourly rate," as tips are not included in the calculation of an employee's hourly rates. *E.g., Davis v. 2192 Niagara St., LLC,* No. 15-CV-00429A(F), 2016 U.S. Dist. LEXIS 98351, at *28 (W.D.N.Y. July 26, 2016) ("[U]nder the FLSA, an employer is required to pay its employees overtime pay at the rate of one and one-half times each employee's regular hourly rate defined as including 'all remuneration for employment,' *but specifically excluding tips or gratuities*." (quoting 29 U.S.C. § 207; 29 C.F.R. § 531.60) (emphasis added)).

139.    Osteria utilizes Toast to ensure that in the event any employee's tipped minimum wage, together with that employee's tips earned in a week, amounts to less than the regular

minimum wage for that week, the Toast system automatically adds the differential owed to make up the difference. <u>Petrosyants Dep. 92:14-16; Willsey Decl. ¶ 20-23.</u>

**Response:**    Plaintiffs lack sufficient knowledge to admit or deny the assertion in Paragraph 139.

140.    Willsey maintains in her declaration that this is reflected in the pay stubs of every employee at Bulldozer. <u>Willsey Decl. ¶ 24</u>; <u>see</u> <u>also</u>, <u>e.g.</u>, ECF Docket Entry 50-2 at 2, 4, 6, 8, 10, 12, 14, 16, 18, 20, 22, 24, 26, 28, 30, 32, and 34 (providing "Additional Information" that the regular rate of pay is $16.50, tip credit is $1.50, and tipped wage is $15.00, and showing no tip make up because she earned the minimum wage with her tips)

**Response:**    Admit that that is what Willsey maintains in her declaration.

141.    Notably, Fernandez was terminated from Osteria (by Paliko), while she was on a two (2) week vacation. <u>Fernandez Dep. 119:16-19; 33:19-34:10; 35:4-7.</u>

**Response:**    Admit.

142.    Teran quit both due to an unrelated knee injury, and due to the pressure he had been feeling around Paliko and Perez. <u>Perez Dep. 56:11-24; 74:13-23; 84:14-23; 85:6-7; 105:24-106:5.</u>

**Response:**    Admit.

143.    Fernandez admits in her deposition that she is suing because she was fired. <u>Fernandez Dep. 141:24-142:7.</u>

**Response:**    Admit that Fernandez brought the lawsuit, among other reasons, because she was fired but deny that that is the only reason she filed the lawsuit.

144.    Additionally, Fernandez says she is suing partly because she was harassed and discriminated against, despite no such causes of action existing within this lawsuit. <u>Id.; 94:3-7; 96:5-18; 97:11-98:20; 138:10-19.</u>

**Response:**    Admit. By way of further response, Plaintiffs state that Fernandez also filed a complaint against Defendants with the EEOC. Buzzard decl. ¶ 17.

145.    Fernandez says in her deposition that she is suing to get justice for her suffering, yet has not established any injury, or even any violation of the law irrespective of an injury to her, pertaining to any of the claims herein. Fernandez Dep. 93:21-94:2; 94:13-25; 97:11-98:20.

**Response:**    Deny. The statements in Paragraph 145 are nonsensical as Plaintiff Fernandez has the instant action pending and no findings have been made in this lawsuit.

146.    Fernandez also contradicts her own stated motivations, when she admits that "I don't care if they obey the law right now because I don't work there anymore." Fernandez Dep. 95:2-10.

**Response:**    Admit that Fernandez made that statement but deny that Defendants have proffered any evidence that that statement somehow contradicts Fernandez's "own stated motivations."

147.    In fact, Fernandez repeatedly said "I don't care" at her deposition. Fernandez Dep. 95:7; 132:2, 4-6, 9; 134:21; 139:10-11; 147:11; 148:7.

**Response:**    Admit.

148.    Despite Harry's not paying Fernandez the minimum wage on at least one occasion, and notwithstanding Harry's never paying her to make up for that difference, Fernandez has never pursued any claims against Harry's. Fernandez Dep. 30:14-31:14; Fernandez Dep. 28:23-29:14; 30:11-13.

