Docusign Envelope ID: 6EF153E3-81D4-4322-8017-AA757F39E969

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KATHERINE FERNANDEZ, on behalf of herself and others similarly situated,

    Plaintiff,

 v.

BULLDOZER HOSPITALITY GROUP, INC., d/b/a OSTERIA LA BAIA, ROBERT PETROSYANTS and MARIANNA SHAHMURADYAN,

    Defendants.

No.: 25-cv-04490 (AS)

## DECLARATION OF KATHERINE FERNANDEZ

I, Katherine Fernandez, under penalty of perjury, declare as follows:

1. I was formerly employed by Osteria La Baia Restaurant in Manhattan and I am a Plaintiff in this lawsuit. I am familiar with the facts and circumstances set forth herein.

2. I submit this declaration in support of Plaintiffs' opposition to Defendants' motion for summary judgment.

3. I worked at Osteria La Baia (the "Restaurant") as a busser/runner from 2022 through 2025.

4. When I worked at the Restaurant, I worked together with an individual named Julio Perez who was a manager at the Restaurant.

5. Perez's primary job duties at OLB were to supervise and oversee the food-service employees to that they were performing their duties properly.

6. Mr. Perez had and exercised the authority to interview and hire front-of-house employees at the Restaurant.

7. I personally witnessed Mr. Perez interview prospective employees on many occasions.

8. Specifically, on multiple occasions I saw Mr. Perez sitting at a table and talking with someone who, at the time, did not work at the Restaurant. Oftentimes, I saw Mr. Perez reviewing a resume with those individuals. Later I saw some of these individuals start training in the Restaurant and become full-fledged employees.

9. On some occasions, the people Mr. Perez met with started training immediately after their meeting with Mr. Perez.

10. These interviews which led to some people starting to train immediately after the interviews also occurred on days that the Restaurant's general manager, Janos Paliko, and the Restaurant's owners were not present in the Restaurant. On those occasions, Mr. Perez was the highest ranking management employee present in the restaurant.

11. On at least three or four occasions, new employees explicitly told me that Mr. Perez had hired them.

12. Mr. Perez also had and exercised the authority to fire employees at Osteria La Baia.

13. For example, I witnessed a server complaining to Mr. Perez that a busser was not performing their job duties adequately.

14. Mr. Perez yelled at the busser and told them they were "stupid" and "were not doing their job."

15. Mr. Perez then told the busboy to "get out of here," and I never saw that busser work at the Restaurant again.

16. On another occasion, a coworker of mine told me they were not working at the Restaurant anymore because they were terminated. The coworker explicitly told me: "I'm leaving, Julio fired me."

17. As another example, during one shift, a runner named Janet was not performing her duties well. Mr. Perez came over to me and said, "I'm going to fire her." A few days later, Janet was no longer working at the Restaurant.

18. Moreover, Janet was fired while she was on vacation from Osteria La Baia. I inquired with Mr. Perez as to whether he intentionally fired her while she was on vacation because I did not think that was an appropriate thing to do. In that conversation, Mr. Perez acknowledged to me that he was the one that fired Janet.

19. Another time a busser named Egson (spelling unknown) was staying longer at work than was necessary to complete his duties. This aggravated some of my coworkers because one of the factors that affected how much employees shared in tips from the tip pool at the Restaurant was the amount of time that each employee worked during the shift. If an employee worked longer they received a large share of the tips and vice versa. Thus, by staying longer, Egson was inflating the amount tips he was entitled to.

20. Some employees at the Restaurant complained to Mr. Perez about Egson's behavior, and I heard Mr. Perez say, "I'm going to fire him." Within one week of Mr. Perez uttering that statement, Egson no longer worked at the Restaurant.

21. Mr. Perez also threatened employees with termination if he did not like how they were performing their job duties.

22. He would frequently say "if you don't like the rules, get out of here," or "if you don't follow the rules, you'll be fired."

23. Mr. Perez also had and exercised the authority to discipline employees at the Restaurant.

24. For example, if a server complained to Mr. Perez about a runner's or busser's performance, Mr. Perez would sometimes cut the runner or busser and tell them to leave early. This would, of course, directly affect that employee's income as they earned less tips and hourly pay than they otherwise would have for that shift.

25. In addition, Osteria La Baia did not allow employees to swap shifts without telling management first. On some occasions when an employee swapped shifts with their coworker without telling management, I witnessed Mr. Perez reprimand that employee and tell them that, if it happened again, the employee would be terminated.

26. In fact, Mr. Perez threatened me with termination when I swapped shifts without telling him first.

27. As another example, Mr. Perez issued me a written warning. Specifically, Perez provided me with a disciplinary form called "Corrective Action Record." (Attached here as Exhibit A is copy of the form.) That form was essentially a written warning issued to me for not attending a meeting that the Restaurant's management said they expected me to attend. The form also states that "Any further violation of the above mentioned incident, or any other company violation, may result in additional corrective action, up to and including termination." The form was signed by Perez as "supervisor" and his signature appears above the line that states "Supervisor Signature."

