UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
KATHERINE FERNANDEZ, on behalf of herself and
others similarly situated,

                                  Plaintiff,

             -against-

BULLDOZER HOSPITALITY GROUP, INC., d/b/a
OSTERIA LA BAIA, ROBERT PETROSYANTS and
MARIANNA SHAHMURADYAN,

                                Defendants.
-------------------------------------------------------------------X

Case No.: 1:25-cv-4490 (AS) (GS)

**DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF ADDITIONAL MATERIAL FACTS PURSUANT TO LOCAL RULE 56.1 IN FURTHER SUPPORT OF THEIR MOTION FOR** <u>**SUMMARY JUDGMENT**</u>

       Defendants, Bulldozer Hospitality Group, Inc. ("Bulldozer"), Robert Petrosyants ("Petrosyants"), and Marianna Shahmuradyan ("Shahmuradyan") (Bulldozer, Petrosyants, and Shahmuradyan collectively hereinafter the "Defendants"), by their attorneys, Sage Legal LLC, hereby respectfully submit this submits this response (and counterstatement of facts) to the Plaintiffs' Statement of Additional Material Facts Pursuant to Local Rule 56.1 in Support of their Motion for Partial Summary Judgment (hereinafter "CSMF" or "Statement").

<u>**RESPONSES TO PLAINTIFFS' STATEMENT**</u>

    **AS TO "A. Julio Was a Manager/Supervisor at OLB"**

    153.     While OLB employs, servers, bussers, runners and bartenders as part of the tipped front of the house food-service staff, the Restaurant also employs one individual, Julio Perez, to supervise the food-service staff. (Petrosyants Dep. at 72:15-73:7).

**Response: Deny. Plaintiffs blatantly mischaracterize the fact located at this citation ("Q: And who's the main server? A: Julio."). <u>Petrosyants Dep.</u> 72:15-16. At most, Petrosyants testifies that Perez is "server-slash-captain," and that this may consist of "[t]raining staff." <u>Petrosyants Dep.</u> 73:2-16. Defendants testify elsewhere that all this means is that Perez is the**

most experienced server that OLB has; this naturally results in him demonstrating leadership regarding the job duties he shares with other servers. Petrosyants Dep. 72:19-75:21; 93:17-22; 98:4-14; Fernandez Dep. 75:13-19; Paliko Dep. 89:22-90:6; Perez Decl. ¶ 5, 10, 23, 30. At times, usually on the rare occasions when Paliko is not present, Perez oversees his fellow servers to ensure service is performed adequately, not to discipline them. Petrosyants Dep. 93:23-94:24; 97:10-21; 98:18-99:3; 99:20-100:8; 111:17-114:4; Teran Dep. 68:23-69:6; Paliko Dep. 23:2-25:9; 94:6-9. During these occasions, Perez does not have increased duties to manage or supervise front-of-house staff. Perez Decl. ¶¶ 13, 23-24, 37 ("While I do handle complaints from patrons, I do not handle complaints made by employees; the General Manager handles any employee complaints"). All decisions pertaining to hiring, firing, disciplining all front-of-house staff, and other day-to-day employee operations, are the responsibility of the managers like Paliko. Shahmuradyan Dep. 16:25-17:3; 82:13-20; Paliko Decl. (74) ¶¶ 13-15.

154.    Perez's primary job duties at OLB were to supervise and oversee the food-service employees to ensure that they were performing their duties properly. (Fernandez Decl. ¶ 5).

Response: Deny. As head waiter or Captain at OLB, Perez' main job duties consist of "primarily serv[ing] customers," as well as "(i) training the front-of-house staff on their duties; (ii) telling the front-of-house staff the specials for the day; (iii) encouraging the front-of-house staff to do good work and provide better service; (iv) meeting job applicants during their interviews to build a good rapport with them; and (v) keeping an eye on the floor to report any issues to the General Manager, who will then decide what, if anything, to do about any such issues." Perez Decl. ¶¶ 1, 10. In other words, any duties/oversight that Perez performs arise directly out of his role as a server with the most experience. Petrosyants Dep.

**72:19-73:7; 93:17-22; 98:4-14; Paliko Dep. 89:22-90:6. Perez's role is limited to ensuring customers are properly served; he does not make any hiring, firing, or disciplinary decisions. Perez Decl. ¶¶ 11-13; Petrosyants Dep. 93:23-94:24; 97:10-21; 98:18-99:3; 99:20-100:8; 111:17-114:4; Teran Dep. 68:23-69:6; Paliko Dep. 23:2-25:9; 94:6- 9. On occasions when Paliko is not present, Perez does not have increased duties to manage or supervise front-of-house staff. Perez Decl. ¶¶ 13, 23-24, 37 ("While I do handle complaints from patrons, I do not handle complaints made by employees; the General Manager handles any employee complaints"); Paliko Dep. 93:12-24 (Paliko assigns employees to their sections in advance for days when he is absent). Perez does not make any key decisions at OLB – he has no authority over maintaining sales records; printing tip reports and distributing tips; taking custody of any cash tips; selecting materials, supplies, machinery, equipment, tools, or food; or decision-making regarding the safety or security of employees, budgeting, or legal compliance. Perez Decl. ¶¶ 31-35, 39-44; Teran Dep. 59:19-22; 66:18-21. All decisions pertaining to hiring, firing, disciplining all front-of-house staff, and other day-to-day employee operations, are the responsibility of the managers like Paliko. Shahmuradyan Dep. 16:25-17:3; 82:13-20; Paliko Decl. (74) ¶¶ 13-15.**

155.    While the food-service employees wear specific uniforms, Perez does not have a uniform and he wears a suit and tie. (Paliko Dep. at 81:10-14, 82:5-12, 82:16-19).

**Response: Admit, but object to this statement as immaterial, because wearing a suit and tie instead of a uniform is merely reflective of Perez's seniority, and is otherwise a legitimate business decision that does not necessitate status as a manager/supervisor with employer-like authority. Petrosyants Dep. 72:19-73:7; 93:17-22; 98:4-14; Paliko Dep. 89:22-90:6.**

156.     Perez interviews prospective hires at OLB. (Petrosyants Dep. at 102:12-105:22; Fernandez Decl. ¶¶ 6-10).

**Response: Deny. Although Perez sometimes observes the General Manager conducting interviews, he does not participate in the decision to hire or decline to hire any such applicants, and is merely there to establish good rapport with his potential coworkers. <u>Perez Decl. ¶¶ 28, 10</u>; <u>Petrosyants Dep.</u> 102:8-105:22; <u>Paliko Dep.</u> 87:10-18; <u>Perez Decl. ¶¶ 11, 22, 29.</u> Note that employees' misunderstanding of Perez's role is not determinative. <u>Teran Dep. 41:21-42:19</u> (Teran merely states that, when he was hired, he "first went to Julio and then [J]anos," and then further clarifies that Perez did not hire him ("Q: If I understand you correctly, when you were first getting your job at Osteria La Baia, you spoke to both Julio and [J]anos, but [J]anos told you you were hired, correct? A: Yes. Q: Julio did not tell you you were hired, correct? A: Yes. Yes"); <u>Molina Dep.</u> 46:16-47:6; 53:16-23 (Molina understood himself to be hired only when Paliko had told him to come in for training the next day, yet still insisted that Perez had hired him, merely because he had spoken to Perez initially upon entering the restaurant to look for a job). Mere discussions with applicants do not necessitate Perez having decision-making authority in the hiring process. <u>Perez Decl. ¶¶ 10</u> (Perez's job duties include "meeting job applicants during their interviews to build a good rapport with them"), <u>11</u> ("In my role as Captain, I never make any hiring, firing, or disciplinary decisions; this is within the sole province of the General Manager"), <u>22</u> ("I never hired or fired anyone at the restaurant and never participated in any such decisions"), <u>25-26</u> ("I do not have the authority to hire, fire, or discipline employees at the restaurant;" "I do not have the power to make recommendations about hiring, firing, advancement, promotion, or any other change of status of other employees"), <u>28</u> ("While I sometimes observe the**

**General Manager conducting interviews, I do not participate in the decision to hire or decline to hire any such applicants"); Petrosyants Dep. 102:8-105:22 (Management is responsible for interviewing front-of-house employees, but Perez might be present at some interviews, due to his experience and seniority as head waiter or Captain). All decisions pertaining to hiring, firing, disciplining all front-of-house staff, and other day-to-day employee operations, are the responsibility of the managers like Paliko. Shahmuradyan Dep. 16:25-17:20; 82:13-20; Paliko Decl. (74) ¶¶ 13-15.**

       157.    For example, Plaintiff Teran was interviewed by Perez. (Teran Dep. at 41:21-42:7).

**Response: Deny. Again, Plaintiffs mischaracterize the very testimony they cite. Teran Dep. 41:21-42:7. Teran merely states that, when he was hired, he "first went to Julio and then [J]anos," and then further clarifies that Perez did not hire him ("Q: If I understand you correctly, when you were first getting your job at Osteria La Baia, you spoke to both Julio and [J]anos, but [J]anos told you you were hired, correct? A: Yes. Q: Julio did not tell you you were hired, correct? A: Yes. Yes"). Teran Dep. 42:5-19. This general idea, of Perez speaking to applicants in passing before they are hired by Paliko, is echoed in Molina's testimony. Molina Dep. 46:16-47:6; 53:16-23 23 (Molina understood himself to be hired only when Paliko had told him to come in for training the next day, yet still insisted that Perez had hired him, merely because he had spoken to Perez initially upon entering the restaurant to look for a job). Although Perez sometimes observes the General Manager conducting interviews, he does not participate in the decision to hire or decline to hire any such applicants, and is merely there to establish good rapport with his potential coworkers. Perez Decl. ¶¶ 28, 10; Petrosyants Dep. 102:8-105:22; Paliko Dep. 87:10-18; Perez Decl. ¶¶ 11, 22,**

**29. Mere discussions with applicants do not necessitate Perez having decision-making authority in the hiring process. Perez Decl. ¶¶ 10 (Perez's job duties include "meeting job applicants during their interviews to build a good rapport with them"), 11 ("In my role as Captain, I never make any hiring, firing, or disciplinary decisions; this is within the sole province of the General Manager"), 22 ("I never hired or fired anyone at the restaurant and never participated in any such decisions"), 25-26 ("I do not have the authority to hire, fire, or discipline employees at the restaurant;" "I do not have the power to make recommendations about hiring, firing, advancement, promotion, or any other change of status of other employees"), 28 ("While I sometimes observe the General Manager conducting interviews, I do not participate in the decision to hire or decline to hire any such applicants"); Petrosyants Dep. 102:8-105:22 (Management is responsible for interviewing front-of-house employees, but Perez might be present at some interviews, due to his experience and seniority as head waiter or Captain). All decisions pertaining to hiring, firing, disciplining all front-of-house staff, and other day-to-day employee operations, are the responsibility of the managers like Paliko. Shahmuradyan Dep. 16:25-17:20; 82:13-20; Paliko Decl. (74) ¶¶ 13-15.**

158.    An [*sic*] another example, Plaintiff Fernandez witnessed Perez interviewing prospective hires on many occasions. (Fernandez Decl. ¶ 7). Specifically, Plaintiff Fernandez saw Perez sitting at a table and talking with individuals who, at the time, did not work at the Restaurant. (*Id.* ¶ 8). Oftentimes, she saw Perez reviewing a resume with those individuals. (*Id.*) Later, she saw some of these individuals start training in the Restaurant and become full-fledged employees, some immediately after meeting with Perez. (*Id.* ¶ 9). On several occasions, neither Paliko nor OLB's owners were present in the restaurant. (*Id.* ¶ 10).

**Response: Admit**, but note that mere discussions with applicants do not necessitate Perez having decision-making authority in the hiring process. Perez Decl. ¶¶ 10 (Perez's job duties include "meeting job applicants during their interviews to build a good rapport with them"), 28 ("While I sometimes observe the General Manager conducting interviews, I do not participate in the decision to hire or decline to hire any such applicants"); Petrosyants Dep. 102:8-105:22 (Management is responsible for interviewing front-of-house employees, but Perez might be present at some interviews, due to his experience and seniority as head waiter or Captain). Any duties that Perez performs concerning staff typically occur when Paliko is absent from the restaurant; even then, Perez does not have any increased authority to make employment-related decisions, only to report to Paliko who makes the decision. Petrosyants Dep. 93:23-94:24; 97:10-21; 98:18-99:3; 99:20-100:8; 111:17-114:4; Teran Dep. 68:23-69:6; Paliko Dep. 23:2-25:9; 94:6- 9; Perez Decl. ¶¶ 12-14, 16-23. For example, Perez may only execute floor plans that Paliko has created in advance; Perez must call or text Paliko before deciding to send any employee home on a slow day; when conducting pre-shift meetings in Paliko's absence, Perez merely relays information Paliko directs him to; and any messages Perez receives from employees regarding latenesses or absences must be relayed to Paliko, for Paliko alone to decide how to respond or whether the absence is approved. Paliko Dep. 93:12-24; Perez Decl. ¶¶ 14, 16-20. In other words, Perez is merely a go-between or a liaison to the General Manager for employee-related issues, and has zero discretion or authority to manage same. Perez Decl. ¶ 21. All decisions pertaining to hiring, firing, disciplining all front-of-house staff, and other day-to-day employee operations, are the responsibility of the managers like Paliko. Shahmuradyan Dep. 16:25-17:20; 82:13-20; Paliko Decl. (74) ¶¶ 13-15.

159.      Perez has and exercises the authority to hire employees at OLB. (*Id.* ¶ 6, 11).

**Response: Deny. Mere discussions with applicants do not necessitate Perez having decision-making authority in the hiring process. Perez Decl. ¶¶ 10 (Perez's job duties include "meeting job applicants during their interviews to build a good rapport with them"), 11 ("In my role as Captain, I never make any hiring, firing, or disciplinary decisions; this is within the sole province of the General Manager"), 22 ("I never hired or fired anyone at the restaurant and never participated in any such decisions"), 25-26 ("I do not have the authority to hire, fire, or discipline employees at the restaurant;" "I do not have the power to make recommendations about hiring, firing, advancement, promotion, or any other change of status of other employees"), 28 ("While I sometimes observe the General Manager conducting interviews, I do not participate in the decision to hire or decline to hire any such applicants"); Petrosyants Dep. 102:8-105:22 (Management is responsible for interviewing front-of-house employees, but Perez might be present at some interviews, due to his experience and seniority as head waiter or Captain). Any duties that Perez performs concerning employees typically occur when Paliko is absent from the restaurant; even then, Perez does not have increased authority to make employment-related decisions. Petrosyants Dep. 93:23-94:24; 97:10-21; 98:18-99:3; 99:20-100:8; 111:17-114:4; Teran Dep. 68:23-69:6; Paliko Dep. 23:2-25:9; 94:6- 9; Perez Decl. ¶¶ 12-14, 16-23. All decisions pertaining to hiring, firing, disciplining all front-of-house staff, and other day-to-day employee operations, are the responsibility of the managers like Paliko. Shahmuradyan Dep. 16:25-17:20; 82:13-20; Paliko Decl. (74) ¶¶ 13-15.**

160.      For example, on at least three or four occasions, new employees explicitly told Plaintiff Fernandez that Perez had hired them. (*Id.*).

Response: Deny. Defendants object to this statement of fact on the grounds that it constitutes inadmissible hearsay. Defendants otherwise lack knowledge or information sufficient to form a belief as to the truth of what other employees may have believed or said to Fernandez regarding their hiring, but note that employees' misunderstanding of Perez's role is not determinative – as Defendants have debunked similar conclusory statements in Plaintiffs' testimony. Teran Dep. 41:21-42:19 (Teran merely states that, when he was hired, he "first went to Julio and then [J]anos," and then further clarifies that Perez did not hire him ("Q: If I understand you correctly, when you were first getting your job at Osteria La Baia, you spoke to both Julio and [J]anos, but [J]anos told you you were hired, correct? A: Yes. Q: Julio did not tell you you were hired, correct? A: Yes. Yes"); Molina Dep. 46:16-47:6; 53:16-23 (Molina understood himself to be hired only when Paliko had told him to come in for training the next day, yet still insisted that Perez had hired him, merely because he had spoken to Perez initially upon entering the restaurant to look for a job). Mere discussions with applicants do not necessitate Perez having decision-making authority in the hiring process. Perez Decl. ¶¶ 10 (Perez's job duties include "meeting job applicants during their interviews to build a good rapport with them"), 11 ("In my role as Captain, I never make any hiring, firing, or disciplinary decisions; this is within the sole province of the General Manager"), 22 ("I never hired or fired anyone at the restaurant and never participated in any such decisions"), 25-26 ("I do not have the authority to hire, fire, or discipline employees at the restaurant;" "I do not have the power to make recommendations about hiring, firing, advancement, promotion, or any other change of status of other employees"), 28 ("While I sometimes observe the General Manager conducting interviews, I do not participate in the decision to hire or decline to hire any such applicants"); Petrosyants Dep. 102:8-105:22

(Management is responsible for interviewing front-of-house employees, but Perez might be present at some interviews, due to his experience and seniority as head waiter or Captain).

161.    Perez also participated in the hiring of Teran. (Teran Dep. at 41:21-42:7).

**Response: Deny. Plaintiffs mischaracterize the very testimony they cite. Teran Dep. 41:21-42:7. Teran merely states that, when he was hired, he "first went to Julio and then [J]anos," and then further clarifies that Perez did not hire him ("Q: If I understand you correctly, when you were first getting your job at Osteria La Baia, you spoke to both Julio and [J]anos, but [J]anos told you you were hired, correct? A: Yes. Q: Julio did not tell you you were hired, correct? A: Yes. Yes"); this low-level participation, which amounts to little more than Perez being in the same room and exchanging pleasantries with applicants, does not rise to the level of Perez being a manager or supervisor. Teran Dep. 42:5-19. This general idea, of Perez speaking to applicants in passing before they are hired by Paliko, is echoed in Molina's testimony. Molina Dep. 46:16-47:6; 53:16-23 23 (Molina understood himself to be hired only when Paliko had told him to come in for training the next day, yet still insisted that Perez had hired him, merely because he had spoken to Perez initially upon entering the restaurant to look for a job). Although Perez sometimes observes the General Manager conducting interviews, he does not participate in the decision to hire or decline to hire any such applicants, and is merely there to establish good rapport with his potential coworkers. Perez Decl. ¶¶ 28, 10; Petrosyants Dep. 102:8-105:22; Paliko Dep. 87:10-18; Perez Decl. ¶¶ 11, 22, 29. Mere discussions with applicants do not necessitate Perez having decision-making authority in the hiring process. Perez Decl. ¶¶ 10 (Perez's job duties include "meeting job applicants during their interviews to build a good rapport with them"), 11 ("In my role as Captain, I never make any hiring, firing, or disciplinary decisions; this is within the sole**

province of the General Manager"), **22** ("I never hired or fired anyone at the restaurant and never participated in any such decisions"), **25-26** ("I do not have the authority to hire, fire, or discipline employees at the restaurant;" "I do not have the power to make recommendations about hiring, firing, advancement, promotion, or any other change of status of other employees"), **28** ("While I sometimes observe the General Manager conducting interviews, I do not participate in the decision to hire or decline to hire any such applicants"); **Petrosyants Dep. 102:8-105:22** (Management is responsible for interviewing front-of-house employees, but Perez might be present at some interviews, due to his experience and seniority as head waiter or Captain). All decisions pertaining to hiring, firing, disciplining all front-of-house staff, and other day-to-day employee operations, are the responsibility of the managers like Paliko. **Shahmuradyan Dep. 16:25-17:20; 82:13-20. Paliko Decl. (74) ¶¶ 13-15.**

162.      Perez has and exercises the authority to fire employees at OLB. (*Id.* ¶ 12).

**Response: Deny.** Fernandez's misunderstanding of Perez's role is not determinative – as we have debunked similar conclusory statements in Plaintiffs' testimony. **Teran Dep. 41:21-42:19** (Teran merely states that, when he was hired, he "first went to Julio and then [J]anos," and then further clarifies that Perez did not hire him ("Q: If I understand you correctly, when you were first getting your job at Osteria La Baia, you spoke to both Julio and [J]anos, but [J]anos told you you were hired, correct? A: Yes. Q: Julio did not tell you you were hired, correct? A: Yes. Yes"); **Molina Dep. 46:16-47:6; 53:16-23** (Molina understood himself to be hired only when Paliko had told him to come in for training the next day, yet still insisted that Perez had hired him, merely because he had spoken to Perez initially upon entering the restaurant to look for a job). In fact, Fernandez's Declaration describes little more than an

interpersonal conflict between front-of-house employees regarding their mutual job duties ("Mr. Perez yelled at the busser and told them they were 'stupid' and 'were not doing their job'"). Even Perez's alleged statement to the busboy to "get out of here" is a mere euphemism; the alleged fact that the busser stopped working at OLB thereafter does not mean he was terminated. A worker being conflict-averse and quitting due to personality clashes and performance issues, is not the same as that worker being terminated. Fernandez Decl. (91) ¶¶ 13-15. For example, in Teran's and Molina's testimonies, they more accurately describe quitting their jobs at OLB following personality clashes with Perez. Teran Dep. 56:11-24 ("Q: "Julio did not terminate you, correct? A: No. I left because I couldn't take it there. They were yelling at people, they were pressuring people"); Molina Dep. 61:2-8[1] ("[Perez] told me if you want to, leave. So I left"). Potential misunderstandings from other employees regarding whether they were terminated or quit perhaps arise *because of* Perez's lack of authority to handle complaints made by employees. Perez Decl. ¶¶ 37; 11 ("In my role as Captain, I never make any hiring, firing, or disciplinary decisions; this is within the sole province of the General Manager"), 22 ("I never hired or fired anyone at the restaurant and never participated in any such decisions"), 25-26 ("I do not have the authority to hire, fire, or discipline employees at the restaurant;" "I do not have the power to make recommendations about hiring, firing, advancement, promotion, or any other change of status of other employees"). Perez is not responsible for hiring, firing, or promoting employees. Petrosyants Dep. 102:8-105:22; Paliko Dep. 87:10-18. As General Manager, Paliko has sole discretion to hire, fire, and discipline front-of-house employees. Paliko Decl.

---

[1] Note that Molina denies quitting ("Q: Now, you say your employment at Osteria La Baia ended because you had a disagreement and you quit; right? A: No"); however, this is another example of an employee misunderstanding Perez's role (or being coached by his counsel).

**(74) ¶¶ 13-15.** For example, Fernandez had been fired by Paliko. Fernandez Dep. **79:22-23.** All decisions pertaining to hiring, firing, disciplining all front-of-house staff, and other day-to-day employee operations, are the responsibility of the managers like Paliko. Shahmuradyan Dep. **16:25-17:20; 82:13-20.** Paliko Decl. **(74) ¶¶ 13-15.**

163.    As an example, Plaintiff Fernandez witnessed a server complaining to Perez that a busser was not performing their job duties adequately. Perez proceeded to yell at the busser and told them they were "stupid" and "were not doing their job." Perez then told the busboy to "get out of here," and Plaintiff Fernandez never saw that busser work at the Restaurant again. (*Id.* ¶¶ 13-15).

**Response: Deny. Defendants object to this statement of fact on the grounds that it constitutes inadmissible hearsay. Defendants otherwise lack knowledge or information sufficient to form a belief as to the truth of whether this event occurred or what Fernandez may have witnessed, but note that employees' misunderstanding of Perez's role is not determinative – as we have debunked similar conclusory statements in Plaintiffs' testimony. Teran Dep. 41:21-42:19 (Teran merely states that, when he was hired, he "first went to Julio and then [J]anos," and then further clarifies that Perez did not hire him ("Q: If I understand you correctly, when you were first getting your job at Osteria La Baia, you spoke to both Julio and [J]anos, but [J]anos told you you were hired, correct? A: Yes. Q: Julio did not tell you you were hired, correct? A: Yes. Yes"); Molina Dep. 46:16-47:6; 53:16-23 (Molina understood himself to be hired only when Paliko had told him to come in for training the next day, yet still insisted that Perez had hired him, merely because he had spoken to Perez initially upon entering the restaurant to look for a job). Fernandez's Declaration describes little more than an interpersonal conflict between front-of-house employees regarding their**

mutual job duties ("Mr. Perez yelled at the busser and told them they were 'stupid' and 'were not doing their job'"). Even Perez's alleged statement to the busboy to "get out of here" is a mere euphemism; the alleged fact that the busser stopped working at OLB thereafter does not mean he was terminated. A worker being conflict-averse and quitting due to personality clashes and performance issues, is not the same as that worker being terminated. Fernandez Decl. (91) ¶¶ 13-15. This is not dissimilar from Teran's and Molina's testimony, in which Plaintiffs more accurately describe quitting their jobs at OLB following personality clashes with Perez. Teran Dep. 56:11-24 ("Q: "Julio did not terminate you, correct? A: No. I left because I couldn't take it there. They were yelling at people, they were pressuring people"); Molina Dep. 61:2-8 ("[Perez] told me if you want to, leave. So I left"). Such misunderstandings perhaps arise *because of* Perez's lack of authority to handle complaints made by employees. Perez Decl. ¶¶ 37; 11 ("In my role as Captain, I never make any hiring, firing, or disciplinary decisions; this is within the sole province of the General Manager"), 22 ("I never hired or fired anyone at the restaurant and never participated in any such decisions"), 25-26 ("I do not have the authority to hire, fire, or discipline employees at the restaurant;" "I do not have the power to make recommendations about hiring, firing, advancement, promotion, or any other change of status of other employees"). Perez is not responsible for hiring, firing, or promoting employees. Petrosyants Dep. 102:8-105:22; Paliko Dep. 87:10-18. As General Manager, Paliko has sole discretion to hire, fire, and discipline front-of-house employees. Paliko Decl. (74) ¶¶ 13-15. For example, Fernandez had been fired by Paliko. Fernandez Dep. 79:22-23.