**Response:**    Admit the assertion but deny that it is material to the instant motion.

149.    Similarly, Teran previously pursued legal action against only one of the other restaurants he worked at, Seafire Grill, despite them all having similar tip credit minimum wage

policies and all not providing written notice. Teran Dep. 20:19-23:19; Teran Dep. 31:25-32:8; Teran Dep. 32:9-20.

**Response:** Admit the assertion but deny that it is material to the instant motion.

150. Fernandez's pay stubs show she was properly paid at all times. Kataev Decl. ¶ 3, Ex. A.

**Response:** Deny.

By way of further response, Plaintiffs state that the Plaintiffs' paystubs merely show what they were paid and do not on their own in any way establish that they were "properly paid at all times." To be sure, Plaintiffs were paid pursuant to a tip credit even though they were not provided with written notice of the tip credit, which is illegal, and they were illegally required to share tips with Perez, a managerial employee. (SAMF 154-201, 257-272).

151. Teran's pay stubs show he was properly paid at all times. Kataev Decl. ¶ 5, Ex. C.

**Response:** Plaintiffs incorporate their response to Paragraph 50 here.

152. Defendants' special event contracts make it evident that the three percent (3%) service charge was mandatory and not a gratuity, because each contract had the same service charge and since each contract had an automatic eighteen percent (18%) gratuity alongside the three percent (3%) service charge. Kataev Decl. ¶ 4, Ex. B.

**Response:** Deny. The assertion in Paragraph 33 is not a factual statement but rather a legal conclusion and should thus be stricken.

By way of further response, Plaintiffs state that whether a "service charge" is a gratuity is a legal question which is not determined based Defendants' self-serving testimony. Specifically, under New York State law, a "service charge" is presumed to be

a gratuity unless certain preconditions are met. *See* N.Y. Comp. Codes R. & Regs. tit. 12, § 146-2.18(b) (there is "a rebuttable presumption that any charge in addition to charges for food, beverage, and other specified materials or services, including…any charge for 'service' or 'food service,' is a charge purported to be a gratuity"), § 146-2.19(b) ("The employer has the burden of demonstrating, by clear and convincing evidence, that the notification [that a charge is not a gratuity] was sufficient to ensure that a reasonable customer would understand that such charge was not purported to be a gratuity.").

## II.    STATEMENT OF ADDITIONAL MATERIAL FACTS

### A.  Julio Perez Was A Manager/Supervisor at OLB

153.    While OLB employs, servers, bussers, runners and bartenders as part of the tipped front of the house food-service staff, the Restaurant also employs one individual, Julio Perez, to supervise the food-service staff. (Petrosyants Dep. at 72:15-73:7).

154.    Perez's primary job duties at OLB were to supervise and oversee the food-service employees to ensure that they were performing their duties properly. (Fernandez Decl. ¶ 5).

155.    While the food-service employees wear specific uniforms, Perez does not have a uniform and he wears a suit and tie. (Paliko Dep. at 81:10-14, 82:5-12, 82:16-19).

156.    Perez interviews prospective hires at OLB. (Petrosyants Dep. at 102:12-105:22; Fernandez Decl. ¶¶ 6-10).

157.    For example, Plaintiff Teran was interviewed by Perez. (Teran Dep. at 41:21-42:7).

158.    An another example, Plaintiff Fernandez witnessed Perez interviewing prospective hires on many occasions. (Fernandez Decl. ¶ 7). Specifically, Plaintiff Fernandez saw Perez sitting at a table and talking with individuals who, at the time, did not work at the Restaurant.  (*Id.* ¶ 8). Oftentimes, she saw Perez reviewing a resume with those individuals.  (*Id.*) Later, she saw some of

these individuals start training in the Restaurant and become full-fledged employees, some immediately after meeting with Perez. (*Id*. ¶ 9). On several occasions, neither Paliko nor OLB's owners were present in the restaurant. (*Id.* ¶ 10).

159.    Perez has and exercises the authority to hire employees at OLB. (*Id*. ¶ 6, 11).

160.    For example, on at least three or four occasions, new employees explicitly told Plaintiff Fernandez that Perez had hired them. (*Id*.).