28. While Mr. Perez did not create the weekly schedule the Restaurant, he was directly involved in and controlled front of the house employees' schedules at the Restaurant.

29. For example, if an employee needed to call out from work due a last minute reason or if they wanted a day off of work, they had to call or message Mr. Perez and inform him so that he could approve their request.

30. Similarly, if there were fewer reservations than expected, Mr. Perez would call certain employees and tell them not to come into work that day.

31. On a few occasions, I had to call out from work or needed to request a day off, and I called Mr. Perez to let him know so that he could approve my request.

32. Similarly, on a few occasions, Mr. Perez called me and told me that he did not need me to come in to work that day because the Restaurant was not busy.

33. Moreover, if employees were running late for work, they also had to inform Mr. Perez.

34. Lastly, as outlined above, if employees wanted to swap shifts with each other they needed Mr. Perez's or Mr. Paliko's permission.

35. Mr. Perez had and exercised the authority to grant or deny requests relating to scheduling on the spot and did not need to first get Mr. Paliko's permission to approve or deny any requests to alter employees' schedules.

36. Prior to every dinner shift at the Restaurant, there was a pre-shift meeting which all the front of the house employees were required to attend.

37. At the meetings, management employees (for example, Messrs. Paliko and Perez) discussed all aspects of employees' duties at the Restaurant including, for example, issues relating to serving customers, menus, uniforms, staffing, tip sharing, and work station assignments.

38. Mr. Perez sometimes disciplined employees during these meetings.

39. For example, at one such meeting, Mr. Perez singled out an employee named Nancy for not wearing the type of shoes the Restaurant required front of house employees to wear. Mr. Perez sent Nancy out of the meeting and told her to go change her shoes and that he did not want to see her with those shoes again. Mr. Perez also told all the employees who were present that "if someone comes with wrong shoes, they will be sent home or fired."

40. On the days that he worked, Mr. Perez would always attend these meetings.

41. On the days that Mr. Paliko worked, he also attended these meetings.

42. Similarly, on days that the Restaurant's owner Robert Petrosyants was in the Restaurant, he attended the pre-shift meetings.

43. When both Mr. Perez and Mr. Paliko were working a shift, they led the meeting together.

44. Mr. Paliko would usually take off one or two days each week. On these occasions, Mr. Perez would lead the meetings on his own.

45. There was always a management level employee working at the Restaurant. In other words, Mr. Perez, Mr. Paliko, and/or Ms. Petrosyants were present in the Restaurant during each shift to oversee the business's operations.

46. This is because the Restaurant is a complex operation and requires a management level employee to supervise its operations. The Restaurant's operational procedures do not just run themselves.

47. Mr. Perez was also involved in recommending employees for promotions at the Restaurant.

48. For example, a busser named James wanted to be promoted to runner. I heard Mr. Perez ask the chef on many occasions if there was any space to elevate James to runner. Specifically, I heard Mr. Perez tell the chef, "I want to make him a runner."

49. If employees had any complaints about issues such as, for example, coworkers' performances or under- of over-staffing at the Restaurant, they would raise the issues with either Mr. Perez or Mr. Paliko.

50. For example, if I had an issue with a server making mistakes in the kitchen or with a busser not cleaning and turning tables over fast enough, I would raise those issues with Mr. Perez directly.

51. Mr. Perez would frequently tell the employees that if they had an issue with a coworker they should not raise it with the coworker but rather bring it to Mr. Perez's attention first and that he would handle it.

52. Mr. Perez was involved in payroll calculation at the Restaurant. For example, on some occasions, Mr. Perez would inform the employees about how much their share of the tip pool was in a given week. (Attached hereto as Exhibit B is a copy of a text message from Mr. Perez to me in which he sent me a picture of payroll data at the Restaurant to show me how the tips were being distributed.)

53. Mr. Perez also had the authority to alter employees' time records.

54. For example, on a few occasions, I forgot to clock-in at the beginning of my shift or to clock-out at the end of the shift. On these occasions, I would contact Mr. Perez to inform him of my mistake, and he would fix the time record for me.

55. Customers at the Restaurant frequently left cash tips for the waitstaff. The cash tips were distributed to employees at the end of the shift. On some occasions, Mr. Perez would be

responsible for gathering all the cash tips, calculating how much each employee was owed, and then distributing the cash tips to each specific employee.

56. I was never provided, let alone signed, a written notice and acknowledgment of pay rate form while I worked at Osteria La Baia.

57. Attached here as Exhibit C are pictures of the screen of the Toast payroll system that the Restaurant used.

58. These are pictures of schedules that the Restaurant used.

59. In these pictures, you can see that Perez is listed together with Paliko in the "Restaurant Manager" section.

60. In addition, in the weeks listed in these schedules, you can see that Paliko was scheduled to be off on Sundays and Mondays and Perez was the only Restaurant Manager to be scheduled to work on those days.

Dated: 1/22/2026

By: _____
Katherine Fernandez