164.    As another example, during one shift, a runner named Janet was not performing her duties well. Perez came over to me and said, "I'm going to fire her." A few days later, Janet

was no longer working at the Restaurant. Later, Perez acknowledged to Fernandez that he fired Janet. (*Id.* ¶ 17-18).

**Response: Deny. Defendants object to this statement of fact on the grounds that it constitutes inadmissible hearsay. Defendants otherwise lack knowledge or information sufficient to form a belief as to the truth of whether this event occurred or what Fernandez may have witnessed, but note that employees' misunderstanding of Perez's role is not determinative – as we have debunked similar conclusory statements in Plaintiffs' testimony. Teran Dep. 41:21-42:19 (Teran merely states that, when he was hired, he "first went to Julio and then [J]anos," and then further clarifies that Perez did not hire him ("Q: If I understand you correctly, when you were first getting your job at Osteria La Baia, you spoke to both Julio and [J]anos, but [J]anos told you you were hired, correct? A: Yes. Q: Julio did not tell you you were hired, correct? A: Yes. Yes"); Molina Dep. 46:16-47:6; 53:16-23 (Molina understood himself to be hired only when Paliko had told him to come in for training the next day, yet still insisted that Perez had hired him, merely because he had spoken to Perez initially upon entering the restaurant to look for a job). Fernandez's Declaration describes little more than an interpersonal conflict between front-of-house employees regarding their mutual job duties ("Mr. Perez yelled at the busser and told them they were 'stupid' and 'were not doing their job'"). Even Perez's alleged statement to the busboy to "get out of here" is a mere euphemism; the alleged fact that the busser stopped working at OLB thereafter does not mean he was terminated. A worker being conflict-averse and quitting due to personality clashes and performance issues, is not the same as that worker being terminated. Fernandez Decl. (91) ¶¶ 13-15. This is not dissimilar from Teran's and Molina's testimonies, in which Plaintiffs more accurately describes quitting their jobs at OLB following**

personality clashes with Perez. Teran Dep. 56:11-24 ("Q: "Julio did not terminate you, correct? A: No. I left because I couldn't take it there. They were yelling at people, they were pressuring people"); Molina Dep. 61:2-8 ("[Perez] told me if you want to, leave. So I left"). Such misunderstandings perhaps arise *because of* Perez's lack of authority to handle complaints made by employees. Perez Decl. ¶¶ 37, 11 ("In my role as Captain, I never make any hiring, firing, or disciplinary decisions; this is within the sole province of the General Manager"), 22 ("I never hired or fired anyone at the restaurant and never participated in any such decisions"), 25-26 ("I do not have the authority to hire, fire, or discipline employees at the restaurant;" "I do not have the power to make recommendations about hiring, firing, advancement, promotion, or any other change of status of other employees"). Perez is not responsible for hiring, firing, or promoting employees. Petrosyants Dep. 102:8-105:22; Paliko Dep. 87:10-18. As General Manager, Paliko has sole discretion to hire, fire, and discipline front-of-house employees. Paliko Decl. (74) ¶¶ 13-15. For example, Fernandez had been fired by Paliko. Fernandez Dep. 79:22-23.

165.    Perez has and exercises the authority to discipline employees at OLB. (*Id.* ¶ 23).

Response: Deny. Perez Decl. ¶¶ 11 ("In my role as Captain, I never make any hiring, firing, or disciplinary decisions; this is within the sole province of the General Manager"), 25-27 ("I do not have the authority to hire, fire, or discipline employees at the restaurant;" "I do not have the power to make recommendations about hiring, firing, advancement, promotion, or any other change of status of other employees;" "In fact, recently when I reported one employee for engaging in insubordination, the General Manager did not engage in any disciplinary measures against that employee, even though I felt it was warranted"). As General Manager, Paliko has sole discretion to hire, fire, and discipline front-of-house

employees. **Paliko Decl. (74) ¶¶ 13-15; Teran Dep. 46:8-47:4 (no terminations were made nor was any discipline issued at pre-shift meetings); Paliko Dep. 25:11-23 (Perez does not have authority to discipline employees; Perez merely informs Paliko, and Paliko may take action the following day). Perez has only ever participated in corrective action notices of other employees as a witness, not as a decisionmaker who imposes discipline. Paliko Dep. 88:3-89:3.[2] All decisions pertaining to hiring, firing, disciplining all front-of-house staff, and other day-to-day employee operations, are the responsibility of the managers like Paliko. Shahmuradyan Dep. 16:25-17:20; 82:13-20. Paliko Decl. (74) ¶¶ 13-15.**

166.    For example, if a server complained to Perez about a runner's or busser's performance, Perez would sometimes cut the runner or busser and tell them to leave early. This would, of course, directly affect that employee's income as they earned less tips and hourly pay than they otherwise would have for that shift. (*Id.* ¶ 24).

**Response: Deny. Perez lacks authority to handle complaints made by employees. Perez Decl. ¶¶ 37; 16-17 ("When making determinations about who to cut in the event the restaurant is not busy, this is a task that is always performed by the General Manager, even in his absence;" "[i]n other words, if cuts are necessary, and the General Manager is absent, I have to contact him by phone or text so that he can make the decision before I execute"). Perez does not have authority to send employees home on slow days. Petrosyants Dep. 95:3-16; 95:16-96:16. Perez must call or text Paliko before deciding to send any employee home on a slow day. Paliko Dep. 93:12-24; Perez Decl. ¶¶ 14, 16-20.**

167.    As another example, Perez once issued Fernandez a written warning. Specifically, Perez provided her with a disciplinary form called "Corrective Action Record." That

---

[2] Although Perez had signed as "Supervisor" on Fernandez's Corrective Action Notice, this designation, on this standardized form, was purely nominal. Fernandez Decl. (91) ¶ 27; Plaintiffs' Exhibit A at ECF Docket Entry 91-1.

form was essentially a written warning issued to Fernandez for not attending a meeting that the Restaurant's management said they expected her to attend. The form states that "Any further violation of the above mentioned incident, or any other company violation, may result in additional corrective action, up to and including termination." The form was signed by Perez as "supervisor" and his signature appears above the line that states "Supervisor Signature." (*Id.* ¶ 27).

**Response: Admit, but note that the Corrective Action Record is a standardized form. Perez signing this form as "Supervisor" is purely nominal and does not connote he has independent authority to execute disciplinary action against employees; notably, this form also features Paliko's signature. Perez Decl. ¶¶ 11 ("In my role as Captain, I never make any hiring, firing, or disciplinary decisions; this is within the sole province of the General Manager"), 25-27 ("I do not have the authority to hire, fire, or discipline employees at the restaurant;" "I do not have the power to make recommendations about hiring, firing, advancement, promotion, or any other change of status of other employees;" "In fact, recently when I reported one employee for engaging in insubordination, the General Manager did not engage in any disciplinary measures against that employee, even though I felt it was warranted"). As General Manager, Paliko has sole discretion to hire, fire, and discipline front-of-house employees. Paliko Decl. (74) ¶¶ 13-15; Teran Dep. 46:8-47:4 (no terminations were made nor was any discipline issued at pre-shift meetings); Paliko Dep. 25:11-23 (Perez does not have authority to discipline employees; Perez merely informs Paliko, and Paliko may then take action). Perez has only ever participated in corrective action notices of other employees as a witness, not as a decisionmaker who imposes discipline. Paliko Dep. 88:3-89:3. All decisions pertaining to hiring, firing, disciplining all front-of-house staff, and other day-to-day**

**employee operations, are the responsibility of the managers like Paliko. Shahmuradyan Dep. 16:25-17:20; 82:13-20; Paliko Decl. (74) ¶¶ 13-15.**

168.    Perez participates in setting employees' schedules at OLB. (Petrosyants Dep. at 107:5-11; Fernandez Decl. ¶¶ 28-35 ).

**Response: Deny. The testimony Plaintiffs cite is inconclusive; Petrosyants merely answers "probably" to whether Perez participates in making the schedule, but admits that he does not remember seeing Perez actually do this. Petrosyants Dep. 107:5-21. Similarly, Fernandez's Declaration does not represent the full story. She merely testifies that "if an employee needed to call out from work due a [*sic*] last minute reason or if they wanted a day off of work, they had to call or message Mr. Perez and inform him so that he could approve their request," "if there were fewer reservations than expected, Mr. Perez would call certain employees and tell them not to come into work that day," "if employees were running late for work, they also had to inform Mr. Perez," and "if employees wanted to swap shifts with each other they needed Mr. Perez's or Mr. Paliko's permission." Fernandez Decl. (91) ¶¶ 29-30 and 33-34. This is only half the story. Perez Decl. ¶¶ 21, 45 ("I am merely a go-between or a liaison to the General Manager for these employee issues and have zero discretion or authority to manage same;" "[a]ll of my extra duties as a Captain are incidental to my primary duty as a server"). For example, "[w]hen making determinations about who to cut in the event the restaurant is not busy, this is a task that is always performed by the General Manager, even in his absence;" "[i]n other words, if cuts are necessary, and the General Manager is absent, I have to contact him by phone or text so that he can make the decision before I execute." Perez Decl. ¶¶ 16-17; Petrosyants Dep. 95:3-96:16. "[A]lthough the front-of-house staff sometimes tells me by text or otherwise that they are running late or unable to**

make it for their shift, I have no discretion in deciding these things and relay the message to the General Manager, typically by taking a screenshot and forwarding it to him, and then relay his response back to the employee who contacted me about his decision on whether the absence is approved or whatever the response is." Perez Decl. ¶ 20. This is echoed by Paliko's testimony. Paliko Dep. 34:22-35:9 ("Q: Isn't it true that Julio Perez is involved in scheduling as well? [… A:] Never. […] He's not involved, […] I'm the only one who's doing the schedule"). Accordingly, Fernandez's statement that "Mr. Perez had and exercised the authority to grant or deny requests relating to scheduling on the spot and did not need to first get Mr. Paliko's permission to approve or deny any requests to alter employees' schedules" is untrue. Fernandez Decl. (91) ¶ 35.

169.    For example, if an employee needed to call out from work due a [*sic*] last minute reason or if they wanted a day off of work, they had to call or message Perez and inform him so that he could approve their request. (*Id.* ¶ 29).

**Response: Deny. Fernandez's Declaration does not represent the full story. She merely testifies that "if an employee needed to call out from work due a [*sic*] last minute reason or if they wanted a day off of work, they had to call or message Mr. Perez and inform him so that he could approve their request." Fernandez Decl. (91) ¶ 29. This is only half the story. Perez Decl. ¶¶ 21, 45 ("I am merely a go-between or a liaison to the General Manager for these employee issues and have zero discretion or authority to manage same;" "[a]ll of my extra duties as a Captain are incidental to my primary duty as a server"). For example, "[w]hen making determinations about who to cut in the event the restaurant is not busy, this is a task that is always performed by the General Manager, even in his absence;" "In other words, if cuts are necessary, and the General Manager is absent, I have to contact him by**

phone or text so that he can make the decision before I execute." **Perez Decl. ¶¶ 16-17;**
**Petrosyants Dep. 95:3-96:16.** "[A]lthough the front-of-house staff sometimes tells me by text
or otherwise that they are running late or unable to make it for their shift, I have no
discretion in deciding these things and relay the message to the General Manager, typically
by taking a screenshot and forwarding it to him, and then relay his response back to the
employee who contacted me about his decision on whether the absence is approved or
whatever the response is." **Perez Decl. ¶ 20.** This is echoed in Paliko's testimony. **Paliko Dep.**
**25:11-23** ("Q: What happens if a server or a busboy shows up late on a day that you're not
there? A: Julio is the one informing me, and I will take the action the following day. Q: […]
So if there are any issues that you would care about as the manager, you expect Julio to
inform you of those issues on the days that you're not present in the restaurant; right? […
A:] Correct.); **34:22-35:9** ("Q: Isn't it true that Julio Perez is involved in scheduling as well?
[… A:] Never. […] He's not involved, […] I'm the only one who's doing the schedule").

170.    Similarly, if there were fewer reservations than expected, Perez would call
certain employees and tell them not to come into work that day. (*Id.* ¶ 30; Petrosyants Dep. at
97:22-25).

**Response: Admit, but object to this statement as immaterial, because merely calling**
**employees to inform them of their revised schedule does not mean Perez made such decisions.**
**Moreover, Plaintiffs wrongfully cite Petrosyants' testimony, which here, states, entirely**
**unrelated, that Julio could send an employee home for arriving to a shift drunk. Petrosyants**
**Dep. at 97:22-98:4. This is distinct in nature from any other type of decision-making or**
**supervisory authority over employees, because this is not a daily operational business**
**decision, but represents a hypothetical situation which would be extremely rare, and which**

would likely invite a corresponding safety-based response from any coworker, instinctively, regardless of authority or seniority (not dissimilar to a hypothetical which could have been posed about an employee arriving to their shift without clothes on, or wielding a weapon; Petrosyants responds in the affirmative because, at a high-level as the Director of Operations, he would likely want such a situation resolved by any means necessary). **Petrosyants Dep. 20:7-21:6; Perez Decl. ¶ 41** ("I play no role in providing for the safety or security of the employees; I would only do what any human would do in a particular circumstance, and inform an employee or a patron to be careful, watch out for something on the floor, or tell them that their shoelace is untied for example"). Plaintiffs' counsel asking this hypothetical question of Petrosyants was, accordingly, in bad faith.  Going back to the issue of Perez allegedly telling employees not to come into work, Perez is "merely a go-between or a liaison to the General Manager for these employee issues and have zero discretion or authority to manage same;" "[a]ll of [his] extra duties as a Captain are incidental to [his] primary duty as a server." **Perez Decl. ¶¶ 21, 45.** For example, "[w]hen making determinations about who to cut in the event the restaurant is not busy, this is a task that is always performed by the General Manager, even in his absence;" "[i]n other words, if cuts are necessary, and the General Manager is absent, I have to contact him by phone or text so that he can make the decision before I execute." **Perez Decl. ¶¶ 16-17; Petrosyants Dep. 95:3-96:16.** "[A]lthough the front-of-house staff sometimes tells me by text or otherwise that they are running late or unable to make it for their shift, I have no discretion in deciding these things and relay the message to the General Manager, typically by taking a screenshot and forwarding it to him, and then relay his response back to the employee who contacted me about his decision on whether the absence is approved or whatever the response is." **Perez Decl. ¶ 20.** This is

echoed in Paliko's testimony. Paliko Dep. 25:11-23 ("Q: What happens if a server or a busboy shows up late on a day that you're not there? A: Julio is the one informing me, and I will take the action the following day. Q: […] So if there are any issues that you would care about as the manager, you expect Julio to inform you of those issues on the days that you're not present in the restaurant; right? [… A:] Correct.); 34:22-35:9 ("Q: Isn't it true that Julio Perez is involved in scheduling as well? [… A:] Never. […] He's not involved, […] I'm the only one who's doing the schedule").

171.    As another example, if employees need a day off or want to swap shifts with each other, they asked Perez for his approval. (Fernandez Decl. ¶ 34).

**Response: Admit, but object to this statement as immaterial, because Fernandez again misses half the story. Perez Decl. ¶¶ 21, 45 ("I am merely a go-between or a liaison to the General Manager for these employee issues and have zero discretion or authority to manage same;" "[a]ll of my extra duties as a Captain are incidental to my primary duty as a server"). For example, "[w]hen making determinations about who to cut in the event the restaurant is not busy, this is a task that is always performed by the General Manager, even in his absence;" "[i]n other words, if cuts are necessary, and the General Manager is absent, I have to contact him by phone or text so that he can make the decision before I execute." Perez Decl. ¶¶ 16-17; Petrosyants Dep. 95:3-96:16. "[A]lthough the front-of-house staff sometimes tells me by text or otherwise that they are running late or unable to make it for their shift, I have no discretion in deciding these things and relay the message to the General Manager, typically by taking a screenshot and forwarding it to him, and then relay his response back to the employee who contacted me about his decision on whether the absence is approved or whatever the response is." Perez Decl. ¶ 20. This is echoed by Paliko's testimony. Paliko Dep.**

**34:22-35:9** ("Q: Isn't it true that Julio Perez is involved in scheduling as well? […] A:] Never. […] He's not involved, […] I'm the only one who's doing the schedule"). Moreover, Plaintiffs neglect to mention that the very portion of Fernandez's Declaration which they cite states that employees may, in the alternative, obtain Paliko's permission to swap shifts (further supporting the truth, that Perez's involvement in such decision-making was limited to serving as an intermediary between employees and Paliko, the true decision-maker). **Fernandez Decl. (91) ¶ 34.**

172.     Perez had and exercised the authority to grant or deny requests relating to scheduling on the spot and did not need to first get Mr. Paliko's permission to approve or deny any requests to alter employees' schedules. (*Id.* ¶ 35).

**Response: Deny. Perez Decl. ¶¶ 21, 45 ("I am merely a go-between or a liaison to the General Manager for these employee issues and have zero discretion or authority to manage same;" "[a]ll of my extra duties as a Captain are incidental to my primary duty as a server"). For example, "[w]hen making determinations about who to cut in the event the restaurant is not busy, this is a task that is always performed by the General Manager, even in his absence;" "[i]n other words, if cuts are necessary, and the General Manager is absent, I have to contact him by phone or text so that he can make the decision before I execute." Perez Decl. ¶¶ 16-17; Petrosyants Dep. 95:3-96:16. "[A]lthough the front-of-house staff sometimes tells me by text or otherwise that they are running late or unable to make it for their shift, I have no discretion in deciding these things and relay the message to the General Manager, typically by taking a screenshot and forwarding it to him, and then relay his response back to the employee who contacted me about his decision on whether the absence is approved or whatever the response is." Perez Decl. ¶ 20. This is echoed by Paliko's testimony. Paliko Dep.**

**34:22-35:9 ("Q: Isn't it true that Julio Perez is involved in scheduling as well? [… A:] Never. […] He's not involved, […] I'm the only one who's doing the schedule").**

173.    Perez has the authority to write up employees at OLB if they were not performing their duties properly. (Petrosyants Dep. at 113:10-114:4; Fernandez Decl. ¶ 27).

**Response: Deny. Plaintiffs misrepresent the very testimony on which they rely. Petrosyants Dep. at 113:10-114:4 ("Q: So Julio had the authority to write people up; right? […] And that's something that happened – right? – at Osteria La Baia? A: Probably. Q: Why are you saying 'probably'? A: I've never seen that document, so I'm assuming, yeah"). In other words, although Petrosyants did testify that Perez "probably" had authority to write employees up, he admits simultaneously that he never actually saw this occur, and is just "assuming." Id. Moreover, note that the Corrective Action Record described by Fernandez is a standardized form. Perez signing this form as "Supervisor" is purely nominal and does not necessitate his independent authority to execute disciplinary action against employees; notably, this form also features Paliko's signature. Perez Decl. ¶¶ 11 ("In my role as Captain, I never make any hiring, firing, or disciplinary decisions; this is within the sole province of the General Manager"), 25-27 ("I do not have the authority to hire, fire, or discipline employees at the restaurant;" "I do not have the power to make recommendations about hiring, firing, advancement, promotion, or any other change of status of other employees;" "[i]n fact, recently when I reported one employee for engaging in insubordination, the General Manager did not engage in any disciplinary measures against that employee, even though I felt it was warranted"). As General Manager, Paliko has sole discretion to hire, fire, and discipline front-of-house employees. Paliko Decl. (74) ¶¶ 13-15; Teran Dep. 46:8-47:4 (no terminations were made nor was any discipline issued at pre-shift meetings); Paliko Dep.**

25

**25:11-23** (Perez does not have authority to discipline employees; Perez merely informs Paliko, and Paliko may take action the following day). Perez has only ever participated in corrective action notices of other employees as a witness, not as a decisionmaker who imposes discipline. **Paliko Dep. 88:3-89:3.** All decisions pertaining to hiring, firing, disciplining all front-of-house staff, and other day-to-day employee operations, are the responsibility of the managers like Paliko. **Shahmuradyan Dep. 16:25-17:20; 82:13-20; Paliko Decl. (74) ¶¶ 13-15.**

174.    Perez trains new hires at OLB. (Petrosyants Dep. at 71:23-72:18).

**Response: Admit,** but object to this statement as immaterial, because mere training alone does not make an employee a manager/supervisor. Plaintiffs mischaracterize the testimony they cite. Petrosyants testifies that Paliko and the chef are responsible for training front-of-house staff (educating staff on food, kitchen plates, and the like), and that Perez – due to his having the greatest experience of any server – contributes his knowledge on how service should be performed (things like how to serve customers, and how bussers should clear tables). **Petrosyants Dep. at 71:23-72:25.** This is not the same as having any decision-making authority over hiring, firing, promotions, or any other condition of employment. **Shahmuradyan Dep. 16:25-17:3; 82:13-20** (all decisions pertaining to hiring, firing, disciplining all front-of-house staff, and other day-to-day employee operations, are the responsibility of the managers like Paliko). Perez is the most experienced server that OLB has; this naturally results in him demonstrating leadership regarding the job duties he shares with other servers. **Petrosyants Dep. 72:19-75:21; 93:17-22; 98:4-14; Fernandez Dep. 75:13-19; Paliko Dep. 89:22-90:6; Perez Decl. ¶ 5, 10, 23, 30.** At times, usually on the rare occasions when Paliko is not present, Perez oversees his fellow servers to ensure service is performed

26

adequately. Petrosyants Dep. 93:23-94:24; 97:10-21; 98:18-99:3; 99:20-100:8; 111:17-114:4; Teran Dep. 68:23-69:6; Paliko Dep. 23:2-25:9; 94:6-9. **During these occasions, Perez does not have increased duties to manage or supervise front-of-house staff.** Perez Decl. ¶¶ 13, 23-24.

175.    For example, Perez trains food-service employees as to their job duties, how to serve customers and, for employees tasked with clearing, how to clear tables. (*Id.* at 72:5-18).

**Response: Admit, but object to this statement as immaterial, because mere training alone does not make an employee a manager/supervisor. As head waiter or Captain at OLB, Perez's main job duties consist of "primarily serv[ing] customers," as well as "(i) training the front-of-house staff on their duties; (ii) telling the front-of-house staff the specials for the day; (iii) encouraging the front-of-house staff to do good work and provide better service; (iv) meeting job applicants during their interviews to build a good rapport with them; and (v) keeping an eye on the floor to report any issues to the General Manager, who will then decide what, if anything, to do about any such issues."** Perez Decl. ¶¶ 1, 10. **In other words, any oversight that Perez has over other employees arise directly out of his role as a server with the most experience, although he has no decision-making authority.** Petrosyants Dep. 72:19-73:7; 93:17-22; 98:4-14; Paliko Dep. 89:22-90:6. **Perez's role is limited to ensuring customers are properly served; he does not make any hiring, firing, or disciplinary decisions.** Perez Decl. ¶¶ 11-13; Petrosyants Dep. 93:23-94:24; 97:10-21; 98:18-99:3; 99:20-100:8; 111:17-114:4; Teran Dep. 68:23-69:6; Paliko Dep. 23:2-25:9; 94:6- 9. **On occasions when Paliko is not present, Perez does not have increased duties to manage or supervise front-of-house staff.** Perez Decl. ¶¶ 13, 23-24; Paliko Dep. 93:12-24 **(Paliko assigns employees to their sections in advance for days when he is absent). Perez does not make any key decisions at OLB – he has no authority over maintaining sales records; printing tip reports and**

distributing tips; taking custody of any cash tips; selecting materials, supplies, machinery, equipment, tools, or food; or decision-making regarding the safety or security of employees, budgeting, or legal compliance. **Perez Decl. ¶¶ 31-35, 39-44; Teran Dep. 59:19-22; 66:18-21.** All decisions pertaining to hiring, firing, disciplining all front-of-house staff, and other day-to-day employee operations, are the responsibility of the managers like Paliko. **Shahmuradyan Dep. 16:25-17:3; 82:13-20; Paliko Decl. (74) ¶¶ 13-15.**

176.     Perez has the authority to comp and void items on customers' checks. (*Id.* at 97:19-21).

**Response: Admit, but object to this statement as immaterial, because it does not involve control over terms and conditions of any employee's employment. Perez's primary job duties as head server and Captain consist of serving customers, and occasionally "(i) training the front-of-house staff on their duties; (ii) telling the front-of-house staff the specials for the day; (iii) encouraging the front-of-house staff to do good work and provide better service; (iv) meeting job applicants during their interviews to build a good rapport with them; and (v) keeping an eye on the floor to report any issues to the General Manager, who will then decide what, if anything, to do about any such issues." Perez Decl. ¶¶ 1, 10. Perez does not make any key decisions at OLB – he has no authority over maintaining sales records; printing tip reports and distributing tips; taking custody of any cash tips; selecting materials, supplies, machinery, equipment, tools, or food; or decision-making regarding the safety or security of employees, budgeting, or legal compliance. Perez Decl. ¶¶ 31-35, 39-44; Teran Dep. 59:19-22; 66:18-21. All decisions pertaining to hiring, firing, disciplining all front-of-house staff, and other day-to-day employee operations, are the responsibility of the managers like Paliko. Shahmuradyan Dep. 16:25-17:3; 82:13-20; Paliko Decl. (74) ¶¶ 13-15.**

177.    The Restaurant's general manager, Paliko, takes off one or two days each week. *Id.* at 93:10-16; Fernandez Decl. ¶ 60).