161.    Perez also participated in the hiring of Teran. (Teran Dep. at 41:21-42:7).

162.    Perez has and exercises the authority to fire employees at OLB. (*Id*. ¶ 12).

163.    As an example, Plaintiff Fernandez witnessed a server complaining to Perez that a busser was not performing their job duties adequately. Perez proceeded to yell at the busser and told them they were "stupid" and "were not doing their job." Perez then told the busboy to "get out of here," and Plaintiff Fernandez never saw that busser work at the Restaurant again. (*Id*. ¶¶ 13-15).

164.    As another example, during one shift, a runner named Janet was not performing her duties well. Perez came over to me and said, "I'm going to fire her." A few days later, Janet was no longer working at the Restaurant. Later, Perez acknowledged to Fernandez that he fired Janet. (*Id*. ¶ 17-18).

165.    Perez has and exercises the authority to discipline employees at OLB. (*Id*. ¶ 23).

166.    For example, if a server complained to Perez about a runner's or busser's performance, Perez would sometimes cut the runner or busser and tell them to leave early. This would, of course, directly affect that employee's income as they earned less tips and hourly pay than they otherwise would have for that shift. (*Id*. ¶ 24).

167.    As another example, Perez once issued Fernandez a written warning. Specifically, Perez provided her with a disciplinary form called "Corrective Action Record." That form was essentially a written warning issued to Fernandez for not attending a meeting that the Restaurant's management said they expected her to attend. The form states that "Any further violation of the above mentioned incident, or any other company violation, may result in additional corrective action, up to and including termination." The form was signed by Perez as "supervisor" and his signature appears above the line that states "Supervisor Signature." (*Id*. ¶ 27).

168.    Perez participates in setting employees' schedules at OLB. (Petrosyants Dep. at 107:5-11; Fernandez Decl. ¶¶ 28-35 ).

169.    For example, if an employee needed to call out from work due a last minute reason or if they wanted a day off of work, they had to call or message Perez and inform him so that he could approve their request. (*Id*. ¶ 29).

170.    Similarly, if there were fewer reservations than expected, Perez would call certain employees and tell them not to come into work that day. (*Id*. ¶ 30; Petrosyants Dep. at 97:22-25).

171.    As another example, if employees need a day off or want to swap shifts with each other, they asked Perez for his approval. (Fernandez Decl. ¶ 34).

172.    Perez had and exercised the authority to grant or deny requests relating to scheduling on the spot and did not need to first get Mr. Paliko's permission to approve or deny any requests to alter employees' schedules. (*Id*. ¶ 35).

173.    Perez has the authority to write up employees at OLB if they were not performing their duties properly. (Petrosyants Dep. at 113:10-114:4; Fernandez Decl. ¶ 27).

174.    Perez trains new hires at OLB. (Petrosyants Dep. at 71:23-72:18).

175.    For example, Perez trains food-service employees as to their job duties, how to serve customers and, for employees tasked with clearing, how to clear tables. (*Id*. at 72:5-18).

176.    Perez has the authority to comp and void items on customers' checks. (*Id*. at 97:19-21).

177.    The Restaurant's general manager, Paliko, takes off one or two days each week. *Id*. at 93:10-16; Fernandez Decl. ¶ 60).

178.    On the days that Paliko and the Individual Defendants are not present in the restaurant, Perez is the highest ranking management employee at OLB, and he supervises and oversees the food-service employees. (Petrosyants Dep. at  93:10-24, 98:23-99:14; Fernandez Decl. ¶ 10).

179.    When Paliko is not present in the restaurant, Perez reports to Petrosyants and Paliko about any issues that happen at the restaurant. (Petrosyants Dep. at  98:9-17).

180.    Similarly, on those occasions, Perez assigns the food-service employees to work in specific sections of the restaurant. (Petrosyants Dep. at 99:15-100:4).

181.    Prior to every dinner shift at the Restaurant, there is a pre-shift meeting which all the front of the house employees are required to attend. (Id. at 66:23-67:2; Fernandez Decl. ¶ 36).