**Response: Admit, but object to this statement as immaterial. Perez does not have any increased managerial or supervisory duties when Paliko is absent. <u>Perez Decl. ¶ 13.</u> In such events, Perez merely executes any plans or decisions Paliko leaves for him, and otherwise maintains communication with Paliko regarding any other issues that arise. <u>Perez Decl. ¶¶ 14, 16-17</u> ("When making determinations about who to cut in the event the restaurant is not busy, this is a task that is always performed by the General Manager, even in his absence;" "[i]n other words, if cuts are necessary, and the General Manager is absent, I have to contact him by phone or text so that he can make the decision before I execute"); <u>19-20</u> ("If the General Manager is absent and unable to lead the pre-shift meeting, I conduct the pre-shift meeting by relaying to the front-of-house staff what the General Manager directs me to tell them;" "although the front-of-house staff sometimes tells me by text or otherwise that they are running late or unable to make it for their shift, I have no discretion in deciding these things and relay the message to the General Manager, typically by taking a screenshot and forwarding it to him, and then relay his response back to the employee who contacted me about his decision on whether the absence is approved or whatever the response is"). "In other words, [Paliko is at all times] merely a go-between or a liaison to the General Manager for these employee issues and ha[s] zero discretion or authority to manage same." <u>Perez Decl. ¶ 21.</u> When Paliko is absent, Perez merely oversees his fellow servers to ensure service is performed adequately. <u>Petrosyants Dep. 93:23-94:24; 97:10- 21; 98:18-99:3; 99:20-100:8; 111:17-114:4; Teran Dep. 68:23-69:6; Paliko Dep. 23:2-25:9; 94:6- 9.</u> When Paliko is absent, Perez does not take custody of any cash tips except his own. <u>Perez Decl. ¶ 34-35.</u>**

178.    On the days that Paliko and the Individual Defendants are not present in the restaurant, Perez is the highest ranking management employee at OLB, and he supervises and oversees the food-service employees. (Petrosyants Dep. at 93:10-24, 98:23-99:14; Fernandez Decl. ¶ 10).

**Response: Admit that on days Paliko is absent, Perez is the highest-ranking employee for front-of-house staff at OLB, but denies that on such occasions, he has any increased duties to manage or supervise front-of-house staff. <u>Perez Decl. ¶ 13.</u> In such events, Perez merely executes the plans and decisions Paliko leaves for him, and otherwise maintains communication with Paliko regarding any other issues that arise. <u>Perez Decl. ¶¶ 14, 16-17</u> ("When making determinations about who to cut in the event the restaurant is not busy, this is a task that is always performed by the General Manager, even in his absence;" "[i]n other words, if cuts are necessary, and the General Manager is absent, I have to contact him by phone or text so that he can make the decision before I execute"); <u>19-20</u> ("If the General Manager is absent and unable to lead the pre-shift meeting, I conduct the pre-shift meeting by relaying to the front-of-house staff what the General Manager directs me to tell them;" "although the front-of-house staff sometimes tells me by text or otherwise that they are running late or unable to make it for their shift, I have no discretion in deciding these things and relay the message to the General Manager, typically by taking a screenshot and forwarding it to him, and then relay his response back to the employee who contacted me about his decision on whether the absence is approved or whatever the response is"). "In other words, [Paliko is at all times] merely a go-between or a liaison to the General Manager for these employee issues and ha[s] zero discretion or authority to manage same." <u>Perez Decl.</u> <u>¶ 21.</u> When Paliko is absent, Perez merely oversees his fellow servers to ensure service is**

performed adequately. <u>Petrosyants Dep.</u> <u>93:23-94:24; 97:10- 21; 98:18-99:3; 99:20-100:8;</u> <u>111:17-114:4;</u> <u>Teran Dep.</u> <u>68:23-69:6;</u> <u>Paliko Dep.</u> <u>23:2-25:9; 94:6- 9.</u> When Paliko is absent, Perez does not take custody of any cash tips except his own. <u>Perez Decl. ¶ 34-35.</u>

179.    When Paliko is not present in the restaurant, Perez reports to Petrosyants and Paliko about any issues that happen at the restaurant. (Petrosyants Dep. at 98:9-17).

**Response: Deny. When Paliko is absent, Perez does not have any increased duties to manage or supervise front-of-house staff. <u>Perez Decl. ¶ 13.</u> In such events, Perez merely executes the plans and decisions Paliko leaves for him, and otherwise maintains communication with Paliko regarding any other issues that arise. <u>Perez Decl. ¶¶ 14, 16-17</u> ("When making determinations about who to cut in the event the restaurant is not busy, this is a task that is always performed by the General Manager, even in his absence;" "[i]n other words, if cuts are necessary, and the General Manager is absent, I have to contact him by phone or text so that he can make the decision before I execute"); <u>19-20</u> ("If the General Manager is absent and unable to lead the pre-shift meeting, I conduct the pre-shift meeting by relaying to the front-of-house staff what the General Manager directs me to tell them;" "although the front-of-house staff sometimes tells me by text or otherwise that they are running late or unable to make it for their shift, I have no discretion in deciding these things and relay the message to the General Manager, typically by taking a screenshot and forwarding it to him, and then relay his response back to the employee who contacted me about his decision on whether the absence is approved or whatever the response is"); <u>37</u> ("While I do handle complaints from patrons, I do not handle complaints made by employees; the General Manager handles any employee complaints"). "In other words, [Paliko is at all times] merely a go-between or a liaison to the General Manager for these employee issues and ha[s] zero discretion or**

authority to manage same." **Perez Decl. ¶ 21. When Paliko is absent, Perez merely oversees his fellow servers to ensure service is performed adequately. Petrosyants Dep. 93:23-94:24; 97:10- 21; 98:18-99:3; 99:20-100:8; 111:17-114:4; Teran Dep. 68:23-69:6; Paliko Dep. 23:2-25:9; 94:6- 9. When Paliko is absent, Perez does not take custody of any cash tips except his own. Perez Decl. ¶ 34-35. Separately, Defendants note that this fact should not imply that Petrosyants is the Plaintiffs' employer. ECF Docket Entry 72 ¶¶ 100-109.**

180.    Similarly, on those occasions, Perez assigns the food-service employees to work in specific sections of the restaurant. (Petrosyants Dep. at 99:15-100:4).

**Response: Deny. On days when Paliko is absent, Perez merely *informs* employees of the sections which *Paliko* has assigned them to. Perez Decl. ¶ 14 ("In the General Manager's absence, he leaves me the floor plan for the day with instructions for me to execute, and I follow the plan as he directs me"); Paliko Dep. 93:12-94:5 (Paliko assigns stations before he takes off, and leaves the floor plan in the office, for Perez to give to employees).**

181.    Prior to every dinner shift at the Restaurant, there is a pre-shift meeting which all the front of the house employees are required to attend. (*Id.* at 66:23-67:2; Fernandez Decl. ¶ 36).

**Response: Admit, but object to this statement as immaterial, because the mere existence of a pre-shift meeting, including one at which Perez at times speaks, does not render Perez a manager or supervisor. Typically, these pre-shift meetings are run by Paliko and the head chef. Petrosyants Dep. 66:23-67:12. Perez primarily speaks at these meetings when Paliko is absent, for the purpose of relaying to employees information that Paliko asks him to in advance, including information regarding the floor plan. Paliko Dep. 93:25-94:5; Perez Decl. ¶ 14, 18-19, 23 ("I am not responsible for managing the front-of-house staff as that is**

**exclusively within the province of the General Manager; I only teach them about their duties, remind them to do good work and provide better service, and inform them about the specials for the day and other related items at pre-shift meetings or one-on-one meetings"). Discussions at pre-shift meetings include specials of the day, how to sell more, complaints about service, and busboys not cleaning tables (in order to encourage the bussers to provide better service); in other words, general discussion of employees' mutual duties, and no instructions that would implicate any decision-making authority over employees, even had they been delivered by Perez or Petrosyants. Teran Dep. 45:18-46:7. Notably, no terminations or disciplinary measures have ever been issued at pre-shift meetings. Teran Dep. 46:8-47:4.**

182.    At the meetings, management employees, including Paliko, Petrosyants and Perez, discuss all aspects of employees' duties at the Restaurant including, for example, issues relating to serving customers, menus, uniforms, staffing, and tip sharing. (*Id.* ¶¶ 37, 40-42; Petrosyants Dep. at 67:14:23).

**Response: Admit, but note that this does not mean Perez is a manager or supervisor at OLB. Typically, these pre-shift meetings are run by Paliko and the head chef. Petrosyants Dep. 66:23-67:12. Perez primarily speaks at these meetings when Paliko is absent, for the purpose of relaying to employees information that Paliko asks him to in advance, including information regarding the floor plan. Paliko Dep. 93:25-94:5; Perez Decl. ¶ 14, 18-19, 23 ("I am not responsible for managing the front-of-house staff as that is exclusively within the province of the General Manager; I only teach them about their duties, remind them to do good work and provide better service, and inform them about the specials for the day and other related items at pre-shift meetings or one-on-one meetings"). Discussions at pre-shift**

meetings include specials of the day, how to sell more, complaints about service, and busboys not cleaning tables (in order to encourage the bussers to provide better service); in other words, general discussion of employees' mutual duties, and no instructions that would implicate any decision-making authority over employees, even had they been delivered by Perez or Petrosyants. **Teran Dep. 45:18-46:7.** Notably, no terminations or disciplinary measures have ever been issued at pre-shift meetings. **Teran Dep. 46:8-47:4.**

183.    Perez sometimes disciplines employees during these meetings. (Fernandez Decl. ¶ 38).

**Response: Deny.** No terminations or disciplinary measures have ever been issued at pre-shift meetings. **Teran Dep. 46:8-47:4.** As head waiter or Captain at OLB, Perez' main job duties consist of "primarily serv[ing] customers," as well as "(i) training the front-of-house staff on their duties; (ii) telling the front-of-house staff the specials for the day; (iii) encouraging the front-of-house staff to do good work and provide better service; (iv) meeting job applicants during their interviews to build a good rapport with them; and (v) keeping an eye on the floor to report any issues to the General Manager, who will then decide what, if anything, to do about any such issues." **Perez Decl. ¶¶ 1, 10.** In other words, any duties that Perez performs concerning employees arise directly out of his role as a server with the most experience. **Petrosyants Dep. 72:19-73:7; 93:17-22; 98:4-14; Paliko Dep. 89:22-90:6.** Perez's role is limited to ensuring customers are properly served; he does not make any hiring, firing, or disciplinary decisions. **Perez Decl. ¶¶ 11-13; Petrosyants Dep. 93:23-94:24; 97:10-21; 98:18-99:3; 99:20-100:8; 111:17-114:4; Teran Dep. 68:23-69:6; Paliko Dep. 23:2-25:9; 94:6-9.** All decisions pertaining to hiring, firing, disciplining all front-of-house staff, and other day-to-day employee operations, are the responsibility of the managers like Paliko.

**Shahmuradyan Dep. 16:25-17:3; 82:13-20; Paliko Decl. (74) ¶¶ 13-15; Perez Decl. ¶ 23** ("I am not responsible for managing the front-of-house staff as that is exclusively within the province of the General Manager; I only teach them about their duties, remind them to do good work and provide better service, and inform them about the specials for the day and other related items at pre-shift meetings or one-on-one meetings").

184.    For example, at one such meeting, Mr. Perez singled out an employee named Nancy for not wearing the type of shoes the Restaurant required front of house employees to wear. Mr. Perez sent Nancy out of the meeting and told her to go change her shoes and that he did not want to see her with those shoes again. Mr. Perez also told all the employees who were present that "if someone comes with wrong shoes, they will be sent home or fired." (*Id.* ¶ 39).

**Response: Deny. Defendants object to this statement of fact on the grounds that it constitutes inadmissible hearsay. Defendants otherwise object to this statement as immaterial, because Perez's mere upholding of mutual standards of performance is not the same as him invoking formal disciplinary action. Notably, no terminations or disciplinary measures have ever been issued at pre-shift meetings. Teran Dep. 46:8-47:4. As head waiter or Captain at OLB, Perez' main job duties consist of "primarily serv[ing] customers," as well as "(i) training the front-of-house staff on their duties; (ii) telling the front-of-house staff the specials for the day; (iii) encouraging the front-of-house staff to do good work and provide better service; (iv) meeting job applicants during their interviews to build a good rapport with them; and (v) keeping an eye on the floor to report any issues to the General Manager, who will then decide what, if anything, to do about any such issues." Perez Decl. ¶¶ 1, 10. In other words, any duties that Perez performs concerning employees arise directly out of his role as a server with the most experience. Petrosyants Dep. 72:19-73:7; 93:17-22; 98:4-14; Paliko Dep. 89:22-90:6. Perez's**

role is limited to ensuring customers are properly served; he does not make any hiring, firing, or disciplinary decisions. Perez Decl. ¶¶ 11-13; Petrosyants Dep. 93:23-94:24; 97:10-21; 98:18-99:3; 99:20-100:8; 111:17-114:4; Teran Dep. 68:23-69:6; Paliko Dep. 23:2-25:9; 94:6-9. All decisions pertaining to hiring, firing, disciplining all front-of-house staff, and other day-to-day employee operations, are the responsibility of the managers like Paliko. Shahmuradyan Dep. 16:25-17:3; 82:13-20; Paliko Decl. (74) ¶¶ 13-15; Perez Decl. ¶ 23 ("I am not responsible for managing the front-of-house staff as that is exclusively within the province of the General Manager; I only teach them about their duties, remind them to do good work and provide better service, and inform them about the specials for the day and other related items at pre-shift meetings or one-on-one meetings").

185.    On the days that Paliko is not present in the restaurant, Perez runs the food-service employees' pre-shift meeting alone. (Petyrosyants Dep. at 100:5-8).

Response: Admit, but object to this statement as immaterial, because Perez's mere speaking at pre-shift meetings does not mean he is a manager or supervisor. Typically, these pre-shift meetings are run by Paliko and the head chef. Petrosyants Dep. 66:23-67:12. Perez primarily speaks at these meetings when Paliko is absent, for the purpose of relaying to employees information that Paliko asks him to in advance, including information regarding the floor plan. Paliko Dep. 93:25-94:5; Perez Decl. ¶ 14, 18-19, 23 ("I am not responsible for managing the front-of-house staff as that is exclusively within the province of the General Manager; I only teach them about their duties, remind them to do good work and provide better service, and inform them about the specials for the day and other related items at pre-shift meetings or one-on-one meetings"). Discussions at pre-shift meetings include specials of the day, how to sell more, complaints about service, and busboys not cleaning tables (in order to encourage

the bussers to provide better service); in other words, general discussion of employees' mutual duties, and no instructions that would implicate any decision-making authority over employees, even had they been delivered by Perez or Petrosyants. Teran Dep. 45:18-46:7. Notably, no terminations or disciplinary measures have ever been issued at pre-shift meetings. Teran Dep. 46:8-47:4.

186.    Perez directed service employees as to which station that they would cover for a meal service without reference to any paper showing who was assigned to which station. (Molina Dep. at 81:13-23).

Response: Deny, and object to this statement as immaterial, because Plaintiffs miss half the story. Perez Decl. ¶¶ 21, 45 ("I am merely a go-between or a liaison to the General Manager for these employee issues and have zero discretion or authority to manage same;" "[a]ll of my extra duties as a Captain are incidental to my primary duty as a server"). On days when Paliko is not there, Perez merely relays to employees the floor plan that Paliko has prepared in advance. Paliko Dep. 93:25-94:5; Perez Decl. ¶ 14, 18-19. Perez delivering this information without holding a piece of paper does not change this fact.

187.    During a meal service, Perez directs the service staff on "everything," including directing them to clean certain tables, prepare tables for incoming guests, bring water to tables, and to help out at other servers' stations. (Molina Dep. at 85:12-24).

Response: Deny. Although Perez ensures all employees performing adequately as part of their collective goal of excellent service, he does "not direct the work of any of the front-of-house staff, as [he is] busy focusing on serving [his] tables, and only engage[s] in the direction of the bussers and runners who [assist him] with serving [his] tables." Perez Decl. ¶ 24. As head waiter or Captain at OLB, Perez' main job duties consist of "primarily serv[ing]

customers," as well as "(i) training the front-of-house staff on their duties; (ii) telling the front-of-house staff the specials for the day; (iii) encouraging the front-of-house staff to do good work and provide better service; (iv) meeting job applicants during their interviews to build a good rapport with them; and (v) keeping an eye on the floor to report any issues to the General Manager, who will then decide what, if anything, to do about any such issues." Perez Decl. ¶¶ 1, 10. In other words, any duties that Perez performs concerning employees arise directly out of his role as a server with the most experience. Petrosyants Dep. 72:19-73:7; 93:17-22; 98:4-14; Paliko Dep. 89:22-90:6. Perez's role is limited to ensuring customers are properly served; he does not make any hiring, firing, or disciplinary decisions. Perez Decl. ¶¶ 11-13; Petrosyants Dep. 93:23-94:24; 97:10-21; 98:18-99:3; 99:20-100:8; 111:17-114:4; Teran Dep. 68:23-69:6; Paliko Dep. 23:2-25:9; 94:6- 9. Perez does not make any key decisions at OLB – he has no authority over maintaining sales records; printing tip reports and distributing tips; taking custody of any cash tips; selecting materials, supplies, machinery, equipment, tools, or food; or decision-making regarding the safety or security of employees, budgeting, or legal compliance. Perez Decl. ¶¶ 31-35, 39-44; Teran Dep. 59:19-22; 66:18-21. All decisions pertaining to hiring, firing, disciplining all front-of-house staff, and other day-to-day employee operations, are the responsibility of the managers like Paliko. Shahmuradyan Dep. 16:25-17:3; 82:13-20; Paliko Decl. (74) ¶¶ 13-15; Perez Decl. ¶ 23 ("I am not responsible for managing the front-of-house staff as that is exclusively within the province of the General Manager; I only teach them about their duties, remind them to do good work and provide better service, and inform them about the specials for the day and other related items at pre-shift meetings or one-on-one meetings"). Perez assists other employees in a limited capacity, including by leading the team meetings, informing

38

employees of what sections Paliko had assigned them to, opening and closing the restaurant, relaying the schedule via Toast, participating in the nightly tipping out process, and asking employees to help clean tables, set tables, and assist in other sections. **Molina Dep. 67:4-13; 82:18-85:24; 86:17-87:15; 88:7-15.**

188.     Unlike other waitstaff, who all had their own "station" during a meal service, Perez did not have his own station. (Molina Dep. at 92:12-21).

**Response: Deny. Perez is always part of the floor plan, with his own specific station that he is assigned to, that he is required to serve along with the other front-of-house staff. Perez Decl. ¶ 15. Accordingly, he "do[es] not direct the work of any of the front-of-house staff, as [he is] busy focusing on serving [his] tables, and only engages in direction of the bussers and runners who [assist him] with serving [his] tables as any server would, rather than the front-of-house staff as a whole. Perez Decl. ¶ 24.**

189.     Plaintiff Teran reported to Perez. (Teran Dep. at 40:21-23).

**Response: Deny. In the very testimony Plaintiffs cite, Teran testified that he reported to Perez _or_ Paliko. Teran Dep. at 40:21-23. Note that this alleged fact neglects the reality that any such instance of an employee allegedly reporting to Perez would have involved Perez then consulting Paliko. Perez Decl. ¶¶ 12 ("My role as a Captain is limited to reporting what I see to the General Manager who makes the decision about what to do in his sole discretion, especially in the unusual circumstance that the General Manager is absent from the restaurant"), 20 (Perez has no discretion to decide employment-related matters and, in such cases, will relay an employee's message to Paliko, and then relay Paliko's response to the employee), 21 ("In other words, I am merely a go-between or a liaison to the General Manager for these employee issues and have zero discretion or authority to manage same"),**

39

**23 ("I am not responsible for managing the front-of-house staff as that is exclusively within the province of the General Manager; I only teach them about their duties, remind them to do good work and provide better service, and inform them about the specials for the day and other related items at pre-shift meetings or one-on-one meetings"), 24 (any alleged reporting to Perez may be attributed to bussers and runners in the same section as Perez merely communicating with him for the purpose of achieving their collective goal of excellent service), 36 ("I do not assess any employees' [*sic*] performance, but I do report what I see, especially if asked by the General Manager"), 37 ("I do not handle complaints made by employees; the General Manager handles any employee complaints"), 45 ("All of my duties as a Captain are incidental to my primary duty as a server"). Perez does not have authority to address issues employees report to him, including but not limited to, requests for time off and to alter time clocks (only Paliko may address such issues). Petrosyants Dep. 108:22-109:4; 109:13-23.**

190.    Perez has recommended employees for promotions at the Restaurant. (Fernandez Decl. ¶¶ 47-48).

**Response: Deny. Perez does not have the power to make recommendations about hiring, firing, advancement, promotion, or any other change of status of other employees. Perez Decl. ¶ 11, 22, 26, 29; Paliko Dep. 87:10-18 (Paliko has not consulted with Perez before promoting an employee; it is Paliko's sole decision). In fact, at least once when Perez tried to make a recommendation regarding disciplinary action against an employee, Paliko declined to pursue Perez's recommendation. Perez Decl. ¶ 27. All decisions pertaining to hiring, firing, disciplining all front-of-house staff, and other day-to-day employee operations, are the responsibility of the managers (like Paliko). Shahmuradyan Dep. 16:25-17:3; 82:13-20.**

40

**Although Paliko may at times ask Perez about his observations of front-of-house staff, Paliko does not ask Perez for any recommendations, because Paliko makes staffing decisions independently. Paliko Decl. (74) ¶ 15.**

191.    If employees had complaints about issues such as, for example, coworkers' performances or under- of over-staffing at the Restaurant, they would raise the issues with Perez or Paliko. (*Id.* ¶¶ 49-50).

**Response: Admit, but note that this alleged fact neglects the reality that any such instance of an employee reporting to Perez would have involved Perez then consulting Paliko. Perez Decl. ¶¶ 12 ("My role as a Captain is limited to reporting what I see to the General Manager who makes the decision about what to do in his sole discretion, especially in the unusual circumstance that the General Manager is absent from the restaurant"), 20 (Perez has no discretion to decide employment-related matters and, in such cases, will relay an employee's message to Paliko, and then relay Paliko's response to the employee), 21 ("In other words, I am merely a go-between or a liaison to the General Manager for these employee issues and have zero discretion or authority to manage same"), 23 ("I am not responsible for managing the front-of-house staff as that is exclusively within the province of the General Manager; I only teach them about their duties, remind them to do good work and provide better service, and inform them about the specials for the day and other related items at pre-shift meetings or one-on-one meetings"), 24 (any alleged reporting to Perez may be attributed to bussers and runners in the same section as Perez merely communicating with him for the purpose of achieving their collective goal of excellent service), 36 ("I do not assess any employees' [*sic*] performance, but I do report what I see, especially if asked by the General Manager"), 37 ("I do not handle complaints made by employees; the General Manager handles any**

employee complaints"), **45** ("All of my duties as a Captain are incidental to my primary duty as a server"). Perez does not have authority to address issues employees report to him, including but not limited to, requests for time off and to alter time clocks (only Paliko may address such issues). Petrosyants Dep. **108:22-109:4; 109:13-23.**

192.    Perez would frequently tell the employees that if they had an issue with a coworker they should not raise it with the coworker but rather bring it to Perez's attention first and that he would handle it. (*Id.* ¶ 51).