182.     At the meetings, management employees, including Paliko, Petrosyants and Perez, discuss all aspects of employees' duties at the Restaurant including, for example, issues relating to serving customers, menus, uniforms, staffing, and tip sharing. (*Id*. ¶¶ 37, 40-42; Petrosyants Dep. at 67:14:23).

183.    Perez sometimes disciplines employees during these meetings. (Fernandez Decl. ¶ 38).

184.     For example, at one such meeting, Mr. Perez singled out an employee named Nancy for not wearing the type of shoes the Restaurant required front of house employees to wear. Mr. Perez sent Nancy out of the meeting and told her to go change her shoes and that he did not want to see her with those shoes again. Mr. Perez also told all the employees who were present that "if someone comes with wrong shoes, they will be sent home or fired." (*Id*. ¶ 39).

185.     On the days that Paliko is not present in the restaurant, Perez runs the food-service employees' pre-shift meeting alone. (Petyrosyants Dep. at 100:5-8).

186.     Perez directed service employees as to which station that they would cover for a meal service without reference to any paper showing who was assigned to which station. (Molina Dep. at 81:13-23).

187.     During a meal service, Perez directs the service staff on "everything," including directing them to clean certain tables, prepare tables for incoming guests, bring water to tables, and to help out at other servers' stations. (Molina Dep. at 85:12-24).

188.     Unlike other waitstaff, who all had their own "station" during a meal service, Perez did not have his own station. (Molina Dep. at 92:12-21).

189.     Plaintiff Teran reported to Perez. (Teran Dep. at 40:21-23).

190.     Perez has recommended employees for promotions at the Restaurant. (Fernandez Decl. ¶¶ 47-48).

191.     If employees had complaints about issues such as, for example, coworkers' performances or under- of over-staffing at the Restaurant, they would raise the issues with Perez or Paliko. (*Id*. ¶¶ 49-50).

192.    Perez would frequently tell the employees that if they had an issue with a coworker they should not raise it with the coworker but rather bring it to Perez's attention first and that he would handle it. (*Id*. ¶ 51).

193.    Perez was involved in payroll calculations at the Restaurant. (*Id*. ¶ 52).

194.    For example, on some occasions, Mr. Perez would inform the employees about how much their share of the tip pool was in a given week. (*Id*.).

195.    On some occasions, Perez would inform the employees via text message about how much their share of the tip pool was in a given week. (*Id*.).

196.    Perez also had the authority to alter employees' time records. (*Id*. ¶ 53).

197.    For example, on a few occasions, Plaintiff Fernandez forgot to clock-in at the beginning her shift or to clock-out at the end of the shift. On these occasions, she contacted Perez to inform him of her mistake, and he corrected the time record for her. (*Id*. ¶ 54).

198.    Customers at the Restaurant frequently left cash tips for the waitstaff. The cash tips were distributed to employees at the end of the shift. (*Id*. ¶ 55).

199.    On some occasions, Perez would be responsible for gathering all the cash tips, calculating how much each employee was owed, and then distributing the cash tips to each specific employee. (*Id*.).

200.    Perez participates in OLB's food-service employees' tip pool as if he were a server. (Petrosyants Dep. at 114:5-7).

201.    The Restaurant's internal payroll systems lists Perez as a "manager" together with Palyko, the restaurant's general manager. (Fernandez Decl. ¶¶ 57-59).

202.    Although Perez participates in the restaurant's tip pool and receives a server's share, he is not paid the tip credit wage like the other food-service employees. (Buzzard Decl. ¶¶ 14-16, Ex. 12).

203.    For example, Defendants' payroll records indicate that, in 2024, Perez was paid $20 per hour whereas the servers, bussers, runners and bartenders were typically paid the tip credit minimum wage of $10.65 per hour . (Buzzard Decl. ¶¶ 14-16, Ex. 12).

**Defendants' Shahmuradyan's and Petrosyants's Operational Control Over OLB**

204.    Defendant Shahmuradyan owns and operates OLB. (Complaint ¶ 10; Answer ¶ 10).

205.    As owner, Defendant Shahmuradyan "oversees everything" at the restaurant. (Shahmuradyan Dep. at 48:3-11 ("I oversee everything.")).