**Response: Admit, but object to this statement as immaterial, because this alleged fact neglects the reality that any such instance of an employee reporting to Perez would then involve Perez consulting Paliko. Perez Decl. ¶¶ 12 ("My role as a Captain is limited to reporting what I see to the General Manager who makes the decision about what to do in his sole discretion, especially in the unusual circumstance that the General Manager is absent from the restaurant"), 20 (Perez has no discretion to decide employment-related matters and, in such cases, will relay an employee's message to Paliko, and then relay Paliko's response to the employee), 21 ("In other words, I am merely a go-between or a liaison to the General Manager for these employee issues and have zero discretion or authority to manage same"), 23 ("I am not responsible for managing the front-of-house staff as that is exclusively within the province of the General Manager; I only teach them about their duties, remind them to do good work and provide better service, and inform them about the specials for the day and other related items at pre-shift meetings or one-on-one meetings"), 24 (any alleged reporting to Perez may be attributed to bussers and runners in the same section as Perez merely communicating with him for the purpose of achieving their collective goal of excellent service), 36 ("I do not assess any employees' [*sic*] performance, but I do report what I see,**

especially if asked by the General Ma nager"), **37** ("I do not handle complaints made by employees; the General Manager handles any employee complaints"), **45** ("All of my duties as a Captain are incidental to my primary duty as a server"). **Perez does not have authority to address issues employees report to him, including but not limited to, requests for time off and to alter time clocks (only Paliko may address such issues). Petrosyants Dep. 108:22-109:4; 109:13-23.**

193. Perez was involved in payroll calculations at the Restaurant. (*Id.* ¶ 52).

**Response: Deny. Perez's mere participation in the nightly division of tips was no different than any other employees' participation in that same system, because Perez was not a manager or supervisor and had no authority over that system. Molina Dep. 73:23-75:5 (all front-of-house employees had the option to be present during that time). Notably, the tip report used by employees to determine tip distribution is printed out by Paliko, not by Perez. Perez Decl. ¶ 32; Teran 59:19-22 (Q: Isn't it true there is a daily tip report printed at the end of the day? A: [J]anos did it, but all I know is we all got the checks"). Perez is not responsible for maintaining any sales records at the restaurant. Perez. Decl. ¶ 31. Since Perez is a server and front-of-house employee, and not a manager or supervisor, he has participated in the tip pool at Osteria, receiving the amount that he is entitled to within his role. Petrosyants Dep. 114:5-115:23; 122:4-8; Fernandez Dep. 75:20-22; Perez Decl. ¶¶ 5, 7-8. Stephanie Willsey is responsible for processing payroll weekly, managing vendor payments, data entry for accounting and bookkeeping purposes, and preparing financial reports. Willsey Decl. (73) ¶¶ 6-7; Paliko Dep. 13:8-22; 57:24-58:5; 61:15-17; 91:14-92:4. Payroll is further calculated/processed using the Toast application. Willsey Decl. (73) ¶¶ 8-9, 11. Perez does not take custody of any cash tips except his own. Perez Decl. ¶ 34-35.**

194.    For example, on some occasions, Mr. Perez would inform the employees about how much their share of the tip pool was in a given week. (*Id.*).

**Response: Admit, but object to this statement as immaterial, because this is no different than how any other employee could have participated in the nightly division of tips, and does not implicate any authority by Perez over that system. Molina Dep. 73:23-75:5 (all front-of-house employees had the option to be present during that time). Notably, the tip report used by employees to determine tip distribution is printed out by Paliko, not by Perez. Perez Decl. ¶ 32; Teran 59:19-22 (Q: Isn't it true there is a daily tip report printed at the end of the day? A: [J]anos did it, but all I know is we all got the checks"). Perez is not responsible for maintaining any sales records at the restaurant. Perez. Decl. ¶ 31. Since Perez is a server and front-of-house employee, and not a manager or supervisor, he has participated in the tip pool at Osteria, receiving the amount that he is entitled to within his role. Petrosyants Dep. 114:5-115:23; 122:4-8; Fernandez Dep. 75:20-22; Perez Decl. ¶¶ 5, 7-8. Stephanie Willsey is responsible for processing payroll weekly, managing vendor payments, data entry for accounting and bookkeeping purposes, and preparing financial reports. Willsey Decl. (73) ¶¶ 6-7; Paliko Dep. 13:8-22; 57:24-58:5; 61:15-17; 91:14-92:4. Payroll is further calculated/processed using the Toast application. Willsey Decl. (73) ¶¶ 8-9, 11. Perez does not take custody of any cash tips except his own. Perez Decl. ¶¶ 34-35.**

195.    On some occasions, Perez would inform the employees via text message about how much their share of the tip pool was in a given week. (*Id.*).

**Response: Admit, but object to this statement as immaterial, because the mere relaying of information does not implicate any authority by Perez over that system. Molina Dep. 73:23-75:5 (all front-of-house employees had the option to be present during tip division); Perez**

**Decl. ¶¶ 21** ("I am merely a go-between or a liaison to the General Manager for these employee issues and have zero discretion or authority to manage same"), **22** (in another context, employees occasionally inform Perez via text about their attendance issues; in such cases, Perez has no discretion to decide and merely relays the message to Paliko, who then informs Perez about how to respond to that employee). Notably, the tip report used by employees to determine tip distribution is printed out by Paliko, not by Perez. **Perez Decl. ¶ 32; Teran 59:19-22** (Q: Isn't it true there is a daily tip report printed at the end of the day? A: [J]anos did it, but all I know is we all got the checks"). Perez is not responsible for maintaining any sales records at the restaurant. **Perez. Decl. ¶ 31.** Since Perez is a server and front-of-house employee, and not a manager or supervisor, he has participated in the tip pool at Osteria, receiving the amount that he is entitled to within his role. **Petrosyants Dep. 114:5-115:23; 122:4-8; Fernandez Dep. 75:20-22; Perez Decl. ¶¶ 5, 7-8.** Stephanie Willsey is responsible for processing payroll weekly, managing vendor payments, data entry for accounting and bookkeeping purposes, and preparing financial reports. **Willsey Decl. (73) ¶¶ 6-7; Paliko Dep. 13:8-22; 57:24-58:5; 61:15-17; 91:14-92:4.** Payroll is further calculated/processed using the Toast application. **Willsey Decl. (73) ¶¶ 8-9, 11.** Perez does not take custody of any cash tips except his own. **Perez Decl. ¶ 34-35.**

196.     Perez also had the authority to alter employees' time records. (*Id.* ¶ 53).

**Response: Deny. Perez does not have authority to alter the time clock records, if any employee reports such an issue; only Paliko has such authority. Petrosyants Dep. 109:13-23.**

197.     For example, on a few occasions, Plaintiff Fernandez forgot to clock-in at the beginning her shift or to clock-out at the end of the shift. On these occasions, she contacted Perez to inform him of her mistake, and he corrected the time record for her. (*Id.* ¶ 54).

**Response: Admit, but note that this allegation misses the fact that, as part of OLB's standard employment-related decision-making procedure, Perez would have first relayed the issue to Paliko. Perez Decl. ¶¶ 21, 45 ("I am merely a go-between or a liaison to the General Manager for these employee issues and have zero discretion or authority to manage same;" "[a]ll of my extra duties as a Captain are incidental to my primary duty as a server"). For example, in other contexts, "if cuts are necessary, and the General Manager is absent, I have to contact him by phone or text so that he can make the decision before I execute;" "although the front-of-house staff sometimes tells me by text or otherwise that they are running late or unable to make it for their shift, I have no discretion in deciding these things and relay the message to the General Manager, typically by taking a screenshot and forwarding it to him, and then relay his response back to the employee who contacted me about his decision on whether the absence is approved or whatever the response is." Perez Decl. ¶¶ 17, 20; Petrosyants Dep. 95:3-96:16; 109:13-23 (Perez does not have authority to alter the time clock records, if any employee reports such an issue; only Paliko has such authority). Paliko's testimony confirms his sole authority in scheduling matters. Paliko Dep. 34:22-35:9 ("Q: Isn't it true that Julio Perez is involved in scheduling as well? [… A:] Never. […] He's not involved, […] I'm the only one who's doing the schedule").**

198.    Customers at the Restaurant frequently left cash tips for the waitstaff. The cash tips were distributed to employees at the end of the shift. (*Id.* ¶ 55).

**Response: Admit, but note that Perez's involvement in gathering and distributing said tips is limited to abiding by the tip report printed out by Paliko; placing cash tips in the safe (or, more typically, providing cash tips to Paliko, who places them in the safe); and receiving his own tips. Perez Decl. ¶¶ 32-35. Perez does not otherwise participate in tip distribution in any**

**manner greater than any other front-of-house employee. Molina Dep. 73:23-75:5 (all front-of-house employees have the option to be present during that time). Notably, the tip report used by employees to determine tip distribution is printed out by Paliko, not by Perez. Perez Decl. ¶ 32; Teran 59:19-22 (Q: Isn't it true there is a daily tip report printed at the end of the day? A: [J]anos did it, but all I know is we all got the checks"). Perez is not responsible for maintaining any sales records at the restaurant. Perez. Decl. ¶ 31. Since Perez is a server and front-of-house employee, and not a manager or supervisor, he has participated in the tip pool at Osteria, receiving the amount that he is entitled to within his role. Petrosyants Dep. 114:5-115:23; 122:4-8; Fernandez Dep. 75:20-22; Perez Decl. ¶¶ 5, 7-8. Stephanie Willsey is responsible for processing payroll weekly, managing vendor payments, data entry for accounting and bookkeeping purposes, and preparing financial reports. Willsey Decl. (73) ¶¶ 6-7; Paliko Dep. 13:8-22; 57:24-58:5; 61:15-17; 91:14-92:4. Payroll is further calculated/processed using the Toast application. Willsey Decl. (73) ¶¶ 8-9, 11. Perez does not take custody of any cash tips except his own. Perez Decl. ¶¶ 34-35.**

199.    On some occasions, Perez would be responsible for gathering all the cash tips, calculating how much each employee was owed, and then distributing the cash tips to each specific employee. (*Id.*).

**Response: Deny. Perez does not take custody of any cash tips except his own. Perez Decl. ¶ 34-35. Perez's involvement concerning tips is limited to abiding by the tip report printed out by Paliko; placing cash tips in the safe (or, more typically, providing cash tips to Paliko, who places them in the safe); and receiving his own tips. Perez Decl. ¶¶ 32-35. Perez does not otherwise participate in tip distribution in any manner greater than any other front-of-house employee. Molina Dep. 73:23-75:5 (all front-of-house employees have the option to be present**

during that time). Notably, the tip report used by employees to determine tip distribution is printed out by Paliko, not by Perez. **Perez Decl. ¶ 32; Teran 59:19-22 (Q: Isn't it true there is a daily tip report printed at the end of the day? A: [J]anos did it, but all I know is we all got the checks").** Perez is not responsible for maintaining any sales records at the restaurant. **Perez. Decl. ¶ 31.** Since Perez is a server and front-of-house employee, and not a manager or supervisor, he has participated in the tip pool at Osteria, receiving the amount that he is entitled to within his role. **Petrosyants Dep. 114:5-115:23; 122:4-8; Fernandez Dep. 75:20-22; Perez Decl. ¶¶ 5, 7-8.** Stephanie Willsey is responsible for processing payroll weekly, managing vendor payments, data entry for accounting and bookkeeping purposes, and preparing financial reports. **Willsey Decl. (73) ¶¶ 6-7; Paliko Dep. 13:8-22; 57:24-58:5; 61:15-17; 91:14-92:4.** Payroll is further calculated/processed using the Toast application. **Willsey Decl. (73) ¶¶ 8-9, 11.**

200.    Perez participates in OLB's food-service employees' tip pool as if he were a server. (Petrosyants Dep. at 114:5-7).

**Response: Admit, but object to this statement as immaterial, because Perez *is* a server. Perez Decl. ¶¶ 10-11.** Perez's involvement concerning tips is limited to abiding by the tip report printed out by Paliko; placing cash tips in the safe (or, more typically, providing cash tips to Paliko, who places them in the safe); and receiving his own tips. **Perez Decl. ¶¶ 32-35.** Perez does not otherwise participate in tip distribution in any manner greater than any other front-of-house employee. **Molina Dep. 73:23-75:5** (all front-of-house employees have the option to be present during that time). Notably, the tip report used by employees to determine tip distribution is printed out by Paliko, not by Perez. **Perez Decl. ¶ 32; Teran 59:19-22 (Q: Isn't it true there is a daily tip report printed at the end of the day? A: [J]anos did it, but all I**

know is we all got the checks"). Perez is not responsible for maintaining any sales records at the restaurant. **Perez. Decl. ¶ 31.** Since Perez is a server and front-of-house employee, and not a manager or supervisor, he has participated in the tip pool at Osteria, receiving the amount that he is entitled to within his role. **Petrosyants Dep. 114:5-115:23; 122:4-8; Fernandez Dep. 75:20-22; Perez Decl. ¶¶ 5, 7-8.** Stephanie Willsey is responsible for processing payroll weekly, managing vendor payments, data entry for accounting and bookkeeping purposes, and preparing financial reports. **Willsey Decl. (73) ¶¶ 6-7; Paliko Dep. 13:8-22; 57:24-58:5; 61:15-17; 91:14-92:4.** Payroll is further calculated/processed using the Toast application. **Willsey Decl. (73) ¶¶ 8-9, 11.** Perez does not take custody of any cash tips except his own. **Perez Decl. ¶¶ 34-35.** Moreover, Perez is not otherwise a manager or supervisor. Perez does "not direct the work of any of the front-of-house staff, as [he is] busy focusing on serving [his] tables, and only engage[s] in the direction of the bussers and runners who [assist him] with serving [his] tables." **Perez Decl. ¶ 24.** Any duties that Perez performs concerning employees arise directly out of his role as a server with the most experience. **Perez Decl. ¶¶ 1, 10; Petrosyants Dep. 72:19-73:7; 93:17-22; 98:4-14; Paliko Dep. 89:22-90:6.** Perez's role is limited to ensuring customers are properly served; he does not make any hiring, firing, or disciplinary decisions. **Perez Decl. ¶¶ 11-13; Petrosyants Dep. 93:23-94:24; 97:10-21; 98:18-99:3; 99:20-100:8; 111:17-114:4; Teran Dep. 68:23-69:6; Paliko Dep. 23:2-25:9; 94:6- 9.** Perez does not make any key decisions at OLB; all decisions pertaining to hiring, firing, disciplining all front-of-house staff, and other day-to-day employee operations, are the responsibility of the managers like Paliko. **Shahmuradyan Dep. 16:25-17:3; 82:13-20; Paliko Decl. (74) ¶¶ 13-15; Perez Decl. ¶ 23** ("I am not responsible for managing the front-of-house staff as that is exclusively within the province of the General Manager; I only

teach them about their duties, remind them to do good work and provide better service, and inform them about the specials for the day and other related items at pre-shift meetings or one-on-one meetings"). Perez merely assists other employees in a limited capacity, including by leading the team meetings, informing employees of what sections Paliko had assigned them to, opening and closing the restaurant, relaying the schedule via Toast, participating in the nightly tipping out process, and asking employees to help clean tables, set tables, and assist in other sections. Molina Dep. 67:4-13; 82:18-85:24; 86:17-87:15; 88:7-15.

201.    The Restaurant's internal payroll systems lists Perez as a "manager" together with Palyko [*sic*], the restaurant's general manager. (Fernandez Decl. ¶¶ 57-59).

**Response: Deny, and object to this statement as immaterial. Perez is listed as a server in payroll records. See ECF Docket Entry 90-12 at 9. Like Perez's designation as a "Supervisor" on Fernandez's Corrective Action Notice, this is purely nominal and does not necessitate his independent authority to execute disciplinary action against employees; notably, this form also features Paliko's signature. Fernandez Decl. (91) ¶ 27; Perez Decl. ¶¶ 11 ("In my role as Captain, I never make any hiring, firing, or disciplinary decisions; this is within the sole province of the General Manager"), 25-27 ("I do not have the authority to hire, fire, or discipline employees at the restaurant;" "I do not have the power to make recommendations about hiring, firing, advancement, promotion, or any other change of status of other employees;" "[i]n fact, recently when I reported one employee for engaging in insubordination, the General Manager did not engage in any disciplinary measures against that employee, even though I felt it was warranted"). As General Manager, Paliko has sole discretion to hire, fire, and discipline front-of-house employees. Paliko Decl. (74) ¶¶ 13-15; Teran Dep. 46:8-47:4 (no terminations were made nor was any discipline issued at**

pre-shift meetings); **Paliko Dep. 25:11-23** (Perez does not have authority to discipline employees; Perez merely informs Paliko, and Paliko may take action the following day). **Perez has only ever participated in corrective action notices of other employees as a witness, not as a decisionmaker who imposes discipline. Paliko Dep. 88:3-89:3. All decisions pertaining to hiring, firing, disciplining all front-of-house staff, and other day-to-day employee operations, are the responsibility of the managers like Paliko. Shahmuradyan Dep. 16:25-17:20; 82:13-20; Paliko Decl. (74) ¶¶ 13-15. Perez merely serves as "a go-between or a liaison to the General Manager," relaying Paliko's messages to employees and otherwise carrying out Paliko's orders when he is not present. Perez Decl. ¶¶ 19-21.**

202.    Although Perez participates in the restaurant's tip pool and receives a server's share, he is not paid the tip credit wage like the other food-service employees. (Buzzard Decl. ¶¶ 14-16, Ex. 12).

**Response: Deny, and object as immaterial. Perez did receive a tip credit wage, the same as any other front-of-house employee. Perez Decl. ¶¶ 5, 7-8. Perez is a server. Perez Decl. ¶¶ 9-11. Since Perez is a server and front-of-house employee, and not a manager or supervisor, he has participated in the tip pool at Osteria, receiving the amount that he is entitled to within his role. Petrosyants Dep. 114:5-115:23; 122:4-8; Fernandez Dep. 75:20-22; Perez Decl. ¶¶ 5, 7-8. Perez is not otherwise a manager or supervisor. Perez does "not direct the work of any of the front-of-house staff, as [he is] busy focusing on serving [his] tables, and only engage[s] in the direction of the bussers and runners who [assist him] with serving [his] tables." Perez Decl. ¶ 24. Any duties that Perez performs concerning employees arise directly out of his role as a server with the most experience. Perez Decl. ¶¶ 1, 10; Petrosyants Dep. 72:19-73:7; 93:17-22; 98:4-14; Paliko Dep. 89:22-90:6. Perez's role is limited to ensuring customers are**

**properly served; he does not make any hiring, firing, or disciplinary decisions. Perez Decl.**

**¶¶ 11-13; Petrosyants Dep. 93:23-94:24; 97:10-21; 98:18-99:3; 99:20-100:8; 111:17-114:4;**

**Teran Dep. 68:23-69:6; Paliko Dep. 23:2-25:9; 94:6- 9. Perez does not make any key decisions**

**at OLB; all decisions pertaining to hiring, firing, disciplining all front-of-house staff, and**

**other day-to-day employee operations, are the responsibility of the managers like Paliko.**

**Shahmuradyan Dep. 16:25-17:3; 82:13-20; Paliko Decl. (74) ¶¶ 13-15; Perez Decl. ¶ 23 ("I**

**am not responsible for managing the front-of-house staff as that is exclusively within the**

**province of the General Manager; I only teach them about their duties, remind them to do**

**good work and provide better service, and inform them about the specials for the day and**

**other related items at pre-shift meetings or one-on-one meetings"). Perez merely assists other**

**employees in a limited capacity, including by leading the team meetings, informing**

**employees of what sections Paliko had assigned them to, opening and closing the restaurant,**

**relaying the schedule via Toast, participating in the nightly tipping out process, and asking**

**employees to help clean tables, set tables, and assist in other sections. Molina Dep. 67:4-13;**

**82:18-85:24; 86:17-87:15; 88:7-15.**

203.    For example, Defendants' payroll records indicate that, in 2024, Perez was paid $20 per hour whereas the servers, bussers, runners and bartenders were typically paid the tip credit minimum wage of $10.65 per hour . (Buzzard Decl. ¶¶ 14-16, Ex. 12).

**Response: Admit, but note that, this is purely due to Perez's seniority. Petrosyants Dep.**

**72:19-73:7 ("he is the oldest server that we have. He knows the best knowledge of how to run**

**things"). Moreover, this does not render him a manager or supervisor. Perez Decl. ¶¶ 11 ("In**

**my role as Captain, I never make any hiring, firing, or disciplinary decisions; this is within**

**the sole province of the General Manager"), 25-27 ("I do not have the authority to hire, fire,**

or discipline employees at the restaurant;" "I do not have the power to make recommendations about hiring, firing, advancement, promotion, or any other change of status of other employees;" "[i]n fact, recently when I reported one employee for engaging in insubordination, the General Manager did not engage in any disciplinary measures against that employee, even though I felt it was warranted"). As General Manager, Paliko has sole discretion to hire, fire, and discipline front-of-house employees. **Paliko Decl. (74) ¶¶ 13-15; Teran Dep. 46:8-47:4** (no terminations were made nor was any discipline issued at pre-shift meetings); **Paliko Dep. 25:11-23** (Perez does not have authority to discipline employees; Perez merely informs Paliko, and Paliko may take action the following day). Perez has only ever participated in corrective action notices of other employees as a witness, not as a decisionmaker who imposes discipline. **Paliko Dep. 88:3-89:3.** All decisions pertaining to hiring, firing, disciplining all front-of-house staff, and other day-to-day employee operations, are the responsibility of the managers like Paliko. **Shahmuradyan Dep. 16:25-17:20; 82:13-20; Paliko Decl. (74) ¶¶ 13-15.** Perez merely serves as "a go-between or a liaison to the General Manager," relaying Paliko's messages to employees and otherwise carrying out Paliko's orders when he is not present. **Perez Decl. ¶¶ 19-21.**

**AS TO "Defendants' Shahmuradyan's and Petrosyants's Operational Control Over OLB"**

204.    Defendant Shahmuradyan owns and operates OLB. (Complaint ¶ 10; Answer ¶ 10).

**Response: Admit to Shahmuradyan's ownership of OLB, but deny Shahmuradyan's operational control over OLB employees; she has never been responsible for hiring or dealing with rank-and-file employees in any capacity. Shahmuradyan Dep. 15:18-18:15 (Although Shahmuradyan is the sole owner, only managers – i.e. only Paliko – handle day-**

to-day operations); <u>18:14-19:12</u> (The Director of Operations, Petrosyants, handles operations pertaining to vendors, food, and working with the Department of Health and fire department); <u>22:22-23:16</u> (Shahmuradyan meets with Paliko very rarely and is barely at OLB. At most, she speaks to him one a week, on the phone, to make sure reports and payroll have been done; although she does not even check these items); <u>48:5-15</u>; <u>49:12-50:8</u> (Shahmuradyan does not remember how the first employee would have been hired at OLB); <u>56:8-11</u>; <u>61:6-66:24</u> (Shahmuradyan is not familiar with employees' payroll records, and does not know any employees' names except for Paliko); <u>Paliko Dep. 16:21-17:19</u> (Shahmuradyan hardly hired Paliko, so much as had a conversation with him after the prior General Manager left); <u>18:23-24</u> (Shahmuradyan is not involved in operations); <u>Petrosyants Dep. 20:7-21:6</u> (as Director of Operations, Petrosyants is responsible for running operational aspects of the business, including overseeing the quality of food and service, and dealing with vendors and payments).

205.    As owner, Defendant Shahmuradyan "oversees everything" at the restaurant. (Shahmuradyan Dep. at 48:3-11 ("I oversee everything.")).

**Response: Deny.** In the very testimony Plaintiffs' cite, they neglect the full scope of Shahmuradyan's testimony, which explains that, although she may oversee things at a "30,000-foot view," "[e]verybody does their own job and the restaurant runs. So the management hires, fires, decides payroll. The chef does his part in the kitchen. Robert meets with the vendors. The hostess is in the front sitting people. The waiters are doing their job. I oversee everything. The restaurant's been running for three, four years, so I don't need to get involved. But every area is run by specific people and it all comes together." <u>Shahmuradyan Dep. at 16:24-17:5</u> ("I do not handle day-to-day operations. Managers do

that"); <u>48:3-15.</u> Shahmuradyan does not have operational control over OLB; she has never been responsible for hiring or dealing with rank-and-file employees in any capacity. <u>Shahmuradyan Dep.</u> <u>15:18-18:15</u> (Although Shahmuradyan is the sole owner, only managers – i.e. only Paliko – handle day-to-day operations); <u>18:14-19:12</u> (The Director of Operations, Petrosyants, handles operations pertaining to vendors, food, and working with the Department of Health and fire department); <u>22:22-23:16</u> (Shahmuradyan meets with Paliko very rarely and is barely at OLB. At most, she speaks to him one a week, on the phone, to make sure reports and payroll have been done; although she does not even check these items); <u>48:5-15;</u> <u>49:12-50:8</u> (Shahmuradyan does not remember how the first employee would have been hired at OLB); <u>56:8-11;</u> <u>61:6-66:24</u> (Shahmuradyan is not familiar with employees' payroll records, and does not know any employees' names except for Paliko); <u>Paliko Dep.</u> <u>16:21-17:19</u> (Shahmuradyan hardly hired Paliko, so much as had a conversation with him after the prior General Manager left); <u>18:23-24</u> (Shahmuradyan is not involved in operations); <u>Petrosyants Dep.</u> <u>20:7-21:6</u> (as Director of Operations, Petrosyants is responsible for running operational aspects of the business, including overseeing the quality of food and service, and dealing with vendors and payments).