206.    Defendant Shahmuradyan has "ultimate authority over all operations of the restaurant." (Shahmuradyan Dep. at 69:24-70:8 ("Q: Okay. Now, as owner of the restaurant, you have ultimate authority over all operations of the restaurant, correct? A: Correct.").

207.    As the 100% owner, Defendant Shahmuradyan has financial control over the restaurant. (Shahmuradyan Dep. at 35:23-36:2).

208.    Defendant Shahmuradyan has authority to hire and fire any employee at the restaurant. (Shahmuradyan Dep. at 70:5-8).

209.    Defendant Shahmuradyan ultimately decides how much employees are paid at OLB. (Shahmuradyan Dep. at 20:24-21:13 ("Q; But as the owner, you were the one who decided how much everyone was going to make at the restaurant; right? A: Yeah. …").

210.    Paliko was hired by Defendant Shahmuradyan to manage the day-to-day operations of OLB. (Shahmuradyan Dep. at 20:12-14, 22:22-23:3, 82:13-20).

211.    Defendant Shahmuradyan decided how much to pay Paliko when he was hired at OLB. (Shahmuradyan Dep. at 54:16-55:5).

212.    The restaurant's general manager, Paliko, reports to Defendant Shahmuradyan. (Shahmuradyan Dep. at 41:8-12)

213.    Every week, Defendant Shahmuradyan speaks with Paliko via telephone about OLB's operations. (Shahmuradyan Dep. at 23:8-10).

214.    During these telephone meetings, Defendant Shahmuradyan checks to make sure that payroll at the restaurant was run. (Shahmuradyan Dep. at 23:11-16).

215.    During such meetings, Shahmuradyan asks Paliko "to make sure to send [her] all the reports" and that "payroll is done," and she "makes sure [payroll] is done." Shahmuradyan Dep. at 23:13-16.

216.    Defendant Shahmuradyan sometimes meets with Paliko in-person at OLB. (Shahmuradyan Dep. at 29:16-23).

217.    During these meetings, Defendant Shahmuradyan discuss OLB's day-to-day operations and whether there any problems with the restaurant's payroll. (Shahmuradyan Dep. at 29:24-30:7).

218.    Defendant Shahmuradyan gave Paliko the responsibility to decide how much to pay the tipped employees at OLB. (Shahmuradyan Dep. at 25:7-21).

219.    Defendant Shahmuradyan gave Paliko the responsibility to interview, schedule, and terminate employees at OLB. (Shahmuradyan Dep. at 25:22-26:16).

220.    Defendant Shahmuradyan hired the head chef at OLB when the restaurant first opened. (Shahmuradyan Dep. at 21:15-22).

221.    Defendant Shahmuradyan decided how much to pay the head chef. (Shahmuradyan Dep. at 21:23-22:17).

222.    Defendant Shahmuradyan tasked the head chef with hiring the employees who worked in the kitchen at OLB. (Shahmuradyan Dep. at 22:18-21).

223.    OLB's payroll company is called Toast. (Shahmuradyan Dep. at 53:8-10).

224.    OLB employees' payroll records are maintained on Toast. (Petrosyants Dep. at 60:12-15).

225.    Defendant Shahmuradyan has access to OLB's payroll records that are electronically-maintained through Toast. (Shahmuradyan Dep. at 23:20-25:6 (testifying that she has access to "the application where [she] see[s] the payroll" through Toast and that she "mostly go[es] on QuickBooks")).

226.    Shahmuradyan reviews OLB's payroll through Toast at least once per month. (Shahmuradyan Dep. at 23:22-24:3).

227.    As the owner, Shahmuradyan "look[s] down" at the restaurant's finances and "goes through all the QuickBooks." (Shahmuradyan Dep. at 16:20-23).