206.    Defendant Shahmuradyan has "ultimate authority over all operations of the restaurant." (Shahmuradyan Dep. at 69:24-70:8 ("Q: Okay. Now, as owner of the restaurant, you have ultimate authority over all operations of the restaurant, correct? A: Correct.").

**Response: Deny. Shahmuradyan elaborated, shortly after the above-cited testimony, that her authority is not all-encompassing ("I think what you're saying doesn't stop with me, because again, there's management beside – Q: Right. But you're the ultimate authority on the top of the operations of the restaurant; right? As the owner. A: Yes, but I don't decide certain**

things in the restaurant").[3] Shahmuradyan Dep. 70:17-25. **Although Shahmuradyan may oversee things at a "30,000-foot view," "[e]verybody does their own job and the restaurant runs. So the management hires, fires, decides payroll. The chef does his part in the kitchen. Robert meets with the vendors. The hostess is in the front sitting people. The waiters are doing their job. I oversee everything. The restaurant's been running for three, four years, so I don't need to get involved. But every area is run by specific people and it all comes together."** Shahmuradyan Dep. at 16:24-17:5 **("I do not handle day-to-day operations. Managers do that");** 48:3-15. **Shahmuradyan does not have operational control over OLB concerning front-of-house employees; she has never been responsible for hiring or dealing with rank-and-file employees in any capacity.** Shahmuradyan Dep. 15:18-18:15 **(Although Shahmuradyan is the sole owner, only managers – i.e. only Paliko – handle day-to-day operations);** 18:14-19:12 **(The Director of Operations, Petrosyants, handles operations pertaining to vendors, food, and working with the Department of Health and fire department);** 22:22-23:16 **(Shahmuradyan meets with Paliko very rarely and is barely at OLB. At most, she speaks to him one a week, on the phone, to make sure reports and payroll have been done; although she does not even check these items);** 48:5-15; 49:12-50:8 **(Shahmuradyan does not remember how the first employee would have been hired at OLB);** 56:8-11; 61:6-66:24 **(Shahmuradyan is not familiar with employees' payroll records, and does not know any employees' names except for Paliko);** Paliko Dep. 16:21-17:19 **(Shahmuradyan hardly hired Paliko, so much as had a conversation with him after the prior**

---

[3] Not only does Shahmuradyan's full testimony reveal her lack of ultimate authority over front-of-house employees, it reveals Plaintiffs' refusal to accept her actual answer; note that Plaintiffs' interrupted her testimony regarding management's authority, and immediately thereafter pivoted the conversation to question her about private events at the restaurant. Shahmuradyan Dep. 70:17-71:4.

**General Manager left); 18:23-24 (Shahmuradyan is not involved in operations); Petrosyants Dep. 20:7-21:6 (as Director of Operations, Petrosyants is responsible for running operational aspects of the business, including overseeing the quality of food and service, and dealing with vendors and payments).**

207.    As the 100% owner, Defendant Shahmuradyan has financial control over the restaurant. (Shahmuradyan Dep. at 35:23-36:2).

**Response: Admit, but object to this statement as immaterial, because ownership and high-level financial control/oversight does not mean Shahmuradyan has operational control over OLB front-of-house employees, such that she is Plaintiffs' employer. Notably, Shahmuradyan has never been responsible for hiring or dealing with rank-and-file employees in any capacity. Shahmuradyan Dep. 15:18-18:15 (Although Shahmuradyan is the sole owner, only managers – i.e. only Paliko – handle day-to-day operations); 18:14-19:12 (The Director of Operations, Petrosyants, handles operations pertaining to vendors, food, and working with the Department of Health and fire department); 22:22-24:10 (Shahmuradyan meets with Paliko very rarely and is barely at OLB. At most, she speaks to him one a week, on the phone, to make sure reports and payroll have been done; although she does not even check these items. "I do only finances. […] I don't want anything else there. [… I] just look at it. But I don't decide, […] I don't go on Toast [except maybe] once a month I do. But I mostly go on QuickBooks;" Shahmuradyan testifies that she is "not sure" whether payroll records are kept electronically or in hard copy); 48:5-15; 49:12-50:8 (Shahmuradyan does not remember how the first employee would have been hired at OLB); 56:8-11; 61:6-66:24 (Shahmuradyan is not familiar with employees' payroll records, and does not know any employees' names except for Paliko); Paliko Dep. 16:21-17:19 (Shahmuradyan hardly**

hired Paliko, so much as had a conversation with him after the prior General Manager left); **18:23-24** (Shahmuradyan is not involved in operations); Petrosyants Dep. **20:7-21:6** (as Director of Operations, Petrosyants is responsible for running operational aspects of the business, including overseeing the quality of food and service, and dealing with vendors and payments). As General Manager, Paliko has sole discretion to hire, fire, and discipline front-of-house employees. Paliko Decl. **(74) ¶¶ 13-15.** The tip report used by employees to determine tip distribution is printed out by Paliko, not by Perez. Perez Decl. **¶ 32;** Teran **59:19-22** (Q: Isn't it true there is a daily tip report printed at the end of the day? A: [J]anos did it, but all I know is we all got the checks"). As a Controller at OLB, Willsey is responsible for processing payroll weekly, managing vendor payments, data entry for accounting and bookkeeping purposes, and preparing financial reports, and she receives assistance from the Toast application in doing so. Willsey Decl. **(73) ¶¶ 1, 4-6, 8-13.**

208.    Defendant Shahmuradyan has authority to hire and fire any employee at the restaurant. (Shahmuradyan Dep. at 70:5-8).

**Response: Deny. Again, in this section of Shahmuradyan's testimony, she elaborates that her authority is not all-encompassing ("I think what you're saying doesn't stop with me, because again, there's management beside – Q: Right. But you're the ultimate authority on the top of the operations of the restaurant; right? As the owner. A: Yes, but I don't decide certain things in the restaurant").[4] Shahmuradyan Dep. 70:17-25. Although Shahmuradyan may oversee things at a "30,000-foot view," "[e]verybody does their own job and the restaurant**

---

[4] Not only does Shahmuradyan's full testimony reveal her lack of ultimate authority, it reveals Plaintiffs' refusal to accept her actual answer; note that Plaintiffs' interrupted her testimony regarding management's authority, and immediately thereafter pivoted the conversation to question her about private events at the restaurant. Shahmuradyan Dep. 70:17-71:4.

runs. So the management hires, fires, decides payroll. The chef does his part in the kitchen. Robert meets with the vendors. The hostess is in the front sitting people. The waiters are doing their job. I oversee everything. The restaurant's been running for three, four years, so I don't need to get involved. But every area is run by specific people and it all comes together." As General Manager, Paliko has sole discretion to hire, fire, and discipline front-of-house employees. Paliko Decl. (74) ¶¶ 13-15. Shahmuradyan Dep. at 15:18-18:15 ("I do not handle day-to-day operations. Managers do that;" Paliko "basically runs everything, from hiring to payroll"); 48:3-15; 18:14-19:12 (The Director of Operations, Petrosyants, handles operations pertaining to vendors, food, and working with the Department of Health and fire department); 22:22-23:16 (Shahmuradyan meets with Paliko very rarely and is barely at OLB. At most, she speaks to him one a week, on the phone, to make sure reports and payroll have been done; although she does not even check these items); 48:5-15; 49:12-50:8 (Shahmuradyan does not remember how the first employee would have been hired at OLB); 56:8-11; 61:6-66:24 (Shahmuradyan is not familiar with employees' payroll records, and does not know any employees' names except for Paliko); 82:13-20 (Paliko's job duties include hiring people, overseeing everything that happens on the floor, making sure employees have their schedules, and other operational matters); Paliko Dep. 16:21-17:19 (Shahmuradyan hardly hired Paliko, so much as had a conversation with him after the prior General Manager left); 18:23-24 (Shahmuradyan is not involved in operations); Petrosyants Dep. 20:7-21:6 (as Director of Operations, Petrosyants is responsible for running operational aspects of the business, including overseeing the quality of food and service, and dealing with vendors and payments). Critically, none of the Plaintiffs were hired or fired by Shahmuradyan. Fernandez Dep. 36:6-15; 119:16-19; Teran Dep. 35:14-19; 56:11-24; 105:24-

**106:5; Molina Dep. 53:16-23; 61:2-8. Neither was Perez hired by Shahmuradyan. Perez Decl. ¶ 6.**

209.    Defendant Shahmuradyan ultimately decides how much employees are paid at OLB. (Shahmuradyan Dep. at 20:24-21:13 ("Q; But as the owner, you were the one who decided how much everyone was going to make at the restaurant; right? A: Yeah. …").

**Response: Deny. Shahmuradyan's testimony here is inconclusive; just prior to the above-referenced quote, she testified that management had decided how much to pay the employees (Q: "When the restaurant first opened, who decided how much to pay the employees? A: I don't remember at that time who was the manager. And it looked like he had – he was – he was the one who was helping me because he had a little more experience. But I don't remember his name"), and immediately thereafter the above-referenced quote, she hesitated further ("but – I did not – […] I do not remember who made. I – at that time. I don't remember"). Shahmuradyan Dep. 20:15-21:13. This is in stark contrast to Paliko's Declaration, which describes compensation at OLB in great detail. Perez Decl. ¶¶ 20-28. Moreover, Shahmuradyan describes soon after in her deposition that Paliko's job duties include deciding how much to pay tipped employees, among other operational employment-related matters. Shahmuradyan Dep. 25:7-26:3 (Q: "who decides how much to pay the tipped employees at the restaurant? A: The management. Q: Janos? A: Yes. […] Q: Anybody else? A: No"); 26:11-16 (Paliko sets employees' schedules); 30:8-18 (Paliko decides staffing matters, like how many bartenders, servers, and busboys to have in a shift).**

210.    Paliko was hired by Defendant Shahmuradyan to manage the day-to-day operations of OLB. (Shahmuradyan Dep. at 20:12-14, 22:22-23:3, 82:13-20).

**Response: Admit, but object to this statement as immaterial, because this does not change the fact that Shahmuradyan is not the employer of any of the Plaintiffs or other front-of-house employees. For example, Shahmuradyan admits to rarely meeting with Paliko or visiting OLB, and only speaking with him on the phone once a week, to verify that the payroll has been done. Shahmuradyan Dep. 23:4-24:4 ("I do only finances. […] I don't want anything else there. [… I] just look at it. But I don't decide, […] I don't go on Toast [except maybe] once a month I do. But I mostly go on QuickBooks"). Paliko is responsible for hiring and firing employees, and has full authority to do so without the permission of Shahmuradyan or Petrosyants. Petrosyants Dep. 41:21-24; 28:8-14; Shahmuradyan Dep. 26:4-16; 55:15-20. In addition, Paliko's job duties include: deciding how much to pay tipped employees; setting the employee schedules; deciding how many of each type of employee (for example, servers, bartenders, busboys) to staff in a single shift. Shahmuradyan Dep. 25:7-26:16; 30:8-18. In the time since Paliko started working as a manager at Osteria, Shahmuradyan does not believe she has ever corrected or questioned a single thing he's done. Shahmuradyan Dep. 82:21-83:14 (Q: "So everything he's done, you have been completely okay with and you're on board with everything that he does. Is that right? A: I think so, yes"). Paliko Decl. (74) ¶ 14 ("In my role as General Manager, I oversee the entire front-of-house staff and make all decisions regarding hiring, firing, and discipline in my sole discretion").**

211.    Defendant Shahmuradyan decided how much to pay Paliko when he was hired at OLB. (Shahmuradyan Dep. at 54:16-55:5.)

**Response: Deny. Shahmuradyan Dep. 54:16-55:5 (Paliko negotiated his own salary by informing Shahmuradyan what he wanted to be paid; Shahmuradyan merely verified this**

amount. **The fact that she does not recall what this amount was further demonstrates how passive her participation in any such decision was. She hardly even regards this negotiation as a discussion; "Q: When you hired Janos, did you discuss how much he was going to get paid? A: I did not"). Moreover, Shahmuradyan's possible, minimal, decision-making regarding Paliko's employment does not change the fact that she is not the Plaintiffs' employer. Critically, none of the Plaintiffs were hired or fired by Shahmuradyan.** <u>Fernandez Dep.</u> **36:6-15; 119:16-19;** <u>Teran Dep.</u> **35:14-19; 56:11-24; 105:24-106:5;** <u>Molina Dep.</u> **53:16-23; 61:2-8. Neither was Perez hired by Shahmuradyan.** <u>Perez Decl. ¶ 6.</u> **Generally, Paliko is responsible for hiring and firing employees, and has full authority to do so without the permission of Shahmuradyan or Petrosyants.** <u>Petrosyants Dep.</u> **41:21-24; 28:8-14;** <u>Shahmuradyan Dep.</u> **26:4-16; 55:15-20. In addition, Paliko's job duties include: deciding how much to pay tipped employees; setting the employee schedules; deciding how many of each type of employee (for example, servers, bartenders, busboys) to staff in a single shift.** <u>Shahmuradyan Dep.</u> **25:7-26:16; 30:8-18. In the time since Paliko started working as a manager at Osteria, Shahmuradyan does not believe she has ever corrected or questioned a single thing he's done.** <u>Shahmuradyan Dep.</u> **82:21-83:14 (Q: "So everything he's done, you have been completely okay with and you're on board with everything that he does. Is that right? A: I think so, yes").** <u>Paliko Decl. (74) ¶ 14</u> **("In my role as General Manager, I oversee the entire front-of-house staff and make all decisions regarding hiring, firing, and discipline in my sole discretion").**

212.    The restaurant's general manager, Paliko, reports to Defendant Shahmuradyan. (Shahmuradyan Dep. at 41:8-12)

**Response: Admit, but objects as immaterial. Shahmuradyan Dep. at 41:8-12 ("Q: Do the managers report to anyone else besides for [*sic*] you? A: No. Q: Do they report to Robert ever? A: Not to my knowledge"). Paliko Decl. (74) ¶ 14 ("In my role as General Manager, I oversee the entire front-of-house staff and make all decisions regarding hiring, firing, and discipline in my sole discretion"). Paliko is responsible for hiring and firing employees, and has full authority to do so without the permission of Shahmuradyan or Petrosyants. Petrosyants Dep. 41:21-24; 28:8-14; Shahmuradyan Dep. 26:4-16; 55:15-20. In addition, Paliko's job duties include: deciding how much to pay tipped employees; setting the employee schedules; deciding how many of each type of employee (for example, servers, bartenders, busboys) to staff in a single shift. Shahmuradyan Dep. 25:7-26:16; 30:8-18. In the time since Paliko started working as a manager at Osteria, Shahmuradyan does not believe she has ever corrected or questioned a single thing he's done. Shahmuradyan Dep. 82:21-83:14 (Q: "So everything he's done, you have been completely okay with and you're on board with everything that he does. Is that right? A: I think so, yes"). Shahmuradyan rarely meets with Paliko or visits OLB, and only speaks with him on the phone once a week, to verify that the payroll has been done. Shahmuradyan Dep. 23:4-24:4 ("I do only finances. […] I don't want anything else there. [… I] just look at it. But I don't decide, […] I don't go on Toast [except maybe] once a month I do. But I mostly go on QuickBooks").**

213.    Every week, Defendant Shahmuradyan speaks with Paliko via telephone about OLB's operations. (Shahmuradyan Dep. at 23:8-10).

**Response: Deny. These telephone conversations are not about OLB's operations writ large, but are strictly limited to Shahmuradyan verifying that the payroll has been done. Shahmuradyan Dep. 23:4-24:4 ("I do only finances. […] I don't want anything else there. […**

I] just look at it. But I don't decide, […] I don't go on Toast [except maybe] once a month I do. But I mostly go on QuickBooks"). Paliko is responsible for hiring and firing employees, and has full authority to do so without the permission of Shahmuradyan or Petrosyants. Petrosyants Dep. 41:21-24; 28:8-14; Shahmuradyan Dep. 26:4-16; 55:15-20. In the time since Paliko started working as a manager at Osteria, Shahmuradyan does not believe she has ever corrected or questioned a single thing he's done. Shahmuradyan Dep. 82:21-83:14 (Q: "So everything he's done, you have been completely okay with and you're on board with everything that he does. Is that right? A: I think so, yes"). Paliko Decl. (74) ¶ 14 ("In my role as General Manager, I oversee the entire front-of-house staff and make all decisions regarding hiring, firing, and discipline in my sole discretion").

214.    During these telephone meetings, Defendant Shahmuradyan checks to make sure that payroll at the restaurant was run. (Shahmuradyan Dep. at 23:11-16).

Response: Admit, but object to this statement as immaterial, because high-level oversight does not necessitate any greater involvement by Shahmuradyan in daily employee operations. Shahmuradyan meets with Paliko very rarely and is barely at OLB; her once-a-week telephone conversations with Paliko are not about OLB's operations writ large, but are strictly limited to verifying that the payroll has been done. Shahmuradyan Dep. 23:4-24:4 ("I do only finances. […] I don't want anything else there. [… I] just look at it. But I don't decide, […] I don't go on Toast [except maybe] once a month I do. But I mostly go on QuickBooks"). Paliko is responsible for hiring and firing employees, and has full authority to do so without the permission of Shahmuradyan or Petrosyants. Petrosyants Dep. 41:21-24; 28:8-14; Shahmuradyan Dep. 26:4-16; 55:15-20. In the time since Paliko started working as a manager at Osteria, Shahmuradyan does not believe she has ever corrected or

**questioned a single thing he's done. Shahmuradyan Dep. 82:21-83:14 (Q: "So everything he's done, you have been completely okay with and you're on board with everything that he does. Is that right? A: I think so, yes"). Paliko Decl. (74) ¶ 14 ("In my role as General Manager, I oversee the entire front-of-house staff and make all decisions regarding hiring, firing, and discipline in my sole discretion"). Shahmuradyan has no greater involvement in the payroll process. Shahmuradyan Dep. at 15:18-18:15 ("I do not handle day-to-day operations. Managers do that;" Paliko "basically runs everything, from hiring to payroll"). The tip report used by employees to determine tip distribution is printed out by Paliko. Perez Decl. ¶ 32; Teran 59:19-22 (Q: Isn't it true there is a daily tip report printed at the end of the day? A: [J]anos did it, but all I know is we all got the checks"). Willsey is responsible for processing payroll weekly, managing vendor payments, data entry for accounting and bookkeeping purposes, and preparing financial reports. Willsey Decl. (73) ¶¶ 6-7; Paliko Dep. 13:8-22; 57:24-58:5; 61:15-17; 91:14-92:4. Payroll is further calculated/processed using the Toast application. Willsey Decl. (73) ¶¶ 8-9, 11.**

215.    During such meetings, Shahmuradyan asks Paliko "to make sure to send [her] all the reports" and that "payroll is done," and she "makes sure [payroll] is done." Shahmuradyan Dep. at 23:13-16.

**Response: Admit, but object to this statement as immaterial, because high-level oversight does not necessitate any greater involvement by Shahmuradyan in daily employee operations. Shahmuradyan meets with Paliko very rarely and is barely at OLB; her once-a-week telephone conversations with Paliko are not about OLB's operations writ large, but are strictly limited to verifying that the payroll has been done. Shahmuradyan Dep. 23:4-24:4 ("I do only finances. […] I don't want anything else there. [… I] just look at it. But I don't**

decide, […] I don't go on Toast [except maybe] once a month I do. But I mostly go on QuickBooks"). Paliko is responsible for hiring and firing employees, and has full authority to do so without the permission of Shahmuradyan or Petrosyants. Petrosyants Dep. 41:21-24; 28:8-14; Shahmuradyan Dep. 26:4-16; 55:15-20. In the time since Paliko started working as a manager at Osteria, Shahmuradyan does not believe she has ever corrected or questioned a single thing he's done. Shahmuradyan Dep. 82:21-83:14 (Q: "So everything he's done, you have been completely okay with and you're on board with everything that he does. Is that right? A: I think so, yes"). Paliko Decl. (74) ¶ 14 ("In my role as General Manager, I oversee the entire front-of-house staff and make all decisions regarding hiring, firing, and discipline in my sole discretion"). Shahmuradyan has no greater involvement in the payroll process. Shahmuradyan Dep. at 15:18-18:15 ("I do not handle day-to-day operations. Managers do that;" Paliko "basically runs everything, from hiring to payroll"). The tip report used by employees to determine tip distribution is printed out by Paliko. Perez Decl. ¶ 32; Teran 59:19-22 (Q: Isn't it true there is a daily tip report printed at the end of the day? A: [J]anos did it, but all I know is we all got the checks"). Willsey is responsible for processing payroll weekly, managing vendor payments, data entry for accounting and bookkeeping purposes, and preparing financial reports. Willsey Decl. (73) ¶¶ 6-7; Paliko Dep. 13:8-22; 57:24-58:5; 61:15-17; 91:14-92:4. Payroll is further calculated/processed using the Toast application. Willsey Decl. (73) ¶¶ 8-9, 11.

216.    Defendant Shahmuradyan sometimes meets with Paliko in-person at OLB. (Shahmuradyan Dep. at 29:16-23).

Response: Admit, but object to this statement as immaterial, because high-level oversight does not necessitate any greater involvement by Shahmuradyan in daily employee

operations. In fact, Shahmuradyan clarifies that these discussions typically center around potential "problems with the payroll" and "making sure all the finances are on point," because she does not "run anything else." Shahmuradyan Dep. 29:16-30:15. She further specifies that she never discusses staffing with Paliko, as those decisions belong to Paliko. Shahmuradyan Dep. 30:8-15. Moreover, any such in-person meetings are few and far between, as she rarely visits OLB or meets with Paliko. Shahmuradyan Dep. 23:4-7.

217.    During these meetings, Defendant Shahmuradyan discuss [*sic*] OLB's day-to-day operations and whether there any problems with the restaurant's payroll. (Shahmuradyan Dep. at 29:24-30:7).

**Response: Admit, but note that Shahmuradyan's use of the phrase "day-to-day" operations refers solely to payroll and "making sure all the finances are on point," because she does not "run anything else." Shahmuradyan Dep. 29:16-30:15. She further specifies that she never discusses staffing with Paliko, as those decisions belong to Paliko. Shahmuradyan Dep. 30:8-15. Moreover, any such in-person meetings are few and far between, as she rarely visits OLB or meets with Paliko in-person. Shahmuradyan Dep. 23:4-7. Shahmuradyan admits to rarely meeting with Paliko or visiting OLB, and only speaking with him on the phone once a week, to verify that the payroll has been done. Shahmuradyan Dep. 23:4-24:4 ("I do only finances. […] I don't want anything else there. [… I] just look at it. But I don't decide, […] I don't go on Toast [except maybe] once a month I do. But I mostly go on QuickBooks"). Paliko is responsible for hiring and firing employees, and has full authority to do so without the permission of Shahmuradyan or Petrosyants. Petrosyants Dep. 41:21-24; 28:8-14; Shahmuradyan Dep. 26:4-16; 55:15-20. In addition, Paliko's job duties include: deciding how much to pay tipped employees; setting the employee schedules; deciding how many of**

each type of employee (for example, servers, bartenders, busboys) to staff in a single shift. Shahmuradyan Dep. **25:7-26:16; 30:8-18.** In the time since Paliko started working as a manager at Osteria, Shahmuradyan does not believe she has ever corrected or questioned a single thing he's done. Shahmuradyan Dep. **82:21-83:14** (Q: "So everything he's done, you have been completely okay with and you're on board with everything that he does. Is that right? A: I think so, yes"). Paliko Decl. **(74) ¶ 14** ("In my role as General Manager, I oversee the entire front-of-house staff and make all decisions regarding hiring, firing, and discipline in my sole discretion").

218.    Defendant Shahmuradyan gave Paliko the responsibility to decide how much to pay the tipped employees at OLB. (Shahmuradyan Dep. at 25:7-21).

**Response: Admit, but object to this statement as immaterial, because this does not mean she has operational control over front-of-house employees like the Plaintiffs. Rather, this further demonstrates that Paliko, alone, has the authority to make decisions pertaining to front-of-house employees.** Shahmuradyan Dep. **25:7-26:20** (Paliko has sole authority in hiring, firing, and interviewing employees, as well as in setting their schedules and deciding how much to pay them). Shahmuradyan rarely meets with Paliko or visits OLB, and only speaks with him on the phone once a week, to verify that the payroll has been done. Shahmuradyan Dep. **23:4-24:4** ("I do only finances. […] I don't want anything else there. [… I] just look at it. But I don't decide, […] I don't go on Toast [except maybe] once a month I do. But I mostly go on QuickBooks"). Paliko is responsible for hiring and firing employees, and has full authority to do so without the permission of Shahmuradyan or Petrosyants. Petrosyants Dep. **41:21-24; 28:8-14;** Shahmuradyan Dep. **26:4-16; 55:15-20.** In addition, Paliko's job duties include: deciding how much to pay tipped employees; setting the employee schedules; deciding how

many of each type of employee (for example, servers, bartenders, busboys) to staff in a single shift. Shahmuradyan Dep. 25:7-26:16; 30:8-18. In the time since Paliko started working as a manager at Osteria, Shahmuradyan does not believe she has ever corrected or questioned a single thing he's done. Shahmuradyan Dep. 82:21-83:14 (Q: "So everything he's done, you have been completely okay with and you're on board with everything that he does. Is that right? A: I think so, yes"). Paliko Decl. (74) ¶ 14 ("In my role as General Manager, I oversee the entire front-of-house staff and make all decisions regarding hiring, firing, and discipline in my sole discretion"). The tip report used by employees to determine tip distribution is printed out by Paliko. Perez Decl. ¶ 32; Teran 59:19-22 (Q: Isn't it true there is a daily tip report printed at the end of the day? A: [J]anos did it, but all I know is we all got the checks"). Otherwise, Willsey is responsible for processing payroll weekly, managing vendor payments, data entry for accounting and bookkeeping purposes, and preparing financial reports. Willsey Decl. (73) ¶¶ 6-7; Paliko Dep. 13:8-22; 57:24-58:5; 61:15-17; 91:14-92:4. Payroll is further calculated/processed using the Toast application. Willsey Decl. (73) ¶¶ 8-9, 11.