228.    Defendant Shahmuradyan is present in the restaurant a few times each week. (Petrosyants Dep. at 65:2-23).

229.    Defendant Shahmuradyan is listed as the principal on OLB's liquor license. (Shahmuradyan Dep. at 69:10-13).

230.    Defendant Shahmuradyan signs off on OLB's tax returns. (Shahmuradyan Dep. at 16:22-24).

231.    Defendant Shahmuradyan is "the boss" of the Restaurant. (Petrosyants Dep. at 64:9-11.)

232.    As "the owner," Shahmuradyan "has access to anything she wants" at the restaurant. (Petrosyants Dep. at 52:2-4).

233.    Defendant Petrosyants was hired by his wife, Defendant Shahmuradyan to be OLB's director of operations. (Shahmuradyan Dep. at 18:16-34; Petrosyants Dep. at 21:23-25).

234.    Defendant Petrosyants was not interviewed prior to being hired. (Petrosyants Dep. at 21:23-22:15).

235.    Shahmuradyan has given Petrosyants "carte blanche to do whatever [he] want[s] in terms of running the operations" of the restaurant. (Petrosyants Dep. at 37:15-18, 38:7-11).

236.    Defendant Petrosyants' job duties are "running the business" of OLB. (Petrosyants Dep. at 20:11-13; 33:13-34:14; 52:10-12).

237.    Specifically, Defendant Petrosyants is responsible for "oversee[ing] the operations," vendors, payments, the quality of food, and the quality of service at OLB. (Petrosyants Dep. at 20:11-18).

238.    Petrosyants job of "run[ning] the restaurant" includes "mak[ing] sure that the financials are in line with . . . being a profitable restaurant. (Petrosyants Dep. at 52:10-12).

239.    Defendant Petrosyants is also responsible for ensuring that employees are paid at the restaurant and "paid properly." (Petrosyants Dep. at 21:11-18).

240.    Defendant Petrosyants has the authority to hire and fire employees at the restaurant. (Petrosyants Dep. at 23:13-25).

241.    Defendant Petrosyants has the authority to discipline employees at OLB. (Petrosyants Dep. at 101:24--102:7).

242.    When Shahmuradyan is not present in the restaurant, Petrosyants is the "highest-ranking" employee. (Petrosyants Dep. at 66:3-8).

243.    Petrosyants meets with the restaurant's general manager a "[f]ew times per week" to discuss "[o]perations in the restaurant." (Petrosyants Dep. at 29:8-16.)

244.    During these meetings, Petrosyants and the general manager discuss service at the restaurant to ensure that it is running "[p]roperly and good," and that the front-of-house service staff are providing consistent service to customers. (Petrosyants Dep. at 30:8-31:6.)

245.    When he is in the restaurant, Petrosyants pays close attention to whether the front-of-house service staff are providing consistent performance for the customers. (Petrosyants Dep. at 30:23-31:10).

246.    When Defendant Petrosyants sees a server not performing their duties properly, he would report that to OLB's manager, who would then "take action." (Petrosyants Dep. at 32:17-22).

247.    OLB has pre-shift meeting for its front-of-the-house employees before the commencement of each shift at the restaurant. (Petrosyants Dep. at 66:23-67:2, 67:24-68:2).

248.    Defendant Petrosyants attends and provides directions at the pre-shift meetings. (Petrosyants Dep. at 67:14-19).

249.    For example, Defendant Petrosyants discussed employees maintaining consistency, performance, and "best value" at the restaurant. (Petrosyants Dep. at 67:20-23).

250.    At these meetings, he also "mak[es] sure that everyone" gives their "consistently best performance." (Petrosyants Dep. at 68:6-14).

251.    Defendant Petrosyants frequently discusses staffing issues with OLB's managers to ensure the restaurant schedules correct number of employees scheduled to work each shift. (Petrosyants Dep. at 80:12-81:9).

252.    Defendant Petrosyants has access to OLB's payroll records maintained by the restaurant's payroll company, Toast. (Petrosyants Dep. at 60:9-21).

253.    Defendants Shahmuradyan and Petrosyants hired the restaurant's accountant. (Shahmuradyan Dep. at 39:13-19; Petrosyants Dep. at 59:5-12).

254.    Shahmuradyan, Petrosyants, and OLB's general manager are the only three people with access to OLB's hard-copy records, which are maintained in the restaurant's storage area. (Petrosyants Dep. at 51:6-52:4.)