219.    Defendant Shahmuradyan gave Paliko the responsibility to interview, schedule, and terminate employees at OLB. (Shahmuradyan Dep. at 25:22-26:16).

**Response: Admit, but object to this statement as immaterial, because this does not mean she has operational control over front-of-house employees like the Plaintiffs. Rather, this further demonstrates that Paliko, alone, has the authority to make decisions pertaining to front-of-house employees. Shahmuradyan Dep. 25:7-26:20 (Paliko has sole authority in hiring, firing, and interviewing employees, as well as in setting their schedules and deciding how much to pay them). Shahmuradyan rarely meets with Paliko or visits OLB, and only speaks with him on the phone once a week, to verify that the payroll has been done. Shahmuradyan Dep. 23:4-**

**24:4** ("I do only finances. […] I don't want anything else there. [… I] just look at it. But I don't decide, […] I don't go on Toast [except maybe] once a month I do. But I mostly go on QuickBooks"). Paliko is responsible for hiring and firing employees, and has full authority to do so without the permission of Shahmuradyan or Petrosyants. **Petrosyants Dep. 41:21-24; 28:8-14; Shahmuradyan Dep. 26:4-16; 55:15-20.** In addition, Paliko's job duties include: deciding how much to pay tipped employees; setting the employee schedules; deciding how many of each type of employee (for example, servers, bartenders, busboys) to staff in a single shift. **Shahmuradyan Dep. 25:7-26:16; 30:8-18.** In the time since Paliko started working as a manager at Osteria, Shahmuradyan does not believe she has ever corrected or questioned a single thing he's done. **Shahmuradyan Dep. 82:21-83:14** (Q: "So everything he's done, you have been completely okay with and you're on board with everything that he does. Is that right? A: I think so, yes"). **Paliko Decl. (74) ¶ 14** ("In my role as General Manager, I oversee the entire front-of-house staff and make all decisions regarding hiring, firing, and discipline in my sole discretion"). Critically, none of the Plaintiffs were hired or fired by Shahmuradyan. **Fernandez Dep. 36:6-15; 119:16-19; Teran Dep. 35:14-19; 56:11-24; 105:24-106:5; Molina Dep. 53:16-23; 61:2-8.** Neither was Perez hired by Shahmuradyan. **Perez Decl. ¶ 6.**

220.    Defendant Shahmuradyan hired the head chef at OLB when the restaurant first opened. (Shahmuradyan Dep. at 21:15-22).

**Response: Admit, but object to this statement as immaterial, because this does not mean she has operational control over tipped front-of-house employees like the Plaintiffs (the head chef is neither a front-of-house employee, nor does he receive tips). Paliko Decl. (74) ¶ 14, fn. 1. Paliko, alone, has the authority to make decisions pertaining to front-of-house employees.**

Shahmuradyan Dep. 25:7-26:20 (Paliko has sole authority in hiring, firing, and interviewing employees, as well as in setting their schedules and deciding how much to pay them). Shahmuradyan rarely meets with Paliko or visits OLB, and only speaks with him on the phone once a week, to verify that the payroll has been done. Shahmuradyan Dep. 23:4-24:4 ("I do only finances. [...] I don't want anything else there. [... I] just look at it. But I don't decide, [...] I don't go on Toast [except maybe] once a month I do. But I mostly go on QuickBooks"). Paliko is responsible for hiring and firing employees, and has full authority to do so without the permission of Shahmuradyan or Petrosyants. Petrosyants Dep. 41:21-24; 28:8-14; Shahmuradyan Dep. 26:4-16; 55:15-20. Paliko's job duties include: deciding how much to pay tipped employees; setting the employee schedules; deciding how many of each type of employee (for example, servers, bartenders, busboys) to staff in a single shift. Shahmuradyan Dep. 25:7-26:16; 30:8-18. In the time since Paliko started working as a manager at Osteria, Shahmuradyan does not believe she has ever corrected or questioned a single thing he's done. Shahmuradyan Dep. 82:21-83:14 (Q: "So everything he's done, you have been completely okay with and you're on board with everything that he does. Is that right? A: I think so, yes"). Paliko Decl. (74) ¶ 14 ("In my role as General Manager, I oversee the entire front-of-house staff and make all decisions regarding hiring, firing, and discipline in my sole discretion"). Critically, none of the Plaintiffs were hired or fired by Shahmuradyan. Fernandez Dep. 36:6-15; 119:16-19; Teran Dep. 35:14-19; 56:11-24; 105:24-106:5; Molina Dep. 53:16-23; 61:2-8. Neither was Perez hired by Shahmuradyan. Perez Decl. ¶ 6.

221.    Defendant Shahmuradyan decided how much to pay the head chef. (Shahmuradyan Dep. at 21:23-22:17).

**Response: Deny. This is a blatant misstatement of the record.** Shahmuradyan Dep. 21:23-22:17 **(Q: "And do you remember how much he was paid? A: I don't remember that. Q: Do you remember who decided how much he was paid? A: I don't remember that. […] I did not decide how much he was […] getting paid. He told us how much he wanted get [*sic*] paid, but I don't remember if we gave him that money or --- I don't remember. Q: He told you how much he wanted and either you agreed to it or there was a negotiation about how much to pay him? A: Yes"). Even if Shahmuradyan had made this decision, Defendants object to this statement as immaterial, because this does not mean she has operational control over tipped front-of-house employees like the Plaintiffs (the head chef is neither a front-of-house employee, nor does he receive tips).** Paliko Decl. (74) ¶ 14, fn. 1. **Paliko, alone, has the authority to make decisions pertaining to front-of-house employees.** Shahmuradyan Dep. 25:7-26:20 **(Paliko has sole authority in hiring, firing, and interviewing employees, as well as in setting their schedules and deciding how much to pay them). Shahmuradyan rarely meets with Paliko or visits OLB, and only speaks with him on the phone once a week, to verify that the payroll has been done.** Shahmuradyan Dep. 23:4-24:4 **("I do only finances. […] I don't want anything else there. [… I] just look at it. But I don't decide, […] I don't go on Toast [except maybe] once a month I do. But I mostly go on QuickBooks"). Paliko is responsible for hiring and firing employees, and has full authority to do so without the permission of Shahmuradyan or Petrosyants.** Petrosyants Dep. 41:21-24; 28:8-14; Shahmuradyan Dep. 26:4-16; 55:15-20. **Paliko's job duties include: deciding how much to pay tipped employees; setting the employee schedules; deciding how many of each type of employee (for example, servers, bartenders, busboys) to staff in a single shift.** Shahmuradyan Dep. 25:7-26:16; 30:8-18. **In the time since Paliko started working as a manager at Osteria, Shahmuradyan does**

not believe she has ever corrected or questioned a single thing he's done. Shahmuradyan Dep. 82:21-83:14 (Q: "So everything he's done, you have been completely okay with and you're on board with everything that he does. Is that right? A: I think so, yes"). Paliko Decl. (74) ¶ 14 ("In my role as General Manager, I oversee the entire front-of-house staff and make all decisions regarding hiring, firing, and discipline in my sole discretion"). Critically, none of the Plaintiffs were hired or fired by Shahmuradyan. Fernandez Dep. 36:6-15; 119:16-19; Teran Dep. 35:14-19; 56:11-24; 105:24-106:5; Molina Dep. 53:16-23; 61:2-8. Neither was Perez hired by Shahmuradyan. Perez Decl. ¶ 6.

222.    Defendant Shahmuradyan tasked the head chef with hiring the employees who worked in the kitchen at OLB. (Shahmuradyan Dep. at 22:18-21).

**Response: Admit, but object to this statement as immaterial, because this does not mean she has operational control over tipped front-of-house employees like the Plaintiffs (the head chef is neither a front-of-house employee, nor does he receive tips). Paliko Decl. (74) ¶ 14, fn. 1. Rather, this fact further demonstrates Shahmuradyan's lack of authority over rank-and-file employees. Much like the head chef has authority over back-of-house employees Paliko, alone, has the authority to make decisions pertaining to front-of-house employees. Id ("In my role as General Manager, I oversee the entire front-of-house staff and make all decisions regarding hiring, firing, and discipline in my sole discretion;" "The chef makes all the hiring and firing decisions in his complete discretion for the back-of-house staff"); Shahmuradyan Dep. 25:7-26:20 (Paliko has sole authority in hiring, firing, and interviewing employees, as well as in setting their schedules and deciding how much to pay them). Shahmuradyan rarely meets with Paliko or visits OLB, and only speaks with him on the phone once a week, to verify that the payroll has been done. Shahmuradyan Dep. 23:4-24:4 ("I do only finances.**

[…] I don't want anything else there. [… I] just look at it. But I don't decide, […] I don't go on Toast [except maybe] once a month I do. But I mostly go on QuickBooks"). Paliko is responsible for hiring and firing employees, and has full authority to do so without the permission of Shahmuradyan or Petrosyants. **Petrosyants Dep. 41:21-24; 28:8-14; Shahmuradyan Dep. 26:4-16; 55:15-20.** Paliko's job duties include: deciding how much to pay tipped employees; setting the employee schedules; deciding how many of each type of employee (for example, servers, bartenders, busboys) to staff in a single shift. **Shahmuradyan Dep. 25:7-26:16; 30:8-18.** In the time since Paliko started working as a manager at Osteria, Shahmuradyan does not believe she has ever corrected or questioned a single thing he's done. **Shahmuradyan Dep. 82:21-83:14** (Q: "So everything he's done, you have been completely okay with and you're on board with everything that he does. Is that right? A: I think so, yes"). Critically, none of the Plaintiffs were hired or fired by Shahmuradyan. **Fernandez Dep. 36:6-15; 119:16-19; Teran Dep. 35:14-19; 56:11-24; 105:24-106:5; Molina Dep. 53:16-23; 61:2-8.** Neither was Perez hired by Shahmuradyan. **Perez Decl. ¶ 6.**

223.    OLB's payroll company is called Toast. (Shahmuradyan Dep. at 53:8-10).

**Response: Admit.**

224.    OLB employees' payroll records are maintained on Toast. (Petrosyants Dep. at 60:12-15).

**Response: Admit.**

225.    Defendant Shahmuradyan has access to OLB's payroll records that are electronically-maintained through Toast. (Shahmuradyan Dep. at 23:20-25:6 (testifying that she has access to "the application where [she] see[s] the payroll" through Toast and that she "mostly go[es] on QuickBooks")).

74

**Response: Admit, but object to this statement as immaterial, because mere access to the payroll system, alone, does not implicate control over that system or an employer relationship with the employees subject to that system; Shahmuradyan's access was primarily focused on her role to oversee the finances of OLB, generally. Shahmuradyan Dep. 16:20-17:20; 18:3-11; 20:12-21:13; 21:23-22:17; 22:22-23:3; 23:13-19; 29:11-15; 30:2-12; 32:13-15; 33:12-35:7; 43:4-17 (Shahmuradyan was not kept updated on day-to-day operations); 48:3-15; 54:16-55:20 (Shahmuradyan does not recall how much Paliko was paid); 57:11-14 (Shahmuradyan does not know whether all tipped employees of OLB are paid the same hourly rate); 70:9-71:20; 82:13-20; Petrosyants Dep. 64:9-19; Paliko Dep. 13:11-17 (Willsey is in charge of payroll). Willsey is responsible for processing payroll weekly, managing vendor payments, data entry for accounting and bookkeeping purposes, and preparing financial reports. Willsey Decl. (73) ¶¶ 6-7; Paliko Dep. 13:8-22; 57:24-58:5; 61:15-17; 91:14-92:4. Payroll is further calculated/processed using the Toast application. Willsey Decl. (73) ¶¶ 8-9, 11. The tip report used by employees to determine tip distribution is printed out by Paliko. Perez Decl. ¶ 32; Teran 59:19-22 (Q: Isn't it true there is a daily tip report printed at the end of the day? A: [J]anos did it, but all I know is we all got the checks").**

226.     Shahmuradyan reviews OLB's payroll through Toast at least once per month. (Shahmuradyan Dep. at 23:22-24:3).

**Response: Admit, but object to this statement as immaterial, because mere access to the payroll system, alone, does not implicate control over that system, or an employer relationship with the employees subject to that system; Shahmuradyan's access was primarily focused on her role to oversee the finances of OLB, generally. Shahmuradyan Dep. 16:20-17:20; 18:3-11; 20:12-21:13; 21:23-22:17; 22:22-23:3; 23:13-19; 29:11-15; 30:2-12;**

**32:13-15; 33:12-35:7; 43:4-17 (Shahmuradyan was not kept updated on day-to-day operations); 48:3-15; 54:16-55:20 (Shahmuradyan does not recall how much Paliko was paid); 57:11-14 (Shahmuradyan does not know whether all tipped employees of OLB are paid the same hourly rate); 70:9-71:20; 82:13-20; Petrosyants Dep. 64:9-19; Paliko Dep. 13:11-17 (Willsey is in charge of payroll). Willsey is responsible for processing payroll weekly, managing vendor payments, data entry for accounting and bookkeeping purposes, and preparing financial reports. Willsey Decl. (73) ¶¶ 6-7; Paliko Dep. 13:8-22; 57:24-58:5; 61:15-17; 91:14-92:4. Payroll is further calculated/processed using the Toast application. Willsey Decl. (73) ¶¶ 8-9, 11. The tip report used by employees to determine tip distribution is printed out by Paliko. Perez Decl. ¶ 32; Teran 59:19-22 (Q: Isn't it true there is a daily tip report printed at the end of the day? A: [J]anos did it, but all I know is we all got the checks").**

227.    As the owner, Shahmuradyan "look[s] down" at the restaurant's finances and "goes through all the QuickBooks." (Shahmuradyan Dep. at 16:20-23).

**Response: Admit.**

228.    Defendant Shahmuradyan is present in the restaurant a few times each week. (Petrosyants Dep. at 65:2-23).

**Response: Deny, and object to this statement as immaterial.  Shahmuradyan rarely visits OLB or meets with Paliko in-person. Shahmuradyan Dep. 23:4-7.  She had no role with rank-and-file front-of-house employees at OLB.  Shahmuradyan Dep. 16:20-17:20; 18:3-11; 20:12-21:13; 21:23-22:17; 22:22-23:3; 23:13-19; 29:11-15; 30:2-12; 32:13-15; 33:12-35:7; 43:4-17 (Shahmuradyan was not kept updated on day-to-day operations); 48:3-15; 54:16-55:20 (Shahmuradyan does not recall how much Paliko was paid); 57:11-14 (Shahmuradyan does not know whether all tipped employees of OLB are paid the same hourly rate); 70:9-71:20;**

**82:13-20;** Petrosyants Dep. **64:9-19;** Paliko Dep. **13:11-17 (Willsey is in charge of payroll). Willsey is responsible for processing payroll weekly, managing vendor payments, data entry for accounting and bookkeeping purposes, and preparing financial reports.** Willsey Decl. **(73) ¶¶ 6-7;** Paliko Dep. **13:8-22; 57:24-58:5; 61:15-17; 91:14-92:4. Payroll is further calculated/processed using the Toast application.** Willsey Decl. (73) ¶¶ 8-9, 11. **The tip report used by employees to determine tip distribution is printed out by Paliko.** Perez Decl. ¶ 32; Teran 59:19-22 **(Q: Isn't it true there is a daily tip report printed at the end of the day? A: [J]anos did it, but all I know is we all got the checks").**

229.    Defendant Shahmuradyan is listed as the principal on OLB's liquor license. (Shahmuradyan Dep. at 69:10-13).

**Response: Admit, but object to this statement as immaterial, because this is entirely irrelevant to Shahmuradyan's status as an alleged employer of tipped front-of-house employees like the Plaintiffs.**

230.    Defendant Shahmuradyan signs off on OLB's tax returns. (Shahmuradyan Dep. at 16:22-24).

**Response: Admit, but object to this statement as immaterial. This is squarely within her role as owner in charge of finances, and implicates no employer relationship with front-of-house employees. Shahmuradyan "mak[es] sure all the finances are on point," and does not "run anything else."** Shahmuradyan Dep. 29:16-30:15. **For example, Shahmuradyan never discusses staffing with Paliko, as those decisions belong to Paliko.** Shahmuradyan Dep. 30:8-15. **Moreover, any such in-person meetings are few and far between, as she rarely visits OLB or meets with Paliko in-person.** Shahmuradyan Dep. 23:4-7. **Shahmuradyan rarely meets with Paliko or visiting OLB, and only speaking with him on the phone once a week, to verify**

that the payroll has been done. Shahmuradyan Dep. 23:4-24:4 ("I do only finances. […] I don't want anything else there. [… I] just look at it. But I don't decide, […] I don't go on Toast [except maybe] once a month I do. But I mostly go on QuickBooks"). **Paliko is responsible for hiring and firing employees, and has full authority to do so without the permission of Shahmuradyan or Petrosyants.** Petrosyants Dep. 41:21-24; 28:8-14; Shahmuradyan Dep. 26:4-16; 55:15-20. **In addition, Paliko's job duties include: deciding how much to pay tipped employees; setting the employee schedules; deciding how many of each type of employee (for example, servers, bartenders, busboys) to staff in a single shift.** Shahmuradyan Dep. 25:7-26:16; 30:8-18. **In the time since Paliko started working as a manager at Osteria, Shahmuradyan does not believe she has ever corrected or questioned a single thing he's done.** Shahmuradyan Dep. 82:21-83:14 (Q: "So everything he's done, you have been completely okay with and you're on board with everything that he does. Is that right? A: I think so, yes"). Paliko Decl. (74) ¶ 14 ("In my role as General Manager, I oversee the entire front-of-house staff and make all decisions regarding hiring, firing, and discipline in my sole discretion").

231.    Defendant Shahmuradyan is "the boss" of the Restaurant. (Petrosyants Dep. at 64:9-11.)

**Response: Admit, but object to this statement as immaterial. Moreover, Petrosyants went on to clarify that although her role involves "mak[ing] decisions on a certain level," management makes other decisions, and thus "they consider [Paliko] as the boss as well."** Petrosyants Dep. 64:9-19. **Shahmuradyan "mak[es] sure all the finances are on point," and does not "run anything else."** Shahmuradyan Dep. 29:16-30:15. **For example, Shahmuradyan never discusses staffing with Paliko, as those decisions belong to Paliko.**

Shahmuradyan Dep. 30:8-15. Moreover, any such in-person meetings are few and far between, as she rarely visits OLB or meets with Paliko in-person. Shahmuradyan Dep. 23:4-7. Shahmuradyan admits to rarely meeting with Paliko or visiting OLB, and only speaking with him on the phone once a week, to verify that the payroll has been done. Shahmuradyan Dep. 23:4-24:4 ("I do only finances. […] I don't want anything else there. [… I] just look at it. But I don't decide, […] I don't go on Toast [except maybe] once a month I do. But I mostly go on QuickBooks"). Paliko is responsible for hiring and firing employees, and has full authority to do so without the permission of Shahmuradyan or Petrosyants. Petrosyants Dep. 41:21-24; 28:8-14; Shahmuradyan Dep. 26:4-16; 55:15-20. In addition, Paliko's job duties include: deciding how much to pay tipped employees; setting the employee schedules; deciding how many of each type of employee (for example, servers, bartenders, busboys) to staff in a single shift. Shahmuradyan Dep. 25:7-26:16; 30:8-18. In the time since Paliko started working as a manager at Osteria, Shahmuradyan does not believe she has ever corrected or questioned a single thing he's done. Shahmuradyan Dep. 82:21-83:14 (Q: "So everything he's done, you have been completely okay with and you're on board with everything that he does. Is that right? A: I think so, yes"). Paliko Decl. (74) ¶ 14 ("In my role as General Manager, I oversee the entire front-of-house staff and make all decisions regarding hiring, firing, and discipline in my sole discretion").

232.    As "the owner," Shahmuradyan "has access to anything she wants" at the restaurant. (Petrosyants Dep. at 52:2-4).

**Response: Admit, but object to this statement as immaterial. Again, this is squarely within her role as owner in charge of finances, and access does not equate to an employer relationship with front-of-house employees. This is further demonstrated by the fact that,**

**despite having access, Shahmuradyan does not know such basic facts as whether all OLB's tipped employees are paid the same hourly rate, or how bartenders are paid. Shahmuradyan Dep. 57:11-14; Paliko Dep. 13:11-17 (Willsey is in charge of payroll). Willsey is responsible for processing payroll weekly, managing vendor payments, data entry for accounting and bookkeeping purposes, and preparing financial reports. Willsey Decl. (73) ¶¶ 6-7; Paliko Dep. 13:8-22; 57:24-58:5; 61:15-17; 91:14-92:4. Payroll is further calculated/processed using the Toast application. Willsey Decl. (73) ¶¶ 8-9, 11. The tip report used by employees to determine tip distribution is printed out by Paliko. Perez Decl. ¶ 32; Teran Dep. 59:19-22 (Q: Isn't it true there is a daily tip report printed at the end of the day? A: [J]anos did it, but all I know is we all got the checks").**

233.     Defendant Petrosyants was hired by his wife, Defendant Shahmuradyan to be OLB's director of operations. (Shahmuradyan Dep. at 18:16-34 [*sic*]; Petrosyants Dep. at 21:23-25).

**Response: Admit, but objecs to this statement as immaterial, because Petrosyants is not a front-of-house employee like the Plaintiffs.**

234.     Defendant Petrosyants was not interviewed prior to being hired. (Petrosyants Dep. at 21:23-22:15).

**Response: Admit, but object to this statement as immaterial.**

235.     Shahmuradyan has given Petrosyants "carte blanche to do whatever [he] want[s] in terms of running the operations" of the restaurant. (Petrosyants Dep. at 37:15-18, 38:7-11).

**Response: Admit, but note that Petrosyants' role as director of operations includes nearly everything except employee management; Petrosyants maintained responsibility over general business operations such as overseeing vendors, general payments and earnings, and**

80

quality of food and service. Petrosyants Dep. 20:11-21. Meanwhile, Paliko handles day-to-day employee operations, including hiring, firing, setting schedules, setting wages, training employees, and/or setting terms and conditions of employment. Paliko Dep. 29:5-30:11 (Paliko has fired at least one employee, and did not consult with anyone else prior to doing so); 34:14-21 (Paliko's "responsibilities are hiring, inventories, scheduling, updating the wine program and the bar program, keeping a good relation with the vendors. Also coaching and training [his] staff"); 93:2-16 (Paliko assigns staff to their sections); Petrosyants Dep. 41:21-42:13; 71:9-11; 71:23-72:11 (the chef is similarly responsible for training back-of-house staff about food/plates); 102:8-11; 106:16-18; Shahmuradyan Dep. 16:25-17:5; 25:22-27:4 (confirming that only Paliko has authority over employee operations; and that Petrosyants is not involved in interviewing, hiring, or firing); 28:20-29:8 (Paliko would know specific details of the Plaintiffs' employment, but Shahmuradyan and Petrosyants do not); 30:8-18 (Paliko decides how many employees work each shift); 32:2-15 (implied that only Paliko would know how much bartenders are paid per hour, and whether they make tips); 40:16-41:7 (The manager hired the person or people who run the social media accounts); 48:3-11 (Shahmuradyan describes Petrosyants' job as "meet[ing] with the vendors").

236.    Defendant Petrosyants' job duties are "running the business" of OLB. (Petrosyants Dep. at 20:11-13; 33:13-34:14; 52:10-12).