255.    Petrosyants participated in hiring Paliko as general manager. (Buzzard Decl., Ex. 3 (Paliko Dep.) at 17:14-17.)

256.    Petrosyants gave Paliko a pay increase. (Paliko Dep. at 18:7-9, 20:24-21:6).

**Food-Service Employees Were Not Provided Written Wage Notices at OLB**

257.    Katherine Fernandez was never provided with a written notice and acknowledgment of pay rate form while she worked at OLB. (Fernandez Decl. ¶ 56).

258.    Adrian Montor-Teran was never provided with a written notice and acknowledgment of pay rate form while he worked at OLB. (Buzzard Decl., Ex. 13).

259.    Javier Patricio Molina was never provided with a written notice and acknowledgment of pay rate form while he worked at OLB. (Molina Dep. 44:15-22.)

260.    In discovery in this Action, Plaintiffs served document requests ("Document Requests") on all Defendants (the "Requests"). (Buzzard Decl., Ex. 7 (Document Requests)).

261.    As part of the Document Requests, Plaintiffs also sought the production of any and all written notices of pay rates that Defendants provided to any Class Member. (Buzzard Decl., Ex. 7 at Requests 1, 5, 10, 11).

262.    In response to these requests, Defendants did not produce any written wage notices that Defendants contend they provided to any Class Member. (Buzzard Decl., Ex. 8 (Defendants' Responses) at Responses 1, 5, 10, 11).

263.    Prior to the initial conference in this lawsuit, the parties submitted a joint letter setting forth their agreement about certain pre-certification discovery that Defendants agreed to produce. (ECF Dkt. No. 26).

264.    As part of that agreement, Defendants agreed to produce the following information:

All wage notices/pay rate acknowledgment forms that Defendants allegedly provided tipped employees who worked at OLB during the limitations period and, as a result of which, Defendants claims they complied with the new hire notice/tip credit notice requirements for the putative class. To the extent Defendants do not have any such records, they will inform Plaintiffs to this effect in writing by the September 26, 2025 production deadline.

(*Id*. at 2).

265.    On September 11, 2025, this Court approved the parties' agreement. (ECF Dkt. No. 27).

266.    On September 26, 2025, Defendants' attorneys emailed Plaintiffs' counsel the following about their agreement to all wage notices/pay rate acknowledgment forms:

These documents have not yet been located. We will follow up regarding availability.

(Buzzard Decl., Ex. 9 (September 26 Email) at p. 2.)

267.    At his November 18, 2025 deposition, Petrosyants, who was testifying on behalf of himself and the corporate defendant, stated that OLB was "still searching" for any notices of how employees were to be paid but had not found any yet. (Petrosyants Dep. at 171:7-17.)

268.    When asked at deposition whether Plaintiff and any other food service employees had been provided with "notice of the tip credit," Petrosyants responded, "I don't know" and "I have no idea." (Petrosyants Dep. at 176:14-22.)

269.    Defendants did not produce any wage notices/pay rate acknowledgment forms in discovery. (Buzzard Decl. ¶ 11).

270.    The paystubs Defendants provided employees had multiple regular hourly rates listed on them. (Buzzard Decl. ¶ 16, Ex. 14).

271.    For example, the paystubs Defendants provided to Plaintiff Fernandez in 2024 listed three regular hourly rates on them: $10.00, 15.00 and $16.50. (*Id*.).

272.    The paystubs OLB provided employees did not state that: "if [employees] did not receive sufficient tips to make up the difference between the tipped wage and the minimum wage the tip makeup amount to pay them the full minimum wage they are entitled to." (*Id*.).

Dated: January 22, 2026                **JOSEPH & KIRSCHENBAUM LLP**
New York, NY

By:   */s/Lucas C. Buzzard*
       D. Maimon Kirschenbaum
       Josef Nussbaum
       Lucas C. Buzzard
       45 Broadway, Suite 320
       New York, NY 10006
       212-688-5640

       *Attorneys for Plaintiffs*
       *and the putative class*