**Response: Admit, but note that Petrosyants clarified that "running the business" means overseeing vendors, payments, operations, quality of food, and quality of service. Petrosyants Dep. 20:11-21:6. Although Petrosyants oversees that employees are paid and do their jobs, generally, this does not mean that he himself controls those processes; for example, Paliko exclusively handles day-to-day operations concerning employees, including hiring, firing,**

setting schedules, setting wages, and/or setting terms and conditions of employment. **Paliko Dep. 29:5-30:11** (Paliko has fired at least one employee, and did not consult with anyone else prior to doing so); **34:14-21** (Paliko's "responsibilities are hiring, inventories, scheduling, updating the wine program and the bar program, keeping a good relation with the vendors. Also coaching and training [his] staff"); **93:2-16** (Paliko assigns staff to their sections); **Petrosyants Dep. 41:21-42:13; 71:9-11; 71:23-72:11** (the chef is similarly responsible for training back-of-house staff about food/plates); **102:8-11; 106:16- 18; Shahmuradyan Dep. 16:25-17:5; 25:22-27:4** (confirming that only Paliko has authority over employee operations; and that Petrosyants is not involved in interviewing, hiring, or firing); **28:20-29:8** (Paliko would know specific details of the Plaintiffs' employment, but Shahmuradyan and Petrosyants do not); **30:8-18** (Paliko decides how many employees work each shift); **32:2-15** (implied that only Paliko would know how much bartenders are paid per hour, and whether they make tips); **40:16-41:7** (The manager hired the person or people who run the social media accounts); **48:3-11** (Shahmuradyan describes Petrosyants' job as "meet[ing] with the vendors"). Moreover, Petrosyants clarified later running the restaurant involves ensuring that the finances are profitable, which establishes that his role was about general oversight, not direct a direct employer relationship with front-of-house employees. **Petrosyants Dep. 52:5-12.**

237.    Specifically, Defendant Petrosyants is responsible for "oversee[ing] the operations," vendors, payments, the quality of food, and the quality of service at OLB. (Petrosyants Dep. at 20:11-18).

**Response: Admit, but note that none of this involves direct management of employees, and that Petrosyants' role as director of operations includes nearly everything except employee**

management; Petrosyants maintained responsibility over general, nonemployee business operations like, for example, overseeing vendors, general payments and earnings, and quality of food and service. Petrosyants Dep. 20:11-21; 52:22-53:7. Meanwhile, Paliko handles day-to-day employee operations, including hiring, firing, setting schedules, setting wages, training employees, and/or setting terms and conditions of employment. Paliko Dep. 29:5-30:11 (Paliko has fired at least one employee, and did not consult with anyone else prior to doing so); 34:14-21 (Paliko's "responsibilities are hiring, inventories, scheduling, updating the wine program and the bar program, keeping a good relation with the vendors. Also coaching and training [his] staff"); 93:2-16 (Paliko assigns staff to their sections); Petrosyants Dep. 41:21-42:13; 71:9-11; 71:23-72:11 (the chef is similarly responsible for training back-of-house staff about food/plates); 102:8-11; 106:16- 18; Shahmuradyan Dep. 16:25-17:5; 25:22-27:4 (confirming that only Paliko has authority over employee operations; and that Petrosyants is not involved in interviewing, hiring, or firing); 28:20-29:8 (Paliko would know specific details of the Plaintiffs' employment, but Shahmuradyan and Petrosyants do not); 30:8-18 (Paliko decides how many employees work each shift); 32:2-15 (implied that only Paliko would know how much bartenders are paid per hour, and whether they make tips); 40:16-41:7 (The manager hired the person or people who run the social media accounts); 48:3-11 (Shahmuradyan describes Petrosyants' job as "meet[ing] with the vendors").

238.     Petrosyants job of "run[ning] the restaurant" includes "mak[ing] sure that the financials are in line with . . . being a profitable restaurant. (Petrosyants Dep. at 52:10-12).

**Response: Admit, but note that this does not implicate direct management of employees, or specific involvement in the process of payroll or tip disbursement. Paliko Dep. 31:3-7 (Paliko**

merely took over the tip pool system, which had been created before him); <u>31:23-32:6</u> (The tip system is created in Toast, and point values were determined before Paliko took over management); <u>Molina Dep.</u> <u>73:9-75:5</u> (Molina says management was in charge of dividing the tips nightly, not Petrosyants); <u>88:7-15</u> Petrosyants' role as director of operations includes nearly everything except employee management; Petrosyants maintained responsibility over general, non-employee business operations like, for example, overseeing vendors, general payments and earnings, and quality of food and service. <u>Petrosyants Dep.</u> <u>20:11-21; 52:22-53:7.</u> Meanwhile, Paliko handles day-to-day employee operations, including hiring, firing, setting schedules, setting wages, training employees, and/or setting terms and conditions of employment. <u>Paliko Dep.</u> <u>29:5-30:11</u> (Paliko has fired at least one employee, and did not consult with anyone else prior to doing so); <u>34:14-21</u> (Paliko's "responsibilities are hiring, inventories, scheduling, updating the wine program and the bar program, keeping a good relation with the vendors. Also coaching and training [his] staff"); <u>93:2-16</u> (Paliko assigns staff to their sections); <u>Petrosyants Dep.</u> <u>41:21-42:13; 71:9-11; 71:23-72:11</u> (the chef is similarly responsible for training back-of-house staff about food/plates); <u>102:8-11; 106:16-18;</u> <u>Shahmuradyan Dep.</u> <u>16:25-17:5; 25:22-27:4</u> (confirming that only Paliko has authority over employee operations; and that Petrosyants is not involved in interviewing, hiring, or firing); <u>28:20-29:8</u> (Paliko would know specific details of the Plaintiffs' employment, but Shahmuradyan and Petrosyants do not); <u>30:8-18</u> (Paliko decides how many employees work each shift); <u>32:2-15</u> (implied that only Paliko would know how much bartenders are paid per hour, and whether they make tips); <u>40:16-41:7</u> (The manager hired the person or people who run the social media accounts); <u>48:3-11</u> (Shahmuradyan describes Petrosyants' job as "meet[ing] with the vendors").

239.    Defendant Petrosyants is also responsible for ensuring that employees are paid at the restaurant and "paid properly." (Petrosyants Dep. at 21:11-18).

**Response: Admit, but note again that Petrosyants' roles are many, and are each limited to broad oversight. Petrosyants Dep. 20:11-21:6. Meanwhile, Paliko handles day-to-day employee operations, including hiring, firing, setting schedules, setting wages, training employees, and/or setting terms and conditions of employment. Paliko Dep. 29:5-30:11 (Paliko has fired at least one employee, and did not consult with anyone else prior to doing so); 34:14-21 (Paliko's "responsibilities are hiring, inventories, scheduling, updating the wine program and the bar program, keeping a good relation with the vendors. Also coaching and training [his] staff"); 93:2-16 (Paliko assigns staff to their sections); Petrosyants Dep. 41:21-42:13; 71:9-11; 71:23-72:11 (the chef is similarly responsible for training back-of-house staff about food/plates); 102:8-11; 106:16-18; Shahmuradyan Dep. 16:25-17:5; 25:22-27:4 (confirming that only Paliko has authority over employee operations; and that Petrosyants is not involved in interviewing, hiring, or firing); 28:20-29:8 (Paliko would know specific details of the Plaintiffs' employment, but Shahmuradyan and Petrosyants do not); 30:8-18 (Paliko decides how many employees work each shift); 32:2-15 (implied that only Paliko would know how much bartenders are paid per hour, and whether they make tips); 40:16-41:7 (The manager hired the person or people who run the social media accounts); 48:3-11 (Shahmuradyan describes Petrosyants' job as "meet[ing] with the vendors").**

240.    Defendant Petrosyants has the authority to hire and fire employees at the restaurant. (Petrosyants Dep. at 23:13-25).

**Response: Admit, but note again that Petrosyants "[does not] get involved with the […] rank-and-file employees," including "service, front of the house and back of the house."**

**Petrosyants Dep. 23:13-25. It is not necessary for Petrosyants to "get involved with" front-of-house employees, because Paliko handles all day-to-day employee operations, including hiring, firing, setting schedules, setting wages, and/or setting terms and conditions of employment. Paliko Dep. 29:5-30:11 (Paliko interviews, hires, and fires employees, and employees report to him; Paliko consults with no one else prior to making these decisions); 34:14-21 (Paliko's "responsibilities are hiring, inventories, scheduling, updating the wine program and the bar program, keeping a good relation with the vendors. Also coaching and training [his] staff"); 93:2-16 (Paliko assigns staff to their sections); Petrosyants Dep. 41:21-42:13; 71:9-11; 71:23-72:11 (the chef is similarly responsible for training back-of-house staff about food/plates); 102:8-11; 106:16-18; Shahmuradyan Dep. 16:25-17:5; 25:22-27:4 (confirming that only Paliko has authority over employee operations; and that Petrosyants is not involved in interviewing, hiring, or firing); 28:20- 29:8 (Paliko would know specific details of the Plaintiffs' employment, but Shahmuradyan and Petrosyants do not); 30:8-18 (Paliko decides how many employees work each shift); 32:2-15 (implied that only Paliko would know how much bartenders are paid per hour, and whether they make tips); 40:16-41:7 (The manager hired the person or people who run the social media accounts); 48:3-11 (Shahmuradyan describes Petrosyants' job as "meet[ing] with the vendors"). Notably, Petrosyants does not remember if he ever hired or fired anyone. Petrosyants Dep. 24:3-18. Critically, none of the Plaintiffs were hired or fired by Petrosyants. Fernandez Dep. 36:6-15; 119:16-19; Teran Dep. 35:14-19; 56:11-24; 105:24-106:5; Molina Dep. 53:16-23; 61:2-8. Neither was Perez hired by Petrosyants. Perez Decl. ¶ 6.**

241.    Defendant Petrosyants has the authority to discipline employees at OLB. (Petrosyants Dep. at 101:24--102:7).

**Response: Admit, but note that Petrosyants clarifies that he does not remember if he *ever* disciplined anyone.** Petrosyants Dep. 101:25-102:3. **It is not necessary for Petrosyants to discipline employees at OLB because Paliko handles all day-to-day employee operations, including hiring, firing, setting schedules, setting wages, and/or setting terms and conditions of employment.** Paliko Dep. 29:5-30:11 **(Paliko interviews, hires, and fires employees, and employees report to him; Paliko consults with no one else prior to making these decisions);** 34:14-21 **(Paliko's "responsibilities are hiring, inventories, scheduling, updating the wine program and the bar program, keeping a good relation with the vendors. Also coaching and training [his] staff");** 93:2-16 **(Paliko assigns staff to their sections);** Petrosyants Dep. 41:21-42:13; 71:9-11; 71:23-72:11; 102:8-11; 106:16-18; Shahmuradyan Dep. 16:25-17:5; 25:22-27:4 **(confirming that only Paliko has authority over employee operations; and that Petrosyants is not involved in interviewing, hiring, or firing);** 28:20-29:8 **(Paliko would know specific details of the Plaintiffs' employment, but Shahmuradyan and Petrosyants do not);** 30:8-18 **(Paliko decides how many employees work each shift);** 32:2- 15 **(implied that only Paliko would know how much bartenders are paid per hour, and whether they make tips);** 40:16-41:7 **(The manager hired the person or people who run the social media accounts);** 41:11-16 **(Shahmuradyan confirms that managers never report to Robert, and does not know how often Robert visits OLB);** 43:18-44:9 **(Robert's conversations with Shahmuradyan about his work are extremely limited; for example, he informs her of the names of new vendors. They speak about OLB so rarely that they do not exchange emails or text messages about it);** 48:3-11 **(Shahmuradyan describes Petrosyants' job as "meet[ing] with the vendors"). Critically, none of the Plaintiffs were hired or fired by Petrosyants.** Fernandez

Dep. **36:6-15; 119:16-19;** Teran Dep. **35:14-19; 56:11-24; 105:24-106:5;** Molina Dep. **53:16-23; 61:2-8.** Neither was Perez hired by Petrosyants. Perez Decl. ¶ 6.

242.    When Shahmuradyan is not present in the restaurant, Petrosyants is the "highest-ranking" employee. (Petrosyants Dep. at 66:3-8).

**Response: Admit, but objects to this statement as immaterial because Paliko handles all employment issues.** Paliko Dep. **29:5-30:11 (Paliko interviews, hires, and fires employees, and employees report to him; Paliko consults with no one else prior to making these decisions); 34:14-21 (Paliko's "responsibilities are hiring, inventories, scheduling, updating the wine program and the bar program, keeping a good relation with the vendors. Also coaching and training [his] staff"); 93:2-16 (Paliko assigns staff to their sections);** Petrosyants Dep. **24:3-18 (Petrosyants does not remember if he ever hired or fired anyone); 41:21-42:13; 71:9-11; 71:23-72:11 (the chef is similarly responsible for training back-of-house staff about food/plates); 102:8-11; 106:16-18;** Shahmuradyan Dep. **16:25-17:5; 25:22-27:4 (confirming that only Paliko has authority over employee operations; and that Petrosyants is not involved in interviewing, hiring, or firing); 28:20- 29:8 (Paliko would know specific details of the Plaintiffs' employment, but Shahmuradyan and Petrosyants do not); 30:8-18 (Paliko decides how many employees work each shift); 32:2-15 (implied that only Paliko would know how much bartenders are paid per hour, and whether they make tips); 40:16-41:7 (The manager hired the person or people who run the social media accounts); 48:3-11 (Shahmuradyan describes Petrosyants' job as "meet[ing] with the vendors").**

243.    Petrosyants meets with the restaurant's general manager a "[f]ew times per week" to discuss "[o]perations in the restaurant." (Petrosyants Dep. at 29:8-16.)

**Response: Admit, but note that these conversations are limited to high-level discussions of consistency in service and performance.** <u>Petrosyants Dep.</u> **29:14-21. Defendants object to this statement as immaterial because Paliko handles all employment issues.** <u>Paliko Dep.</u> **29:5-30:11 (Paliko interviews, hires, and fires employees, and employees report to him; Paliko consults with no one else prior to making these decisions); 34:14-21 (Paliko's "responsibilities are hiring, inventories, scheduling, updating the wine program and the bar program, keeping a good relation with the vendors. Also coaching and training [his] staff"); 93:2-16 (Paliko assigns staff to their sections);** <u>Petrosyants Dep.</u> **24:3-18 (Petrosyants does not remember if he ever hired or fired anyone); 41:21-42:13; 71:9-11; 71:23-72:11 (the chef is similarly responsible for training back-of-house staff about food/plates); 102:8-11; 106:16-18;** <u>Shahmuradyan Dep.</u> **16:25-17:5; 25:22-27:4 (confirming that only Paliko has authority over employee operations; and that Petrosyants is not involved in interviewing, hiring, or firing); 28:20-29:8 (Paliko would know specific details of the Plaintiffs' employment, but Shahmuradyan and Petrosyants do not); 30:8-18 (Paliko decides how many employees work each shift); 32:2-15 (implied that only Paliko would know how much bartenders are paid per hour, and whether they make tips); 48:3-11 (Shahmuradyan describes Petrosyants' job as "meet[ing] with the vendors").**

244.    During these meetings, Petrosyants and the general manager discuss service at the restaurant to ensure that it is running "[p]roperly and good," and that the front-of-house service staff are providing consistent service to customers. (Petrosyants Dep. at 30:8-31:6.)

**Response: Admit, but note that this is squarely within Petrosyants' role as director of operations, and does not necessitate personal involvement in the management of front-of-house employees. Defendants object to this statement as immaterial because Paliko handles**

all employment issues. Paliko Dep. 29:5-30:11 (Paliko interviews, hires, and fires employees, and employees report to him; Paliko consults with no one else prior to making these decisions); 34:14-21 (Paliko's "responsibilities are hiring, inventories, scheduling, updating the wine program and the bar program, keeping a good relation with the vendors. Also coaching and training [his] staff"); 93:2-16 (Paliko assigns staff to their sections); Petrosyants Dep. 24:3-18 (Petrosyants does not remember if he ever hired or fired anyone); 41:21-42:13; 71:9-11; 71:23-72:11 (the chef is similarly responsible for training back-of-house staff about food/plates); 102:8-11; 106:16-18; Shahmuradyan Dep. 16:25-17:5; 25:22-27:4 (confirming that only Paliko has authority over employee operations; and that Petrosyants is not involved in interviewing, hiring, or firing); 28:20- 29:8 (Paliko would know specific details of the Plaintiffs' employment, but Shahmuradyan and Petrosyants do not); 30:8-18 (Paliko decides how many employees work each shift); 32:2-15 (implied that only Paliko would know how much bartenders are paid per hour, and whether they make tips); 40:16-41:7 (The manager hired the person or people who run the social media accounts); 48:3-11 (Shahmuradyan describes Petrosyants' job as "meet[ing] with the vendors").

245.    When he is in the restaurant, Petrosyants pays close attention to whether the front-of-house service staff are providing consistent performance for the customers. (Petrosyants Dep. at 30:23-31:10).

**Response: Admit, but note that this is squarely within Petrosyants' role as director of operations, and does not necessitate personal involvement in the management of front-of-house employees, such as hiring, firing, setting schedules, setting wages, and/or setting terms and conditions of employment, which Paliko handles. Defendants object to this statement as immaterial because Paliko handles all employment issues. Paliko Dep. 29:5-30:11 (Paliko**

interviews, hires, and fires employees, and employees report to him; Paliko consults with no one else prior to making these decisions); **34:14-21** (Paliko's "responsibilities are hiring, inventories, scheduling, updating the wine program and the bar program, keeping a good relation with the vendors. Also coaching and training [his] staff"); **93:2-16** (Paliko assigns staff to their sections); **Petrosyants Dep. 24:3-18** (Petrosyants does not remember if he ever hired or fired anyone); **41:21-42:13; 71:9-11; 71:23-72:11** (the chef is similarly responsible for training back-of-house staff about food/plates); **102:8-11; 106:16-18; Shahmuradyan Dep. 16:25-17:5; 25:22-27:4** (confirming that only Paliko has authority over employee operations; and that Petrosyants is not involved in interviewing, hiring, or firing); **28:20-29:8** (Paliko would know specific details of the Plaintiffs' employment, but Shahmuradyan and Petrosyants do not); **30:8-18** (Paliko decides how many employees work each shift); **32:2-15** (implied that only Paliko would know how much bartenders are paid per hour, and whether they make tips); **48:3-11** (Shahmuradyan describes Petrosyants' job as "meet[ing] with the vendors").

246. When Defendant Petrosyants sees a server not performing their duties properly, he would report that to OLB's manager, who would then "take action." (Petrosyants Dep. at 32:17-22).

**Response: Admit, but note that this properly demonstrates that Petrosyants' role does not involve managing employees himself. Defendants object to this statement as immaterial because Paliko handles all employment issues. Paliko Dep. 29:5-30:11 (Paliko interviews, hires, and fires employees, and employees report to him; Paliko consults with no one else prior to making these decisions); 34:14-21 (Paliko's "responsibilities are hiring, inventories, scheduling, updating the wine program and the bar program, keeping a good relation with**

the vendors. Also coaching and training [his] staff"); <u>93:2-16</u> (Paliko assigns staff to their sections); <u>Petrosyants Dep.</u> <u>24:3-18</u> (Petrosyants does not remember if he ever hired or fired anyone); <u>41:21-42:13; 71:9-11; 71:23-72:11</u> (the chef is similarly responsible for training back-of-house staff about food/plates); <u>102:8-11; 106:16-18;</u> <u>Shahmuradyan Dep.</u> <u>16:25-17:5; 25:22-27:4</u> (confirming that only Paliko has authority over employee operations; and that Petrosyants is not involved in interviewing, hiring, or firing); <u>28:20-29:8</u> (Paliko would know specific details of the Plaintiffs' employment, but Shahmuradyan and Petrosyants do not); <u>30:8-18</u> (Paliko decides how many employees work each shift); <u>32:2-15</u> (implied that only Paliko would know how much bartenders are paid per hour, and whether they make tips); <u>40:16-41:7</u> (The manager hired the person or people who run the social media accounts); <u>48:3-11</u> (Shahmuradyan describes Petrosyants' job as "meet[ing] with the vendors").

247.    OLB has pre-shift meeting for its front-of-the-house employees before the commencement of each shift at the restaurant. (Petrosyants Dep. at 66:23-67:2, 67:24-68:2).

**Response: Admit, but object to this statement as immaterial, because Paliko handles all employment issues.** <u>Paliko Dep.</u> <u>29:5-30:11</u> (Paliko interviews, hires, and fires employees, and employees report to him; Paliko consults with no one else prior to making these decisions); <u>34:14-21</u> (Paliko's "responsibilities are hiring, inventories, scheduling, updating the wine program and the bar program, keeping a good relation with the vendors. Also coaching and training [his] staff"); <u>93:2-16</u> (Paliko assigns staff to their sections); <u>Petrosyants Dep.</u> <u>24:3-18</u> (Petrosyants does not remember if he ever hired or fired anyone); <u>41:21-42:13; 71:9-11; 71:23-72:11</u> (the chef is similarly responsible for training back-of-house staff about food/plates); <u>102:8-11; 106:16-18;</u> <u>Shahmuradyan Dep.</u> <u>16:25-17:5; 25:22-</u>

**27:4** **(confirming that only Paliko has authority over employee operations; and that Petrosyants is not involved in interviewing, hiring, or firing); 28:20- 29:8 (Paliko would know specific details of the Plaintiffs' employment, but Shahmuradyan and Petrosyants do not); 30:8-18 (Paliko decides how many employees work each shift); 32:2-15 (implied that only Paliko would know how much bartenders are paid per hour, and whether they make tips); 40:16-41:7 (The manager hired the person or people who run the social media accounts); 48:3-11 (Shahmuradyan describes Petrosyants' job as "meet[ing] with the vendors").**

248.     Defendant Petrosyants attends and provides directions at the pre-shift meetings. (Petrosyants Dep. at 67:14-19).

**Response: Admit, but note that Petrosyants involvement in these meetings is limited to broad reminders about consistency in performance. Petrosyants Dep. 67:20-23. Further, Petrosyants frequently travels and is not present for pre-shift meetings as a result. Petrosyants Dep. 66:23-67:5; Paliko Decl. (74) ¶ 16.**

249.     For example, Defendant Petrosyants discussed employees maintaining consistency, performance, and "best value" at the restaurant. (Petrosyants Dep. at 67:20-23).

**Response: Admit, but note that this is squarely within his role as director of operations, and does not imply the ability to hire, fire, set schedules, set wages, and/or set terms and conditions of employment for front-of-house employees. Paliko Dep. 29:5-30:11 (Paliko interviews, hires, and fires employees, and employees report to him; Paliko consults with no one else prior to making these decisions); 34:14-21 (Paliko's "responsibilities are hiring, inventories, scheduling, updating the wine program and the bar program, keeping a good relation with the vendors. Also coaching and training [his] staff"); 93:2-16 (Paliko assigns staff to their sections); Petrosyants Dep. 24:3-18 (Petrosyants does not remember if he ever**

hired or fired anyone); <u>41:21-42:13; 71:9-11; 71:23-72:11</u> (the chef is similarly responsible for training back-of-house staff about food/plates); <u>102:8-11; 106:16-18;</u> <u>Shahmuradyan Dep. 16:25-17:5; 25:22-27:4</u> (confirming that only Paliko has authority over employee operations; and that Petrosyants is not involved in interviewing, hiring, or firing); <u>28:20-29:8</u> (Paliko would know specific details of the Plaintiffs' employment, but Shahmuradyan and Petrosyants do not); <u>30:8-18</u> (Paliko decides how many employees work each shift); <u>32:2-15</u> (implied that only Paliko would know how much bartenders are paid per hour, and whether they make tips); <u>40:16-41:7</u> (The manager hired the person or people who run the social media accounts); <u>48:3-11</u> (Shahmuradyan describes Petrosyants' job as "meet[ing] with the vendors").

250.    At these meetings, he also "mak[es] sure that everyone" gives their "consistently best performance." (Petrosyants Dep. at 68:6-14).

**Response: Admit, but note that any further "instructions" are delivered by management, and that no such instructions involve hiring, firing, setting schedules, setting wages, and/or setting terms and conditions of employment. <u>Petrosyants Dep. 68:6-15.</u> Defendants object to this statement as immaterial because Paliko handles all employment issues. <u>Paliko Dep. 29:5-30:11</u> (Paliko interviews, hires, and fires employees, and employees report to him; Paliko consults with no one else prior to making these decisions); <u>34:14-21</u> (Paliko's "responsibilities are hiring, inventories, scheduling, updating the wine program and the bar program, keeping a good relation with the vendors. Also coaching and training [his] staff"); <u>93:2-16</u> (Paliko assigns staff to their sections); <u>Petrosyants Dep. 24:3-18</u> (Petrosyants does not remember if he ever hired or fired anyone); <u>41:21-42:13; 71:9-11; 71:23-72:11</u> (the chef is similarly responsible for training back-of-house staff about food/plates); <u>102:8-11; 106:16-</u>**

**18; Shahmuradyan Dep. 16:25-17:5; 25:22-27:4 (confirming that only Paliko has authority over employee operations; and that Petrosyants is not involved in interviewing, hiring, or firing); 28:20-29:8 (Paliko would know specific details of the Plaintiffs' employment, but Shahmuradyan and Petrosyants do not); 30:8-18 (Paliko decides how many employees work each shift); 32:2-15 (implied that only Paliko would know how much bartenders are paid per hour, and whether they make tips); 40:16-41:7 (The manager hired the person or people who run the social media accounts); 48:3-11 (Shahmuradyan describes Petrosyants' job as "meet[ing] with the vendors").**

251.    Defendant Petrosyants frequently discusses staffing issues with OLB's managers to ensure the restaurant schedules correct number of employees scheduled to work each shift. (Petrosyants Dep. at 80:12-81:9).

**Response: Admit, but note that that this is squarely within his role as director of operations, and does not imply any involvement with directing front-of-house employees; for example, Petrosyants has no involvement in hiring, firing, setting schedules, setting wages, and/or setting terms and conditions of employment. Paliko Dep. 29:5-30:11 (Paliko interviews, hires, and fires employees, and employees report to him; Paliko consults with no one else prior to making these decisions); 34:14-21 (Paliko's "responsibilities are hiring, inventories, scheduling, updating the wine program and the bar program, keeping a good relation with the vendors. Also coaching and training [his] staff"); 93:2-16 (Paliko assigns staff to their sections); Petrosyants Dep. 24:3-18 (Petrosyants does not remember if he ever hired or fired anyone); 41:21-42:13; 71:9-11; 71:23-72:11 (the chef is similarly responsible for training back-of-house staff about food/plates); 102:8-11; 106:16- 18; Shahmuradyan Dep. 16:25-17:5; 25:22-27:4 (confirming that only Paliko has authority over employee operations; and**

that Petrosyants is not involved in interviewing, hiring, or firing); <u>28:20-29:8</u> (Paliko would

know specific details of the Plaintiffs' employment, but Shahmuradyan and Petrosyants do

not); <u>30:8-18</u> (Paliko decides how many employees work each shift); <u>32:2-15</u> (implied that

only Paliko would know how much bartenders are paid per hour, and whether they make

tips); <u>40:16-41:7</u> (The manager hired the person or people who run the social media

accounts); <u>48:3-11</u> (Shahmuradyan describes Petrosyants' job as "meet[ing] with the

vendors").

252.    Defendant Petrosyants has access to OLB's payroll records maintained by the

restaurant's payroll company, Toast. (Petrosyants Dep. at 60:9-21).

**Response: Admit, but note that access to the payroll system and its records does not**

**necessitate an employer relationship with the front-of-house employees within that system**

**and its records. <u>Petrosyants Dep. 84:20-25</u> (Q: "[A]ll the front-of-house employees are**

**subject to the same payroll policies at the restaurant, correct?" A: "I really hope so") This**

**implies lack of involvement in payroll; <u>85:13-20</u> (Q: "Isn't it true that all front-of-house**

**employees are subject to the same payroll policies at Osteria La Baia?" A: "As I said, to my**

**best – I might be mistaken, but to my best knowledge, I think they – they do." This response**

**is speculative at best, and implies lack of involvement in payroll). Beyond mere access,**

**Petrosyants has no involvement in payroll, and hardly understands the records which were**

**produced, or whether any other potentially relevant records could exist). <u>Petrosyants Dep.</u>**

**<u>49:8-25</u> (Paliko was ultimately responsible for producing records relevant to this lawsuit);**

**<u>60:16-21; 132:12-14; 156:7-20; 159:21-160:4; 174:21-175:7.</u>**

253.    Defendants Shahmuradyan and Petrosyants hired the restaurant's accountant.

(Shahmuradyan Dep. at 39:13-19; Petrosyants Dep. at 59:5-12).

**Response: Admit, but note that this does not necessitate participating in hiring decisions regarding front-of-house staff like the Plaintiffs.**

254.     Shahmuradyan, Petrosyants, and OLB's general manager are the only three people with access to OLB's hard-copy records, which are maintained in the restaurant's storage area. (Petrosyants Dep. at 51:6-52:4.)

**Response: Admit, but note that access to hard-copy records, alone, does not necessitate an employer relationship with the front-of-house employees whose records are accessible.**

255.     Petrosyants participated in hiring Paliko as general manager. (Buzzard Decl., Ex. 3 (Paliko Dep.) at 17:14-17.)

**Response: Deny. Paliko himself testified that this was more like a "conversation" than an interview, and that prior to this conversation, "nobody promoted me. The [...] general manager who had been with us, he left, and I just took over his role." Paliko Dep. 16:19-24. Even if Paliko had been hired by Petrosyants, note that Paliko is not a front-of-house employee like the Plaintiffs. Paliko Dep. 17:14-17.**

256.     Petrosyants gave Paliko a pay increase. (Paliko Dep. at 18:7-9, 20:24-21:6.)

**Response: Admit, but note again that Paliko is not a front-of-house employee like the Plaintiffs, and thus any such decision by Petrosyants does not implicate any decision-making authority by Petrosyants over the Plaintiffs. Paliko Dep. 17:14-17.**

**AS TO "Food-Service Employees Were Not Provided Written Wage Notices at OLB"**

257.     Katherine Fernandez was never provided with a written notice and acknowledgment of pay rate form while she worked at OLB. (Fernandez Decl. ¶ 56).

**Response: Deny. Notice was provided to Plaintiffs via pay stubs on the Toast application, which they each had access to. ECF Docket Entry 76-1 (Exhibit A - copies of Plaintiff**

Katherine Fernandez's Pay Stubs), 76-3 (Exhibit B - copies of Plaintiff Adrian Montor Teran's Pay Stubs), and 83-1 (copies of Plaintiff Javier Molina's Pay Stubs). In addition, Defendants had posted billboards providing written notice to Plaintiffs of same. **Paliko Decl. (74) ¶¶ 21-22; ECF Docket Entry 74-1** ("We also have a poster on a billboard in the restaurant that discusses the tip credit. A copy of the billboard with the posters is annexed hereto as Exhibit 'A' (providing, *inter alia*, that "[e]mployers of tipped employees who meet certain conditions may claim a partial wage credit based on tips received by their employees. Employers must pay tipped employees a cash wage of at least $2.13 per hour if they claim a tip credit against their minimum wage obligation. *If an employee's tips combined with the employer's cash wage of at least $2.13 per hour do not equal the minimum hourly wage, the employer must make up the difference*") (emphasis added);" "Employees pass by this billboard frequently throughout the day and have an opportunity to review it because it is located in the hallway next to the management office"); Declaration of Janos Paliko in Support of Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment ("Paliko Decl. Opp.") **(84) ¶¶ 4-6** ("The poster has remained on that same billboard, in that same hallway, ever since [I started working at OLB as a floor manager in February 2022]") Moreover, Adrian Montor Teran admitted in his deposition to filling out his notice and acknowledgment of pay rate and pay day form from the New York State Department of Labor (when viewing Defendants' Exhibit A, a blank version of same). **Teran Dep. 95:2-12** (admitting being given the notice of pay rate form); **Paliko Dep. 38:24-39:25** ("All the time when I do the hiring, I – I give them the – the notice of the pay rate and everything. I go over all the requirements to be sure we are in accordance with the federal law and state." Q: "Do

you give them something in writing?" A: "Yes." Q: "And do they sign it?" A: "Yes"); Willsey Decl. (73) ¶¶ 10-19.

258.     Adrian Montor-Teran was never provided with a written notice and acknowledgment of pay rate form while he worked at OLB. (Buzzard Decl., Ex. 13).

**Response: Deny. Notice was provided to Plaintiffs via pay stubs on the Toast application, which they each had access to. ECF Docket Entry 76-1 (Exhibit A - copies of Plaintiff Katherine Fernandez's Pay Stubs), 76-3 (Exhibit B - copies of Plaintiff Adrian Montor Teran's Pay Stubs), and 83-1 (copies of Plaintiff Javier Molina's Pay Stubs). In addition, Defendants had posted billboards providing written notice to Plaintiffs of same. Paliko Decl. (74) ¶¶ 21-22; ECF Docket Entry 74-1 ("We also have a poster on a billboard in the restaurant that discusses the tip credit. A copy of the billboard with the posters is annexed hereto as Exhibit 'A' (providing, *inter alia*, that "[e]mployers of tipped employees who meet certain conditions may claim a partial wage credit based on tips received by their employees. Employers must pay tipped employees a cash wage of at least $2.13 per hour if they claim a tip credit against their minimum wage obligation. *If an employee's tips combined with the employer's cash wage of at least $2.13 per hour do not equal the minimum hourly wage, the employer must make up the difference*") (emphasis added);" "Employees pass by this billboard frequently throughout the day and have an opportunity to review it because it is located in the hallway next to the management office"); Paliko Decl. Opp. (84) ¶¶ 4-6 ("The poster has remained on that same billboard, in that same hallway, ever since [I started working at OLB as a floor manager in February 2022]") Moreover, Adrian Montor Teran admitted in his deposition to filling out his notice and acknowledgment of pay rate and pay day form from the New York State Department of Labor (when viewing Defendants' Exhibit**

A, a blank version of same). **Teran Dep. 95:2-12; Paliko Dep. 38:24-39:25 ("All the time when I do the hiring, I – I give them the – the notice of the pay rate and everything. I go over all the requirements to be sure we are in accordance with the federal law and state." Q: "Do you give them something in writing?" A: "Yes." Q: "And do they sign it?" A: "Yes"); Willsey Decl. (73) ¶¶ 10-19.**

259.     Javier Patricio Molina was never provided with a written notice and acknowledgment of pay rate form while he worked at OLB. (Molina Dep. 44:15-22.)

**Response: Deny. Notice was provided to Plaintiffs via pay stubs on the Toast application, which they each had access to. ECF Docket Entry 76-1 (Exhibit A - copies of Plaintiff Katherine Fernandez's Pay Stubs), 76-3 (Exhibit B - copies of Plaintiff Adrian Montor Teran's Pay Stubs), and 83-1 (copies of Plaintiff Javier Molina's Pay Stubs). In addition, Defendants had posted billboards providing written notice to Plaintiffs of same. Paliko Decl. (74) ¶¶ 21-22; ECF Docket Entry 74-1 ("We also have a poster on a billboard in the restaurant that discusses the tip credit. A copy of the billboard with the posters is annexed hereto as Exhibit 'A' (providing, _inter alia_, that "[e]mployers of tipped employees who meet certain conditions may claim a partial wage credit based on tips received by their employees. Employers must pay tipped employees a cash wage of at least $2.13 per hour if they claim a tip credit against their minimum wage obligation. _If an employee's tips combined with the employer's cash wage of at least $2.13 per hour do not equal the minimum hourly wage, the employer must make up the difference_") (emphasis added);" "Employees pass by this billboard frequently throughout the day and have an opportunity to review it because it is located in the hallway next to the management office"); Paliko Decl. Opp. (84) ¶¶ 4-6 ("The poster has remained on that same billboard, in that same hallway, ever since [I started**

working at OLB as a floor manager in February 2022]") Moreover, Adrian Montor Teran admitted in his deposition to filling out his notice and acknowledgment of pay rate and pay day form from the New York State Department of Labor (when viewing Defendants' Exhibit A, a blank version of same). Teran Dep. 95:2-12; Paliko Dep. 38:24-39:25 ("All the time when I do the hiring, I – I give them the – the notice of the pay rate and everything. I go over all the requirements to be sure we are in accordance with the federal law and state." Q: "Do you give them something in writing?" A: "Yes." Q: "And do they sign it?" A: "Yes"); Willsey Decl. (73) ¶¶ 10-19. Molina received a pay stub each week, electronically via the app Toast, containing information about the tip credit, identifying his minimum wage per hour, the tipped minimum wage he was paid, the difference between the two identified as the tip credit amount, the amount of tips he made, and if he did not receive sufficient tips to make up the difference between the tipped wage and the minimum wage the tip makeup amount to pay him the full minimum wage he was entitled to. Molina Dep. 34:17-35:5; 37:10-19; 60:6-25 (Molina also received a paper check); 63:18-22; 69:5-9; 87:16-20; 102:4-103:6; 107:10-20; 110:13-130:3; 132:7-133:8. Molina provided his email address on the touch screen to be placed into the Toast system, so that he could have access to it via the phone application. Molina Dep. 59:4-7; 87:6-20. Toast included Molina's schedule, pay stubs, and other employment-related documents. Molina Dep. 87:6-20.

260.    In discovery in this Action, Plaintiffs served document requests ("Document Requests") on all Defendants (the "Requests"). (Buzzard Decl., Ex. 7 (Document Requests)).

**Response: Admit.**

261.     As part of the Document Requests, Plaintiffs also sought the production of any and all written notices of pay rates that Defendants provided to any Class Member. (Buzzard Decl., Ex. 7 at Requests 1, 5, 10, 11).

**Response: Admit.**

262.     In response to these requests, Defendants did not produce any written wage notices that Defendants contend they provided to any Class Member. (Buzzard Decl., Ex. 8 (Defendants' Responses) at Responses 1, 5, 10, 11).

**Response: Admit. Defendants note that they have these forms in hard-copy form in storage, but that they could not locate them, because this system was set up before they began operating it. Petrosyants Dep. 43:16-44:10; 167:14-21; Paliko Dep. 31:3-7.**

263.     Prior to the initial conference in this lawsuit, the parties submitted a joint letter setting forth their agreement about certain pre-certification discovery that Defendants agreed to produce. (ECF Dkt. No. 26).

**Response: Admit.**

264.     As part of that agreement, Defendants agreed to produce the following information:

> All wage notices/pay rate acknowledgment forms that Defendants allegedly provided tipped employees who worked at OLB during the limitations period and, as a result of which, Defendants claims they complied with the new hire notice/tip credit notice requirements for the putative class. To the extent Defendants do not have any such records, they will inform Plaintiffs to this effect in writing by the September 26, 2025 production deadline.

(*Id.* at 2).

**Response: Admit.**

265.     On September 11, 2025, this Court approved the parties' agreement. (ECF Dkt. No. 27).

**Response: Admit.**

266.　　On September 26, 2025, Defendants' attorneys emailed Plaintiffs' counsel the following about their agreement to all wage notices/pay rate acknowledgment forms:

These documents have not yet been located. We will follow up regarding availability.

(Buzzard Decl., Ex. 9 (September 26 Email) at p. 2.)

**Response: Admit.**

267.　　At his November 18, 2025 deposition, Petrosyants, who was testifying on behalf of himself and the corporate defendant, stated that OLB was "still searching" for any notices of how employees were to be paid but had not found any yet. (Petrosyants Dep. at 171:7-17.)

**Response: Admit, but object to this statement as immaterial, because this does not necessitate that such notice did not exist. Notice was provided to Plaintiffs via pay stubs on the Toast application, which they each had access to. ECF Docket Entry 76-1 (Exhibit A - copies of Plaintiff Katherine Fernandez's Pay Stubs), 76-3 (Exhibit B - copies of Plaintiff Adrian Montor Teran's Pay Stubs), and 83-1 (copies of Plaintiff Javier Molina's Pay Stubs). In addition, Defendants had posted billboards providing written notice to Plaintiffs of same. Paliko Decl. (74) ¶¶ 21-22; ECF Docket Entry 74-1 ("We also have a poster on a billboard in the restaurant that discusses the tip credit. A copy of the billboard with the posters is annexed hereto as Exhibit 'A' (providing, *inter alia*, that "[e]mployers of tipped employees who meet certain conditions may claim a partial wage credit based on tips received by their employees. Employers must pay tipped employees a cash wage of at least $2.13 per hour if they claim a tip credit against their minimum wage obligation. *If an employee's tips combined with the employer's cash wage of at least $2.13 per hour do not equal the minimum hourly wage, the employer must make up the difference*") (emphasis added);" "Employees pass by this**

billboard frequently throughout the day and have an opportunity to review it because it is located in the hallway next to the management office"); Paliko Decl. Opp. (84) ¶¶ 4-6 ("The poster has remained on that same billboard, in that same hallway, ever since [I started working at OLB as a floor manager in February 2022]") Moreover, Adrian Montor Teran admitted in his deposition to filling out his notice and acknowledgment of pay rate and pay day form from the New York State Department of Labor (when viewing Defendants' Exhibit A, a blank version of same). Teran Dep. 95:2-12; Paliko Dep. 38:24-39:25 ("All the time when I do the hiring, I – I give them the – the notice of the pay rate and everything. I go over all the requirements to be sure we are in accordance with the federal law and state." Q: "Do you give them something in writing?" A: "Yes." Q: "And do they sign it?" A: "Yes"); Willsey Decl. (73) ¶¶ 10-19. Molina received a pay stub each week, electronically via the app Toast, containing information about the tip credit, identifying his minimum wage per hour, the tipped minimum wage he was paid, the difference between the two identified as the tip credit amount, the amount of tips he made, and if he did not receive sufficient tips to make up the difference between the tipped wage and the minimum wage the tip makeup amount to pay him the full minimum wage he was entitled to. Molina Dep. 34:17-35:5; 37:10-19; 60:6-25 (Molina also received a paper check); 63:18-22; 69:5-9; 87:16-20; 102:4-103:6; 107:10-20; 110:13-130:3; 132:7-133:8. Molina provided his email address on the touch screen to be placed into the Toast system, so that he could have access to it via the phone application. Molina Dep. 59:4-7; 87:6-20. Toast included Molina's schedule, pay stubs, and other employment-related documents. Molina Dep. 87:6-20.

268.    When asked at deposition whether Plaintiff and any other food service employees had been provided with "notice of the tip credit," Petrosyants responded, "I don't know" and "I have no idea." (Petrosyants Dep. at 176:14-22).

**Response: Admit that Petrosyants testified as such, but note that notice was provided to Plaintiffs via pay stubs on the Toast application, which they each had access to. ECF Docket Entry 76-1 (Exhibit A - copies of Plaintiff Katherine Fernandez's Pay Stubs), 76-3 (Exhibit B - copies of Plaintiff Adrian Montor Teran's Pay Stubs), and 83-1 (copies of Plaintiff Javier Molina's Pay Stubs). In addition, Defendants had posted billboards providing written notice to Plaintiffs of same. Paliko Decl. (74) ¶¶ 21-22 ("We also have a poster on a billboard in the restaurant that discusses the tip credit. A copy of the billboard with the posters is annexed hereto as Exhibit 'A' (providing, *inter alia*, that "[e]mployers of tipped employees who meet certain conditions may claim a partial wage credit based on tips received by their employees. Employers must pay tipped employees a cash wage of at least $2.13 per hour if they claim a tip credit against their minimum wage obligation. *If an employee's tips combined with the employer's cash wage of at least $2.13 per hour do not equal the minimum hourly wage, the employer must make up the difference*") (emphasis added);" "Employees pass by this billboard frequently throughout the day and have an opportunity to review it because it is located in the hallway next to the management office"); Paliko Decl. Opp. (84) ¶¶ 4-6 ("The poster has remained on that same billboard, in that same hallway, ever since [I started working at OLB as a floor manager in February 2022]") Moreover, Adrian Montor Teran admitted in his deposition to filling out his notice and acknowledgment of pay rate and pay day form from the New York State Department of Labor (when viewing Defendants' Exhibit A, a blank version of same). Teran Dep. 95:2-12; Paliko Dep. 38:24-39:25 ("All the time when**

**I do the hiring, I – I give them the – the notice of the pay rate and everything. I go over all the requirements to be sure we are in accordance with the federal law and state." Q: "Do you give them something in writing?" A: "Yes." Q: "And do they sign it?" A: "Yes"); <u>Willsey Decl. (73) ¶ 11.</u>**

269.     Defendants did not produce any wage notices/pay rate acknowledgment forms in discovery. (Buzzard Decl. ¶ 11).

**Response: Admit, but note that Plaintiffs' pay rates are set forth in their pay stubs. Plaintiffs received wage notice from Defendants, in a variety of forms. For example, they each received pay stubs, which were visible in the Toast application, which they each had access to. <u>ECF Docket Entry 76-1</u> (Exhibit A - copies of Plaintiff Katherine Fernandez's Pay Stubs), <u>76-3</u> (Exhibit B - copies of Plaintiff Adrian Montor Teran's Pay Stubs), and <u>83-1</u> (copies of Plaintiff Javier Molina's Pay Stubs). In addition, Defendants had posted billboards providing written notice to Plaintiffs of same. <u>Paliko Decl. (74) ¶¶ 21-22</u> ("We also have a poster on a billboard in the restaurant that discusses the tip credit. A copy of the billboard with the posters is annexed hereto as Exhibit 'A' (providing, *inter alia*, that "[e]mployers of tipped employees who meet certain conditions may claim a partial wage credit based on tips received by their employees. Employers must pay tipped employees a cash wage of at least $2.13 per hour if they claim a tip credit against their minimum wage obligation. *If an employee's tips combined with the employer's cash wage of at least $2.13 per hour do not equal the minimum hourly wage, the employer must make up the difference*") (emphasis added);" "Employees pass by this billboard frequently throughout the day and have an opportunity to review it because it is located in the hallway next to the management office"); <u>Paliko Decl. Opp. (84) ¶¶ 4-6</u> ("The poster has remained on that same billboard, in that same hallway,**

ever since [I started working at OLB as a floor manager in February 2022]") Moreover, Adrian Montor Teran admitted in his deposition to filling out his notice and acknowledgment of pay rate and pay day form from the New York State Department of Labor (when viewing Defendants' Exhibit A, a blank version of same). Teran Dep. 95:2-12; Paliko Dep. 38:24-39:25 ("All the time when I do the hiring, I – I give them the – the notice of the pay rate and everything. I go over all the requirements to be sure we are in accordance with the federal law and state." Q: "Do you give them something in writing?" A: "Yes." Q: "And do they sign it?" A: "Yes"); Willsey Decl. (73) ¶ 11.

270.     The paystubs Defendants provided employees had multiple regular hourly rates listed on them. (Buzzard Decl. ¶ 16, Ex. 14).

**Response: Admit, but object to this statement as immaterial.**

271.     For example, the paystubs Defendants provided to Plaintiff Fernandez in 2024 listed three regular hourly rates on them: $10.00, 15.00 and $16.50. (*Id.*).

**Response: Admit.**

272.     The paystubs OLB provided employees did not state that: "if [employees] did not receive sufficient tips to make up the difference between the tipped wage and the minimum wage the tip makeup amount to pay them the full minimum wage they are entitled to." (*Id.*).

**Response: Admit, but add that employees received verbal and written notice of same. Plaintiffs each received pay stubs, which were visible in the Toast application, which they each had access to, and which listed "tip makeup" for any instance in which their tips were not enough to meet the minimum wage (which never happened). ECF Docket Entry 76-1 (Exhibit A - copies of Plaintiff Katherine Fernandez's Pay Stubs), 76-3 (Exhibit B - copies of Plaintiff Adrian Montor Teran's Pay Stubs), and 83-1 (copies of Plaintiff Javier Molina's**

Pay Stubs). In addition, Defendants had posted billboards providing written notice to Plaintiffs of same. Paliko Decl. (74) ¶¶ 21-22 ("We also have a poster on a billboard in the restaurant that discusses the tip credit. A copy of the billboard with the posters is annexed hereto as Exhibit 'A' (providing, *inter alia*, that "[e]mployers of tipped employees who meet certain conditions may claim a partial wage credit based on tips received by their employees. Employers must pay tipped employees a cash wage of at least $2.13 per hour if they claim a tip credit against their minimum wage obligation. *If an employee's tips combined with the employer's cash wage of at least $2.13 per hour do not equal the minimum hourly wage, the employer must make up the difference*") (emphasis added);" "Employees pass by this billboard frequently throughout the day and have an opportunity to review it because it is located in the hallway next to the management office"); Paliko Decl. Opp. (84) ¶¶ 4-6 ("The poster has remained on that same billboard, in that same hallway, ever since [I started working at OLB as a floor manager in February 2022]") Moreover, Adrian Montor Teran admitted in his deposition to filling out his notice and acknowledgment of pay rate and pay day form from the New York State Department of Labor (when viewing Defendants' Exhibit A, a blank version of same). Teran Dep. 95:2-12; Paliko Dep. 38:24-39:25 ("All the time when I do the hiring, I – I give them the – the notice of the pay rate and everything. I go over all the requirements to be sure we are in accordance with the federal law and state." Q: "Do you give them something in writing?" A: "Yes." Q: "And do they sign it?" A: "Yes"); Willsey Decl. (73) ¶ 11.

Dated: Jamaica, New York
       February 11, 2026

                                    Respectfully submitted,

                                    **SAGE LEGAL LLC**

                                    *_/s/ Emanuel Kataev, Esq._____*
                                    Emanuel Kataev, Esq.
                                    18211 Jamaica Avenue
                                    Jamaica, NY 11423-2327
                                    (718) 412-2421 (office)
                                    (917) 807-7819 (cellular)
                                    (718) 489-4155 (facsimile)
                                    emanuel@sagelegal.nyc

                                    *Attorneys for Defendants*
                                    *Bulldozer Hospitality Group, Inc.,*
                                    *Robert Petrosyants, and*
                                    *Marianna Shahmuradyan*

**VIA ECF**
Joseph & Kirschenbaum LLP
<u>Attn</u>: Josef Nussbaum, Esq.
45 Broadway, Suite 320
New York, NY 10006-3007
(212) 688-5640 (office)
jnussbaum@jk-llp.com

*Attorneys for Plaintiff*
*Katherine Fernandez*